UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

KENYON B. FITZGERALD, JR.,            :
PETER SCOVILLE WELLS, SIDNEY SILLER, and
DISABLED AMERICAN VETERANS           :
DEPARTMENT OF NEW YORK, INC.,
                                     :
                    Plaintiffs,
            v.                       :

WADE F. B. THOMPSON, ELIHU ROSE, ARIE L.    :
KOPELMAN, STEPHEN LASH, EDWARD KLEIN,
REBECCA ROBERTSON, KIRSTEN REOCH,    :
CHARLES GARGANO, WILLIAM SHERMAN,
CAROL BERENS, JOHN DOE, MARY ROE and :
SEVENTH REGIMENT ARMORY
CONSERVANCY, INC.,                   :
                    Defendants.
                                     :

------------------------------------------------------------x



COMPLAINT
Jury Trial Requested

Civil Action
No._____

**07 CIV 6851**

JUDGE JONES

### Nature of Action

1. This is an action to declare unconstitutional Chapter 482 of the New York

State Laws of 2004, and to invalidate the 2006 lease of the Seventh Regiment Armory to

the Conservancy, in order to regain access, possession and control of the Seventh

Regiment Armory in New York City for the Regiment and its successor units for use as a

drill shed and armory and other public purposes of said Regiment (including a military

history museum and free use by veterans organizations) pursuant to the explicit terms of

the 1874/1879 property lease from the City of New York, plus the charter of the Board of

Regents of the State of New York, and § 183 of the NYS Military Law; along with

related claims for damages and other relief. The action is brought by plaintiffs

individually, combined with two class actions, one brought on behalf of members of named veterans organizations, including some chartered by the Congress of the United States, together with a class action on behalf of all military personnel who served in the Seventh Regiment, the 107th Infantry Regiment, and successor organizations of the New York National Guard.

## Jurisdiction

2. This action arises under the Constitution and Laws of the United States, including Article 1, Section 10; Amendments 1, 5 and 14; and 42 U.S.C. §1983; along with the Court's equitable and pendent jurisdiction. The Court has jurisdiction over the federal question claims under 28 U.S.C. §1331, over declaratory judgments under 28 U.S.C. §2201, and over the statutory, common law and equitable claims under the Court's supplemental jurisdiction under 28 U.S.C. §1367. The Seventh Regiment Armory property ("the Armory") that is the subject of this action is located in this District and all defendants are found in this District, and accordingly venue properly lies here.

## The Parties

3. Plaintiff KENYON B. FITZGERALD, JR., is Chair of the 107th Infantry Regiment (Seventh New York) Historical Society, chartered by the Regents of the State of New York in 1964 to operate a military history museum pertaining to the Seventh Regiment New York National Guard. He served in the armed forces of the United States from June 1960 to June, 1966. He brings this action individually and as representative of the Historical Society and also as class representative of all military personnel who served in the Seventh Regiment, the 107th Infantry Regiment, and successor organizations. Mr. Fitzgerald presently resides in the State of Connecticut.

4.  Plaintiff PETER SCOVILLE WELLS is Treasurer of the 107th Infantry Regiment (Seventh New York) Historical Society.  He served in the Armed Forces of the United States from 1958 to 1964, first in the 525 M. I. Group and then in the Seventh Regiment, 107th Battle Group.  Mr. Wells' father and grandfather also both served in the Seventh Regiment of the New York National Guard, based at the Armory.  He brings this action individually and as representative, along with Mr. Fitzgerald, of the Historical Society, and as a class representative of all military personnel who have served in the Seventh Regiment, the 107th Infantry Regiment, and successor organizations.  He also brings this action as a taxpayer of the City of New York.  Mr. Wells currently resides in New York City.

5.  Plaintiff SIDNEY SILLER is Department Adjutant for the Disabled American Veterans, Department of New York, Inc.; and a disabled veteran of World War II and the U.S. military force in Korea in 1945 and 1946.  Mr. Siller presently resides in the state of New Jersey and maintains an office in New York City.

6.  Plaintiff DISABLED AMERICAN VETERANS DEPARTMENT OF NEW YORK, INC. is one of the veterans organizations expressly granted, under Section 183 of the Military Law of New York State, the use of armories in New York State for regular and special meetings and organization social events of a private nature without payment of any charge or expense therefor.  It brings this action on its own behalf and, along with Sidney Siller, as class representative for all members statewide of all other veterans' organizations granted similar rights under such law, including posts or chapters of

> The United Spanish War Veterans
> The American Legion
> The Veterans of Foreign Wars of the United States

The Disabled American Veterans
The AMVETS
American Veterans of World War II
The Jewish War Veterans of the United States, Inc.
The Catholic War Veterans, Inc.
The Italian American War Veterans of the United States, Incorporated
The Polish Legion of American Veterans, Inc.
The Army and Navy Union of the United States of America
Posts of the Masonic War Veterans of the state of New York, Incorporated
Groups of squadrons of New York Wing
Groups of squadrons of New York Civil Air Patrol,
Groups of incorporated associations of veterans of units of the organized militia
Organizations of sons of veterans of any war of the United States
Organizations of the Reserve Officers Association of the United States
Organizations of historic military commands set forth in section two hundred
      forty-a of the NYS Military Law

7.  Defendants WADE F. B. THOMPSON, ELIHU ROSE, STEPHEN LASH,
ARIE L. KOPELMAN, EDWARD KLEIN, REBECCA ROBERTSON, and KIRSTEN
REOCH are sued herein in their individual capacities and as directors, officers and
employees of defendant Seventh Regiment Armory Conservancy, Inc.

8.  Defendant CHARLES GARGANO was Chair of the Empire State
Development Corporation, and defendants WILLIAM SHERMAN and CAROL
BERENS were Project Managers of ESDC at the times of the wrongful actions described
below.  Defendants GARGANO, SHERMAN and BERENS are sued herein in their
individual and representative capacities.

9.  Defendants JOHN DOE and MARY ROE are fictitious names representing
other persons who participated as members of the conspiracy and wrongful acts alleged
below.  Their true identities are presently unknown, and they will be identified and served
with process when their actual identities are learned through discovery or otherwise.

10. Defendant SEVENTH REGIMENT ARMORY CONSERVANCY, INC. ("the Conservancy") is the purported Lessee of the Armory from the State of New York acting through the Empire State Development Corporation ("ESDC"). The Conservancy is a not-for-profit corporation organized under the laws of the State of New York, (using a deceptive name that falsely suggests some official connection with the Seventh Regiment). The Conservancy's supporters and advisors include a number of well-known civic leaders and preservationists originally attracted to support a plan to repair the deteriorating Armory and preserve it as a major historic landmark. Many of these good citizens are presumably unaware of the deceptions and fraud employed in their name by the corporation's representatives, as described below, or of their intention to prevent the use of this national treasure as a military history museum honoring America's citizen-soldiers and instead to convert it into a high-brow performing arts center and an elite high-priced commercially-operated restaurant, cocktail bar and corporate reception facility from which most middle and low-income members of the public – including military service personnel and veterans and their families– will necessarily be excluded.

## Class Action Allegations

11. This proceeding is brought individually by the foregoing named plaintiffs combined with two class actions under FRCiv.P Rule 23(b)(2) to force and prevent action that concerns members of each class individually and involves broad questions of constitutional law and public policy and seeks injunctive and declaratory relief. The requirements of Rule 23 (a) are met in that (1) the classes are so numerous that joinder of all members is impracticable, (2) there are questions of law or fact that are common to the classes, (3) the claims of the representative parties are typical of the claims of each

5

class, and (4) the representative parties will fairly and adequately protect the interests of each class. The parties opposing these classes have acted or refused to act on grounds generally applicable to both classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to both classes as a whole.

## STATEMENT OF FACTS

### The Property

12.  The Seventh Regiment Armory ("the Armory") is a National Historic Landmark occupying a full city block in New York City bounded by Park Avenue, East 67th Street, Lexington Avenue, and East 66th Street.

13.  In August, 1824, men serving in various units of the militia of the State of New York met in New York City to form a new battalion of the militia under the name of the National Guards, a title not then in general use in the militia, but borrowed from the Garde Nationale de Paris -- an organization associated with the Marquis de Lafayette, hero of the Revolutionary War. Some of these units were formed as early as 1806, and the successor organization is considered the oldest regimental organization of the New York National Guard.

14.  In July, 1847 the battalion was renamed as the Seventh Regiment of New York State Militia. Unlike current practice, the Seventh Regiment provided for its own expenses.

15.  In 1859 the Seventh Regiment refurbished at its own expense drill and office space provided by the City of New York at Tompkins Market (now Tompkins Square on the lower East Side). By 1861, the Seventh Regiment, on its own initiative, answered the

call of President Abraham Lincoln for the defense of Washington, D.C. and was the first regiment to secure the White House, the Capitol and the Archives. The Seventh Regiment is recognized by the U.S. Army Center for Military History as having saved Washington, D.C. from capture by Confederate forces.

16. By the 1870s, the Tompkins Market Armory had become too small for the Regiment's purposes. A committee of officers, veterans, and members of each of the ten companies of the Seventh Regiment petitioned the New York State legislature for an act securing City-owned land for an Armory for members of the Regiment. In 1873, the State Legislature empowered the Board of Supervisors of the County of New York to create a board of commissioners for the erection of armories. Chapter 429 of the Laws of 1873, further required that the comptroller pay for erection of those armories. At the same time, chapter 431 of the Laws of 1873 was enacted, directing the City to lease to the field officers of the Seventh Regiment, and their successors in office acting for said Regiment, and for "the public purposes of said regiment," a plot of ground belonging to the City. The field officers of the Seventh Regiment were authorized and empowered to accept the lease and the site with the same effect as if a body corporate, to be thereafter exclusively used for an armory and drill rooms by the Regiment.

17. Chapter 234 of the laws of 1874 directed the City to lease to the Regiment the plot of land bounded by Sixty-sixth and Sixty-seventh Streets on the north and south, and by Park and Lexington Avenues on the east and west as the site for a new armory for the Regiment.

7

**The City Lease**

18.  On September 23, 1874, the City entered into a lease of the land on which the Armory now stands with the field officers of the Seventh Regiment.  The lease provides that the property is to be used "exclusively" for an "Armory and Drill Rooms." The lease also provides that if the regimental officers cease to use the building for such purposes "or shall use the same for any other than the purposes of an Armory and Drill rooms or the public purposes of said regiment" the lease "shall thereupon cease and determine, and these presents and every article and clause herein contained shall become null and void."

19.  The term of the lease was extended on April 23, 1879. . . "for and during the period the regiment shall exist and act as a military organization, and desire to occupy said armory for its lawful purposes."

(Marked copies of both leases are attached hereto as Exhibits A and B.)

20.  The New York State Military Law, Section 183, governing the use of armories, permits space in armories to be rented to third parties, but directs that the income from such rentals is to be transmitted to the State for its General Fund.

**Ownership of the Building**

21.  In Chapter 57 of the Laws of 1879, the New York State Legislature authorized the board of officers of the Regiment to issue bonds in the name of the Regiment in order to complete construction of the Armory building and, in order to secure payment of the bonds, to convey the leased property and the Armory to "the trustees of the Seventh Regiment Armory fund" and their successors "in trust."  The bonds, issued and sold in 1879, were redeemed from private monies raised from

8

donations from veterans and friends of the Seventh Regiment, member assessments and rental fees.

22. During the construction of the Armory and thereafter, several private groups affiliated with members of the Regiment decorated and furnished rooms in the Armory. The members of the Regiment spent over $ 600,000. for construction of the Armory, most of which came from their own funds. Hundreds of thousands of dollars were expended to furnish the individual rooms of the Armory.

23. No State money was used to construct the building.

24. In 1893 by statute, the field officers of the Seventh Regiment were designated the Trustees of the Seventh Regiment Armory. (A marked copy of Chapter 518 of the Laws of 1893 is attached as Exhibit C.)

25. In 1937, the New York State Court of Appeals unanimously held that the building is "owned by the regiment." [Tobin v. LaGuardia, 276 N.Y. 34, 43 (1937)]

26. The Armory is unique in New York and in the United States in that it was constructed and furnished solely with private funds raised by the active and veteran members of the Regiment. The lease and the Armory are owned privately by the Regiment, it is not and never has been owned by the State or the City of New York.

**Historic Landmark Status**

27. The Armory was designed by Charles W. Clinton, a member of the Regiment, and the interior of the Armory was decorated by such leading lights of 19th and early 20th Century decorative arts as Louis Comfort Tiffany, Stanford White, Candace Wheeler, the Herter Brothers, Jasper Cropsey and others.

28. In 1992, the Armory and its principal interior spaces were designated New York City landmarks by the NYC Landmarks Preservation Commission. The designation of the interior spaces was an unusual action, based on the Commission's finding that they constituted "historically and architecturally significant spaces." In explaining the basis for its findings, the Commission stated that:

> "...to decorate and furnish the interiors in 1879-81, the regiment and individual companies chose some of the most prominent American design and interior decoration firms of the day, including Associated Artists, Herter Brothers, Pottier & Stymus, Kimbel & Cabus, Alexander Roux & Co., and George C. Flint & Co., resulting in the creation of a series of lavish late-Victorian interiors, most with Aesthetic Movement decoration and Renaissance Revival woodwork; that as an ensemble, the regimental and company rooms of the Seventh Regiment Armory are a nationally important collection of high-style interiors, which are on a scale with and display an elegance and quality usually found only in the interiors of private clubs and the most ornate residences, few of which survive in New York City from this period, and they represent the height of American interior design within a single building,"

29. The building is listed on the New York State and National Registers of Historic Places. In 1993, the Armory was designated a National Historic Landmark.

30. The Armory consists of two structures: (1) a multistoried building, or administrative building (the "Administrative Building"), which contains administrative and social areas, and (2) a one-story drill room (the "Drill Hall"), used for military training.

31. The Administrative building contains important late nineteenth-century period rooms designed and decorated by the above-referenced artists. The Drill Hall, a 200 by 300 foot structure, is said to be the oldest extant "balloon shed" (barrel-vaulted roof supported on exposed trusses or ribs) in America.

32. In recent times, the Armory's principal military use has been as a military center and gathering point for use in the event of civil emergency. It was used as such following the terrorist attacks on September 11, 2001. It also has served as office and meeting space for Seventh Regiment successor organizations.

33. In addition to its role as a military building, the Armory currently houses a women's shelter run by Lenox Hill Neighborhood House. The women's shelter occupies two floors of the Armory. In times of emergency, the Armory can also provide an additional facility for the homeless.

34. In recent years the Armory Drill Hall has also been used as a venue for a variety of temporary income-generating antique shows, art shows, and antiquarian book fairs used as fund raising vehicles for a host of community and charitable organizations.

35. The successor units to the Seventh Regiment have attempted to get the State to provide funds out of Armory revenues to renovate and maintain the Armory, and have also proposed installation of a military history museum in the Armory. The State has repeatedly refused to discuss these matters. As a result of years of the State's neglect, the Armory's interior and exterior have deteriorated and are in need of repair and replacement. This "blight" is the State's own doing through deliberate withholding of funds.

### Award of Armory Lease to the Conservancy

36. In or about July, 2000, ESDC and the State Division of Military and Naval Affairs (DMNA) issued a Request for Proposals purportedly seeking a developer for the "reuse" of the Armory. This RFP was issued without the consent of or the approval of

11

the Trustees of the Armory. The RFP purported to offer the Armory without regard to the terms of the City's lease or the ownership rights of the Regiment.

37. On November 15, 2000, the defendant Seventh Regiment Armory Conservancy, Inc. submitted its bid for restoration of the Armory, and on September 9, 2001, ESDC issued a letter designating the Conservancy the "Preferred Proposer" for the restoration of the Armory.

38. In August, 2004, the New York State Legislature enacted Chapter 482 of the Laws of the State of New York amending the Military Law of the State of New York and the New York State Urban Development Act to add a new section 180-a to the Military Law and a new section 39 to the New York State Urban Development Act. The Act became law on September 21, 2004, with the approval of the Governor. The full text of the statute is attached hereto as Exhibit D and is incorporated herein by reference.

39. On June 16, 2005, ESDC declared itself the lead agency for the Armory management project. ESDC then entered into a 99-year lease with the Conservancy, affirmed by the New York State Division of Military and Naval Affairs, and by the City of New York.

## Statutory Right of Access and Use

40. Paragraphs (a) and (b) of New York State Military Law §183 provide:

§183. Use of armories. 1. Armories may be used as follows:

(a.) By members and units of the organized militia and cadet corps of such units.

(b.) On application of one or more posts or chapters of the United Spanish War Veterans, the American Legion, the Veterans of Foreign Wars of the United States, the Disabled American Veterans, the AMVETS, American Veterans of World War II, the Jewish War Veterans of the United States, Inc., The Catholic War Veterans, Inc., the Italian American War Veterans of the United States, Incorporated, the Polish Legion of American Veterans, Inc., the Army and Navy

Union of the United States of America, posts of the Masonic War Veterans of the state of New York, Incorporated or groups of squadrons of New York Wing, Civil Air Patrol, or of incorporated associations of veterans of units of the organized militia, or one or more posts or chapters of organizations of sons of veterans of any war of the United States or of the Reserve Officers Association of the United States, or those historic military commands set forth in section two hundred forty-a of the [NYS Military Law]....approved by the officer in charge and control of the armory, and by his military superiors as prescribed by regulations issued pursuant to this chapter and under such restrictions as may be prescribed by the adjutant general, the officer in charge and control of an armory shall provide a proper and convenient room or rooms or other appropriate space in such armory where such posts or chapters may hold regular and special meetings and organizational social events of a private nature without the payment of any charge of expense therefore, provided that such use does not interfere with the members and units of the organized militia stationed in such armory.

41.   On October 23, 1964, the Board of Regents of the State of New York granted an absolute charter to the 107th Infantry Regiment (Seventh, New York) Historical Society to establish and maintain a military history museum. The start-up proposal was modest, providing as follows:

"Board of Regents Minutes October 23, 1964, Absolute Charter, 107[th] Infantry Regiment (Seventh New York) Historical Society. An absolute charter is granted incorporating George K. Brazill, L. Emory Boyden, Walter A. Capitain, Joseph A. Cox, P. Randolph Harris, George F. Johnston, Kenneth C. Miller and Leslie M. Stewart as trustees.
The purposes for which such corporation is to be formed are:
a.   To collect, receive, and preserve books, papers, documents, diaries, letters, records, citations, battle streamers, flags, honors, metals, decorations, and other memorabilia pertaining to the Seventh Regiment, New York National Guard;
b.   To maintain a museum and library for the care and custody thereof;
c.   To assist in maintaining the historical continuity of this distinguished regiment, regardless of changes in tactical organization in peace and war;
d.   To provide an opportunity for the individual soldier to become familiar with the history and traditions of the Seventh Regiment;
e.   To maintain records of members of the said regiment; and
f.   To direct or conduct research into the history of the Seventh Regiment, and to publish the results of such research."

42. No funds were ever provided by the State out of rental revenues or other State-controlled resources to assist in carrying out this museum program. The terms of the ESDC lease to the Conservancy, which is the subject of this litigation, make implementation now impossible, in the present or future. Meanwhile recognition that there is a strong need for a humanistic military history museum on a national scale of world-class quality is strongly supported by scholars, historians and particularly those who have served as citizen-soldiers in recent U.S. military engagements and have received little or no public understanding of the sacrifices such service involves.

### Facts Giving Rise to Plaintiffs' Claims for Relief

43. For many years, the Armory has generated substantial revenues from the rental of its drill hall for antiques, art, and antiquarian book fairs – netting some $ 1.8 million per year. These rentals, however, were required by law to be transmitted to the State of New York where they became part of the State's General Fund, instead of being applied to the maintenance and repair of the Armory (except for nominal sums), with predictable harmful results. In or about 1986, a group of civic-minded preservationists became concerned about the deteriorating physical condition of the Seventh Regiment Armory.

44. On September 27, 1999, individual defendants THOMPSON, ROSE, KOPELMAN, REOCH and ROBERTSON, along with others, seeing an opportunity to serve their self-interests, caused the formation of the Seventh Regiment Armory Conservancy, Inc. as a not-for-profit corporation under New York law "to promote and

14

assist in the restoration, preservation, and management of the Seventh Regiment Armory." (Emphasis added.)

45. Defendants' undisclosed reason for organizing the corporation was to allow these individual defendants and their associates to take control of the Armory and permit diversion of substantial amounts of the Armory's rental revenues to a select group of private charities (to the exclusion of other deserving charities, community groups, and particularly plans to install a military museum in the Armory), and to benefit arts groups and organizations favored by them.

46. Immediately after the Conservancy's incorporation, the Empire State Development Corporation, purportedly acting on behalf of the State of New York, issued a Request for Proposals (RFP) for the restoration, operation and management of the Armory. The RFP was tailored exactly to fit the Conservancy's goals, exclude competing bidders, and thereby guarantee its selection as lessee and operator of the Armory.

47. Defendants had engaged a leading New York law firm not only to file incorporation documents for the Conservancy, but also to write legislation that would result in the State's transfer of all the perquisites of ownership of the Armory from the private trustees of the Armory to themselves. (See Exhibit E.)

48. On August 11, 2004, the State Legislature, without debate, unanimously passed the bill prepared by the Conservancy's lawyers, which became Chapter 482 of the Laws of the State of New York. The law amended the State Military Law by adding a new Section 180-a, and amended the State Urban Development Corporation law by adding a new Section 39, which together delivered ownership and control of the Armory to the Conservancy, and took ownership and control of the Armory away from its

trustees. The Conservancy's bill expressly violated and breached the City lease of 1874/1879 and invalidated the reversionary provisions of the City lease that would have given control of the Armory and its revenues to the City of New York, thereby depriving the taxpayers of New York City of the substantial potential revenues from the property. The Governor signed the Conservancy's bill into law on September 21, 2004. Shortly thereafter the Governor approved a discretionary transfer of $ 30 million of Port of New York Authority funds to the Conservancy to be applied to the preservation and renovation of the Armory – funds which had never been made available while the Armory was under the Trustees' control despite their repeated requests for State aid.

49. Being the sole bidder qualified to submit a proposal in response to the ESDC's RFP, the Conservancy was automatically awarded the Armory lease by default, without competition, giving defendants absolute control of the Armory, its operations and, most significantly, its rental income – estimated to have a potential level of $ 5 million or more per year.

50. The ESDC and the Conservancy subsequently executed a formal lease (the terms of which are incorporated herein by reference) giving total effective control and management of the Armory to defendants.

51. The entire manipulation of the governmental process orchestrated by defendants was calculated from the start to evict the National Guard from the Armory, deny free Armory access to veterans and veteran organizations, and to turn over the benefits of total ownership to the Conservancy and themselves.

52. This act of favoritism by the State of New York in awarding control of the privately-owned Armory to a hand-picked private organization, controlled by private

16

individuals, allowed the individual defendants to arrange for distribution of the proceeds from Armory rentals to their favorite charities to the exclusion of others in the community, and to award lucrative performance contracts and arts opportunities to favored performing and visual arts organizations, all in violation of basic principles of due process, fairness and lawful functioning of government, as well as antithetical to the State Military Law.

**Conspiracy, Fraud and Deception**

53.   As part of their plan to take over control of the Armory, the individual defendants conspired and agreed together to mislead plaintiffs, the public, State officials and the ESDC's directors into believing that one of their principal purposes for seeking a lease of the Armory was and is to open up the restored historic rooms of this National Historic Landmark to the community and to the general public, and to encourage installation of a military history museum and exhibits for visitation by schoolchildren, families, and visitors to the City that will honor the citizen-soldiers of the Regiment and other military units who have made sacrifices to defend the nation and to preserve and secure freedom.  In fact, defendants' true purpose was and is exactly the opposite -- to deprive plaintiffs, servicemen and women, and veterans and veterans organizations, of their rights of use of the Armory, to block the installation of a military history museum of any importance, and to deny the general public open access to the historic rooms and traditions of this national landmark.

54.   In furtherance of the conspiracy and agreement, and to carry out the purposes thereof, the defendants committed the following overt acts, among others:

55. At the ESDC public hearing required by Section 16 of the New York State Urban Development Corporation Act, held on July 21, 2005, these defendants made the following false and misleading statements:

56. Defendant WADE F. THOMPSON publicly declared that the Armory would provide:

"Exhibition space for the Army – for the Armory's decorative, social and military history." (Public Hearing Tr. p. 11)

Defendant ELIHU ROSE testified that the Conservancy was committed to

"opening this magnificent building to the public." (Tr. p. 13)

Defendant STEVEN LASH stated in a written statement:

"It is exciting to imagine these dark and damaged interiors restored, well-lighted and finally open for the public to view and enjoy." (Tr. p. 15)

Defendant EDWARD KLEIN testified that he would work with the Board

"To ensure that the history, architecture and art of the Seventh Regiment Armory are preserved and displayed proudly for generations to come....

"Its distinguished and handsomely-appointed regimental rooms, which few have had the privilege to see, must be open to the public. The Conservancy is willing to make this commitment....

"The Armory will be opened to the public while retaining a military presence and function...

"And in accordance with Military Law, its spaces will be made available to veterans group – groups free of charge...a restored and magnificent building featuring publicly accessible exhibits and military history of the regiment, all of it sustained by arts and cultural programming.

"There could hardly be a better outcome for the veterans of this State and the people of this City." (Tr. pp. 18-19)

57. On July 3, 2007, defendant KRISTIN REOCH represented falsely to the New York State Education Department that the Conservancy has plans for a museum within

the Armory; that a number of public spaces will be used to display historic artifacts; and that the displays and museum activities will by carried out by the NYS Division of Military and Naval Affairs.

58.  Contrary to these representations, the lease between defendant ESDC and defendant Conservancy makes no provision for a museum or exhibits on military history. The closest the lease comes is a statement in its "Public Goals" (in Art. 42) that the Conservancy will use "diligent efforts":

> To offer interpretive and/or educational programs related to the social aesthetic and military history of the building and other topics to the extent practicable.

59.  Moreover, the Conservancy's certificate of incorporation states that it will <u>not</u> operate a museum.

60.  The defendants' representation that the DMNA will operate a military history museum in the Armory is directly refuted by the ESDC lease itself.  The Conservancy has restricted DMNA to the use of two small offices on the third floor. (Exhibit F)

**<u>Conservancy's Plans for Restored Interior Spaces</u>**

61.  Instead of a museum, the Conservancy's plans are to grant concessions to operate a high-priced restaurant, bars and cocktail reception areas in the renovated historic Regimental rooms on the First Floor of the historic Armory, and to operate a series of private corporate reception rooms in the landmark historic Company rooms on the Second Floor.  (See attached Exhibits G and H.)

62.  The Conservancy has no intention of opening the restored Regimental and Company rooms on the First and Second floors to schoolchildren and the general public (except possibly for limited guided tours during morning hours).  The historic spaces that

are being restored with public funds will be used to provide exclusive private dining facilities for well-to-do customers, corporate executives, and ticket-holders for concerts and performances. The level of these services is clearly demonstrated by the three caterers and restaurateurs selected by the Conservancy to submit proposals for operating these spaces year-round. They include the entrepreneurs who operate the expensive "Four Seasons" Restaurant in the Seagram Building, and the former "Windows on the World" in the World Trade Center (with its famed wine cellar). (Exhibits I, J & K)

63. The NYC Landmarks Preservation Commission, in its 1992 resolution giving the Armory's interior rooms official landmark status, made particular mention of the beauty of the Veterans' Room and the Library on the First Floor of the Armory:

"…the Veterans' Room and Library, designed and decorated by Associated Artists (Louis C. Tiffany & Co.), are considered among the most beautiful and significant surviving interiors of the American Aesthetic Movement…"

64. The Veterans' Room contains the stained glass window naming and honoring the Seventh Regiment's ten Congressional Medal of Honor recipients in the Civil War and World War I.

65. The Conservancy's plans for the First Floor (Exhibit H) calls for use of these "most beautiful and significant" rooms as a large private reception space with a combined capacity of 215 persons.

66. This proposed use of these landmark interior spaces for private parties violates the City Landmarks Commission's official guidelines, set forth on its website, which state:

"Interior landmarks must be customarily accessible to the public."

67. The Conservancy's plans for the Armory are to use all of the officially designated historic Regimental and Company interior spaces as attractions for an elite clientele of wealthy individuals, priced to exclude the general public, and to make a mockery of the tributes to the heroism of the ten Congressional Medal of Honor awardees and other soldiers who served in the Seventh Regiment and its successors, along with citizen-soldiers and other military service men and women currently serving in combat areas abroad, and those who served this country in the past during the Civil War, World Wars I and II, Korea, Vietnam, the Persian Gulf and other wars. Defendants have lied to the public, to the plaintiffs, and to the representatives of the State as to their true purposes in taking over control of this national historic landmark, that has played such an important part in the nation's military history.

68. Defendants GARGANO, SHERMAN and BERENS aided and abetted defendants' wrongful acts by concealing from the public the actual terms of the proposed Armory lease and by inducing the Directors of the ESDC to issue required statutory findings and to adopt resolutions that were unsupported, misleading and false.

**Injury to Plaintiffs**

69. Defendants' wrongful conduct and conspiracy have resulted in the following injuries to plaintiffs, among others:

(a) Denial of access, control and use of the Armory for traditional military and related purposes (except for two small offices on the third floor of the Administration Building amounting to 1.4% of the entire structure) in violation of plaintiffs' City lease, ownership rights, and First Amendment rights.

21

(b) Preventing establishment and operation of a military history museum and interpretive programs in the Armory's historic spaces for public education by turning over use and control of the Armory's most beautiful and historic rooms to private commercial businesses to operate profit-making bar, restaurant and private corporate reception services, in violation of plaintiffs' First, Fifth and Fourteenth Amendment rights;

(c) Denial to veterans organization members of the right of free use of the Armory for meetings and gatherings in violation of Section 183 of the New York State Military Law and of their First, Fifth and Fourteenth Amendment rights; and

(d) Depriving City and State taxpayers of support for publicly-funded cultural institutions by diverting audience and donor revenues to the Conservancy and its favored private charities and arts organizations.

## FIRST CLAIM FOR RELIEF
(Declaratory Judgment – Unconstitutionality of Statute for violation of Due Process)
(See Eastern Enterprises v. Apfel, 524 U.S. 498 (1998))

70. Chapter 482 of the Laws of 2004 was written by the Conservancy's own private lawyers expressly to transfer control of the Armory solely to the Conservancy alone for the private benefit of defendants. To facilitate this Conservancy takeover of the Armory, the statutory language was written by the Conservancy's lawyers to preclude triggering the reversion language in the 1874 City lease.

71. Enactment of this retroactive statute violates fundamental notions of justice and is disfavored in the law. When it also involves a taking of private property, as here, it becomes unconstitutional.

72.  Prior to the enactment of the statute, ownership of the Armory building by the Board of Officers of the Seventh Regiment as trustees was recognized by the New York State Legislature and by the New York State Court of Appeals.  The 2004 statutory language asserting State control was combined with transfer of that control to the private Conservancy.  This taking of private property and transferring it to a favored private party violates the Constitution's due process principles made applicable to this state legislation by the Fourteenth Amendment.

73.  Chapter 482 should therefore be declared unconstitutional and the implementation thereof should be enjoined.

### SECOND CLAIM FOR RELIEF
(Declaratory Judgment – Unconstitutionality of Statute under Public Use Clause)
(See discussion in all opinions in Kelo v. City of New London, 545 U.S. 469 (2005))

74.  The Conservancy's privately-written statute, Chapter 482 of the Laws of 2004, constitutes a taking of private property owned by the Regiment's trustees for the benefit of a known private party. The stated public purpose is only incidental to the benefits that will be conferred upon that private party.  The defendants and preferred private charities and arts organizations will be the primary beneficiaries.

75.  This is a private transfer orchestrated by defendants in which the risk of impermissible favoritism is so acute that a presumption of invalidity is warranted under the Public Use Clause.  The admitted role of a private law firm in drafting this legislation to benefit a private client is a procedure so prone to abuse that the Court should presume an impermissible private purpose.

23

76. Moreover, the blighted condition of the Armory here was caused by the State itself taking the rental proceeds from the Drill Hall and not returning sufficient funds to repair and maintain the Armory structure. Therefore that condition cannot justify a transfer to a private party for improved maintenance, particularly when the State simultaneously grants to the favored private party the full proceeds from the rental income which it has refused to the original owner.

77. The ability of these defendants to have the Legislature unanimously pass complex legislation crafted by their own lawyers in the closing hours of the legislative session, with no debate, demonstrates that these defendants have disproportionate influence and power in the political process.

78. The Court should declare the statute unconstitutional and enjoin its implementation. It should also enjoin any attempt by the ESDC to dispose of the Armory's valuable air rights transferred to it by the same statute.

### THIRD CLAIM FOR RELIEF
(Declaratory Judgment – Violation of Article I, Section 10)
(See Charleston Corp. v. Sinclair, 264 U.S. 543, 547-548 (1924))

79. The enactment of Chapter 482 of the Laws of 2004 impairing and invalidating the City lease is not a proper exercise of the police power, and therefore violates Article I, Section 10 of the United States Constitution. The statute, drawn by the Conservancy's private counsel, did not establish any public purpose to justify cancellation of the long-standing lease of the Armory property to the Regiment and its successor units.

80. The purported need for Armory preservation and restoration was created by the State itself, and the remedy of allowing the Conservancy to keep the Armory rentals for preservation and other purposes could just have easily been allowed to the trustees of the Armory, and therefore does not serve the public welfare.

81. The Court should declare the statute unconstitutional, enjoin any implementation thereof, and order an accounting of all funds received by the Conservancy.

## FOURTH CLAIM FOR RELIEF
(Declaratory Judgment voiding ESDC Lease)

82. The New York State Urban Development Corporation Act (Ch. 174 of the Laws of 1968) provides:

"§10. Findings of the corporation. Notwithstanding any other provision of this act, the corporation shall not be empowered to undertake the acquisition, construction, reconstruction, rehabilitation or improvement of a project unless the corporation finds: * * * (d) in the case of a civic project:
(1) That there exists in the area in which the project is to be located, a need for the educational, cultural, recreational, community, municipal, public service or other civic facility to be included in the project;" (Emphasis added.)

83. Section 10 of the New York State Urban Development Corporation Act requires the ESDC to make a finding of need for a civic project "in the area in which the project is to be located." The plain intent of the statute is that the corporation itself shall make an independent factual determination that such a need exists. In the present case, the ESDC itself made no such determination. Instead it referred back to the language of the legislation written by the Conservancy's private counsel as the basis for its finding. (ESDC Report of June 16, 2005, attached hereto as Exhibit L.)

84. No adequate or reliable fact investigations were conducted to support these findings, which were and are contrary to actual conditions. There is no need for a massive performing arts center or for a high-priced elite restaurant in the community. There are no studies, no opinion surveys, no counts of existing restaurants, no evaluation of existing performance facilities, or the impact of a major competing facility on their economic viability.

85. This reliance on self-serving and factually unsupported statements by the Conservancy's own counsel violated the plain terms of existing law, which provides that the development corporation "shall not be empowered" to undertake the project unless the corporation makes such a finding. Accordingly, the ESDC had no power under the statute to enter into the Conservancy lease and it must be declared void ab initio.

86. Furthermore, the Act provides in Section 16 that:

"(c) the corporation shall conduct a public hearing pursuant to such notice, provided that such public hearing shall not take place before the adoption or filing of such plan by the corporation; (d) upon a written finding of the chief executive officer of the corporation that no substantive negative testimony or comment has been received at such public hearing, such plan shall be effective at the conclusion of such hearing; provided, however, that if any substantive negative testimony or comment is received at such public hearing, the corporation may, after due consideration of such testimony and comment, affirm, modify or withdraw the plan in the manner provided for the initial filing of such plan in paragraph (a) of this subdivision." (Emphasis added.)

87. In disregard of the statute, on November 16, 2005, defendants GARGANO, SHERMAN and BERENS submitted a report to the Directors of the ESDC on the public hearing seeking the Directors' affirmation of the General Project Plan, in which they made no mention of the following negative testimony at the public hearing by Josephine Carita:

26

"This was an Armory that was very well cared for by the regiment. The State is really a sham in this whole scheme. They are making the veterans look like they're nothing. They're telling you a bag of lies, things that are not the truth.

"All this memorabilia [indicating] either was donated by the families of the deceased or given by the soldiers themselves when they came back from war.

"This is a memorial. This room should not be used as a dining room. It was never meant for that." (Tr. p. 50-51) (Emphasis added.)

88.   The failure of defendants GALGANO, SHERMAN and BERENS to disclose to the Directors of ESDC this negative testimony at the public hearing on the use of the Armory's historic rooms as a commercial restaurant violated Section 16 of the UDC Act and independently invalidated the ESDC lease of the Armory and renders it void. (See RESDC Report of November 16, 2005, Exhibit M hereto.)

89.   In that same report to the Directors of ESDC, defendants GARGANO, SHERMAN and BERENS misrepresented the permitted future use of the Armory by veterans organizations (including those represented by plaintiffs here).

The report stated (at p. 3):

"It should be noted that under New York State Military Law, these groups are entitled to use from time to time parts of armories with the consent of DMNA. Under the proposed project, DMNA retains space within the Armory and can allow access to its retained space to the Veterans and the Fund."

90.   This statement was a willful misrepresentation. Under Article 27 of the Conservancy lease with the ESDC, the DMNA is limited to two small offices on the third floor of the Administrative Building  limited to "offices and related uses" and amounting to 1.4% of the total square footage in the Administration Building, while the Conservancy takes over 98.6% of the space. (Exhibit F)

91.   Such material omissions and misrepresentation misled the Directors of the ESDC to authorize the execution of a lease of the Armory to the Conservancy which

27

would deny access to the Armory's principal historic rooms and artifacts to plaintiffs as well as to schoolchildren, the general public, veterans organizations, and members of the organized militia and cadet corps; and would prevent the installation of a proper military history museum in the restored historic rooms of the Armory. The lease should be rescinded and declared null and void for fraud and failure to comply with the UDC Act in material respects.

### FIFTH CLAIM FOR RELIEF
(Tortious Interference with a Contract)

92. Defendants, with full knowledge of the City's 1874/1879 lease, intentionally conspired to, and did, interfere with the City lease through bid rigging, illegal favoritism and fraud, as above alleged, and without justification, caused the Mayor of New York City to consent to the breach of the lease by allowing defendants to prevent use of the Armory as a drill hall and armory and for other public purposes of the regiment as provided without termination of the lease and without reversion of the property to the City. Defendants' wrongful actions caused injury and damages to plaintiffs by denying them access and use of the Armory and its rental proceeds, and to the City's taxpayers by wasting City assets and revenue resources.

93. As part of defendants' unlawful plan and actions defendants induced the field officers acting as Trustees for the regiment (and its successor units) to breach their fiduciary duty to the regiment veterans and other beneficiaries to whom they owed their primary duty by agreeing to limit military use of the Armory to two offices on the third floor, 1.4% of the Armory's total space.

28

94. Plaintiffs should be awarded legal and compensatory equitable damages against defendants for causing such breach of contract and breach of Trustees' fiduciary duty.

## SIXTH CLAIM FOR RELIEF
(Constructive Trust and Accounting)

95. The Armory generates significant sums of money from the rental of space to vendors for antiques, art and antiquarian book fairs amounting to more than $1 million per year. Heretofore these revenues were transmitted to the State Treasurer of New York pursuant to Military Law Section 183(5). The rental revenues generated by the Seventh Regiment Armory far exceeded the amounts allocated by the DMNA for its maintenance and upkeep, with the result that in recent years the Armory has fallen into disrepair and has developed serious repair needs.

96. The enactment of Chapter 482 of the Laws of 2004 radically altered this arrangement and allocated all of the Armory's rental revenues directly to the Conservancy for its own use under the ESDC lease.

97. The Armory rental revenues properly belong to the trustees of the Armory building, and should be allocated to them for payment of maintenance and upkeep to avoid decay and blight, and also to support Armory operations and programs, including the installation and operation of a military history museum approved by the Board of Regents in 1964.

98. On information and belief, substantial amounts of the Armory rental income have been expended by the Conservancy for attorneys' fees, staff salaries, public relations, marketing, entertaining, and other costs not properly chargeable to the

preservation of the Armory as a "drill hall and armory." These expenditures do not constitute a public purpose or use.

99. Plaintiffs ask the Court to impose a Constructive Trust on all funds received by the Conservancy, past and future; that it direct defendants and the Conservancy's Board of Directors to make and file an Accounting of all such funds, specifying the exact nature and purpose of all expenditures; and that the Court surcharge defendants as constructive trustees for all Conservancy expenditures found to have been made in violation of their fiduciary duty to preserve and restore the Armory building.

100. Plaintiffs further ask the Court to appoint a Master to receive and take control of all Armory revenues and rental income, proceeds of any surcharge made against defendants, and future Armory rental revenues, and apply the same to: (a) maintenance and upkeep of the Armory structure; (b) installation and operation of a first-rate military history museum telling the story of America's citizen soldiers, approved by the Board of Regents and operated by a qualified and committed Board of Trustees; (c) and for such other purposes and uses as the Court may direct.

## SEVENTH CLAIM FOR RELIEF
### (Violations of 42 U.S.C. Section 1983)

101. Commencing in or about 1986, defendants entered into a conspiracy to deprive plaintiffs of the control, use and rental income from the Armory, on the pretense that their principal objective was to protect and preserve the historic structure, which was at that time in serious need of delayed maintenance and upkeep. Defendants' true objective was to terminate virtually all military use and occupancy of the Armory and to convert it into a performing and visual arts center and restaurant and corporate reception

facility, gaining public and private benefits for defendants, creating the equivalent of a private club, and generating income for a select group of private charities and arts organizations.

102. Operating under color of state law, defendants deprived plaintiffs of their constitutionally protected statutory and contract rights and their civil rights of freedom of expression to recognize and honor citizen-soldiers through museum exhibits, programs and publications; their right of assembly and statutory right of access to the Armory for events, presentations and ceremonies; and their due process and equal protection rights under the Fourteenth Amendment.

103. As a result of defendants' conspiracy and wrongful acts, plaintiffs have suffered and will continue to suffer injury and loss of rights under the Military Law of the State of New York and the Constitution of the United States. Such deprivation of plaintiffs' civil rights has been willful and intentional, done with malice, ill will and fraud.

104. Plaintiffs ask the Court to enter judgment directing defendants to pay exemplary and punitive damages in an amount not less than $30 million, sufficient to complete renovation, restoration and preservation of the Armory, and for research, design and installation of a first rate world-class military history museum telling the story of the citizen-soldier in American history, together with plaintiffs' attorneys fees and expenses.


**PRAYER FOR RELIEF**

105. Wherefore plaintiffs pray that the Court enter an order certifying the plaintiff classes, and enter judgment:

(a) Declaring Chapter 482 of the Laws of 2004 unconstitutional and enjoining its enforcement, including judgment enjoining the sale of any air rights without prior Court approval to benefit the public purposes of the regiment; (b) declaring the ESDC lease to the Conservancy unlawful and void ab initio; (c) awarding damages to plaintiffs for tortious interference with the City lease and causing a breach of fiduciary duty by the Armory trustees;  (d) imposing a constructive trust on all funds received by the Conservancy, ordering an accounting of such funds, and surcharging defendants as fiduciaries for expenditures not made for the actual renovation and preservation of the Armory; (e) directing defendants to pay an amount not less than $30 million in exemplary and punitive damages to pay for the completion of restorations and preservation work on the Armory and for all expenses for installation of a first-rate world-class museum telling the story of the citizen-soldier, and appointing a Master to oversee same; (f) together with payment of plaintiffs' attorneys' fees and expenses; (g) plus such other and further relief as the Court shall deem just and proper.

Dated: New York, NY
July 31, 2007

WHITNEY NORTH SEYMOUR, JR.
Federal Bar No. WS2019
425 Lexington Avenue, Room 1721
New York, NY  10017
Tel:  212-455-7640
Fax:  212-455-2502
Email:  wseymour@stblaw.com


GABRIEL NORTH SEYMOUR
Federal Bar No. ct27131
200 Route 126
Falls Village, CT  06031

860-824-1412
Email:  certiorari@earthlink.net

Attorneys for Plaintiffs

03/22/2001  18:42  - 5187864944            DHA NHLA                    PAGE  02

# LEASE
## of
## September 23, 1874

THIS INDENTURE made the twenty-third day of September of the year of our Lord one thousand eight hundred and seventy four,

BETWEEN The Mayor, Alderman and Commonalty of the city of New York, parties of the first part, and Emmons Clark, Colonel of the 7th Regiment of the National Guard of the State of New York, Stephen C. Ryder, Lieutenant Colonel, and George Moore Smith, Major of said regiment, and field officers thereof, parties of the second part.

WHEREAS by section 1 of Chapter two hundred thirty-four of the laws of 1874 the Commissioners of the Sinking Fund of said City of New York were authorized and required to lease, by due resolution and deed of lease to the said parties of the second part and their successors in office the lands and premises hereafter described for the public purposes of said regiment for the term of twenty-one years for the nominal rental of one dollar per year,

AND WHEREAS the said Commissioners of the Sinking Fund on the 3rd day of September 1874, duly adopted a Resolution in the words and figures following, to wit:

"RESOLVED: That the plot of ground bounded by and situated between Sixty-sixth and Sixty-seventh Streets and Fourth and Lexington Avenues, be leased to the field officers for the time being, of the Seventh Regiment of the National Guard of the State of New York, and their successors in office acting for said regiment, and for the public purposes of said regiment, for a term of twenty

*1874; 1 of 4*

EXHIBIT A

03/22/2001  18:42  5187864944                    DMA MIL.A                    PAGE  03

one years with and at the nominal rental of one dollar per year; and that the Counsel to the Corporation prepare a lease of such premises in accordance with the provisions of Chapter 234, Laws of 1874."

NOW THIS INDENTURE WITNESSETH that said parties of the first part have leased and by these presents to grant, devise and to farm let unto the said parties of the second part and their successors in office, the plot of ground bounded by and situated between Sixty-sixth and Sixty-seventh streets and Fourth and Lexington Avenues, To have and to hold the same with the appurtenances unto the said parties of the second part and their successors in office for the term or period of twenty-one years from the date hereof to be exclusively held and used for an Armory and Drill Rooms by said regiment yielding and paying therefor unto the said parties of the first part and their successors and assigns the yearly nominal rent or sum of One Dollar payable annually on the first day of January in each year during said term.

AND the said parties of the second part do hereby covenant and agree to and with the said parties of the first part to erect or cause to be erected upon the said devised premises suitable buildings for the purposes of an Armory and Drill Rooms for said regiment as soon as the same can reasonably be done, and further to keep and maintain such buildings thereon during the term aforesaid without any cost, charge or expense to the said parties of the first part their successors or assigns, of such maintenance.

AND the said parties of the second part do further covenant and agree, and these presents are upon the express condition and understanding, that if the

*1874; 2 of 4*

said parties of the second part or their successors in office shall refuse or neglect

to erect or cause to be erected, as aforesaid, the buildings aforesaid upon the

said devised premises or at anytime during the said term neglect or refuse to

keep and maintain the same thereon, as aforesaid, or shall cease to use the said

devised premises for the purposes aforesaid or shall use the same for any other

than the purposes of an Armory and Drill Rooms or the public purposes of said

regiment or in furtherance of such public purposes, that then this lease and all

the estate, right, title and interest of the said parties of the second part or their

successors in office of, in and to the plot of land herein devised shall thereupon

cease and determine, and these presents and every article and clause herein

contained shall become null and void.

AND the said parties of the second part do further covenant and agree to

and with the said parties of the first part their successors and assigns that the

said parties of the second part and their successors in office will pay the said rent

at the times and in the manner hereinbefore specified and that if the said parties

of the second part or their successors in office shall neglect or refuse to pay the

said rent or any part hereof to the said parties of the first part their successors

and assigns that then it may be lawful for the said parties of the first part their

successors and assigns to re-enter upon the said devised premises and every

part thereof and to repossess the same as in their former estates.

AND it is hereby stipulated, understood, and declared that the said parties

of the first part by the execution and delivery of these presents or any thing

herein contained do not incur any liability whatever to the said parties of the

*1874; 3 of 4*

second part or their successors in office and that nothing herein contained shall be implied, taken or construed to be a covenant of warranty or seizin on the part of the said parties of the first part or of any authority or assumption of authority on their part, to execute these presents further than they lawfully can claim the same under their several charters and the various acts of the Legislature of the State of New York.

IN WITNESS WHEREOF to one part of these presents remaining with the said party of the second part the said parties of the first part have caused their Common Seal to be attached and to the other part thereof, remaining with the said parties of the first part the said parties of the second part have offered their hands and seals the day and year first above written.

In presence of

By the Common Council
/s/ Joseph C. Pinkney
Clerk

State of New York, City and County of New York, in this twenty-third day of September 1874, before me came Joseph C. Pinkney to me personally known who being duly sworn did depose and say that he resides in the City and County of New York, that he is the Clerk of the Common Council of the City of New York, that he seal affixed the foregoing conveyance is the Common Seal of the City of New York, and was so affixed by their authority.

/s/ C. W. Lawrence
Notary Public, City and County of New York

1874; 404

## EXHIBIT A — LEASE

INDENTURE made the 23rd day of April, one thousand eight hundred and seventy-nine BETWEEN THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, parties of the first part, and THE FIELD OFFICERS OF THE SEVENTH REGIMENT OF THE NATIONAL GUARD OF THE STATE OF NEW YORK, parties of the second part;

WHEREAS, the Commissioners of the Sinking Fund of the City of New York, at a meeting of said Commissioners, held April 18, 1879, adopted the following preambles and resolution:

WHEREAS, On the 23rd of September, 1874, the Mayor, Aldermen and Commonalty of the City of New York did make a lease (recorded in the office of the Register of said City, liber 1306 of conveyances, October 12, 1874) to the Field Officers of the Seventh Regiment of the National Guard of the State of New York, pursuant to the first section of the 334th Chapter of the Laws of 1874; and also pursuant to a resolution of the Commissioners of the Sinking Fund of said City, adopted on the 3rd day of September, 1874, which lease was for the period of twenty-one years, upon the conditions therein mentioned, and was of certain lands, for an armory, which lands are situated between Fourth and Lexington Avenues, and between Sixty-sixth and Sixty-seventh Streets in said City; and

WHEREAS, An armory has been partially constructed by said regiment on said premises, now held under said lease, and by section 4, of the 57th Chapter of the Laws of 1878 (passed March 1, 1879) the said Commissioners of the Sinking Fund are authorized and required to extend the

*1879*
*1 of 3*

EXHIBIT B

of said lease, as said fourth section provides; therefore
in compliance with the last named act

RESOLVED, That the term of the lease of said
premises be and the same is hereby so extended and the
lease so modified that the same shall "convey and assure to
said lessees and said regiment the premises therein des-
cribed for and during the period that said regiment shall
exist and act as a military organization, and desire to
occupy said armory for its lawful purposes."

AND, that the Counsel to the Corporation prepare a
proper instrument for the formal extension and modification
of said lease, in accordance with the provisions of said
57th Chapter of Laws of 1879."

NOW THIS INDENTURE WITNESSETH, That the said parties
of the first part have granted, demised and to farm let,
and by these presents do grant, demise and to farm let,
unto the said parties of the second part and their suc-
cessors in office the plot or parcel of ground bounded by
and situated between Sixty-sixth and Sixty-seventh Streets,
and Fourth and Lexington Avenues, in the city of New York.

TO HAVE AND TO HOLD the same, with the appurtenances,
unto the said parties of the second part and their suc-
cessors in office, for and during the period that said regi-
ment shall exist and act as a military organization, and
desire to occupy said armory for its lawful purposes; said
regiment yielding and paying therefor, unto the said parties
of the first part, their successors and assigns, the yearly
nominal rent or sum of one Dollar, payable annually on the
first day of January in each year during said term; said
plot or parcel of ground and appurtenances to be held and

1879
2 of 3

used exclusively for an armory and drill rooms by said
regiment, subject to all respects to the covenants, condi-
tions and restrictions contained and expressed in the lease
made September 23, 1874, in said preambles mentioned, except
so far as the same have been modified by or pursuant to any
act of the Legislature of the State of New York.

IN WITNESS WHEREOF, the said parties of the first part
have caused the common seal of the said City of New York to
be affixed to these presents in duplicate, and the said
parties of the second part have hereunto set their hands and
seals the day and year first above written.

                    (Sgd)    EMMONS CLARK - Colonel   (Seal)
                             7th Regt. N.G.S.N.Y.

                    (Sgd)    LOUIS FITZGERALD - Lieut.Col.(Seal)
                             7th Regt. N.G.S.N.Y.

                    (Sgd)    GEO. MOORE SMITH - Major   (Seal)
                             7th Regt. N.G.S.N.Y.

Sealed and delivered
in the presence of

(Sgd)  C. W. LAWRENCE

1879
3 of 3

## Chap. 518.

*Laws 1893*

An act to amend chapter fifty-seven of the laws of eighteen hundred and seventy-nine, entitled "An act to secure the completion of the seventh regiment new armory in the city of New York.

Approved by the Governor May 9, 1893.   Passed, three-fifths being present.

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

Section 1. Section eight of chapter fifty-seven of the laws of eighteen hundred and seventy-nine is hereby amended to read as follows:

§ 8. Upon the payment of the final appropriation of fifteen thousand dollars, provided to be paid under section five of this act, and the redemption and cancellation of the last of the bonds authorized by this act, and the discharge and cancellation of the entire issue thereof, the then trustees of the seventh regiment armory fund shall reassign and convey unto the field officers of the said seventh regiment the lease of the ground in the city of New York heretofore leased to the said field officers of the said regiment by the commissioners of the sinking fund of said city, pursuant to chapter two hundred and thirty-four of the laws of eighteen hundred and seventy-four, and the property covered thereby; and said field officers shall thereafter hold the same pursuant to the terms of the lease solely and exclusively for the public purposes of the said regiment, and the said field officers of the seventh regiment and their successors in office shall be, and they hereby are constituted trustees of the seventh regiment armory building, and shall be and remain charged with the duty of maintaining and improving the same for the public purposes of said regiment.

§ 2. There shall be added to said chapter the following new sections, to be known as sections ten, eleven and twelve, and to to read as follows:

§ 10. The board of estimate and apportionment of the city of New York is authorized to estimate and appropriate annually such sum or sums, not exceeding eight thousand dollars, as an equivalent, and in lieu of the rental for an armory for said regiment, as may be required by the trustees of the seventh regiment


EXHIBIT C

armory building, which sums so appropriated shall be paid to
the said trustees of the seventh regiment armory building, and
applied by them to the preservation, maintenance and improve-
ment of the seventh regiment armory building, and the several
parts and appurtenances thereof devoted to the uses of the said
regiment and to the improvement thereof as an efficient military
organization; and the said trustees shall annually, on or before
the fifteenth day of October, report to the board of estimate and
apportionment such sum or sums as they may require for the pay-
ment of the charges and expenses of repairing, altering, maintain-
ing and improving said building and the several parts and appur-
tenances thereof.

*Report to board of estimate, etc.*

§ 11. The trustees of the seventh regiment armory building
shall make and transmit annually on or before the first day of
February, to the comptroller of the city and county of New
York, a report, dated on the thirty-first day of December next
preceding, which report shall state what amount of moneys
the said trustees received during the year for the purposes of
said building, and the specific purposes for which such moneys
have been expended, and such other information as the comptroller
may, from time to time, require.

*Report to city comp-troller.*

§ 12. Nothing herein contained shall affect, modify or
qualify the authority of the commanding officer of the regiment
for which said armory has been provided; and the said armory
shall be subject to the provisions of the military code relating to
armories and to the rules and regulations prescribed by the proper
military authorities for other regimental armories in the city of
New York.

*Authority of com-manding officer.*

*Armory subject to military code.*

§ 3. This act shall take effect immediately.

## Chap. 519.

An Act for the relief of the Mount Sinai hospital of the city of
New York, and to authorize changes in the conditions of leases
to said society.

Approved by the Governor May 2, 1898. Passed, three-fifths being present.

*The People of the State of New York, represented in Senate
and Assembly, do enact as follows:*

*Changes in conditions of leases authorized.*

Section 1. The commissioners of the sinking fund of the city
of New York, are hereby authorized to modify, alter and qualify

**LEASES—CORPORATIONS—SEVENTH REGIMENT ARMORY**

**CHAPTER 482**

**A. 11817**

Approved and effective September 21, 2004

AN ACT to amend the military law and the New York state urban development corporation act, in relation to a lease of the seventh regiment armory to a not-for-profit corporation

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

Additions are indicated by underline; deletions by strikeout; vetoes by shading    **1037**



Ch. 482, § 1

§ 1.  Statement of legislative findings and purposes.  It is hereby found and declared that New York state's Seventh Regiment Armory, located in the city of New York, is an important historic landmark; that it has been a prominent center of cultural and civic events since its construction in 1879; that it is of great military historic value; that the continued ability to operate the seventh regiment armory for military purposes in times of civil or military emergency is vitally important to the city and state, and that the physical restoration and refurbishment of the armory is necessary and important to preserve this structure for current and future generations of New Yorkers.

It is further found and declared that the armory is an important civic and cultural facility for the community in which it is located and for the residents of the city and state; and that the continued use of the armory for cultural events and other civic uses is beneficial to the health, safety, welfare, and education of the people of the city and the state, and is consistent with the armory's purpose as a military facility.

It is further found and declared that a portion of the armory has been successfully utilized for a range of activities, including use as a shelter for homeless women that has been operated by the city of New York and that continued use of a portion of the armory as a shelter for homeless women is beneficial to the health, safety, welfare and education of the people of the city and state, and is consistent with the armory's purpose as a military facility and is contemplated pursuant to this legislation.

It is further found and declared that the armory has suffered deterioration in its physical infrastructure and plant in recent decades and that the continued deterioration of the facility must be remedied and reversed; that the renovation of the armory will require the investment of many millions of dollars and that financial circumstances make such public expenditures very difficult.

It is further found and declared that the restoration and renovation of the armory is in the public interest and that a partnership between the state and the private sector is necessary to undertake the financing of the restoration and future operation of this historic structure; that the division of military and naval affairs and the urban development corporation issued a request for proposals from interested private sector organizations in the year 2000 to undertake the restoration and operation of the armory.  A not-for-profit organization, the seventh regiment armory conservancy, was named as chosen developer and deemed to fulfill all financial, organizational and operational requirements to undertake this endeavor in partnership with the state.

It is further found and declared that leasehold title to the seventh regiment armory is the property of the state under an indenture of lease made on September 23, 1874 between "the mayor, alderman and commonality of the city of New York," as lessors, and "the field officers of the seventh regiment of the national guard of the state of New York," as lessees, which field officers were later redesignated as the trustees of the seventh regiment armory building (Chapter 518 of the Laws of 1898), as amended by an indenture of lease dated April 23, 1879. The 107th corps support group, a division of the New York state national guard, is recognized by the department of the army and the courts of the state of New York as the lineal descendent of the seventh regiment, and the field officers of the 107th corps support group are recognized as the current trustees of the armory and successors in interest to the lessee under the above-cited leases, subject to the supervision of the New York state division of military and naval affairs.  Pursuant to this act, the armory is under the general charge and control of the adjutant general, the commanding general and senior military officer of the New York state national guard.

Therefore, it is hereby found and declared that it is in the public interest for the state, acting through the division of military and naval affairs by the authority of the adjutant general, to enter into a public/private partnership with a not-for-profit corporation dedicated to the preservation of the armory as a historical, civic and cultural facility for the community and to undertake the renovation and operation of the armory and to exercise the rights and powers herein authorized.  Furthermore, such lease and all development-related activities, as well as any subsequent leases or development-related activities, shall be administered by the empire state development corporation on behalf of the division of military and naval affairs and the state.

§ 2.  The military law is amended by adding a new section 180–a to read as follows:

1038

3. Lease and operation of armory; certain provisions of this chapter not applicable. (a) Except with respect to expenditures made by the state or the division in connection with military use or the operation of the armory during a period of civil or military emergency, the following provisions of this article shall not apply to the repair, restoration, refurbishment or operation of the armory pursuant to the lease or the management agreement: section one hundred seventy-eight, subdivisions two and three of section one hundred eighty and section one hundred eighty-one.

(b) The provisions of section one hundred eighty-two of this article shall apply only with respect to military use of the portions of the armory not demised under the lease, and with respect to periods of civil or military emergency, and shall not apply to the operations of the armory under the lease or the management agreement.

(c) Except with respect to military use and during periods of civil or military emergency, section one hundred eighty-three of this article shall not apply to the operations of the armory pursuant to the lease or the management agreement. The following provisions shall apply in lieu of such section one hundred eighty-three:

(i) On application of any of the associations of veterans described in paragraph b of subdivision one of such section one hundred eighty-three, the lessee or the manager pursuant to the terms of the management agreement shall provide a proper and convenient room or rooms or other appropriate space in the armory where such posts or chapters may hold regular and special meetings and organizational social events of a private nature, without the payment of any charge or expense therefor, provided that such use does not interfere with the use by the lessee or the manager pursuant to the terms of the management agreement, including any use by third parties contracted for under subparagraph (ii) of this paragraph.

(ii) The armory may be used by any person, firm, association, corporation, or municipal entity, provided that such person, firm, association or corporation enters into an agreement with the lessee or the manager pursuant to the terms of the management agreement permitting such use. The terms of any agreement entered into between the lessee or the manager pursuant to the terms of the management agreement and a user shall provide for such usage to cease during any periods of civil or military emergency.

(d) The provisions of sections one hundred eighty-five, one hundred eighty-six and one hundred eighty-seven of this article shall not apply to the armory.

(e) The management agreement and lease shall not apply to shelter use. Shelter use shall be governed by a separate agreement between the city of New York, the lessee and the state of New York; such separate agreement shall be executed prior to the execution of the lease.

§ 3. Section 1 of chapter 174 of the laws of 1968, constituting the New York state urban development corporation act, is amended by adding a new section 39 to read as follows:

§ 39. Lease and operation of seventh regiment armory. (a) The corporation is hereby authorized to act on behalf of the state and the division of military and naval affairs to enter into a lease or subsequent leases and the management agreement on behalf of the state and the division with a lessee, subsequent lessee or the manager pursuant to the terms of the management agreement in order to accomplish the purposes of this section. The leasing of the armory to a lessee or subsequent lessee and the entrance into the management agreement and the repair, restoration and refurbishment of the armory and operation thereof by a lessee or subsequent lessee for cultural and other civic uses pursuant to the lease is hereby declared to be a valid use under the city lease, and is undertaken for public purposes.

(b) The lease with a lessee or subsequent lessee authorized by this section shall require a lessee or subsequent lessee to undertake a program of repair, restoration and refurbishment of the armory and to manage and use the same as a facility for cultural and other civic uses. The lease shall demise all portions of the armory other than those reserved for a homeless shelter for women operated by the city of New York pursuant to agreement with the state and for that reserved for military use by the division. The portion of the premises allocated to the shelter for homeless women shall be sufficient and suitable space for the current and uninterrupted operation of the shelter by the city of New York. The division shall cause the 107th corps support group or its lineal descendent to maintain military use within the reserved portions of the armory. The division, and the city of New York, respectively, shall be responsible to repair and maintain their reserved premises, including the costs of

renovation and uninterrupted use, and to pay an annual common maintenance charge to a lessee or subsequent lessee to cover allocated costs of repair, maintenance and operation of the common portions of the armory. . The lessee or subsequent lessee shall be required to apply all revenues generated by operations at the armory to pay or provide for costs of repairs, restoration, refurbishment, operating, maintenance and programming of the armory and the uses therein and the activities of the lessee or subsequent lessee with respect thereto.

(c) The corporation, in carrying out its authorization under this section may exercise all of the power granted it in law, as if fully enumerated herein.  Without limiting the generality of the foregoing, the powers granted to the corporation under sections sixteen and twenty-two of this act shall be utilized by the corporation in its administration of the lease, and shall be applicable in respect to the repair, restoration, refurbishment and operation of the armory pursuant to the lease.

(d) In no event shall the lessee or subsequent lessee be deemed a state actor or an agent or an instrumentality of the state by reason of the lease or this section or any of the activities of the lessee or subsequent lessee with respect to the armory pursuant to the lease or this section.

(e) Except with respect to military use or periods of civil or military emergency, for any action involving the armory that may have a significant effect on the environment, the corporation shall be the lead agency having principal responsibility for carrying out or approving such action for purposes of article eight of the environmental conservation law.

§ 4.   Construction. This act, being necessary for the welfare of the state and its inhabitants, shall be liberally construed so as to effect its purposes.

§ 5.   Severability clause.  If any section, clause or provision of this act shall be unconstitutional or be ineffective in whole or in part, to the extent that it is not unconstitutional or ineffective it shall be valid and effective and no other section, clause or provision shall on account thereof be deemed invalid or ineffective.

§ 6.   This act shall take effect immediately.

# Paul|Weiss

9/22/2004
**Governor Pataki Signs Into Law a Bill Drafted by Paul, Weiss**

Lewis R. Clayton, Meredith J. Kane

On September 22, 2004, Governor Pataki signed into law a bill drafted by Paul, Weiss lawyers that facilitates the restoration and reuse by our client the Seventh Regiment Armory Conservancy, Inc. of the historic Seventh Regiment Armory building located at Park Avenue and 66th Street. The new law, which amends provisions of the New York Military Law and the New York Urban Development Corporation Law regarding the use, disposition and renovation of the armory, enables our client to enter into a long-term lease of the Armory, to restore its extraordinary 19th century architectural and decorative splendor, and to open it to the public as a performing and visual arts center. The renovation will be accomplished with a mix of public and private funds. The bill, which was passed at the very end of the New York State legislative session, just after adoption of New York State's 2005 fiscal year budget, was drafted by Meredith Kane and Elizabeth Stein, with input from Lew Clayton.



EXHIBIT E





EXHIBIT   G



(Conservancy lease, excerpt from Appendix 2A)

| Floor | Use | Location | SF | Capacity/Specs/Notes (T= toilet, U= urinal) |
|---|---|---|---|---|
| First Floor | | | | |
| Administration Building First Floor | | | | |
| | Restaurant | | | |
| | Dining Room | Board of Officers | 1,780 | capacity: 88 seated |
| | Dining Room | Reception Room | 850 | capacity: 36 seated |
| | Dining Room | Colonel's Room | 920 | capacity: 36 seated |
| | Dining Room | Adjutant's Room | 646 | capacity: 28 seated |
| | Bar | South Hallway | 1,600 | |
| | Sub-total | | 5,796 | |
| | | | | |
| | Restaurant Back of House and Patron Facilities | | | |
| | Kitchen | | 1,180 | |
| | Ladies Room (ADA) | | 120 | 1T |
| | Mens Room (ADA) | | 120 | 1T |
| | Coat Check | | 130 | |
| | Sub-total | | 1,550 | |
| | | | | |
| | Public Rooms | | | |
| | Reception Rm | Veterans Room | 1,750 | capacity: 145 standing |
| | Reception Rm | Library | 845 | capacity: 70 standing |
| | Reception Rm | Field and Staff | 920 | capacity: 76 standing |
| | Sub-total | | 3,515 | |
| | | | | |
| | Public Rooms Back of House | | | |
| | Prep Room | Equipment Room | 529 | |
| | Storage | | 200 | |
| | Sub-total | | 729 | |
| | | | | |
| | Patron Facilities | | | |
| | Lobby | | 1,610 | |
| | Box office storage | Inner Committee | 200 | |
| | Elevator & lobby | Outer Committee | 160 | |
| | Sub-total | | 1,970 | |
| | | | | |
| | Other | | | |
| | Mechanical | | 50 | |
| | Stairs | North End | 195 | |
| | | South End | 250 | |
| | Elevator | | 285 | |
| | Sub-Total | | 780 | |
| | | | | |
| | TOTAL First Floor NSF | Administration Building | 14,340 | |
| | TOTAL Actual GSF | Administration Building | 18,726 | |

EXHIBIT H

| Floor | Use | Location | SF | Capacity/Specs/Notes (T= toilet, U= urinal) |
|---|---|---|---|---|
| Second Floor - Administration Building | | | | |
| | Corporate Entertaining | | | |
| | Corporate Rms | 12 Company Rms | 10,094 | capacity: 30 ea. standing |
| | Food prep | | 590 | |
| | Sub-total | | 10,684 | |
| | | | | |
| | Patron Facilities | | | |
| | Men's Room | | 210 | 2T/3U |
| | Ladies Room | | 400 | 6T |
| | Lobby | Hall | 3,671 | capacity: 306 standing |
| | Sub-total | | 4,281 | |
| | | | | |
| | Other | | | |
| | Mechanical | | 114 | |
| | Stairs | North End | 195 | |
| | | South End | 220 | |
| | Elevator | | 200 | |
| | Sub-total | | 729 | |
| | | | | |
| | TOTAL Second Floor NSF | Administration Building | 15,694 | |
| | TOTAL Actual GSF | Administration Building | 18,726 | |
| Second Mezzanine - Administration Building | | | | |
| | | | | |
| | Gallery Offices | | 1,015 | |
| | Gallery Storage | | 750 | |
| | Mechanical | | 103 | |
| | Stairs | | 421 | |
| | Elevator | | 200 | |
| | | | | |
| | TOTAL Second Mezzanine | Administration Building | 2,489 | |
| | TOTAL Actual GSF | Administration Building | 2,742 | |
| Third Floor - Administration Building | | | | |
| | | | | |
| | Galleries | | 10,080 | |
| | Offices/Storage/Other | | 3,594 | |
| | Concessions | | 550 | |
| | Ladies Room | | 215 | 6T |
| | Mens Room | | 217 | 2T/3U |
| | Lounge | | 400 | |
| | Coat Room | | 60 | |
| | Lobby | Hall | 165 | |
| | Mechanical | | 109 | |
| | Stairs | North End | 196 | |
| | | South End | 231 | |
| | Elevator | | 200 | |
| | | | | |
| | TOTAL 3rd Floor NSF | Administration Building | 16,017 | |
| | TOTAL Actual GSF | Administration Building | 18,726 | |

# 7th Regiment Armory Conservancy Restaurant, LLC

24 East 80th Street
New York, N.Y. 10021

Fax     (212) 249-8500
        (212) 396-0829

October 6, 2000

Mr. Wade Thompson
Chairman
Seventh Regiment Armory Conservancy
C/o Thor Industries
230 Park Avenue, Suite 618
New York, N.Y. 10169

Dear Mr. Thompson:

Anne Rosenzweig and Night Sky Restaurants are pleased to submit our bid in response to your Request for Proposals for restaurant and catering services at the Seventh Regiment Armory. We are confident that our model, in which the restaurant and banquet operations are combined into a single entity with both fine dining and banquet space experience, will be an effective way to provide fabulous food to visitors at the Armory.

We look forward to discussions about the details of our proposal and welcome any questions you might have concerning our experience and our commitment to this project.

Yours sincerely,

David Emil
for Night Sky Restaurants and
Anne Rosenzweig

cc:     Anne Rosenzweig



 JOSEPH BAUM & MICHAEL WHITEMAN CO. INC. 

October 4, 2000

Mr. Wade Thompson
Chairman
Seventh Regiment Armory Conservancy
C/O Thor Industries
230 Park Avenue, Suite 618
New York, NY 10169

Dear Mr. Thompson:

Joseph Baum & Michael Whiteman Co. and Tentation Potel &
Chabot Caterers were pleased to submit a bid in response to
your request for proposals for restaurant and catering
services at the Seventh Regiment Armory. We look forward to
further discussions about the range and excellence of the food
services that we can provide.

Yours sincerely,

Michael J. Whiteman

186 FIFTH AVENUE  NEW YORK, NY 10010  (212) 206-7110  FAX (212) 206-7114
baumwhiteconsult@mindspring.com

EXHIBIT J

**Restaurant Associates**

aurant Associates Corp.
W 45 Street
York, NY 10036
212.789.8100
212.302.8032

October 4, 2000

Mr. Wade Thompson
Chairman
Seventh Regiment Armory Conservancy
C/O Thor Industries
230 Park Avenue, Suite 618
New York, NY 10169

Dear Mr. Thompson:

Restaurant Associates is very pleased to submit a bid in response to your request for proposal for a restaurant and catering services at the Seventh Regiment Armory. We are looking forward to discussing the opportunities and partnership further.

Restaurant Associates has a great deal of experience in cultural centers, museums, and performing arts centers. We would truly appreciate the opportunity to apply this expertise to the armory and work to surpass all your food service expectations.

Sincerely,

Ed Sirhal

Ed Sirhal
Senior Vice President Development


EXHIBIT K

Charles A. Gargano
Chairman
and Chief Executive Officer

**FOR CONSIDERATION**
June 16, 2005

| | |
|---|---|
| **TO:** | The Directors |
| **FROM:** | Charles A. Gargano |
| **SUBJECT:** | New York (New York County) – Seventh Regiment Armory. Civic Project |
| **REQUEST FOR:** | Civic Project Findings; Authorization to Adopt the Proposed General Project Plan; Authorization to Hold a Public Hearing(s) Pursuant to the UDC Act and Other Applicable Laws |

General Project Plan

**I.    Project Summary**

| | |
|---|---|
| **Lessee:** | Seventh Regiment Armory Conservancy, Inc. 230 Park Avenue New York, New York 10021 Wade F.B. Thompson, Chairman 212-249-5517 |
| **Project Location:** | Seventh Regiment Armory 643 Park Avenue New York, NY 10021 |
| **Proposed Project:** | Restoration and renovation of the Seventh Regiment Armory for use as a cultural arts center for the visual and performing arts. The Seventh Regiment Armory Conservancy will lease the Seventh Regiment Armory for 99 years from the State of New York acting through ESDC. |
| **Project Team:** | Project Management:      William Sherman                           Carol Berens Legal:      Lawrence Gerson Environmental:      Rachel Shatz |

**Empire State Development Corporation**
633 Third Avenue  New York, New York  10017-6754  Tel 212 803 3700  Fox 212 803 3715



Project Completion:    Initial renovation to be completed within 10 years of lease-signing; lease to 2104

## II.    Project Description

The Seventh Regiment Armory Civic Project ("Project") is the restoration and renovation of the historic Seventh Regiment Armory (the "Armory") into a cultural arts center for the visual and performing arts. The State of New York (the "State"), acting through the New York State Urban Development Corporation d/b/a Empire State Development Corporation ("ESDC"), will lease the Armory for 99 years to the not-for-profit Seventh Regiment Armory Conservancy, Inc. (the "Conservancy") which will renovate and maintain the Armory and operate the cultural arts center.

## A.    Background—Armory Significance and History

The Armory, located on the full city-block bounded by 66th and 67th Streets and Lexington and Park Avenues on the Upper East Side of Manhattan, New York, was constructed between 1877 and 1881 as the home of the Seventh Regiment (the "Regiment"), the largest and one of the most prestigious volunteer military organizations of the nineteenth century. The building, designed by Charles W. Clinton, a member of the Regiment, is now a National Historic Landmark, a New York City Landmark, and is listed on the State and National Registers of Historic Places.

Since 1942, pursuant to New York Military Law, the Armory has been controlled and maintained by the Adjutant General of the State of New York, who is also the Commissioner of the Division of Military and Naval Affairs ("DMNA"). (Before World War II, New York City was responsible for the maintenance of all the armories located within its boundaries.) Title to the building itself is vested in The Board of Officers of the Seventh Regiment (currently the 107th Corps Support Group of the New York Army National Guard). The Governor is the Commander-in-Chief of the New York National Guard, of which the New York Army National Guard is a service branch. The Armory was built upon land donated by the City of New York ("City"), and the land continues to be leased from the City in accordance with a 1877 Deed of Lease which requires the building to serve a "military purpose."

A particularly American building type, armories evolved during the nineteenth century in response to political and social circumstances. An armory is the military headquarters building and drill center used originally by the volunteer regiments maintained by each state and subsequently by the National Guard. (The National Defense Act of 1916 federalized the state militias as reserve organizations for the U.S. Army.) In New York, many of these structures, including the Armory, were built in response to social and labor unrest sparked by the Civil War, the Panic of 1873 and subsequent depression as well as the influx of immigrants.

2

armory buildings housed offices, meeting rooms, rifle ranges, and ancillary spaces. Moreover, in order to attract volunteers, armories provided athletic facilities and social entertainment and augmented maintenance budgets through rentals for public gatherings. Consequently, the Armory became a significant cultural destination and now hosts internationally renowned antiques shows, art fairs and other varied community and arts uses. Since 1981, State Emergency regulations allow homeless facilities to operate in armories. A women's shelter now run by the Lenox Hill Neighborhood House occupies two floors of the Armory.

The Armory is the most historically and socially significant as well as architecturally influential armory in New York State and probably the United States. The Armory is composed of two structures—a multistoried building, or headhouse, containing administrative and social areas, and a one-story drill shed for military training. Its creative plan and medieval exterior design provided inspiration for New York State's and the nation's subsequent armories. In addition, according to the New York City Landmarks Preservation Commission, "Together with the Drill Room,...the interiors of the Seventh Regiment Armory represent the height of American interior design within a single building, for a 'single' (in this case, military) client, during a period of fifty years."

Much of the Armory remains as originally designed. Despite several alterations, the significance of the interior of the building cannot be overstated. The 200 by 300 feet Drill Room was, at the time of completion, one of the largest unobstructed interiors in New York City. It is thought to be the oldest extant "balloon shed" (a barrel vaulted-shaped roof supported on visible trusses or ribs) in America.

The headhouse contains important late nineteenth-century period rooms designed and decorated by some of New York's, and therefore America's, most illustrious firms. Design firms such as the Herter Brothers, Louis C. Tiffany and Associated Artists with Stanford White, Pottier & Stymus, Alexander Roux & Co., and George C. Flint & Co were hired to lavishly decorate the entrance, central stair and corridors, reception rooms and the ten company rooms.

B.    Background—Project

Today, the Armory suffers from decades of neglect and minimal maintenance. The roof, masonry walls and windows leak, ceilings are falling, plaster is crumbling, building systems are inadequate and HVAC systems are non-existent. The World Monuments Fund put the building on its Watch List of the world's 100 most endangered sites in 1999. DMNA, which does not have the financial means nor mission to do more than necessary repairs and maintenance, requested ESDC's help to explore ways to raise funds to preserve and restore this historically and culturally important Armory and pay for repairs and on-going maintenance.

In 1998, ESDC issued a request for proposals ("RFP") for a consultant to analyze existing conditions, recommend and evaluate physical improvements and uses, help

operations and write and evaluate an RFP for future developer(s)/operator(s). In August 1999, ESDC Directors approved a $325,000 contract for E & Y Kenneth Leventhal Real Estate Group to provide such consulting services.

An RFP for a developer/operator of the Armory was issued in June 2000 and extensively advertised. Despite a broad outreach effort, only one bid, that from the Conservancy, was received on the November 15, 2000 due date. On September 9, 2001, after months of negotiation, ESDC issued a letter stating that the Conservancy was the Preferred Proposer for the restoration of the Armory. Emergency events following the terrorist attacks on September 11, 2001 stalled progress on the Project for a while. During subsequent negotiations, serious legal issues relating to military law, ownership of the building and state contracting issues arose. In November 2003, the Office of the Attorney General opined that an amendment to the NYS Military Law was required in order to lease the Armory to a non-military entity.

The Conservancy was established in 1997 to find ways to restore the Armory and return it to active public life. The Conservancy has three objectives: to restore the Armory through a public/private partnership with the State of New York and to operate it as a not-for-profit cultural arts center to develop and implement a self-sustaining plans for the Armory's restoration; and to raise the funds necessary to restore the Armory. The Board of the Conservancy includes a number of prominent New Yorkers who have been active in public redevelopment, historic preservation, private philanthropy and the cultural life of New York. The Conservancy is duly incorporated by New York State and is exempt from federal income tax under Section 501(a) of the Internal Revenue Code as an organization described in Section 501(c)(3).

C.    Background—Legislation

On August 12, 2004 the NYS Legislature enacted Chapter 482 of the Laws of the State of New York to amend the Military Law to authorize ESDC to act on behalf of the State of New York to lease of the Armory and undertake related actions. The Governor signed this bill into law on September 21, 2004. The legislation recognizes the Armory's historic importance as a cultural and artistic venue and allows a non-governmental entity to renovate the building and continue its cultural role.

Among other things, this legislation asserts State control of the Armory to preclude triggering reversion language in the ground lease. The legislation clarifies that the State is the lawful successor of the original City leases and owns the building and everything affixed within. In addition, the Armory remains available for military and emergency uses. Space retention for DMNA and the City shelter is mandated. (Costs for renovation for the City shelter are the responsibility of the City of New York.) Responsibility for day-to-day operations of the building, programming and running of cultural/community uses, etc. to a non-governmental entity is permitted and capital repairs and maintenance expenses are specifically excluded from State contracting procedures and Military Law.

4

### D.    The Project

The proposed Project will be implemented by the State, acting through ESDC, leasing the Armory to the Conservancy for a 99-year term.   The lease will set out the following goals (the "Project Goals"):

1.  To restore the historic interiors and exterior of the Seventh Regiment Armory in accordance with the standards of the Secretary of the Interior

2.  To maintain the restored interiors and exteriors at the standards appropriate to an historic structure and landmark of this importance

3.  To create and operate, through a not-for-profit institution, a unique destination for the public that offers the highest quality cultural programming

4.  To serve the not-for-profit visual and/or performing arts, by promoting artistic expression and creativity, adding diversity and richness to New York's cultural base and strengthening New York's role as the cultural capital of the country

5.  To generate activity in the Armory ~~as close to~~ 330 days a year ~~as possible~~ not more than

6.  To offer interpretive and/or educational programs related to the aesthetic and military history of the building to the greatest extent practicable

7.  To implement a model of cross-subsidy to support the not-for-profit cultural programming and the on-going care and maintenance of the building through revenue-producing ancillary activities

The Armory intends to be a cultural institution, unique in both the magnificence of its rooms and the flexibility and accessibility of its programming.  It will offer dance, music and visual arts.

The scope of the renovation includes the restoration and renovation of the Armory's interiors and exteriors, the installation of new and upgraded mechanical, electrical and plumbing systems and new circulation systems.  Work on the historic elements of the Armory will be done in accordance with the Secretary of the Interior's Standards and through a consultative process with the State Historic Preservation Office. The leased premises shall be brought into compliance with current codes while being sensitive to the historic nature of the building.  Complete scope of work is attached.

A five-year $30 million grant from the Port Authority Bank funds to be administered by ESDC has been allocated to the Project.  The authorization of the grant and the grant disbursement terms will be brought before the ESDC Directors when the terms have been fully negotiated.

5

The mechanism for implementing the Project will be a 99-year lease (the "Lease") between the Conservancy and the State acting through ESDC. A Project Term Sheet has been negotiated between ESDC and the Conservancy and has been agreed to by the Governor's Office, the Office of General Services ("OGS") and DMNA. Highlights of the Lease are:

1. **Goals:** The Armory shall be operated as a not-for-profit cultural center for the visual and performing arts as well as for-profit activities to support the Conservancy's not-for-profit activities that promote the Project Goals.

2. **Condition of Premises:** The Conservancy shall take the Armory in its "as is" physical condition on the Lease commencement date.

3. **Rental:** Rent, commencing on the 7th anniversary of the "full operation date," shall be 20% of gross revenues from commercial operations of Armory above a hurdle of $9,000,000 as escalated annually by CPI.

4. **Construction Obligations:** Construction shall begin within four (4) years of the Lease commencement date and shall be completed no later than the tenth (10th) anniversary of the Lease commencement date. Prior to commencing construction, the Conservancy shall demonstrate that all funding necessary to complete the work will be available.

5. **Repairs and Maintenance:** The State shall continue to be responsible for funding emergency repairs of structural elements, roof and major building systems until such items are replaced or rehabilitated by the Conservancy. The State shall not be obligated to repair any damage caused by the Conservancy. The State's obligation to fund emergency repairs shall cease upon the Substantial Completion of the Conservancy's construction obligations.

6. **Indemnification:** The Conservancy shall indemnify, defend and hold ESDC, DMNA and the State harmless from any loss or liability arising out of the Project, its occupancy of the Armory, or any act or omission related thereto.

7. **ESDC Project Fee:** ESDC shall receive a $100,000 annual administrative fee, until the earlier of (i) the substantial completion of the work or (ii) the tenth Lease Year. Conservancy will pay all outside legal costs incurred by ESDC. ESDC shall not be required to expend any non-appropriated funds on the Project.

IV.    Civic Project Findings

Based on the foregoing and the following information, the Directors are requested to make the Civic Project findings require by Section 10 (d) of the UDC Act:

6

In enacting the Armory legislation, the State Legislature found that the lease, renovation and management of the Armory are required in order to effect its modernization and use for cultural and civic purposes.

2.     That the Project shall consist of a building or buildings or other facilities which are suitable for educational, cultural, recreational, community, municipal, public service or other civic purposes;

The Project recognizes the value of the Armory as an architectural, cultural and historical resource. The Project will permit more public access which has been limited because of dangerous conditions and for military security reasons.

3.     Such Project will be leased to or owned by the State or an agency or instrumentality thereof, a municipality of an agency or instrumentality thereof, a public corporation, or any other entity which is carrying out a community, municipal, public service or other civic purpose, and that adequate provision has been made for the payment of the cost of acquisition, construction, operation, maintenance and upkeep of the Project; and

The Armory is the property of the State of New York and the land on which it is located is the property of the City of New York. The titles to the building and the land will not be altered by leasing the Armory.

Prior to commencement of the Initial Construction Work, as defined in the proposed Term Sheet, the Conservancy will present to ESDC a financial plan which demonstrates that the funding necessary to complete the Initial Construction Work shall be raised in a timely manner to allow for the diligent and continuous performance and completion of the Initial Construction Work.

4.     That the plans and specifications for the Project will assure adequate light, air, sanitation, and fire protection.

The Project will bring a currently non-complying building with many standing violations into accordance with the applicable codes.

Relocation

There are no families currently located on the project site. The New York City women's homeless shelter and spaces will be relocated within the Armory. Accordingly, the relocation requirements of Section 10(g) of the UDC Act are not applicable.

7

ESDC, as lead agency, is conducting an environmental review for the Project pursuant to the State Environmental Quality Review Act (SEQRA). An Environmental Assessment will be made available for public review during the review and comment period for the GPP. The Directors will be requested to make a Determination of Significance prior to or at the time the lease will be authorized.

## VI.    Affirmative Action

ESD's Non-Discrimination and Affirmative Action Program will apply to this Project. The Conservancy shall use its best efforts to achieve not less than 20% Minority/Women-Owned Business Enterprise and an overall goal of 25% Minority and Female Workforce participation on this Project.

## VII.    Additional Submissions to Directors

Resolutions
Scope of Work

8

**NEW YORK (NEW YORK COUNTY) – Seventh Regiment Armory Civic Project – Civic Project Findings Pursuant to Section 10 of the UDC Act**

RESOLVED, that on the basis of the materials presented to this meeting, a copy of which is hereby ordered filed with the records of the Corporation, relating to the Seventh Regiment Armory Civic Project (the "Project"), the Corporation hereby finds pursuant to Section 10 of the New York State Urban Development Corporation Act of 1968, as amended (the "Act"):

(1)     There exists in the area in which the Project is to be located a need for the educational, cultural, recreational, community, municipal, public service or other civic facility to be included in the Project;

(2)     That the Project shall consist of a building or buildings or other facilities which are suitable for educational, cultural, recreational, community, municipal, public service or other civic purposes;

(3)     Such Project will be leased to or owned by the State or an agency or instrumentality thereof, a municipality of an agency or instrumentality thereof, a public corporation, or any other entity which is carrying out a community, municipal, public service or other civic purpose, and that adequate provision has been made for the payment of the cost of acquisition, construction, operation, maintenance and upkeep of the Project; and

(4)     That the plans and specifications for the Project will assure adequate light, air, sanitation, and fire protection.

and be it further

RESOLVED, that on the basis of the materials presented to his meeting relating to the Project indicating that there are no families of individuals to be displaced from the Project area, the Corporation hereby finds that the requirements of Section 10(g) of the Act are satisfied.

* * *

June 16, 2005

NEW YORK (NEW YORK COUNTY)--Authorization to Adopt the Proposed
General Project Plan;  Authorization to Hold a Public Hearing(s) Pursuant to the
UDC Act and Other Applicable Laws

RESOLVED, that the Corporation does hereby approve, for the purposes of the public
hearing required by Section 16(2) of the New York State Urban Development
Corporation Act of 1968, as amended, with respect to the Seventh Regiment Armory
Civic Project (the "Project"), the General Project Plan (the "Plan") for the Project
submitted to this meeting, together with such changes therein a the President and Chief
Executive Officer of the Corporation or his designee(s) may deem appropriate, a copy of
which Plan, together with such changes, is hereby ordered filed with the records of the
Corporation; and be it further

RESOLVED, that the President and Chief Executive Officer or his designee(s) be, and
any of the same is, hereby authorized to take such action as he or she deems necessary in
the connection with the holding of such hearing.

\* \* \*

Seventh Regiment Armory
Scope of Work

## Building

The scope of the renovation includes the restoration and renovation of the Armory's interiors and exteriors, the installation of new and upgraded mechanical, electrical and plumbing systems and new circulation systems. Work on the historic elements of the Armory will be done according to the Secretary of the Interior's Standards. The leased premises shall be brought into compliance with current codes while being sensitive to the historic nature of the building. Any interventions of environmental controls, fire protection, egress, lighting, and wiring will be integrated into the décor in as harmonious a manner as possible. Ongoing care and management plans for these interiors will also be adopted. More specifically:

## Exterior

The Armory's exterior will be structurally stabilized, rebuilt, repaired and repointed. Mortar repairs, masonry rebuilding, and relief joints will be made where necessary. New drainage and roofing will be installed where necessary. Compatible and unobtrusive graphics will be designed and installed and a discrete and focused lighting system installed which will respect the surrounding residential neighbors.

## Drill Hall

The Drill Hall will be designed to adapt to many arts installations. Seating and technical equipment will be impermanent and visually identifiable as modern. New required egress, environmental controls, and other life safety measures will be inserted and designed in as complementary and unobtrusive a manner as possible.

## Administration Building

The Administration Building's interiors on the first and second floors will be fully restored in accordance with the Secretary of Interior's Standards. The third floor of the Armory will serve for the administration offices, continuing DMNA offices, and exhibition galleries. The fourth floor of the Armory will house the existing New York City homeless shelter for women. The fifth floor will serve for rehearsal and back-of-house areas to support the Armory's artistic programming.

The goal of the restoration plan for the first and second floors of the Adminis██████ Building is to restore the decorative wall, ceiling and floor finishes in accord██ Secretary of the Interior's Standards. In addition, the Conservancy also pl█████

## Management and Operations

The restored 52,000-square-foot Drill Hall will serve as a cultural arts center for exhibitions and performances.   Programming will be provided for more than 330 days of the year.   Rooms in the Administration Building will feature a program of exhibitions, tours, lectures and classes focusing on various aspects of the social, military and decorative arts history of the Armory.

Post-construction, the Conservancy will manage and maintain the restored Armory with an experienced and knowledgeable in-house staff and qualified out-sourcing of services when appropriate—from top management level to janitorial level.  The Conservancy staff mission will be to ensure the highest quality of overall management, operations and programming in conjunction with the highest industry standard of daily care and maintenance of the museum quality interiors and exteriors of the landmarked building.

Scope of Work—Page 2

Empire State Development

**Charles A. Gargano**
Chairman
and Chief Executive Officer

<u>FOR CONSIDERATION</u>
November 16, 2005

TO:              The Directors

FROM:            Charles A. Gargano

SUBJECT:         New York (New York County) – Seventh Regiment Armory Civic
                 Project

REQUEST FOR:     Affirmation of the General Project Plan, as Modified;
                 Determination of No Significant Effect on the Environment;
                 Authorization to Act as Agent on Behalf of The People of the State
                 of New York to Execute a Lease and Related Documents for the
                 Project

---

<u>Project Summary</u>

Lessee:          Seventh Regiment Armory Conservancy, Inc.
                 230 Park Avenue
                 New York, New York 10021
                 Wade F.B. Thompson, Chairman
                 212-249-5517

Project Location:  Seventh Regiment Armory
                   643 Park Avenue
                   New York, NY 10021

Proposed Project:  Restoration and renovation of the Seventh Regiment Armory for
                   use as a cultural arts center for the visual and performing arts. The
                   Seventh Regiment Armory Conservancy will lease the Seventh
                   Regiment Armory for 99 years from the State of New York acting
                   through ESDC, as Agent.

Project Team:      Project Management:      William Sherman
                                            Carol Berens
                   Legal:                   Lawrence Gerson
                   Environmental:           Rachel Shatz

**Empire State Development Corporation**
633 Third Avenue  New York, New York  10017-6754  Tel 212 803 3700  Fax 212 803 3715


EXHIBIT M

Project Completion:    Initial renovation to be completed within 10 years of lease-signing;
                       lease to 2104, or 99 years

Actions to Date

      At their June 2005 meeting, the ESDC Directors made Civic Project Findings
pursuant to Section 10 of the UDC Act, authorized the adoption the Proposed General
Project Plan ("GPP") for the renovation of the Seventh Regiment Armory ("Armory")
into a cultural arts center for the visual and performing arts.  Pursuant to the Directors'
authorization, ESDC held a duly-noticed public hearing at the Armory on July 21, 2005
at which oral and written comments were received from the public.  Further written
comments were accepted through August 21, 2005.  A summary of all public comments
received is set forth below.  A transcript of the hearing and a copy of all written
comments received is attached as an Exhibit. The complete background and description
of the project is contained in the GPP which is attached as an Exhibit.

      ESDC, as lead agency, conducted an environmental review for the Project
pursuant to the State Environmental Quality Review Act ("SEQRA").  The resulting
Environmental Assessment was made available for public review during the review and
comment period for the GPP.

Public Process

      A total of 27 people spoke at the July 21, 2005 public hearing, and eight
subsequent letters or statements were received during the open public hearing period.
Eighteen speakers and four letters supported the proposed project, generally citing the
years of neglect and deterioration that the Seventh Regiment Armory Conservancy's (the
"Conservancy") involvement would reverse.  The Armory's use as a cultural center was,
for the most part, seen as an asset to the community and an important way of making the
building more accessible to the general public.  Representatives of elected officials
including City Council member Eva Moskowitz and Assembly Member Jonathan Bing
spoke in favor of the project as did a representative of New York City Landmarks and
Preservation Commission Chairman Robert B. Tierney.  Representatives from the
National Trust for Historic Preservation, Hunter College, CIVITAS, Christie's as well as
from those who fundraise for the various charities that have their benefits at the Armory
spoke or entered written statements of support into the record.

      Eight speakers opposed the project, the majority of whom either represented or
supported the Veterans of the Seventh Regiment ("Veterans") and the Seventh Regiment
Armory Fund ("Fund"), entities which claim ownership of the artifacts, fixtures and the
building itself.  These speakers stated that the State did not own the Armory and that the
Veterans should control the building.  In response to these comments, it should be noted
that the State (Division of Military and Naval Affairs ("DMNA") and the Attorney
General's Office) and ESDC have tried to negotiate with the Veterans and the Fund on
the basis that the State controls the building as an Armory pursuant to New York State

2

Military Law. These talks have proved fruitless. The issue of ownership has resulted in litigation in which the Veterans and the Fund have sued the State and ESDC. The State continues to believe that the claims of the Veterans and the Fund are without merit.

Some negative letters in support of the Veterans and the Fund's efforts to restore the building indicated that these groups had submitted a proposal. In fact, the Veterans and the Fund did not submit a proposal in response to the RFP, a copy of which they were given. Members of these groups also attended the RFP information meeting and were aware of and participated in the public process.

It should be noted that under New York State Military Law, these groups are entitled to use from time to time parts of armories with the consent of DMNA. Under the proposed project, DMNA retains space within the Armory and can allow access to its retained space to the Veterans and the Fund.

Other negative testimony revolved around the request to remember the importance of the National Guard, specifically the history of the Seventh Regiment. In response, it should be noted that the Seventh Regiment is part of the New York State National Guard on whose behalf we are undertaking the project. The proposed project will restore the company rooms and have exhibits highlighting the history of the Seventh Regiment. The remaining negative testimony was critical of the State's maintenance of the building and cast doubts on the State's following through on its commitment to rehabilitate the Armory under this Project. An adjacent property owner expressed concerned about present maintenance of the building, asking that future maintenance be improved. In response, this Project is being undertaken in order to stem the deterioration of the building and to restore it.

Environmental Review

ESDC, as lead agency, has completed an environmental review of the proposed project, pursuant to the requirements of the State Environmental Quality Review Act ("SEQRA") and the implementing regulations of the New York State Department of Environmental Conservation. This review, which was coordinated with the involved agencies due to the project's Type I classification, found that the proposed project would not result in significant adverse impacts on the environment. Therefore, ESDC staff recommend that the Directors make a Determination of No Significant Effect on the Environment.

Due to the Armory's inclusion on the National Register of Historic Places, ESDC will ensure that consultation be conducted with the NYS Office of Parks, Recreation and Historic Preservation in connection with any capital improvements. This requirement will be incorporated in the proposed lease between the Conservancy and the State.

3

<u>Modifications to and Affirmation of the General Project Plan</u>

The GPP attached to these materials is unchanged from the GPP adopted by the Directors on June 16, 2005 for purposes of public comment, with exception of the following substantive modifications:

(a)    The original GPP states, under the section "Construction Obligations," that the construction (which is the total renovation of the building into a cultural arts facility) will be accomplished in a single phase within 10 years. The modification will allow the scope of the initial renovation to be done in phases to reflect the realities of fundraising and maintain flexibility of programming. If the work is done in phases, the completion date of the total construction will be extended to 15 years. This will not affect the rental commencement date.

(b)    In the original GPP, the State retains responsibility for replacing capital items that have broken beyond repair. The modified GPP provides for the Conservancy to reimburse the State for such expenses within a maximum of seven years from time of repair.

<u>Attachments</u>

Resolution
General Project Plan, dated June 16, 2005
Transcript of July 21, 2005 Public Hearing with copies of all written comments received through the August 21, 2005 comment period

4

November 16, 2005

NEW YORK (NEW YORK COUNTY) – Seventh Regiment Armory Civic
Project -- Affirmation of the General Project Plan, as Modified; Determination of
No Significant Effect on the Environment; and Authorization to Act as Agent on
Behalf of The People of the State of New York to Execute a Lease and Related
Documents for the Project

RESOLVED, that on the basis of the materials presented to this meeting, a copy of which
is hereby ordered filed with the records of the Corporation, relating to the Seventh
Regiment Armory Civic Project (the "Project"), and pursuant to Section 16 of the New
York State Urban Development Corporation Act of 1968, as amended, ("UDC Act"),
after due consideration of: (1) the testimony given at the public hearing on July 21, 2005
on the proposed General Project Plan; (2) all comments received by the Corporation
during the comment period concluding August 21, 2005; and (3) the Environmental
Assessment prepared in connection with the Project, including responses to comments
made at the public hearing or received thereafter, the Corporation does hereby affirm the
General Project Plan, as modified, a copy of which is attached hereto and which has been
presented to this meeting and is ordered filed with the records of the Corporation relating
to the Project; and be it further

RESOLVED, that that based on the materials submitted to the Directors with respect to
the Project, the Corporation hereby determines that the proposed action will not have a
significant effect on the environment; and be it further

RESOLVED, that, pursuant to Section 16(2) of the UDC Act, on the basis of the
materials presented to this meeting, a copy of which is hereby ordered filed with the
records of the Corporation relating to the Project, and after full consideration of the oral
and written public comments received by the Corporation on the essential terms of the
proposed lease and related documents for the Project with the Seventh Regiment Armory
Conservancy ("Conservancy") or an affiliate thereof and other parties, the Corporation
hereby finds that such proposed lease and related documents are in conformity with the
Project's General Project Plan as modified, and the Chairman or his designee(s) be, and
each of them hereby is, authorized and directed to execute in the name and on behalf of
the Corporation, substantially on the terms and conditions presented to this meeting, the
proposed lease and related documents with the Conservancy or an affiliate thereof and
other parties, including all exhibits thereto; and be it further

RESOLVED, that any and all acts performed by any officers of the Corporation prior to
the date of these resolutions in furtherance of these or prior resolutions with respect to the
Project are hereby ratified, adopted, confirmed, and approved in all respects; and be it
further

RESOLVED, that the Chairman or his designee(s) be, and each of them hereby is, authorized and directed, in the name and on behalf of the Corporation, to execute and deliver any and all documents and to take any and all such actions as may be necessary or appropriate to effectuate the foregoing resolutions; and be it further

RESOLVED, that all continuing authority of the Chairman and his designee(s) to carry out the Project pursuant to the resolutions previously adopted and adopted today by the Directors with respect to the Project hereby is ratified and confirmed.

* * *