```
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: IAS PART 36
------------------------------------------X

DAVID L. DALVA, II,

                              Plaintiff,
                                                Index No. 116965/05
             -against-

GEORGE PATAKI, as Governor of the State
of New York, BRIG. GEN. FREDRIC DAVID
SHEPPARD, as Adjutant General for the
Division of Military and Naval Affairs,
the DIVISION OF MILITARY and NAVAL
AFFAIRS, NYS URBAN DEVELOPMENT
CORPORATION, d/b/a EMPIRE STATE
DEVELOPMENT CORPORATION, SEVENTH
REGIMENT ARMORY CONSERVANCY, INC.,
and THE CITY OF NEW YORK,

                              Defendants.
------------------------------------------X
```



FILED
MAR 0 8 2006
NEW YORK
COUNTY CLERK'S OFFICE

Marilyn Shafer, J.:

The building known as the Seventh Regiment Armory (the Armory) has graced a full city block in Manhattan, bounded by Park Avenue and Lexington Avenue, and 66th and 67th Streets, for over 125 years. This action involves a battle over its future use and preservation, between an individual who would see the structure retain its historical military character, and the representatives of the State and City of New York, who envision the renovation and preservation of this landmarked building for public use.

In the present motion, plaintiff David L. Dalva II (Dalva),

1

EX. C

a resident of the Upper East Side[1], moves for a preliminary injunction barring defendants from implementing a special law, Chapter 482 of New York Laws of 2004, which provides for the creation of a public/private partnership, involving the State defendants and the not-for-profit Seventh Regiment Armory Conservancy, Inc. (the Conservancy), to operate the Armory, after complete restoration, as, among other things, a nonprofit cultural arts center and public resource (the Armory project).

The entire history of the Armory, and the Seventh Regiment of the New York State Militia (the Seventh Regiment), although quite interesting, need not be detailed herein. Suffice it to say that the Armory was built on land leased from the City of New York (the City), pursuant to Chapter 234 of the Laws of 1874, by the "Field Officers" of "the Seventh Regiment of the National Guard of the State of New York." See Verified Complaint, Ex 3, 1874 Lease (the 1874 Lease). The 1874 Lease was for a term of 21 years, at a rent of one dollar per year.

The 1874 Lease, by its terms, required the building of the Armory, and further provided that the Armory was to be used for the purpose of an "Armory and Drill Rooms" by the regiment, and that, if the Field Officers "cease to use the devised premises

---

[1] Although Dalva does not discuss his personal interest in the Armory in his papers, at a public hearing held on July 1, 2005, he identified himself as the "First Vice President of the Seventh Regiment Veterans" and "one of the Vice Presidents of the Seventh Regiment Fund." Aff. of Graber, Ex. F., at 27.

for any other than the purpose of an Armory and Drill Rooms or the public purposes of said regiment or in furtherance of such public purposes," that the lease "shall become null and void." *Id.* unnumbered pages 3-4.

The 1874 Lease was extended by an Indenture dated 1879 (the 1879 Lease). Verified Complaint, Ex 4. The 1879 Lease incorporated the provisions of the 1874 Lease. The Armory itself was built in 1879.

In the intervening years, the Armory has passed, to some extent, beyond the military uses that engendered it. It has in recent years been used to house several annual special events, such as the Winter Antique Show, and the Antiquarian Book Fair. It has housed, for approximately a decade, a women's homeless shelter, which cares for middle-aged women with emotional problems. It was used by the New York National Guard during the aftermath of September 11, 2001 in relation to military and other relief efforts. And, sadly enough, it has deteriorated to a point from which it may never be used again, unless something is done very soon.

In 1999, the State of New York created the Seventh Regiment Advisory Council to look for ways to continue to use the Armory for public purposes commensurate with its founding authority, for the benefit of the state and city public. Defendant Empire State Development Corporation (ESDC), for the benefit of defendant

3

Department of Military and Naval Affairs (DMNA), made a request for proposals for a public/private partnership to effect those ends, while seeing to the restoration and preservation of the structure. Only the Conservancy responded to the request, albeit with the support of many interested individuals and organizations. The ESDC accepted the Conservancy's proposal, which would provide for public use of the Armory as, among other things, a cultural center.

In order to implement the Conservancy's plan, the New York State Legislature (the Legislature) enacted Chapter 482 of the Laws of 2004 (Chapter 482). Chapter 482 provides, in short, for (1) the lease of the Armory to the Conservancy for 99 years; (2) the restoration and preservation of the Armory building; (3) the use of the Armory for civic and cultural events; (4) the continued military character of the Armory, for use in times of military need; and (5) the continued presence of the women's shelter on the premises.

## II. Arguments

Dalva, referring to the 1874 Lease language quoted above, claims that the State is not the lessor of the Armory, and does not have the authority to rent it out to the Conservancy for non-military uses. In fact, he claims that the property is about to, or has already, reverted to the City, as a result of the proposed lease to the Armory (because it will no longer be used as an

4

armory and drill rooms), and the plans provided for its future use as envisioned under Chapter 482. He brings this action as a taxpayer, under State Finance Law (SFL) § 123-b, and under the common law. Specifically, Dalva challenges the constitutionality of Chapter 482, and the State's claims as lessee under the 1874 Lease. Dalva seeks a preliminary injunction, or an immediate trial, to adjudge Chapter 482's constitutionality. A temporary restraining order is in effect, pending a determination of the motion.

Defendants maintain their right to enter into the new lease with the Conservancy, advancing the following arguments: (1) that Dalva's action is barred by a one-year statute of limitations; (2) that Dalva has no standing to bring this action; (3) that the State of New York is the actual lessee of the Armory, and so, effectually the owner of the premises, pursuant to the language of the 1874 Lease; (4) that no "home rule message" was required from the City prior to the enactment of Chapter 482; and (5) that the State has a substantial interest in the project, overriding Dalva's home rule argument.

### III. Discussion

#### A. Preliminary Injunction

A preliminary injunction will only be granted if the movant shows a likelihood of success on the merits, that he or she will suffer irreparable harm should the injunction not be granted; and

5

that the equities balance in his or her favor. *See W.T. Grant Co. v Srogi*, 52 NY2d 496 (1981); *Sterling Fifth Associate v Carpentille Corporation, Inc.*, 5 AD3d 328 (1st Dept 2004).

**B. Likelihood of Success on the Merits**

   **A. Standing**

Standing to pursue a claim is a threshold issue. *Saratoga County Chamber of Commerce, Inc. v Pataki*, 100 NY2d 801 (2003)(*Saratoga*). SFL § 123-b (1) states that:

> Notwithstanding any inconsistent provision of law, any person, who is a citizen taxpayer, whether or not such person is or may be affected or specially aggrieved by the activity herein referred to, may maintain an action for equitable or declaratory relief, or both, against an officer or employee of the state who in the course of his or her duties has caused, is now causing, or is about to cause a wrongful expenditure, misappropriation, misapplication, or any other illegal or state unconstitutional disbursement of state funds or property ... .

Dalva basis his standing under SFL § 123-b on the proposed expenditure by the State of $30 million on the Armory project.

As expressed in *Saratoga*, "courts have been inhospitable to plaintiffs who seek essentially to challenge nonfiscal activities by invoking the convenient statutory hook of section 123-b." *Id.* at 813. As a result, the Court of Appeals has held that "a plaintiff's claims must have a sufficient nexus to fiscal activities of the State in order to confer standing [internal quotation marks omitted]." *Id.*

It is accepted that a constitutional challenge to a

6

legislative enactment must be "a specific challenge to the expenditures of identifiable State funds ... ." *Matter of Public Utility Law Project of New York, Inc. v New York State Public Service Commission*, 263 AD2d 879, 881 (3d Dept 1999). "Since most activities [of government] can be viewed as having some relationship to expenditures, ... too broad a reading of section 123-b would create standing for any citizen who had the desire to challenge virtually all governmental acts." *Rudder v Pataki*, 93 NY2d 273, 281 (1999). A plaintiff must not be permitted "'to obtain judicial scrutiny of the [State's] nonfiscal activities.'" *Id.* at 280, quoting *Matter of Transactive Corporation v New York State Department of Social Services*, 92 NY2d 579, 589 (1998).

I find that Dalva has supplied a sufficient nexus between his attack on Chapter 482 and the fiscal activities of the State of New York. The expenditure of monies to support the Armory project are "identifiable," and will aid in its advancement.

> The task, of course, is to distinguish between cases that present a challenge to the expenditure of money and those that use the expenditure of money as a pretense to challenge a governmental decision. As [the Court of Appeal] has said, 'it is one thing to have standing to correct clear illegality of official action and quite another to have standing in order to interpose litigating plaintiffs and the courts into the management and operation of public enterprises' *(Matter of Abrams v New York City Transit Authority*, 39 NY2d 990, 992 [1976]). Accordingly, a claim that state funds are not being spent wisely is patently insufficient to satisfy the minimum threshold for standing, but a claim that it is illegal to spend money *at all* for the questioned activity likely would provide the plaintiff with standing [emphasis in original].

7

*Saratoga*, 100 NY2d at 813-814.

In this case, Dalva does not merely claim that state funds are not being spent wisely, he is claiming that "it is illegal to spend money *at all*" for the Armory project. *Id*. Therefore, under *Saratoga*, Darva has standing under SFL § 123-b.

I would grant Dalva standing in any event, pursuant to *Saratoga*, and the earlier case of *Boryszewski v Brydges* (37 NY2d 361 [1975]), to which *Saratoga* refers. The Court in *Saratoga* raised the issue of whether an enactment would forever be foreclosed from scrutiny if standing were to be denied based on SFL § 123-b, because of the possibility that "an important constitutional issue would be effectively insulated from judicial review ." *Saratoga*, 100 NY2d at 814. The Court in *Saratoga* recognized that there would be instances where few persons would be in the position to claim concrete injury from unconstitutional enactments, and found that "[t]hus, where a denial of standing would pose 'in effect ... an impenetrable barrier to any judicial scrutiny of legislative action,' our duty is to open rather than close the door to the courthouse." *Id.*, quoting *Boryszewski v Brydges*, 37 NY2d at 364.

There is no party likely to question the constitutionality of Chapter 482 other than Dalva, or another taxpayer plaintiff. The State defendants suggest that the City has standing to oppose Chapter 482, and so, it is not true that there is an

8

"impenetrable barrier" to litigation of the matter. However, the City's ability to sue notwithstanding (*see e.g. Town of Black Brook v State of New York*, 41 NY2d 486 [1977]), the City will, without doubt, not do so, because of the bounty it will receive from the enactment of Chapter 482. It is disengenuous to suggest that it might be a possible plaintiff. *See Saratoga*, 100 NY2d at 814 (party which will benefit from agreement is an "unlikely plaintiff"). The proper course is to allow that Dalva has standing, and to let the action continue.

### B. Statute of Limitations and Laches

Whether Dalva has met the statute of limitations involves, according to the parties, the alleged tension between *New York State Association of Plumbing-Heating-Cooling Contractors, Inc. v Egan* (65 NY2d 793 [1985]), which provides for a one-year statute of limitations for certain constitutional challenges (CPLR 215 [4]), and *Saratoga*, which applies the six-year statute of CPLR 213 (1).

CPLR 215 (4) is applicable to "an action to enforce a penalty or forfeiture." The Court in *New York State Association of Plumbing-Heating Contractors, Inc. v Egan, supra*, found that, in an action to annul construction contracts awarded by the State in the absence of competitive bidding, the plaintiffs were entitled to the benefit of a one-year statute of limitations, rather than the four months afforded to petitioners in an Article

9

78 proceeding.

CPLR 213 (1), on the other hand, provides for a six-year statute of limitations for "an action for which no limitation is specifically prescribed by law." The Court in *Saratoga* found that a plaintiff who seeks "a declaration as to the unconstitutionality of [a statute] and an injunction against the use of state funds to implement it" is ruled by CPLR 213 (1). *Id.* at 815. This action comports more with the situation found in *Saratoga*, and is therefore timely.

The Conservancy claims that, regardless of whether the statute of limitations is six years, Dalva is barred from pursuing this action by the doctrine of laches, as Chapter 482 was on the books for over a year before the present action was commenced. The Conservancy claims that it has been considerably prejudiced, because it has already expended significant sums in anticipation of the commencement of the project.

The Court of Appeals in *Saratoga* defined laches as "an equitable bar, based on a lengthy neglect or omission to assert a right and the resulting prejudice to an adverse party." *Id.* at 816; *see also In re Linker*, 23 AD3d 186 (1st Dept 2005). "The mere lapse of time, without a showing of prejudice, will not sustain a defense of laches." *Saratoga*, 100 NY2d at 816; *see also in re Linker*, *supra*. Although laches is not available in an action at law if the action is commenced within the statute of

10

limitations (see *Roth v Black Star Publishing Co., Inc.*, 302 AD2d 442 [2d Dept 2003]), it can be raised in equitable actions and declaratory judgment actions, "where the defendant shows prejudicial delay even though the limitations period was met." *Saratoga*, 100 NY2d at 816.

The Conservancy, through its project director, Kristen R. Reoch, states that "Mr. Dalva has vigorously opposed the Conservancy's project since its proposal was submitted to the State" (Aff. of Reoch, at 11), and that an action was commenced in federal court in 2001 to stop any proposed lease of the Armory. This action was dismissed. The Conservancy allows that it was also aware of a complaint, nearly identical to the present one, which was filed by Dalva in April 2005, but was, however, never served on the Conservancy, and was apparently dropped. Dalva also moved, unsuccessfully, for a preliminary injunction on July 26, 2005. A second request for a preliminary injunction was denied on December 8, 2005. The present action was filed on December 6, 2005. Under these circumstances, I find that Dalva has made his intentions known, and has acted in such a manner, as to undermine the Conservancy's argument that Dalva unnecessarily delayed in seeking to stop the project, merely because his efforts were without success. In the absence of significant delay in bringing this action in a proper format, and in light of the Conservancy's knowledge of Dalva's intentions, there has been

11

no delay sufficient to invoke a defense of laches.

**D. Municipal Home Rule**

Article IX § 2 (b) (2) of the State Constitution provides that the Legislature "[s]hall have the power to act in relation to the property, affairs or government of any local government ... by special law[2] only (a) on request of two-thirds of the total membership of its legislative body or on request of its chief executive officer concurred in by a majority of such membership ... ." This request is often called a "home rule message." See *Patrolmen's Benevolent Association of City of New York v City of New York*, 97 NY2d 378 (2001). Dalva maintains that defendants have unconstitutionally pushed through a statutory scheme without benefit of the required home rule message from the City, whose property, allegedly, is the subject of Chapter 482.

Defendants, in contrast, insist that Chapter 482 does not in any way affect the property of the City, as the premises involved in Chapter 482 is the Armory, not the underlying city-owned land, and because the 1874 Lease was, essentially, one between the City and the State, based on the nomenclature used to describe the lessees in the 1874 lease. Defendants also argue that the

---

[2] "Special law" is defined in Article IX (3) (d) (4) as "[a] law which in terms and in effect applies to one or more, but not all, counties, counties other than those wholly included within a city, cities, towns or villages." Chapter 482 is a special law under this definition, a fact which the parties do not dispute.

State's substantial concern in the project permits implementation of Chapter 482, and ensures its constitutionality, even if the enactment is concerned with property belonging to the City.

There is an "exceedingly strong presumption" of the constitutionality of statutes. *Lighthouse Shores, Inc. v Town of Islip*, 41 NY2d 7, 11 (1976); *see also Hotel Dorset Company v Trust for Cultural Resources of City of New York*, 46 NY2d 358 (1978). Further, "[c]ourts are required to exercise a large measure of restraint when considering highly intricate and imaginative schemes for public financing or for public expenditures designed to be in the public interest." *Hotel Dorset Company v Trust for Cultural Resources of City of New York*, 46 NY2d at 369.

Section 1 of Chapter 482 provides an extensive list of legislative findings and purposes convincingly justifying the public/private effort which is to culminate in the Armory project. Section 1 commences as follows:

> It is hereby found and declared that New York State's Seventh Regiment Armory, located in the City of New York, is an important historic landmark; that it has been a prominent center of cultural and civic events since its construction in 1879; that it is of great military historic value; that the continued ability to operate the seventh regiment armory for military purposes in times of civil or military emergency is vitally important to the city and state, and that the physical restoration and refurbishment of the armory is necessary and important to preserve this structure for current and future generations of New Yorkers.

Section 1 goes on to cite, as findings supporting the project,

13

that the Armory is an "important civic and cultural facility for the community," so as to be "beneficial to the "health, safety, welfare and education of the people of the city and state"; that the continuing use of the Armory to house the women's shelter is also "beneficial to the health, safety, welfare and education" of the state and city's residents; that the alleviation of the grievous physical deterioration of the building is "in the public interest," with a public/private partnership with a not-for-profit corporation as the best vehicle to achieve that end.

Section 1 also recites, as a finding, the history of the 1874 Lease, an argument advanced by the State defendants in order to cement their entitlement to the leasehold. The language of section 1 reads, in this regard, as follows:

> [i]t is also found and declared that leasehold title to the seventh regiment armory is the property of the state under an indenture of lease made on September 23, 1874 between the "mayor, aldermen and commonality of the city of New York" as lessors, and the "field officers of the seventh regiment of the national guard of the state of New York," as lessees, which field officers were later redesignated as the trustees of the seventh regiment armory building (Chapter 518 of the Laws of 1893), as amended by an indenture of lease dated April 23, 1879. The 107th corps support group, a division of the New York state national guard, is recognized by the department of the army and the courts of the state of New York as the lineal descendant of the seventh regiment, and the field officers of the 107th corps support group are recognized as the current trustees of the armory and successors in interest to the lessee under the above-cited leases, subject to the supervision of the New York state division of military and naval affairs. Pursuant to this act, the armory is under the general charge and control of the adjutant general, the commanding general and senior military

officer of the New York state national guard.

The State defendants' argument convinces me that the State is, indeed, the lessee of the Armory, and may, therefore, claim the rights of a lessee. I am not convinced, however, that this puts to rest the question of whether Chapter 482 involves the "property" of the City, so as to require, in many cases, a home rule message. In fact, case law signifies that the City has a potential property interest in the Armory, as well as in the land upon which the Armory stands.

The State defendants argue that only the land underneath the Armory belongs to the City, but that the building belongs to the State, presumably, because the State's predecessors in interest built it. This would have the effect of negating any claim that Chapter 482 effects City "property."

The Armory was built as a condition to the 1874 Lease. There is nothing in the 1874 Lease which would indicate that the Armory to be built on the City's land was to be the property of the lessees, therefore, "[p]rima facie, such a building would be a fixture, and would not be removable. The legal effect of putting it on another's land, would be to make it a part of the freehold." *Smith & Britton v Benson & Peck*, 1 Hill 176 (1841). Established law states that "[t]he title and ownership of permanent erections by one person upon the land of another, in the absence of contract rights regulating the interests of the

respective parties, generally follows and accrues to the holder of the title of the land ... ." *People v Board of Assessors of Brooklyn*, 93 NY 308, 311 (1883); *see also People v Franck*, 257 NY 69, 71 (1931)(the ordinary rule [with regard to tax assessments to property] is that "when structures are erected by persons not owners of the land, they become part of the realty, and as such the property of the landowner [internal quotation marks and citation omitted]").[3]

If one thing can be said about the Armory, it is that it was not meant, and is not, moveable. And, in any event, it sits on City property. The Armory project involves the property of the City.[4]

The requirement of a home rule message does not immediately follow, however. "A recognized exception to the home rule message requirement exists when a special law serves a substantial State concern." *Patrolmen's Benevolent Association*

---

[3] Although the 1874 Lease provides that the "<u>plot of land</u>" [*id.* at unnumbered pages 3-4, emphasis in original], will revert to the City should the terms of the lease not be met, the 1874 Lease, like any writing, must be read in its entirely, and in a manner that makes sense, which would indicate that the City did not expect to regain a piece of property without any value whatsoever; a piece of property, in fact, which is practically a philisophical abstract, in light of its encumbrance. It should also be noted that many terms in the 1874 Lease are underlined, for reasons not obvious from a reading of the document.

[4] I note that the question of whether the Armory itself has or will revert to the City by virtue of the reverter clause in the 1874 Lease is a matter between the lessee and lessor, and not one in which Dalva has shown any right to intrude.

16

of the City of New York Inc. v City of New York, 97 NY2d at 386. The enactment must have "a reasonable relationship" to the accompanying substantial State concern. *Id.* A home rule message will not be necessary, even if it "encroach[es] upon local concerns" if the "subject matter in need of legislative attention was of sufficient importance to the State, transcendent of local or parochial interests or concerns." *Wambat Realty Corp. v State of New York*, 41 NY2d 490, 494 (1977).

The present case falls squarely within the above parameters. The State's substantial interest in the Armory project is manifest in its statement of legislative intent. Chapter 482, § 1. The legislation will save an irreplaceable State landmark for future generations. It will create an important public cultural center. It will sustain the women's shelter within its walls. And it will maintain the entire facilities of the Armory for military use in times of need, as it has in the past. All of these uses will, as set forth in the statement of legislative intent, inure to the "health, safety, welfare and education of the State of New York." *Id.* There is no question that the Armory project is "in the public interest" (*id.*), and that the State has a substantial interest in its completion. I find that, in light of these considerations, no home rule message is required to institute Chapter 482, and Dalva cannot show a likelihood of success on the merits.

17

## C. Irreparable Harm and Balance of Equities

Dalva has failed to allege irreparable harm. The cost to taxpayers of a state's spending is not irreparable injury such as would support a preliminary injunction. *See Matter of Schulz v State of New York*, 217 AD2d 393 (3d Dept 1995). But, more glaring is Dalva's failure to show that the equities balance in his favor. In his papers, Dalva suggests no alternative to the State's plan which would salvage the Armory before it becomes a ruin, no plan for its viable use, and certainly no evidence of the wherewithal to accomplish either goal.[5] On the other hand, the State proposal provides for the restoration of a valuable resource and a viable plan for its use. The equities lean inexorably in the State's direction.

## IV. Conclusion

I find that Dalva has failed to show a likelihood of success on the merits, irreparable harm, or a balance of equities in his favor. Consequently, he has failed to make a case for a preliminary injunction.

Accordingly, it is

---

[5]At the public hearing previously mentioned, Dalva did say that he would like to see the Panel Room in the Armory "used as a museum and on display for the people of the City of New York." Aff. of Graber, Ex. F, at 29.

ORDERED that plaintiff David L. Dalva II's motion for a preliminary injunction is denied.

Dated: 3/3/06

ENTER:

_____
J.S.C.

HON. MARILYN SHAFER, JSC



FILED
MAR 0 3 2006