EXECUTION COPY

AGREEMENT OF LEASE

between

THE PEOPLE OF THE STATE OF NEW YORK,

Landlord,

acting through

NEW YORK STATE URBAN DEVELOPMENT CORPORATION, d/b/a
EMPIRE STATE DEVELOPMENT CORPORATION,
as agent,

and

SEVENTH REGIMENT ARMORY CONSERVANCY, INC.

Tenant,

Demised Premises

A Portion of the Seventh Regiment Armory
101-129 East 66th Street, 100-126 East 67th Street,
888-898 Lexington Avenue and 641-649 Park Avenue
New York, New York
Manhattan Block 1401, Lot 1

As of November 14, 2006

EX. O

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| ARTICLE 1 | DEFINITIONS | 2 |
| ARTICLE 2 | DEMISED PREMISES AND TERM OF LEASE | 15 |
| ARTICLE 3 | BASE RENT, ADDITIONAL CHARGES | 16 |
| ARTICLE 4 | IMPOSITIONS | 19 |
| ARTICLE 5 | LATE CHARGES | 21 |
| ARTICLE 6 | ORDER OF PREFERENCE | 22 |
| ARTICLE 7 | INSURANCE | 23 |
| ARTICLE 8 | CASUALTY; USE OF INSURANCE PROCEEDS; RESTORATION | 29 |
| ARTICLE 9 | CONDEMNATION | 32 |
| ARTICLE 10 | ASSIGNMENT, SUBLETTING, MORTGAGES, ETC. | 35 |
| ARTICLE 11 | MAJOR CONSTRUCTION WORK | 45 |
| ARTICLE 12 | REPAIRS; MAINTENANCE OF DEMISED PREMISES AND PUBLIC AREAS | 54 |
| ARTICLE 13 | CHANGES, ALTERATIONS AND ADDITIONS | 56 |
| ARTICLE 14 | REQUIREMENTS OF PUBLIC AUTHORITIES AND OF INSURANCE UNDERWRITERS AND POLICIES | 57 |
| ARTICLE 15 | EQUIPMENT | 58 |
| ARTICLE 16 | DISCHARGE OF LIENS; BONDS | 59 |
| ARTICLE 17 | REPRESENTATIONS; POSSESSION | 60 |
| ARTICLE 18 | LANDLORD NOT LIABLE FOR INJURY OR DAMAGE, ETC. | 60 |
| ARTICLE 19 | MUTUAL INDEMNIFICATION | 61 |
| ARTICLE 20 | RIGHT OF INSPECTION, ETC. | 64 |
| ARTICLE 21 | LANDLORD'S RIGHT TO PERFORM TENANT'S COVENANTS | 64 |
| ARTICLE 22 | NET LEASE; NO ABATEMENT OF BASE RENT OR ADDITIONAL CHARGES | 65 |
| ARTICLE 23 | PERMITTED USE; NO UNLAWFUL OCCUPANCY | 65 |
| ARTICLE 24 | EVENTS OF DEFAULT; CONDITIONAL LIMITATIONS, REMEDIES, ETC. | 67 |
| ARTICLE 25 | NOTICES | 74 |

                                                                                Page

ARTICLE 26    FINANCIAL AND VENDOR RESPONSIBILITY REPORTS............75
ARTICLE 27    DMNA OCCUPANCY ........................................................................77
ARTICLE 28    [INTENTIONALLY OMITTED] ..........................................................80
ARTICLE 29    STREET WIDENING ..........................................................................80
ARTICLE 30    SUBORDINATION AND NON-DISTURBANCE................................80
ARTICLE 31    EXCAVATIONS AND SHORING ......................................................81
ARTICLE 32    CERTIFICATES BY LANDLORD AND TENANT .............................82
ARTICLE 33    CONSENTS AND APPROVALS..........................................................82
ARTICLE 34    SURRENDER AT END OF TERM.......................................................83
ARTICLE 35    WAIVER OF AIR RIGHTS.................................................................84
ARTICLE 36    QUIET ENJOYMENT .........................................................................84
ARTICLE 37    INVALIDITY OF CERTAIN PROVISIONS .........................................84
ARTICLE 38    ENVIRONMENTAL PROVISIONS .....................................................85
ARTICLE 39    RECORDING OF MEMORANDUM; TRANSFER TAXES ...............89
ARTICLE 40    NO DISCRIMINATION .......................................................................90
ARTICLE 41    MISCELLANEOUS ..............................................................................91
ARTICLE 42    PUBLIC GOALS...................................................................................96

EXHIBITS

| | |
|---|---|
| LAND | A |
| ADMINISTRATION BUILDING AND DRILL HALL | B |
| DMNA RETAINED SPACE – CURRENT | C-1 |
| DMNA RETAINED SPACE – FUTURE – AND COMMON AREAS | C-2 |
| SHELTER RETAINED SPACE – CURRENT | C-3 |
| SHELTER RETAINED SPACE – FUTURE | C-4 |
| [INTENTIONALLY OMITTED] | D |
| [INTENTIONALLY OMITTED] | E |
| TITLE MATTERS | F |
| MEMORANDUM OF LEASE | G |
| NON-DISCRIMINATION AND AFFIRMATIVE ACTION CONSTRUCTION CONTRACT PROVISIONS | H |
| MAJOR CAPITAL REPAIR AND REPLACEMENT ITEMS | I |
| [INTENTIONALLY OMITTED] | J |
| PUBLIC GOALS | K |
| MAJOR CONSTRUCTION SCHEDULE | L |
| MAJOR CONSTRUCTION WORK | M |
| EXISTING PHYSICAL CONDITIONS ASSESSMENT | N-1 |
| ENVIRONMENTAL CONDITIONS DOCUMENT REVIEW | N-2 |
| PHASE II ENVIRONMENTAL SITE ASSESSMENT | N-3 |
| ADDENDUM REPORT | N-4 |
| VENDOR RESPONSIBILITY QUESTIONNAIRE | O |

APPENDICES

| | |
|---|---|
| STANDARD CLAUSES FOR NEW YORK STATE CONTRACTS | A |

AGREEMENT OF LEASE made as of the 14TH day of November, 2006 between THE PEOPLE OF THE STATE OF NEW YORK (the "State"), as landlord ("Landlord"), acting by and through its agent, New York State Urban Development Corporation d/b/a Empire State Development Corporation ("ESDC"), which agent is a corporate governmental agency of the State of New York, constituting a public benefit corporation and a political subdivision thereof, having an office at 633 Third Avenue, 36th floor, New York, New York 10017, and SEVENTH REGIMENT ARMORY CONSERVANCY, INC., a New York not-for-profit corporation, having an office at 643 Park Avenue, New York, New York 10021, as tenant ("Tenant").

## W I T N E S S E T H:

WHEREAS, The City of New York (the "City") owns in fee simple those certain parcels of land located at 101-129 East 66th Street, 100-126 East 67th Street, 888-898 Lexington Avenue and 641-649 Park Avenue, in the County of New York, State of New York and identified as Block 1401, Lot 1 on the tax map of the City of New York, as more particularly described on Exhibit A attached hereto and made a part hereof (the "Land");

WHEREAS, the City leased the Land to the Field Officers of the Seventh Regiment of the National Guard of the State of New York (the "Officers") pursuant to those certain Ground Leases dated as of September 22, 1874 and April 23, 1879 between the City, as landlord, and the Officers, as tenant (as amended, collectively, the "City Lease");

WHEREAS, under the New York Military Law the Division of Military and Naval Affairs ("DMNA") operates the armory building erected upon the Land (the "Armory"; the Land and the Armory being hereinafter collectively called the "Property") and utilizes the Armory for military use, as well as cultural, artistic and civic functions; and

WHEREAS, the Armory is one of the most important historic landmarks in New York City and contains the country's most intact Aesthetic Movement interior rooms representing the work of Louis Comfort Tiffany, Stanford White, the Herter Brothers and other important designers of the period, as well as being a prominent venue historically used for arts, cultural, social, sports and other events;

WHEREAS, the Armory is in urgent need of repair and restoration;

WHEREAS, the State, acting through ESDC on behalf of DMNA, issued a Request for Proposals ("RFP") in June, 2000 seeking a developer/operator capable of restoring, redeveloping and operating the Armory and Tenant responded with a proposal to restore, preserve and manage the Armory as a not-for-profit arts and cultural center for performing and visual arts and other similar cultural exhibitions; art and antique shows, food services; offices; and other uses incidental or ancillary thereto, in addition to maintaining military use therein ("Project"); and

WHEREAS, in September, 2001, Landlord designated Tenant as Preferred Developer of the Project in response to the RFP and Tenant's proposal for the Project;

WHEREAS, Tenant will commit private funds to initiate much-needed restoration work of the Armory and to assist Landlord with its goals of restoring and maintaining this important landmark building;

WHEREAS, in order to facilitate the Project, the Governor of the State of New York signed into law Chapter 482 of Laws of 2004, which amended Article 9 of the Military Law of the State of New York to add a new Section 180-A, and amended Section 1 of chapter 174 of the laws of 1968 constituting the New York state urban development corporation act to add a new section 39, each such new section governing the lease and operation of the Seventh Regiment Armory (the "Legislation");

WHEREAS, pursuant to the Legislation, ESDC is acting solely as an agent for the State and shall have no obligation or liability hereunder;

WHEREAS, in order to assist Landlord in achieving Landlord's goals with respect to the Armory and pursue the Public Goals set forth herein, Landlord and Tenant desire to enter into this Lease for the Property;

NOW, THEREFORE, in consideration of the mutual agreements contained in this Agreement, Landlord and Tenant agree as follows:

## ARTICLE 1

### DEFINITIONS

The terms defined in this Article 1 shall, for all purposes of this Lease and all agreements supplemental hereto, have the meanings herein specified.

"Accounting Principles" shall mean generally accepted accounting principles consistently applied (GAAP), as applicable to real estate and property management.

"Additional Charges" shall have the meaning set forth in Section 3.01(e).

"Adjusted for Inflation" shall mean adjusted by the percentage increase, if any, in the Consumer Price Index for an adjustment period commencing on June 1, 2005 and being the most current index available on the date of the particular event or for such other period that may be provided.

"Administration Building" shall mean that portion of the Building other than the Drill Hall consisting of a 5-story building and located in the westerly portion of the Building, as more particularly described on Exhibit B attached hereto and made a part hereof.

"Affiliate" shall mean any Person (hereinafter defined) which, directly or indirectly, controls, is controlled by or is under common control with any other Person. "Control" shall be deemed to mean either (i) ownership of more than fifty percent (50%) of all of the legal or equitable interests in any entity or (ii) the possession of the power, directly or indirectly, to cause the direction of management and policy of a corporation, partnership, trust or other business entity, whether through voting securities, by contract or common directors, officers or trustees or otherwise; provided that another not-for-profit entity shall not be deemed to be an Affiliate of the Seventh Regiment Armory Conservancy, Inc. unless more than fifty percent (50%) of the members of the board of directors of such entity are also officers or directors of Seventh Regiment Armory Conservancy, Inc. or any of the officers, including but not limited to the president, vice president, executive director, director, treasurer or secretary, of such other entity are officers or directors of the Seventh Regiment Armory Conservancy, Inc.

"AIA Form Agreement" shall have the meaning provided in Section 11.03(a).

"Approved Engineer" shall have the meaning provided in Section 8.03(a)(i).

"Architect" shall mean one or more architectural firms selected by Tenant to perform services with respect to the Project, and any successor(s) thereto.

"Base Rent" shall have the meaning provided in Section 3.01(a).

"Breakpoint" shall have the meaning provided in Section 3.01(b)(ii).

"Budget" shall mean the budget of hard costs for any Phase of the Major Construction Work being undertaken, prepared by Tenant and submitted to Landlord pursuant to Section 11.03(a), Section 11.04(a) or Section 11.05(a), and certified by a professional estimator or construction manager selected by Tenant and approved by the Landlord to be complete and sufficient to complete such Phase.

"Building" shall mean the building (including footings and foundations), Equipment, sidewalks, landscaping, utilities, vaults (other than vaults which are maintained by a utility company) and all other improvements and appurtenances of every kind and description now located or hereafter erected, constructed, or placed upon the Land, and any and all alterations and replacements thereof, additions thereto and substitutions therefor.

"Business Days" shall mean any day which is not a Saturday, Sunday or a day observed as a holiday by either the State of New York or the Federal government.

"Casualty" shall have the meaning set forth in Section 8.01.

"City" shall have the meaning set forth in the Recitals.

"Capital Improvement" shall have the meaning provided in Section 13.01.

"Certificate of Occupancy" shall mean, if applicable, a temporary or permanent certificate of occupancy issued by the Department of Buildings of New York City pursuant to Section 645 of the New York City Charter or other similar certificate issued by a department or agency of New York City.

"Certified Public Accountant" or "CPA" shall mean any reputable public accounting firm with recognized expertise in real estate at least one of whose principals is licensed as a certified public accountant by the New York State Department of Education.

"City" shall have the meaning provided in the Recitals to this Lease.

"Commencement Date" shall mean the date on which both (i) and (ii) have occurred: (i) all of the New York State Office of the Attorney General, Comptroller of the State of New York and DMNA shall have approved this Lease, as evidenced by the execution by such entities of this Lease, and (ii) either (x) Landlord shall have given written notice to Tenant that the Demised Premises are free and clear of any and all tenancies, occupancies, licenses or any other rights to use and occupy any portion of the Demised Premises other than pursuant to or as provided in this Lease (such non-permitted occupancies, "Non-Permitted Occupancies" and any party claiming a Non-Permitted Occupancy, a "Non-Permitted Occupant"), or (y) Tenant shall have delivered written notice to Landlord accepting possession of the Demised Premises pending Landlord's completion of its obligations under Section 2.02 hereof to remove Non-Permitted Occupancies.

"Commencement of Major Construction" shall mean the date upon which the first Phase of Major Construction Work shall commence.

"Commercial User" shall mean either (i) a Direct User that is neither a not-for-profit entity nor a governmental entity; or (ii) an Intermediary User that is neither a not-for-profit entity nor a governmental entity, but only to the extent any entity which is performing or showing works or otherwise using or benefiting from a performance or show within the Demised Premises through or pursuant to an agreement with such Intermediary User is also neither a not-for-profit entity nor a governmental entity. By way of example, but without limitation, the following types of Intermediary Users shall not be deemed Commercial Users: (x) a for-profit producer that produces a performance by a not-for-profit performing arts group, (y) a for-profit producer that sponsors a performance (regardless of the nature of the performer) primarily for the benefit of a not-for-profit entity, or (z) a not-for-profit producer that produces a performance or show by an entity which is a for-profit entity.

"Common Areas" shall mean those portions of the Administration Building which, by their location, are legally required or are otherwise necessary and appropriate for pedestrian ingress or egress by Tenant, DMNA and the Shelter and their respective agents, representatives, licensees, employees and invitees to and from the Demised Premises, the DMNA Retained Space and/or the Shelter Retained Space, as

applicable, and for any other legally required or necessary and appropriate purposes, including, without limitation, the elevator, common stairways, entrance hall, stair halls, common hallways and sidewalks. The Common Areas are more particularly depicted in Exhibit C-2.

"Common Area Operating Expenses" shall mean all costs and expenses paid or incurred by Tenant in operating, cleaning, equipping, protecting, lighting, heating, air conditioning, insuring, repairing and maintaining the Common Areas exclusively and other costs paid or incurred by Tenant reasonably related exclusively to the operation of the Common Areas. "Common Area Operating Expenses" shall include, but not be limited to, those reasonable costs incurred by Tenant in providing the following to the Common Areas: utilities; supplies; janitorial services; compensation and benefits for on-site non-management employees of Tenant to the extent they provide maintenance and repair services to the Common Areas; garbage, snow and ice removal; maintenance and repairs, including those to elevators and any utility, security or lighting system located within the Common Areas; landscaping; painting; lighting; amortization of equipment used in operation and maintenance of the Administration Building; amortization of capital expenditures which as of the date incurred were either required to enable the Common Areas to comply with laws and/or were reasonably intended and expected by Tenant to reduce the Common Area Operating Expenses of the Administration Building; maintenance and repair of sprinkler systems. Notwithstanding anything to the contrary stated in this Lease, Common Area Operating Expenses shall not include any Excluded Costs.

"Completion of Construction Date" shall mean the date upon which the Major Construction Work shall be completed.

"Condemning Authority" shall have the meaning provided in Section 9.04.

"Construction Agreements" shall mean all agreements for the construction, Restoration, Capital Improvement, rehabilitation, alteration, repair or demolition of all or any part of the Demised Premises, including, without limitation, the Major Construction Contract, performed pursuant to this Lease and all modifications thereof and supplements thereto made in accordance with Article 11.

"Construction Documents" shall have the meaning provided in Section 11.05(a).

"Construction Document Submission" shall have the meaning provided in Section 11.05(a).

"Consumer Price Index" shall mean the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the United States Department of Labor, New York, New York - Northeastern New Jersey Area, All Items (1982-1984 = 100), or any successor index thereto, appropriately adjusted.

"Contract Documents" shall have the meaning provided in Section 11.10.

Doc #:NY6:491877.32

"Contractor" shall mean any construction manager, contractor, subcontractor, laborer or materialman who shall supply goods, services, labor or materials in connection with the development, construction, management, maintenance or operation of any part of the Project.

"Default" shall mean any condition or event which constitutes or would, after notice or lapse of time, or both, constitute an Event of Default.

"Deficiency" shall have the meaning provided in Section 24.04(c).

"Demised Premises" shall mean all of Landlord's interest in and to the Property, excluding the DMNA Retained Space and the Shelter Retained Space.

"Depositary" shall mean (x) a savings bank, a savings and loan association or a commercial bank or trust company which would qualify as an Institutional Lender, designated by Tenant and reasonably approved by ESDC, or (y) the Mortgagee, during any period when the Building shall be encumbered by a Mortgage. Such depositary shall serve as Depositary pursuant to this Lease.

"Design Development Documents" shall have the meaning provided in Section 11.04.

"Design Development Submission" shall have the meaning provided in Section 11.04.

"Direct User" shall have the meaning provided in Section 10.04(a).

"Disposition Plan" shall have the meaning provided in Section 2.03.

"DMNA Retained Space" shall mean that space in the Building which is used and occupied from time to time by the DMNA, and is excluded from the Demised Premises. The current configuration of the DMNA Retained Space is depicted in Exhibit C-1. No later than the Completion of Construction Date, DMNA shall relocate into the space depicted in Exhibit C-2, and such space shall thereafter constitute the DMNA Retained Space, unless the DMNA shall at any time determine that it does not want a portion of the space depicted in Exhibit C-2, in which event such portion shall cease to comprise part of the DMNA Retained Space and shall become part of the Demised Premises.

"Drill Hall" shall mean that portion of the Demised Premises originally used as a drill hall located in the easterly portion of the Building, as more particularly described on Exhibit B.

"Due Date" shall mean, (i) with respect to any Taxes or Imposition, the last date on which such Taxes or Imposition can be paid without any fine, penalty, interest or cost being added thereto or imposed by law for the non-payment thereof and

(ii) with respect to Base Rent, the date on which such payments are required to be made under this Lease without taking into account any grace periods.

"Emergency Repairs" shall have the meaning provided in Section 12.02.

"Emergency Use" shall have the meaning provided in Section 9.04.

"Environment" shall have the meaning provided in Section 38.01.

"Environmental Complaint" shall have the meaning provided Section 38.04.

"Environmental Condition" shall have the meaning provided in Section 38.01.

"Environmental Damages" shall have the meaning provided in Section 38.01.

"Environmental Laws" shall have the meaning provided in Section 38.01.

"Equipment" shall mean all fixtures incorporated in the Demised Premises, including, without limitation, all machinery, boilers, heating and lighting equipment, pumps, tanks, motors, air conditioning compressors, pipes, conduits, fittings, ventilating and communications apparatus, elevators, escalators and garbage compactors, except to the extent any of the foregoing shall be owned by Users, concessionaires or Contractors. "Equipment" shall not include any fixture or utilities owned by any utility company.

"ESDC" shall mean the New York State Urban Development Corporation d/b/a Empire State Development Corporation or any successor thereto.

"Event of Default" shall have the meaning provided in Section 24.01.

"Excluded Costs" shall mean (i) Base Rent and Additional Charges, (ii) any capital improvement and any cost or expense that would be treated as a capital expenditure under GAAP; provided, that any such capital expenditure which as of the date incurred were either required to enable the Common Areas to comply with laws and/or were reasonably intended and expected by Tenant to reduce the Common Area Operating Expense of the Administration Building shall be amortized on a straight-line basis over the useful life of such capital item, and the amortized amount shall be included on an annual basis in Common Area Operating Expenses, (iii) depreciation and amortization (except as specifically provided above in the definition of "Common Area Operating Expenses", (iii) interest on, amortization of, and other costs incurred by Tenant in connection with any financings for purposes other than to finance expenditures on items which are includible in Common Area Operating Expenses, (iv) advertising and promotional expenditures, (v) leasing or brokerage commissions, or fees, attorneys' fees, appraisal fees or accountants' fees, (vi) legal or accounting fees in connection with tax

returns, tax reporting or accounting of Tenant; provided, however, that Tenant shall be permitted to include in Common Area Operating Expenses (x) amounts paid to outside accountants to perform any review of Tenant's books and records in connection with the preparation of a Common Area Operating Expense statement, and (y) the costs of negotiating and preparing agreements that relate directly to and facilitate the repair, maintenance, cleaning, operation and/or security of the Common Areas, (vii) any costs incurred for the purpose of effecting an assignment of this Lease or subletting of all or a portion of the Demised Premises permitted under Article 10, whether or not any such transaction is consummated, (viii) payments of any amounts to any person (including DMNA and/or the Shelter) seeking recovery for breaches of contract, negligence or other torts committed by Tenant, including any associated attorneys' fees and disbursements, (ix) costs of Tenant's charitable and political contributions, (x) damages and attorneys' fees and disbursements and any other costs in connection with any proceeding, judgment, settlement or arbitration award resulting from any liability of Tenant and fines or penalties against Tenant, (xi) Tenant's overhead and administrative costs, (xii) costs incurred by reason of any fire or other casualty, and (xiii) costs of Tenant's compliance with its obligations under Section 38.03 hereof.

"Existing Environmental Condition" shall have the meaning provided in Section 38.01.

"Expiration Date" shall mean the Scheduled Expiration Date or such earlier date upon which this Lease may be terminated as provided herein.

"Full Operation Date" shall mean the earlier of (i) the eleventh (11th) anniversary of the Commencement Date and (ii) the first date on which all of the following shall have occurred (x) the Demised Premises shall have been open for business to the general public following the Substantial Completion of all Phases of the Major Construction Work and (y) at least eighty percent (80%) of the gross leasable area of the Demised Premises, including without limitation the Drill Hall and first and second floors of the Administration Building, shall be open for business and leased to Users pursuant to their respective User Agreements, and such User Agreements shall be in effect.

"Governmental Authority (Authorities)" shall mean the United States of America, the State of New York, The City of New York and any agency, department, corporation, commission, board, bureau, instrumentality or political subdivision of any of the foregoing, now existing or hereafter created, having or exercising jurisdiction over the Demised Premises or any portion thereof including, without limitation, jurisdiction over the administration or enforcement of any Environmental Law, to the extent that such entity is acting in its capacity as a governmental authority rather than in its capacity as Landlord or a principal in Landlord.

"Gross Revenues from Commercial Operations" shall have the meaning provided in Section 3.01(b)(i).

"Imposition" or "Impositions" shall have the meaning provided in Section 4.01.

"Improvement Approvals" shall have the meaning provided in Section 13.01(a).

"Indemnitees" shall mean any Landlord Indemnitees and/or Tenant Indemnitees.

"Institutional Lender" shall mean a savings bank, a savings and loan association, a commercial bank or trust company (whether acting individually or in a fiduciary capacity), an insurance company, a real estate investment trust, a religious, educational or eleemosynary institution, a governmental agency, body or entity, an employee, benefit, pension or retirement plan or fund, a commercial credit corporation, an investment bank, a commercial bank or trust company acting as trustee for bondholders in a public or private placement of bonds, securities or other debt instrument, or as fiduciary for pension funds or tax-exempt funds, or a corporation or other entity which is owned wholly by any other Institutional Lender, or any combination of the foregoing; provided, that such entity shall (i) have an office for the conduct of business in New York City, (ii) be organized and existing under the laws of the United States or any state thereof, (iii) shall not be a Prohibited Party and (iv) except for a governmental agency, body, or entity, or a religious, educational or eleemosynary institution, shall have consolidated assets of not less than Ten Billion Dollars ($10,000,000,000). Such government agency, body or entity, or religious, educational or eleemosynary institution, shall have consolidated assets of not less than two hundred million ($200,000,000.00) dollars.

"Intermediary User" shall have the meaning provided in Section 10.04(a).

"Involuntary Rate" shall mean the Prime Rate plus four percent (4%) per annum but, in no event, in excess of the maximum applicable permissible interest rate then in effect in the State of New York.

"Land" shall mean the parcel of land described in Exhibit A and all easements and other rights pertaining thereto, whether presently existing or hereafter created.

"Landlord" shall mean The People of the State of New York, acting by and through ESDC solely as agent, subject to Section 41.13.

"Landlord-Funded Remediation Work" shall have the meaning provided in Section 38.02(b).

"Landlord Indemnitees" shall have the meaning provided in Section 19.01.

"Landlord Personalty" shall have the meaning set forth in Section 2.03.

"Landlord's Mortgage" shall have the meaning provided in Section 30.02.

"Lease" shall mean this Agreement of Lease including all Exhibits hereto and all amendments, modifications and supplements hereof.

"Lease Year" shall mean a calendar year, all or any portion of which falls within the Term. Any Lease Year only a portion of which falls within the Term shall be a partial Lease Year.

"Major Construction Schedule" shall mean the schedule for the Major Construction Work set forth on Exhibit L attached hereto and made a part hereof, prepared by Tenant and approved by Landlord (provided that Tenant may amend or modify such major Construction Schedule from time to time subject to Landlord's consent, not to be unreasonably withheld, conditioned or delayed), including milestones for the progress of construction and, if applicable, phasing of the Major Construction Work over two or more sequential Phases, and all modifications thereof and supplements thereto.

"Major Construction Work" shall mean the construction work to be performed by Tenant pursuant to this Lease for the restoration and/or renovation of the Building, and shall include without limitation the restoration, renovation and/or replacement of all items set forth in Exhibit I, and of the interiors of the Demised Premises other than those interiors on the Third and Fifth Floors of the Administration Building. Major Construction Work is set forth in more detail in Exhibit M attached hereto and made a part hereof, prepared by Tenant and approved by Landlord (provided that Tenant may amend or modify such description from time to time subject to Landlord's consent, not to be unreasonably withheld, conditioned or delayed.)

"Mortgage" shall mean any mortgage which constitutes a lien on Tenant's interest in this Lease and the leasehold estate created hereby.

"Mortgagee" shall mean the holder of any Mortgage that is (a) an Institutional Lender or (b) Tenant, but only in connection with a permitted assignment by Tenant of Tenant's interest in this Lease; provided that, at the time in question, such Person is not an Affiliate of Tenant.

"Non-Disturbance Agreement" shall have the meaning provided in Section 30.03.

"OPRHP" shall mean the New York State Office of Parks, Recreation and Historic Preservation, or any successor agency thereto which regulates the historic preservation of State-owned properties.

"Permits" shall mean all authorizations, consents, decrees, permits, waivers, privileges, approvals from and filings with all applicable Governmental Authorities necessary for the realization of the transactions contemplated herein.

"Permitted Uses" shall have the meaning provided in Section 23.01(a).

"Person" shall mean and include an individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any Federal, State, County or municipal government, bureau, department or agency thereof, and any other entity.

"Phase" shall have the meaning provided in Section 11.01.

"Primary Use" shall have the meaning provided in Section 23.01(a).

"Prime Rate" shall mean the rate announced from time to time by Citigroup, Inc. or any successor thereto at its principal office as its "base rate." If Citigroup, Inc. no longer announces a "base rate," the Prime Rate shall mean a comparable rate announced from time to time by a comparable institution selected in writing by Landlord.

"Prohibited Party" shall mean the following: (i) any person (a) that is in default or in breach, beyond any applicable grace period, of its obligations under any written agreement with ESDC, the State or the City or (b) that, directly or indirectly controls, is controlled by, or is under common control with a Person that is in default or in breach, beyond any applicable grace period, of its obligations under any written agreement with ESDC, the State or the City, unless such default or breach has been cured by such Person or waived in writing by ESDC, the State or the City, as the case may be; (ii) any person (a) that has been convicted in a criminal proceeding for a felony or any crime involving moral turpitude or that is an organized crime figure or is reputed (as determined by Landlord in its sole discretion) to have substantial business or other affiliations with an organized crime figure, or (b) that, directly or indirectly, controls, is controlled by, or is under common control with a Person (or is reputed to be an affiliate thereof) that has been convicted in a criminal proceeding for a felony or any crime involving moral turpitude or that is an organized crime figure or is reputed to have substantial business or other affiliations with an organized crime figure; (iii) any government, or any Person which is directly or indirectly controlled by a government, which is finally determined, beyond right to appeal, by the Federal Government or any agency, branch or department thereof to be in violation of (including, but not limited to, any participant in an international boycott in violation of) the Export Administration Act of 1979, as amended, or any successor statute, or the regulations issued pursuant thereto, or any government which is, or any Person which, directly or indirectly, is controlled (rather than only regulated) by a government which is, subject to the regulations or controls thereof (which control shall not be deemed to exist in the absence of a determination to that effect by a Federal court or by the Federal Government or any agency, branch or department thereof); (iv) any government, or any Person which, directly or indirectly, is controlled (rather than only regulated) by a government, the effects of the activities of which are regulated or controlled pursuant to regulations of the United States Treasury Department or executive orders of the President of the United States of America issued pursuant to the Trading with the Enemy Act of 1917, as amended; and (v) any Person acting or reputed to be acting, directly or indirectly, on

12

behalf of terrorists or terrorist organizations, including those persons or entities that are included on any relevant lists maintained by the United Nations, North Atlantic Treaty Organization, Organization for Economic Cooperation and Development, Financial Action Task Force, U.S. Office of Foreign Assets Control, U.S. Securities and Exchange Commission, U.S. Federal Bureau of Investigation, U.S. Central Intelligence Agency, and the U.S. Internal Revenue Service, all as may be amended from time to time.

"Project" shall have the meaning provided in the Recitals.

"Property" shall have the meaning provided in the Recitals.

"Public Goals" shall mean the goals described in Section 42.01 and set forth in Exhibit K.

"Repairs" shall have the meaning provided in Section 12.01.

"Requirements" shall have the meaning provided in Section 14.01.

"Restoration" shall have the meaning provided in Section 8.02.

"Restoration Funds" shall have the meaning provided in Section 8.03(a).

"Restore" shall have the meaning provided in Section 8.02.

"Scheduled Expiration Date" shall mean the day preceding the 99th anniversary of the Commencement Date.

"Schematic Design Documents" shall have the meaning provided in Section 11.03(a).

"Schematic Design Submission" shall have the meaning provided in Section 11.03(a).

"Shelter" shall mean the women's shelter currently operated under license from the City and currently located on the portions of the third and fifth floors of the Administration Building.

"Shelter Retained Space" shall mean that space in the Building which is used and occupied by the Shelter pursuant to that certain License Agreement to be executed immediately prior to the date hereof by and among Tenant, the State and the City, acting by and through the Department of Homeless Services, and is excluded from the Demised Premises. The current configuration of the Shelter Retained Space is depicted in Exhibit C-3. No later than the Completion of Construction Date, the Shelter shall relocate into the space depicted in Exhibit C-4, and such space shall thereafter constitute the Shelter Retained Space, provided that any Shelter Retained Space which is permanently vacated (other than a vacation due to temporary repairs, casualty or a taking by any lawful power or authority for an Emergency Use) shall, immediately upon such vacating in broom-clean condition, with all personal property removed and with no

Doc #:NY6:491877.32

13

remaining subtenancies or occupancies, automatically and without further writing be deemed added to the Demised Premises upon all of the terms and conditions of this Lease.

"Significant Sub-occupant" shall mean any subtenant, Tenant's licensee, Tenant's assignee or User, including but not limited to Direct Users or Intermediary Users, with which Tenant, pursuant to Article 10, enters into a sublease, license, assignment of Lease or User Agreement for a term of more than nineteen (19) consecutive or non-consecutive weeks in any year.

"Subject to Appropriation" shall mean, with respect to Landlord's obligations hereunder, subject to (i) the enactment into law of an appropriation for the applicable budget year of an appropriation sufficient to cover such obligations, and (ii) such appropriated funds actually being made available to Landlord.

"Substantial Completion of the Major Construction Work" shall be deemed to have occurred upon (i) completion of all Phases of the Major Construction Work, other than minor details of construction and mechanical adjustment which do not materially interfere with the use and operation of the Demised Premises for the Permitted Uses, and (ii) a temporary or permanent certificate of occupancy has been issued for the use and occupancy of the first and second floors of the Administration Building and the Drill Hall.

"Substantial Completion of a Phase of the Major Construction Work" shall be deemed to have occurred upon (i) completion of a particular Phase of the Major Construction Work, other than minor details of construction and mechanical adjustment which do not materially interfere with the use and operation of the Demised Premises for the Permitted Uses, and (ii) all construction sign-offs, use permits, occupancy permits, including, if applicable, an amended temporary or permanent certificate of occupancy, have been issued for the use and occupancy of the applicable Phase and the portion of the Demised Premises affected thereby.

"Substantial Portion of the Demised Premises" shall have the meaning provided in Section 9.01(b).

"Superior Lease" shall have the meaning provided in Section 30.02, and shall mean and include the City Lease.

"Superior Lessor" shall have the meaning provided in Section 30.02, and shall mean and include the City, as lessor under the City Lease.

"Taxes" shall have the meaning provided in Section 3.05(a).

"Tenant" shall mean Seventh Regiment Armory Conservancy, Inc. or any successor to its interest permitted in accordance with the terms of this Lease.

"Tenant Indemnitees" shall have the meaning provided in Section 19.02.

Doc #:NY6:491877.32

"Tenant's Insurance" shall have the meaning provided in Section 7.01(a).

"Tenant's Net Income or Net Loss" means the net excess (or deficiency) of revenues and public support over expenses for a Fiscal Year.

"Tenant's Property Insurance" shall have the meaning provided in Section 7.01(a)(vi).

"Term" shall mean the term of this Lease as set forth in Article 2.

"Threatened Release" shall have the meaning provided in Section 38.01.

"Title Matters" shall mean those matters affecting title to the Land and/or the Demised Premises set forth in Exhibit F hereto.

"Unavoidable Delays" shall mean delays incurred due to (a) strikes, lockouts and work stoppages due to labor jurisdictional disputes, acts of God, inability to obtain labor or materials due to governmental restrictions, military action, enemy action, civil commotion, fire, casualty or other similar causes beyond the control of Landlord or Tenant, as the case may be, but excluding any strikes or lockouts that are specific to Tenant or the Building, (b) acts of any Non-Permitted Occupants, (c) the occupancy of all or a portion of the Demised Premises for Emergency Use, (d) impacts on construction logistics or scheduling due to the occupancy of the Shelter Retained Space, including the residential usage of such space, pursuant to the Shelter Agreement (such as a delay in construction caused by the inability to shut off utilities servicing the Shelter Space), provided that Tenant may not claim Unavoidable Delay on account of this clause (d) for more than 60 days in the aggregate during the Term), (e) the failure of any utility company to provide and maintain utilities, services, water and sewer lines and power transmission lines which are required for the rehabilitation or occupancy of the Building or for other obligations of Landlord or Tenant, as the case may be, (f) any unforeseen condition which shall prevent or require a redesign or change in the construction of the Major Construction Work, (g) the failure of any Governmental Authority, except Landlord acting in its capacity as Landlord under this Lease, or any agent, employee, or representative thereof, to grant any approval or to furnish any information which is required to commence the Major Construction Work prior to the dates contemplated herein or (h) the failure of Landlord to comply timely with its obligations under this Lease with respect to Major Construction Work; provided that in all instances, Tenant shall promptly notify Landlord of the occurrence of any Unavoidable Delay and shall use commercially reasonable efforts to mitigate the effects of Unavoidable Delays on the progress of the Project.

"User" shall mean any permitted user under a User Agreement.

"User Agreement" shall mean any sublease, license agreement, or other written agreement entered into by Tenant in accordance with the provisions of Section 10.04 allowing any permitted party other than Tenant to use or occupy all or any portion of the Demised Premises for a Permitted Use.

"User Pledge" shall mean a pledge by User to Tenant to contribute towards Major Construction Work or otherwise commit to invest in improvements to the Demised Premises an amount of not less than $1,000,000 (Adjusted for Inflation on each twenty-year anniversary of the Commencement Date); provided that (i) such contributions or investments are in cash or cash equivalents and not "in-kind", (ii) such contributions are used for Major Construction Work, reimbursement of Landlord for Capital Replacements, Capital Improvements or operations of the Demised Premises, and (iii) such pledge shall include a requirement to be funded, and shall in fact be funded, within five (5) years from the date of such pledge.

"Work Contract" shall have the meaning set forth in Section 7.01(a)(viii)(D)1).

"Zoning Resolution" shall mean the Zoning Resolution of the City of New York, or any successor statute or regulation in effect at the time in question.

## ARTICLE 2

## DEMISED PREMISES AND TERM OF LEASE

Section 2.01    Demise. Landlord hereby demises and leases to Tenant, and Tenant hereby hires and takes from Landlord the Demised Premises, subject to the Title Matters, TO HAVE AND TO HOLD unto Tenant, its permitted successors and assigns, for a term (the "Term") which shall commence on the Commencement Date and shall expire on the Expiration Date.

Section 2.02    Non-Permitted Occupancies. Landlord shall undertake all actions reasonably necessary prior to the Commencement Date to remove from the Demised Premises all actual or claimed occupancies of or within the Demised Premises other than as created pursuant to this Lease, and shall deliver the Demised Premises to Tenant on the Commencement Date free and clear of any and all tenancies, occupancies, licenses, or any other rights to use and occupy any portion of the Demised Premises other than as created pursuant to this Lease.

Section 2.03    Landlord Personalty. Tenant shall work diligently with DMNA to develop within six (6) months of the Commencement Date a master plan (the "Disposition Plan") for the method and timing of the disposition of all personal property of Landlord remaining on the Demised Premises as of the Commencement Date (such personal property, other than any personal property which is incorporated in, attached or affixed to walls, ceilings, floors or other parts of the Demised Premises, the "Landlord Personalty"). The Disposition Plan shall designate those items of Landlord Personalty to remain on the Demised Premises and those items to be removed from the Demised Premises, and shall comply with applicable Requirements. DMNA shall implement the Disposition Plan in a manner so as not unreasonably to interfere with Tenant's use and enjoyment of the Demised Premises, and Tenant shall reasonably cooperate with DMNA in the implementation of the Disposition Plan. Landlord shall promptly repair or restore any damage to the Demised Premises caused by the

implementation of the Disposition Plan. Tenant shall utilize reasonable efforts to safeguard any Landlord Personalty remaining on the Demised Premises following the implementation of the Disposition Plan. Except for damages arising from Tenant's willful acts or negligence, Tenant shall have no liability arising from the loss, damage or destruction of any such Landlord Personalty. At the end of the Term, Tenant shall leave within the Demised Premises any Landlord Personalty then located on the Demised Premises.

## ARTICLE 3

### BASE RENT, ADDITIONAL CHARGES

Section 3.01    Base Rent and Additional Charges.

(a)    Tenant shall pay to Landlord, in currency which, at the time of payment, is legal tender for public and private debts in the United States of America, without notice or demand, "Base Rent", which shall be payable on the seventh (7th) anniversary of the Full Operation Date and on each anniversary thereafter, and which shall be an amount equal to 20% of Gross Revenues from Commercial Operations from the Armory, its renovation or site in excess of Breakpoint for the immediately preceding Lease Year.

(b)    Definitions. As used herein, the following terms have the following definitions:

(i)    "Gross Revenues from Commercial Operations" shall mean all revenues of whatever kind or nature, including without limitation base rent and percentage rent, received by Tenant from Commercial Users under User Agreements in connection with their use of the Demised Premises or any portion thereof. Notwithstanding the foregoing, Gross Revenues from Commercial Operations shall exclude (i) security deposits received from Commercial Users (except to the extent applied toward the payment of rent or other charges due under related User Agreements), and (ii) pass-through charges and reimbursements, including reasonable and customary overhead, mark-up and/or sales or excise taxes thereon, received by Tenant on account of operating expenses charged to a Commercial User, or for provision of goods or services by Tenant or its agents to a Commercial User in connection with its use of the Demised Premises, whether such goods or services are made available directly to Commercial Users and/or directly by Tenant to patrons, invitees or members of the general public in connection with the use of the Demised Premises by a Commercial User (including, by way of example but without limitation, security, labor, utilities and other services provided to a Commercial User by Tenant or by a service provider with whom Tenant has contracted, or catering or concessions provided to patrons, invitees or members of the general public in connection with the use of the Demised Premises by a Commercial User by Tenant or by a service provider with whom Tenant or the Commercial User has contracted).

(ii)    "Breakpoint" shall mean $9,000,000.00, as Adjusted for Inflation through the end of the Lease Year with respect to which the calculation of Base Rent is made.

(c)    Tenant shall deliver to Landlord within one hundred fifty (150) days after the close of each Lease Year, a statement of Gross Revenues from Commercial Operations for the preceding Lease Year which shall conform to and be in accordance with Accounting Principles and this Section 3.01. The annual statement shall be accompanied by the signed certificate of an independent Certified Public Accountant stating specifically that (i) they have examined the report of Gross Revenues from Commercial Operations for the preceding Lease Year, (ii) their examination included such tests of Tenant's books and records as they considered necessary or appropriate under the circumstances, (iii) such report presents fairly the Gross Revenues from Commercial Operations of the preceding Lease Year, and (iv) the said Gross Revenues from Commercial Operations conform with and are computed in compliance with the definition of Gross Revenues from Commercial Operations contained in this Section 3.01. Tenant shall pay the Base Rent due simultaneously with the submission to Landlord of its annual statement of Gross Revenues from Commercial Operations. At any time or from time to time upon not less than ten (10) days notice to Tenant, Landlord or its agents or accountants shall have the right to examine such books and records, including without limitation all records required by this Section 3.01, as may be necessary to certify the amount of Tenant's Gross Revenues from Commercial Operations for such Lease Year and Tenant shall make all such books and records available for examination and copying in the Borough of Manhattan.

(d)    For the purpose of permitting verification by Landlord of any amounts due as Base Rent, Tenant will preserve for at least six (6) years, and during the Term shall keep at the Demised Premises, a general ledger, copies of User Agreements with for-profit, commercial Users, records and other supporting documentation, together with original or duplicate books and records, which shall disclose all information required to determine Tenant's Gross Revenues from Commercial Operations and which shall conform to and be in accordance with Accounting Principles. At any time or from time to time after reasonable advance notice to Tenant, Landlord or its agents and accountants shall have the right during business hours to make any examination or audit of such books and records which Landlord may desire. If such audit shall disclose a liability in any Lease Year for Base Rent in excess of the Base Rent theretofore paid by Tenant for such period, Tenant shall promptly pay such liability. Should any such liability for Base Rent equal or exceed five percent (5%) of Base Rent previously paid for such Lease Year, Tenant shall promptly pay the cost of audit and interest at the Involuntary Rate on all additional Base Rent then payable, from the date such additional Base Rent was due and payable.

(e)    "Additional Charges" shall consist of all other sums of money as shall become due and payable from Tenant to Landlord hereunder, and shall be paid on or before the respective due dates of such sums.

Section 3.02    Proration of Rent Payments. Rent of whatever kind that is due for any partial month, year or other applicable period shall be appropriately prorated.

Section 3.03    Net Lease. It is the purpose and intention of Landlord and Tenant, and the parties hereto agree that, except as expressly set forth herein, Base Rent and Additional Charges shall be net to Landlord without abatement, deduction, counterclaim, set-off or offset.

Section 3.04    Rental. All of the amounts payable by Tenant pursuant to this Lease, including, without limitation, Base Rent and Additional Charges, Impositions and all other sums, costs, expenses or deposits which Tenant in any of the provisions of this Lease assumes or agrees to pay and/or deposit (such amounts, "Rental") shall constitute rent under this Lease and, in the event of Tenant's failure to pay Rental after the expiration of any applicable notice and cure periods, Landlord shall have all of the rights and remedies provided for herein or under applicable law in the case of non-payment of rent. All Rental shall be payable at Landlord's address first above set forth or as Landlord may from time to time direct.

Section 3.05    Taxes.

(a)    For the purposes of this Lease, the following terms shall have the following meanings:

"Tax Year" shall mean each tax fiscal year of New York City (such fiscal year being July 1 through June 30 on the date of this Lease).

"Taxes" shall mean the real property taxes assessed and levied against the Demised Premises or any part thereof pursuant to the provisions of Chapter 58 of the Charter of the City of New York and Chapter 17, Title E, of the Administrative Code of the City of New York, as the same may now or hereafter be amended, or any statute or ordinance in addition thereto or in lieu thereof in whole or in part and which would otherwise be payable if the Demised Premises or any part thereof or the owner thereof were not exempt therefrom; subject, in any event, to any abatement of, or deferral or exemption from, Taxes that would be available to the Demised Premises if the Demised Premises were owned by an entity that is not exempt from the payment of Taxes.

(b)    Landlord represents and warrants that as of the date hereof the Demised Premises are fully exempt from Taxes arising from Landlord's ownership and/or long-term lease thereof.

Section 3.06    Method for Payment of Rent. All payments of Base Rent and Additional Charges shall be paid to Landlord in lawful money of the United States by good and sufficient check (subject to collection) drawn on a bank organized and existing under the laws of the United States or any state thereof with a banking office in New York City, and delivered to Landlord at its office, or such other place as Landlord shall designate by notice to Tenant.

Section 3.07    Proration for Partial Month. If the Commencement Date
occurs on a day other than the first day of a calendar year or the Expiration Date occurs
on a day other than the last day of a calendar year, Base Rent and Additional Charges
for such month shall be pro-rated on a per diem basis, computed on the basis of a 365-
day year.

Section 3.08    Partial Payment. No payment by Tenant or receipt or
acceptance by Landlord of a lesser amount than the correct Base Rent and Additional
Charges shall be deemed to be other than a payment on account, nor shall any
endorsement or statement on any check or any letter accompanying any check or
payment be deemed an accord and satisfaction, and Landlord may accept such check or
payment without prejudice to Landlord's right to recover the balance or pursue any
other remedy provided in this Lease or at law or in equity.

Section 3.09    Rent Restrictions. If any Base Rent and Additional
Charges payable under the terms and provisions of this Lease shall be or become
uncollectible, reduced or required to be refunded because of any act or law enacted by a
Governmental Authority, Tenant shall enter into such agreement(s) and take such other
steps and Additional Charges as Landlord may reasonably request and as may be
legally permissible to permit Landlord to collect the maximum amounts which from
time to time during the continuance of such legal rent restriction may be legally
permissible (provided that such amounts are not in excess of the amounts reserved
therefor under this Lease). Upon the termination of such legal rent restriction, (i) Base
Rent and Additional Charges shall become and thereafter be payable in accordance
with the amounts reserved herein for the periods following such termination and (ii)
Tenant shall pay Landlord, to the maximum extent legally permissible, an amount equal
to the Base Rent and Additional Charges that would have been paid pursuant to this
Lease but for such legal rent restriction less the Base Rent and Additional Charges
actually paid by Tenant during the period such legal rent restriction was in effect.

## ARTICLE 4

## IMPOSITIONS

Section 4.01    Impositions. Except as otherwise expressly provided in
this Lease, or unless Tenant shall be exempt therefrom either on account of Tenant's
not-for-profit status or Landlord's exempt status, Tenant shall pay, as hereinafter
provided, all of the following items (collectively, "Impositions") imposed by any
Governmental Authority: (a) real property assessments and business improvement
district charges (not including Taxes), (b) occupancy and rent taxes, (c) water, water
meter and sewer rents, rates and charges, (d) license and permit fees, (e) other
municipal liens, charges and assessments, (f) fines, penalties and other similar or like
governmental charges applicable to the foregoing and any interest or costs with respect
thereto and (g) except for Taxes, any and all other governmental levies, fees, rents,
assessments or taxes and charges, general and special, ordinary and extraordinary,
foreseen and unforeseen, of any kind and nature whatsoever, and any interest or costs
with respect thereto, which at any time during the Term are (A) assessed, levied,

confirmed, imposed upon or in respect of the Demised Premises or the use and occupancy thereof by Tenant and (B) encumbrances or liens on (i) the Demised Premises or any appurtenances of the Demised Premises, (ii) any personal property of Tenant or (iii) the Base Rent and Additional Charges (or any portion thereof) payable by Tenant hereunder. Impositions shall not, however, include any property tax, sales tax, income tax, water or sewer charges, other municipal service charges, or other tax or municipal charge from which Landlord is exempt from the payment thereof, it being agreed that Tenant shall, to the extent legally possible, enjoy the benefit of all of the exemptions to which Landlord is entitled in respect of the Demised Premises by virtue of Landlord's ownership or lease thereof. Each such Imposition, or installment thereof, during the Term shall be paid on or prior to the Due Date therefor. However, if, by law, any Imposition may at the option of the taxpayer be paid in installments (whether or not interest shall accrue on the unpaid balance of such Imposition), Tenant, after notice to Landlord, may exercise the option to pay the same in such installments and shall be responsible for the payment of such installments only, together with applicable interest, if any, provided that all such installment payments together with applicable interest, if any, relating to periods prior to the Expiration Date shall be made prior to the Expiration Date.

Section 4.02     Receipts. Tenant, from time to time upon request of Landlord, shall promptly furnish to Landlord official receipts of the appropriate imposing authority, or other evidence reasonably satisfactory to Landlord, evidencing the payment thereof.

Section 4.03     Proration for Beginning and End of Term. Any Imposition relating to a period a part of which is included within the Term and a part of which is included in a period of time before the Commencement Date or after the Expiration Date shall be apportioned between Landlord and Tenant as of the Commencement Date or Expiration Date so that Tenant shall pay that portion of such Imposition which that part of such fiscal period included in the period of time after the Commencement Date and before the Expiration Date, bears to such fiscal period, and Landlord shall pay the remainder thereof.

Section 4.04     Sales Tax Exemption. To the extent permitted under applicable law, Tenant and its Contractors and agents shall be entitled to purchase all labor, materials and tangible personal property incorporated or installed in the Demised Premises as part of the Major Construction Work and any Capital Improvements utilizing Landlord's sales and use tax exemption therefor. At Tenant's request, Landlord shall issue to Tenant a letter, which may be utilized by Tenant and its Contractors and agents in the purchase of such labor, materials and personal property, evidencing such exemption.

Section 4.05     Contest. (a)     Tenant shall have the right to contest the amount or validity, in whole or in part, of any Imposition by appropriate proceedings diligently conducted in good faith, in which event, notwithstanding the provisions of Section 4.01, payment of such Imposition shall be postponed if, and only as long as:

Doc #:NY6:491877.32

(i)      neither Landlord nor Tenant would by reason thereof be subject to any civil or criminal liability;

(ii)     neither the Demised Premises nor any part thereof, or interest therein or any income therefrom or any other assets of or funds appropriated to Landlord would, by reason of such postponement or deferment, be in imminent danger of being forfeited or lost or subject to any lien, encumbrance or charge; and

(iii)    if the contested amount exceeds $250,000, Adjusted for Inflation, Tenant shall have delivered to Landlord a cash deposit or a bond of a surety company satisfactory to Landlord, in form and substance reasonably satisfactory to Landlord, in an amount equal to the sum of (i) the contested amount and (ii) the criminal or civil fines or penalties that may be reasonably expected to accrue by reason of such non-compliance.

(b)      Upon the termination of such proceedings, it shall be the obligation of Tenant to pay the amount of such Imposition or part thereof as finally determined in such proceedings, the payment of which may have been deferred during the prosecution of such proceedings.

Section 4.06    Reduction in Valuation. Tenant shall have the right to seek a reduction in the valuation of the Demised Premises assessed for Taxes and to prosecute any action or proceeding in connection therewith, provided that no such action or proceeding shall postpone Tenant's obligation, if any, to pay any Taxes or Imposition except in accordance with the provisions of Section 4.05.

Section 4.07    Landlord Participation in Proceeding. Landlord shall not be required to join in any proceedings referred to in Section 4.05 or Section 4.06 unless (i) the provisions of any Requirements at the time in effect shall require that such proceedings be brought by or in the name of Landlord and (ii) Landlord determines, based on the requirements of Section 4.05, that such proceedings are reasonable and have been brought in a timely manner, in which event, Landlord shall join and cooperate in such proceedings or permit the same to be brought in its name. Landlord shall reasonably cooperate with Tenant in such proceeding provided that Landlord shall not be obligated to incur any third-party expense, other than a de minimis amount, with respect to such proceeding.

## ARTICLE 5

## LATE CHARGES

In the event that any payment of Base Rent shall remain unpaid for sixty (60) days beyond the Due Date thereof or any payment of Additional Charges shall remain unpaid for ninety (90) days beyond the Due Date thereof or if no such date is set forth in this Lease for such Additional Charges, then such Due Date for purposes of this Article 5 shall be deemed to be thirty (30) days after the date upon which such additional charges accrue, such late payment shall bear interest at the Involuntary Rate for the

period from the Due Date to the date of actual payment thereof to Landlord, together with such interest. Such interest shall constitute Additional Charges hereunder and shall be due and payable by Tenant on demand. No failure by Landlord to insist upon the strict performance by Tenant of its obligations to pay late charges shall constitute a waiver by Landlord of its right to enforce the provisions of this Article 5 in any instance thereafter occurring.

## ARTICLE 6

### ORDER OF PREFERENCE

Section 6.01    The terms and conditions set forth in the following documents are hereby incorporated into the Lease as if set forth herein at length.

(a)    "Appendix A Standard Clauses for New York State Contracts" attached hereto as Appendix A.

(b)    The provisions contained in Exhibits A to O other than the Appendix A to this Lease.

(c)    Request for Proposals issued by ESDC as agent for DMNA in June of 2000.

(d)    Response by The Seventh Regiment Armory Conservancy, Inc. to the ESDC RFP of June 2000.

Section 6.02    Conflict of Clauses, Order of Preference. In the event of a conflict between the terms of this Lease , including any and all attachments, exhibits and appendices thereof, such conflict shall be resolved in the following order of precedence:

(a)    Appendix A, Standard Clauses for New York State Contracts.

(b)    The provisions contained in the body of this Lease.

(c)    The provisions contained in the Exhibits to this Lease other than the Appendix A to this Lease.

(d)    Request for Proposals issued by ESDC as Agent for DMNA in June of 2000.

(e)    Response by The Seventh Regiment Armory Conservancy, Inc. to ESDC RFP of June 2000.

## ARTICLE 7

### INSURANCE

Section 7.01    Required Coverages of Tenant.

(a)    Tenant, throughout the Term, or as otherwise required by this Lease, shall obtain and maintain in full force and effect, the following insurance (collectively, "Tenant's Insurance") with limits not less than those set forth below and as required by the terms and provisions of this Lease, or as required by law, whichever is greater (provided that limits may be provided through a combination of primary and umbrella/excess policies):

(i)    Commercial General Liability Insurance with a limit of not less than $25,000,000 per occurrence. Such insurance shall be written on the Insurance Service Office's (ISO) occurrence form CG 00 01, or a substitute form providing equivalent coverages, and shall cover liability arising from the operation of the Demised Premises, independent contractors, products-completed operations and broad form property damage (including completed operations, personal and advertising injury, cross liability coverage, and liability assumed in a contract). The limit for Fire Damage Legal shall not be less than $100,000. If such insurance contains an aggregate limit, it shall apply separately to the Demised Premises.

(ii)    Workers Compensation, Employers Liability, and Disability Benefits as required by applicable law. If employees will be working on, near or over navigable waters, US Longshore and Harbor Workers Compensation Act endorsement shall also be included.

(iii)    Comprehensive Business Automobile Liability Insurance with a limit of not less than $5,000,000 per accident. Such insurance shall cover liability arising out of any automobile including owned, leased, hired and non-owned automobiles.

(iv)    If Tenant or any User or any other Person acting by, through or under Tenant uses, stores, handles, processes or disposes of Contaminants, then Tenant shall maintain in full force and effect through the Term, Environmental Impairment Liability insurance with limits of not less than $3,000,000, providing coverage for bodily injury, property damage or damage of actual, alleged or threatened emission, discharge, dispersal, seepage, release or escape of pollutants, including any loss, cost or expense incurred as a result of any cleanup of pollutants or in the investigation, settlement or defense of any claim, suit, or proceedings against the State, arising from Tenant's use, storage, handling, processing or disposal of Contaminants.

(v)    If Tenant or any User or any other Person acting by, through or under Tenant sells, distributes, serves or furnishes alcoholic beverages, then Tenant shall maintain in full force and effect through the Term, Liquor Liability Insurance with limits of not less than $5,000,000.

(vi)    Commercial Property Insurance covering loss or damage by fire and other hazards to the Demised Premises commonly included in insurance policies with All Risk coverage, including, if reasonably available, coverage for loss or damage due to water, flood, subsidence, earthquake, collapse, vandalism and malicious mischief, with limits in an amount sufficient to permit Tenant to fulfil its obligations to Restore the Demised Premises pursuant to Section 8.02(a), including, an "agreed amount" endorsement and any increase in value from increased costs of construction, demolition and contingent liability from operation of building laws; and including broad form boiler and machinery insurance (including business interruption coverage) in an amount not less than $10,000,000, Adjusted for Inflation, per accident on a combined basis, covering direct property loss and loss of income and loss of rents and covering all steam, mechanical and electrical equipment, including, without limitation, all boilers and other pressure vessels or systems, whether fired or unfired, air conditioning equipment, elevators, piping and wirings ("Tenant's Property Insurance");

(vii)    Insurance covering loss or damage to Tenant's personal property, furniture and equipment stored in and/or used in the operations of the Demised Premises, in an amount equal to the full insurable value thereof;

(viii)    In addition to the foregoing, during the performance of any Major Construction Work or Capital Improvements, (x) Tenant shall carry builder's risk insurance, on a completed value form, in the amount of the total construction cost of the Major Construction Work or Capital Improvements, and (y) Tenant shall cause all Contractors to obtain and maintain in full force and effect the following insurance with limits not less than those set forth below (provided that limits may be provided through a combination of primary and umbrella/excess policies):

(A)    Commercial General Liability Insurance with a limit of not less than (x) $25,000,000 per occurrence for any Contractor that serves as the construction manager or general contractor for such Major Construction Work or Capital Improvements, and (y) $3,000,000 per occurrence for any other Contractor, in each case with coverage as designated in clause (i) above. General Liability Additional Insured Endorsement shall be on Insurance Service Office's (ISO) form number CG 20 10 11 85.

(B)    Business Automobile Liability Insurance with a limit of not less than $5,000,000 per accident with coverage as designated in clause (ii) above.

(C)    If such Major Construction Work or Capital Improvement involves abatement, removal, repair, replacement, enclosure, encapsulation and/or disposal of any petroleum, petroleum product or other Contaminant, Contractor shall maintain in full force and effect throughout the performance of such Major Construction Work or Capital Improvement hereof, pollution legal liability insurance with limits of not less than $5,000,000 providing coverage for bodily injury and property

damage, including loss of use of damaged property or of property that has not been physically injured. Such policy shall provide coverage for actual, alleged or threatened emission, discharge, dispersal, seepage, release or escape of Contaminants, including any loss, cost or expense incurred as a result of any cleanup of pollutants or in the investigation, settlement or defense of any claim, suit, or proceedings against Landlord arising from Contractor's work.

        1)      All policies must be written on an occurrence basis . If occurrence coverage cannot be obtained and after Landlord's prior written approval, which such approval shall not be unreasonably withheld, coverage is written on a claims-made policy, any applicable retroactive date shall precede the effective date of the contract pursuant to which such Contractor is engaged by Tenant (a "Work Contract"); and continuous coverage will be maintained, or an extended discovery period exercised, for a period of not less than ten (10) years from the time work under such Work Contract is completed.

        2)      If such Major Construction Work or Capital Improvement includes disposal of materials from the job site, Contractor must furnish to Landlord, evidence of pollution legal liability insurance with a limit of not less than $2,000,000 maintained by the disposal site operator for losses arising from the disposal site accepting waste resulting from such Major Construction Work or Capital Improvement.

        3)      If automobiles are to be used for transporting Contaminants, Contractor shall provide pollution liability broadened coverage for covered automobiles (endorsement CA 99 48) as well as proof of MCS 90.

        (D)      If providing professional services, Contractor shall maintain, or if subcontracting professional services, subcontractor shall maintain, errors and omissions liability insurance with a limit of not less than $2,000,000 per loss.

        1)      Such insurance shall apply to professional errors, acts, or omissions arising out of the scope of services covered by the applicable Work Contract and may not exclude pollution or asbestos related claims, testing, monitoring, measuring, or laboratory analyses.

        2)      If coverage is written on a claims-made policy, any applicable retroactive date shall precede the effective date of the applicable Work Contract; and continuous coverage will be maintained, or an extended discovery period

26

exercised, for a period of not less than two (2) years from the time
work under is completed.

(E)    Prior to the commencement of construction,
Tenant shall cause any Contractor to file with Landlord policies of
insurance evidencing compliance with all requirements contained in this
Section 7.1. Such policies shall be of form and substance reasonably
acceptable to Landlord. Acceptance and/or approval of such policies by
Landlord does not and shall not be construed to relieve Contractor or
Tenant of any obligations, responsibilities or liabilities under this Lease.

(F)    All Contractor's insurance (i) shall be
obtained at the sole cost and expense of Contractor; (ii) shall be
maintained with insurance carriers licensed to do business in New York
State, and reasonably acceptable to Landlord; (iii) shall be primary and
non-contributing to any insurance or self-insurance maintained by
Landlord; (iv) shall be endorsed to provide written notice be given to
Landlord, at least thirty (30) days prior to the cancellation, non-renewal, or
material alteration of such policies, subject to insurance company
approval, and (v) except with respect to workers compensation, employers
liability and disability benefits and professional liability, shall name the
State, its officers, agents, and employees as additional insureds thereunder.
The general liability additional insured endorsement shall be on then-
current insurance service office's (ISO) form for such coverage.

(G)    Contractor shall be solely responsible for the
payment of all deductibles and self insured retentions to which such
policies are subject. Deductibles and self insured retentions shall be
subject to approval by Landlord, such approval not to be unreasonably
withheld.

(H)    Each insurance carrier shall be rated at least
"a-" class "vii" in the most recently published Best's Insurance Report. If,
during the term of a policy, a carrier's rating falls below "a-" class "vii",
the insurance policy provided by such carrier shall be replaced no later
than the renewal date of such policy with a policy from an insurer
reasonably acceptable to landlord and rated at least "a-" class "vii" in the
most recently published Best's Insurance Report.

(I)    Tenant shall cause all Contractor's insurance
to be in full force and effect as of the commencement of construction and
to remain in full force and effect throughout the construction period and as
further required by this Lease. Contractor shall not take any action, or omit
to take any action that would suspend or invalidate any of the required
coverages during the period of time such coverages are required to be in
effect.

27

        (J)     Not less than five (5) days prior to the expiration date or renewal date of any policy, Tenant shall supply Landlord updated replacement certificates of insurance and amendatory endorsements.

        (K)    <u>Waiver of Claims; Waiver of Subrogation.</u> Contractor shall include in Contractor's Property Insurance a waiver of the insurer's right of subrogation against Landlord, or, if such waiver is unobtainable (i) an express agreement that such policy shall not be invalidated if Tenant or Contractor waives or has waived before the casualty the right of recovery against Landlord or (ii) any other form of permission for the release of Landlord, provided such waiver, agreement or permission is obtainable under normal commercial insurance practice at the time. If such waiver, agreement or permission shall not be obtainable without additional charge, Tenant shall pay such additional charge, which such charge shall be deemed prepaid Base Rent for which Tenant shall receive a credit against the next due installment(s) of Base Rent and Additional Charges until such credit is extinguished. So long as Contractor's Property Insurance includes the waiver of subrogation or agreement or permission to release liability referred to in above, Tenant shall cause Contractor to waive, for Contractor and those claiming through and under Contractor, any right of recovery against Landlord for any loss occasioned by fire or other insured casualty. If at any time Contractor's Property Insurance shall not include such or similar provisions because the same are not obtainable, the waiver set forth in the foregoing sentence shall be of no further force or effect.

        (ix)    Landlord shall have the right from time to time during the Term to update the minimum insurance limits and coverages required pursuant to clauses (i) through (viii) of this <u>Section 7.01(a)</u> to limits and coverages which are then reasonably available and customarily carried by tenants of property which are similar in location and use to the Demised Premises.

        (b)    Prior to the Commencement Date, Tenant shall file with Landlord policies of insurance evidencing compliance with all requirements contained in this <u>Section 7.01</u>. Such policies shall be of form and substance reasonably acceptable to Landlord. Acceptance and/or approval of such policies by Landlord does not and shall not be construed to relieve Tenant of any obligations, responsibilities or liabilities under this Lease.

        (c)    All Tenant's Insurance (i) shall be obtained at the sole cost and expense of Tenant (other than insurance maintained and obtained by Contractors or sub-contractors pursuant to <u>Section 7.01(a)(viii)</u> hereof); (ii) shall be maintained with insurance carriers licensed to do business in New York State, and reasonably acceptable to Landlord; (iii) shall be primary and non-contributing to any insurance or self-insurance maintained by Landlord; (iv) shall be endorsed to provide written notice be given to Landlord, at least thirty (30) days prior to the cancellation, non-renewal, or

material alteration of such policies, subject to insurance company approval, and (v) except with respect to Workers Compensation, Employers Liability and Disability Benefits and Professional Liability, shall name the State, its officers, agents, and employees as additional insureds thereunder. The General Liability Additional Insured Endorsement shall be on then-current Insurance Service Office's (ISO) form for such coverage.

      (d)    Tenant shall be solely responsible for the payment of all deductibles and self insured retentions to which such policies are subject. Deductibles and self insured retentions shall be subject to approval by Landlord, such approval not to be unreasonably withheld.

      (e)    Each insurance carrier for Tenant's Insurance shall be rated at least "A-" Class "VII" in the most recently published Best's Insurance Report. If, during the term of a policy, a carrier's rating falls below "A-" Class "VII", the insurance policy provided by such carrier shall be replaced no later than the renewal date of such policy with a policy from an insurer reasonably acceptable to Landlord and rated at least "A-" Class "VII" in the most recently published Best's Insurance Report.

      (f)    Tenant shall cause all Tenant's Insurance to be in full force and effect as of the Commencement Date and to remain in full force and effect throughout the Term and as further required by this Lease. Tenant shall not take any action, or omit to take any action that would suspend or invalidate any of the required coverages during the period of time such coverages are required to be in effect.

      (g)    Not less than five (5) days prior to the expiration date or renewal date of any policy, Tenant shall supply Landlord updated replacement certificates of insurance and amendatory endorsements.

      Section 7.02    <u>No Required Coverage of Landlord</u>.  In no event shall Landlord be required during the Term to carry any property insurance with respect to the Demised Premises.

      Section 7.03    <u>Waiver of Claims; Waiver of Subrogation</u>.  Tenant shall include in Tenant's Property Insurance a waiver of the insurer's right of subrogation against Landlord, or, if such waiver is unobtainable (i) an express agreement that such policy shall not be invalidated if Tenant waives or has waived before the casualty the right of recovery against Landlord or (ii) any other form of permission for the release of Landlord, provided such waiver, agreement or permission is obtainable under normal commercial insurance practice at the time. If such waiver, agreement or permission shall not be obtainable without additional charge, Tenant shall pay such additional charge, which such charge shall be deemed prepaid Base Rent for which Tenant shall receive a credit against the next due installment(s) of Base Rent and Additional Charges until such credit is extinguished. So long as Tenant's Property Insurance includes the waiver of subrogation or agreement or permission to release liability referred to in above, Tenant hereby waives, for itself and those claiming through and under it, any right of recovery against Landlord for any loss occasioned by fire or other insured casualty. If at any time

Tenant's Property Insurance shall not include such or similar provisions because the same are not obtainable, the waiver set forth in the foregoing sentence shall be of no further force or effect.

## ARTICLE 8

## CASUALTY; USE OF INSURANCE PROCEEDS; RESTORATION

Section 8.01    Notice of Damage. If all or any part of any of the Demised Premises shall be destroyed or damaged in whole or in part by fire or other casualty of any kind or nature (including any casualty for which insurance was not obtained or obtainable), ordinary or extraordinary, foreseen or unforeseen (a "Casualty"), Tenant shall give to Landlord immediate notice thereof.

Section 8.02    Obligation to Restore.

(a)    Tenant Obligation to Restore. In the event of a Casualty, Tenant shall be obligated to repair, alter, restore, replace and rebuild (collectively, "Restore" and the act of Restoring, a "Restoration") the Demised Premises, including the historic interiors and exteriors, to the Standards of the Secretary of the Interior for the Demised Premises and make the Demised Premises as nearly as possible equal to the condition, quality, character and class of the Demised Premises existing immediately prior to such occurrence. In the event that the Demised Premises are damaged or destroyed to such an extent that it is impossible or impractical to Restore the Demised Premises to such condition, quality, character or class, then Landlord and Tenant shall cooperate to determine by mutual agreement a scope of Restoration which is feasible and practical to accommodate the Permitted Uses and achieve the goals and objectives of this Lease, taking into account the extent of such damage or destruction, the importance of any features or elements which were so damaged or destroyed, the feasibility and utility of the proposed Restoration and any other matters related thereto. In the event that portions of the Building outside the Demised Premises shall be damaged or destroyed , and the Tenant shall be obligated hereunder to Restore the portions of the Building outside the Demised Premises, then the Tenant shall also be obligated to Restore the portions of the Building outside of the Demised Premises in a timely fashion so as to enable timely Restoration of the Demised Premises pursuant to this Lease. Landlord may oversee and coordinate on behalf of Tenant the time and manner of Tenant's performance of the Restoration, in order to ensure that the Restoration is performed in a manner that is consistent with the terms of this Lease and, if applicable, will minimize interference with the operation of the Demised Premises pursuant to the terms of this Lease.

(b)    No Obligation of Landlord to Restore. Landlord shall have no obligation to Restore the Demised Premises.

Section 8.03    Restoration Funds.

Doc #:NY6:491877.32

(a)     In the event of a Restoration which is subject to <u>Section 8.02(a)</u>, Tenant shall cause to be deposited in the Depositary all proceeds of Tenant's Property Insurance. Subject to the satisfaction by Tenant of the terms and conditions of this <u>Article 8</u>, and receipt of the written approval of the Landlord, which such approval shall not be unreasonably withheld, Depositary shall pay over to Tenant from time to time, any monies which may be received by Depositary from Tenant's Property Insurance (the "<u>Restoration Funds</u>"), to be utilized by Tenant solely for the purpose of the Restoration, such payments to be made in accordance with the following provisions of this <u>Section 8.03</u>:

(i)     Prior to commencing any Restoration, Tenant shall furnish Landlord with an estimate of the cost of such Restoration, prepared by an independent licensed professional engineer or registered architect selected by Tenant and reasonably approved by Landlord (the "<u>Approved Engineer</u>).

(ii)     The Restoration Funds shall be paid to Tenant in installments as the Restoration progresses, subject to <u>Section 8.03(a)(iii)</u>. If any vendor's, mechanic's, laborer's, or materialman's lien is filed against the Demised Premises or any part thereof, or Tenant's leasehold interest therein, Tenant shall promptly satisfy or discharge such lien (by bonding or otherwise).

(iii)     Upon completion of and payment for the Restoration by Tenant, subject to the rights of any Mortgagee, after receipt of the written approval of the Landlord, which such approval shall not unreasonably be withheld, Depositary shall pay the balance of the Restoration Funds, if any, to Tenant.

(b)     The following shall be conditions precedent to each payment made to Tenant as provided in <u>Section 8.03(a)</u> above:

(i)     The Restoration shall be carried out under the supervision of the Approved Engineer and there shall be submitted to Depositary and Landlord the certificate of the Approved Engineer stating that (i) the materials and other items which are the subject of the requisition have been incorporated in the Demised Premises, free and clear of all liens and encumbrances, and no unsatisfied or unbonded mechanic's or other liens have been claimed, except for any mechanic's lien for claims that will be discharged with funds to be received pursuant to such requisition; provided that a release of such lien is delivered to Depositary in accordance with Section 8.03(a)(ii); (ii) the sum then requested to be withdrawn either has been paid by Tenant or is due and payable to Contractors, engineers, architects or other Persons (whose names and addresses shall be stated), who have rendered or furnished services or materials for the work and giving a brief description of such services and materials and the principal subdivisions or categories thereof and the several amounts so paid or due to each of such Persons in respect thereof, and stating in reasonable detail the progress of the work up to the date of such certificate; (iii) no part of such expenditures has been or is being made the basis, in any previous or then pending requisition, for the withdrawal of Restoration Funds or has been made out of the Restoration Funds received by Tenant; (iv) the sum then requested does not exceed the value of the services and materials

described in the certificate; (v) the work relating to such requisition has been performed in accordance with the approved plans and specifications for such Restoration, and all Permits and other Requirements; (vi) the balance of the Restoration Funds held by Depositary or otherwise provided for in a manner reasonably acceptable to Landlord will be sufficient upon completion of the Restoration to pay for the same in full, and stating in reasonable detail an estimate of the cost of such completion; and (vii) in the case of the final payment to Tenant, the Restoration has been completed in accordance with the approved plans and specifications, and all Requirements.

(ii) There shall be furnished to Landlord an official search, or a certificate of a title insurance company reasonably satisfactory to Landlord, showing that there has not been filed any vendor's, mechanic's, laborer's, or materialman's statutory or other similar lien affecting the Demised Premises, or any part thereof, or any public improvement lien with respect to the Demised Premises or the Restoration created or permitted to be created by Tenant affecting Landlord, or the assets of or funds appropriated to Landlord, which had not been discharged of record (by bonding or otherwise), except for any mechanic's lien for claims that will be discharged with funds to be received pursuant to the requisition then under consideration; provided that a release of such lien is delivered to Depositary in accordance with Section 8.03(a)(ii).

(iii) At the time of the final payment to Tenant, there shall be furnished to Landlord an amended Certificate of Occupancy including the Restoration if required by any Governmental Authority, and lien waiver issued by each Contractor who shall have performed services or provided materials for the Restoration.

(c) It is expressly understood that the requirements of this Article 8 are for the benefit only of Landlord, and no Contractor or other person shall have or acquire any claim against Tenant as a result of any failure of Tenant actually to undertake or complete any Restoration as provided in Section 8.02 or to obtain the evidence, certifications and other documentation provided for herein.

Section 8.04    No Termination or Abatement. Except as hereinafter expressly provided, this Lease shall not terminate or be forfeited or be affected in any manner by reason of damage to or total, substantial or partial destruction of any of the Building or any part thereof or by reason of the untenantability of the same or any part thereof, for or due to any reason or cause whatsoever, and Tenant, notwithstanding any law or statute present or future, waives any and all rights to quit or surrender any part of the Demised Premises thereof. Notwithstanding the foregoing, (i) in the event that a Casualty occurs which renders seventy-five percent (75%) or more of the area of the Demised Premises untenantable for the Permitted Uses, then this Lease shall automatically terminate as of the date of such Casualty, and/or (ii) in the event that a Casualty occurs which renders either or both of the Administration Building and/or the Drill Hall substantially untenantable for the Permitted Uses, and the proceeds of Tenant's Property Insurance are insufficient to Restore the Premises to the condition provided in Section 8.02(a), and neither Landlord nor Tenant elects (in each case at its sole option), within 12 months following the date of casualty, to provide additional

funds sufficient to Restore the Premises to such condition, then this Lease shall automatically terminate upon the first anniversary of the date of such Casualty, or at such earlier date as Landlord and Tenant may mutually elect. Upon the termination of this Lease pursuant to clause (i) or (ii) of the preceding sentence, Tenant shall vacate and deliver to Landlord the Demised Premises in its then-current condition together with any proceeds of Tenant's Property Insurance actually received by Tenant and an assignment of Tenant's right to receive any such additional proceeds, and neither Party shall have any further obligation to the other under this Lease except for the obligations that are expressly provided in this Lease to survive the termination of this Lease. Tenant shall carry commercial rent loss and business interruption insurance in an amount sufficient to reimburse Tenant for any rent loss during the Restoration Period and shall continue to pay rent to the Landlord as if the Demised Premises in an amount equal to the amount the Tenant should have paid Landlord on the date of such Casualty. Except as provided in this Section 8.04, the existence of any present or future law notwithstanding, Tenant waives all rights to quit or surrender all or any part of the Demised Premises by reason of any casualty whatsoever to the Demised Premises. It is the intention of Landlord and Tenant that the foregoing is an "express agreement to the contrary" as provided Section 227 of the Real Property Law of the State of New York.

## ARTICLE 9

## CONDEMNATION

Section 9.01    Taking of a Substantial Portion of Demised Premises.

(a)    If the whole or a Substantial Portion of the Demised Premises shall be taken (excluding a taking of the fee interest in the Demised Premises, or any leasehold interest superior to that of the Tenant's or otherwise constituting an interest in the Demised Premises if after such taking, Tenant's rights and obligations under this Lease are not affected) for any public or quasi-public purpose by any lawful power or authority by the exercise of the right of condemnation or eminent domain or by agreement among Landlord, Tenant and those authorized to exercise such right, this Lease and the Term shall terminate and expire on the date of such taking and the Breakpoint shall be equitably adjusted as of the date of such taking. In the event of a taking which is less than the whole or a Substantial Portion of the Demised Premises, this Lease and the Term shall continue without abatement and the Breakpoint shall be equitably adjusted as of the date of such taking.

(b)    The term "Substantial Portion of the Demised Premises" shall mean such portion of the Demised Premises as, when so taken, would leave remaining a balance of the Demised Premises which, due either to the area so taken or the location of the part so taken in relation to the part not so taken, would not permit the Restoration of the Building so as to constitute a complete, rentable building or buildings capable of producing a fair and reasonable net annual income proportional to the number of square feet not so taken. Without limiting the foregoing, any taking that includes any portion (other than a de minimis portion) of the first and/or second floors of the

(b)     Landlord shall have the right to review and approve each element comprising the Schematic Design Submission; provided that Landlord shall not unreasonably withhold, delay or condition its consent thereto so long as: (i) with respect to the description of the Major Construction Work, any proposed revisions do not materially reduce the scope of the Major Construction Work below the previously-approved description of the Major Construction Work (taking into account that elements of the Major Construction Work may be performed in a later Phase), (ii) with respect to the Major Construction Schedule, any proposed revisions do not materially delay the overall date for Substantial Completion of the Major Construction Work beyond the Outside Completion Date, and (iii) with respect to the Schematic Design Documents, the work shown therein (1) is in accordance with the description of the Major Construction Work, (2) is of good professional engineering/architectural design and incorporates into the Building first-quality equipment and materials, (3) would not jeopardize or adversely affect the structural integrity of the Building, the major Building systems or the roof, and (4) otherwise provides for a quality of design, equipment, materials and techniques that are commensurate in quality with the historic significance of the Building and are in accordance with the restoration standards applicable to a building of this type and significance. Landlord shall notify Tenant within twenty (20) days whether Landlord approves or disapproves of the Schematic Design Submission in whole or in part, which notice shall identify with specificity any matters disapproved (time being of the essence). Tenant shall resubmit to Landlord revised elements of the Schematic Design Submission addressing the matters as to which Landlord notified Tenant of its disapproval, and Landlord shall review and respond to all such revised elements within twenty (20) days (time being of the essence). In the event that Landlord fails to respond to any submission within such twenty-day period, Tenant shall deliver a second notice to Landlord requesting Landlord to review and respond to the Schematic Design Submission or revised Schematic Design Submission within fifteen (15) days (time being of the essence), which notice shall state prominently "LANDLORD RESPONSE TO THE BELOW SUBMISSION IS REQUIRED WITHIN FIFTEEN (15) DAYS FROM THE DATE OF THIS NOTICE OR LANDLORD APPROVAL WILL BE DEEMED GIVEN." Any Schematic Design Submission or revised Schematic Design Submission to which Landlord has not notified Tenant of its approval or disapproval within such fifteen (15) day period following such second notice shall be deemed to have been approved by Landlord. Tenant shall consult with OPRHP with respect to the Schematic Design Documents as required by applicable law and/or agreement between Tenant and OPRHP, and Landlord shall cooperate with Tenant with respect to such consultation.

Section 11.04     Design Development Submission.

(a)     Following Landlord's approval of the Schematic Design Submission and prior to the commencement of any Phase of Major Construction Work, Tenant shall submit to Landlord the following items (the "Design Development Submission"), identifying any changes in such items from the Landlord-approved Schematic Design Submission: (i) an update to the Major Construction Schedule, (ii) an updated description of the Major Construction Work, and (iii) design development drawings, a scope of work description and a Budget with respect to the proposed Phase

Administration Building and/or the Drill Hall shall constitute a taking of a Substantial Portion of the Demised Premises.

(c)     If the whole or a Substantial Portion of the Demised Premises shall be taken or condemned as provided in Section 9.01(a), the award, awards or damages in respect thereof shall be apportioned as follows: (i) there shall first be paid to any Mortgagee who shall hold a first priority Mortgage on Tenant's interest in this Lease and who shall have complied with the first sentence of Section 10.10(a), so much of the portion of the award attributable to the Building as shall be required to pay the unpaid principal balance of such Mortgage (not to exceed total costs incurred by Tenant in connection with the Major Construction Work), plus interest accrued thereon from the date of taking to the date of payment to such Mortgagee, at the rate of interest payable in the condemnation proceedings, (ii) there shall then be paid to Tenant the costs of Tenant's major capital improvements to the Building (not to exceed total costs incurred by Tenant in connection with the Major Construction Work, plus any Capital Improvements, less any amounts apportioned to any Mortgagees under clause (i) hereof, and, in the event such taking or condemnation occurs during or following the fiftieth Lease Year, depreciated on a straight-line basis over the period from the first day of the fiftieth Lease Year to the last day of the Term), and (iii) there shall then be paid to Landlord the balance, if any, of such award.

Section 9.02      Date of Taking. For purposes of this Article 9, the date on which a taking shall occur shall be deemed to be the earlier of (i) the date on which actual possession of the whole or a Substantial Portion of the Demised Premises, or a part thereof, as the case may be, is acquired by any lawful power or authority pursuant to the provisions of the applicable federal or New York State law or (ii) the date on which title to the Demised Premises or the aforesaid portion thereof shall have vested in any lawful power or authority pursuant to the provisions of the applicable federal or New York State law.

Section 9.03      Taking of Less than a Substantial Portion of Demised Premises. If less than a Substantial Portion of the Demised Premises shall be so taken, this Lease and the Term shall continue as to the portion of the Demised Premises remaining without abatement of the Base Rent or Additional Charges or diminution of any of Tenant's obligations hereunder; provided, however, that Landlord acknowledges that Base Rent is calculated and paid solely on the basis of a percentage of Gross Revenues from Commercial Operations in excess of the Breakpoint, and therefore the Breakpoint shall be equitably adjusted as set forth in Section 9.01. Tenant shall utilize the award received by it to Restore any remaining part of the Demised Premises not so taken so that the latter shall be complete, operable, self-contained architectural units in good condition and repair, to the extent feasible in light of the amount of the award so received. Tenant's obligation to restore shall be contingent on Landlord's restoration of any portion of the Building so taken which is not part of the Demised Premises. In the event of any taking pursuant to this Section 9.03, the Tenant's portion shall be paid to Tenant to be applied to Restoration of the Building if under $2,000,000 Adjusted for Inflation and to Depositary if $2,000,000 Adjusted for Inflation or more and, in either case, shall be applied to the cost of Restoration of the part of the Demised Premises not

so taken. Subject to the provisions and limitations in this Article 9, Depositary shall, after receipt of the written approval of the Landlord make available to Tenant as much of that portion of the award as is actually received and held by Depositary, if any, as may be necessary to pay the cost of Restoration of the part of the Demised Premises remaining.

Section 9.04    Emergency Use of Demised Premises; Temporary Taking. If the temporary use of the whole or any portion of the Demised Premises shall be taken for any public or quasi-public purpose, including military use in the event of a national or state declaration of emergency ("Emergency Use"), by any lawful power or authority whether by the exercise of the right of condemnation or otherwise (the "Condemning Authority") due to the status of the Building as an armory, (i) unless prohibited by law, the Term and all dates and deadlines set forth herein shall be tolled during the period of the Emergency Use or temporary taking, plus any additional period as shall be equitable taking into account the additional time required for Tenant to re-schedule and re-commence any activities in the Demised Premises which were disrupted by the Emergency Use or temporary taking, (ii) Breakpoint shall be equitably adjusted during the period of Emergency Use and/or temporary taking, and until the first anniversary of the date on which the Full Operation Date shall have been achieved following the period of Emergency Use. The provisions of this Lease which entitle Landlord to use the Demised Premises for Emergency Use shall not be deemed to diminish Tenant's rights to receive any condemnation award arising under applicable law or to assert a claim for compensation and reimbursement under applicable law, regardless of whether Landlord is the Condemning Authority.

Section 9.05    Change of Grade. In case of any governmental action, not resulting in the taking or condemnation of any portion of the Demised Premises but creating a right to compensation therefor, such as the changing of the grade of any street upon which the Demised Premises abut, this Lease shall continue in full force and effect without reduction or abatement of Base Rent and Additional Charges and the award shall be paid to Landlord.

Section 9.06    Negotiated Sale in Lieu of Condemnation. In the event of a negotiated sale of all or a portion of the Demised Premises in lieu of condemnation, subject to the approval reasonably exercised of Landlord and Tenant, the proceeds shall be distributed as provided as in cases of condemnation.

Section 9.07    Landlord's Right to Participate. Landlord, Tenant and any Mortgagee shall be entitled to file any claim permitted to such party pursuant to this Article 9 and otherwise participate in any condemnation or similar proceeding and all hearings, trials and appeals in respect thereof.

Section 9.08    Trade Fixtures. Notwithstanding anything to the contrary contained in this Article 9, in the event of any permanent or temporary taking of all or any part of the Demised Premises, Tenant and its Users shall have the exclusive right to assert claims for any trade fixtures and personal property so taken which were the property of Tenant or its Users (but not including any Equipment) and

for relocation expenses of Tenant or its Users, and all awards and damages in respect thereof shall belong to Tenant and its Users, and Landlord hereby waives any and all claims to any part thereof; provided, however, that if there shall be no separate award or allocation for such trade fixtures or personal property or relocation expenses, then such claims of Tenant and its Users, or awards and damages, shall be subject and subordinate to Landlord's claims under this Article 9.

## ARTICLE 10

### ASSIGNMENT, SUBLETTING, MORTGAGES, ETC.

Section 10.01    No Assignment; Subletting Permitted.

(a)    Except as otherwise provided in this Article 10, Tenant shall not, without the prior written consent of Landlord and the State Comptroller assign or otherwise transfer Tenant's rights, title and interest under this Lease or the term and estate hereby granted. Furthermore, except as otherwise provided in this Article 10, Tenant shall not, without the prior written approval of the Landlord (i) sublet, permit any other person to use or occupy, or enter into any User Agreement with respect to the Demised Premises or any part thereof, (ii) mortgage, pledge or encumber this Lease or (iii) permit any User to sublet or sublicense any portion of the Demised Premises or assign any User Agreement to any other Person (it being understood that this clause (iv) shall not prevent a User under a User Agreement which provides for the booking of shows, performances, and the like from entering into such booking arrangements pursuant to its User Agreement). Any of the arrangements in clauses (i)-(iv) above entered into in violation of this Article 10 shall be null and void. For the purposes of this Article 10, the merger or consolidation of Tenant into or with another entity or transfer of control of the Tenant to any other entity shall be deemed an assignment of this Lease.

(b)    Notwithstanding anything to the contrary set forth herein, Tenant shall not assign its interest in this Lease, nor sublet or enter into any User Agreement for any portion of the Demised Premises, to any person or entity which is a Prohibited Party, nor allow any such Prohibited Party to use or occupy all or any portion of the Demised Premises. Landlord or Tenant may terminate any assignment, sublease, User Agreement or licensed use of the Demised Premises or any part thereof, in the event that any assignee, sublessee, assignee or User, their officers, directors, managers, employees, or operators meets the definition of a Prohibited Party at any time during the term of such assignment, sublease, User Agreement or licensed use of the Demised Premises or any part thereof. Tenant shall cause any written agreement for the assignment, sublease or licensed use of the Demised Premises, or any part thereof, and any User Agreement to contain a provision providing for Landlord's and Tenant's right to terminate such agreement as described in the proceeding sentence.

(c)    Tenant shall require any subtenant, Tenant's licensee, or Tenant's assignee, who is a Significant Sub-occupant, to execute and deliver to Tenant and/or Landlord a Vendor Responsibility Questionnaire on the form hereto attached as Exhibit O or any successor or replacement form required by the Landlord or the Office

of the State Comptroller. No occupancy or sub-occupancy agreement of any type with a Significant Sub-occupant (other than User Agreements with Significant Sub-occupants, which shall be governed by Section 10.04) shall be effective until Landlord approves the Significant Sub-occupant. Nothing in this Article 10 shall relieve any Significant Sub-occupant from complying with any and all approval requirements imposed by any City, State or Federal statute, ordinance, rule or regulation.

Section 10.02    Certain Permitted Assignments. Notwithstanding the provisions of Section 10.01(a), Landlord shall not unreasonably withhold, delay or condition its consent to the following:

(a)    a sale, assignment or transfer of Tenant's interest in this Lease to (i) a for-profit entity of which the Tenant or an Affiliate has and maintains management control for the purpose of obtaining the federal historic rehabilitation tax credit for the Major Construction Work, or (ii) an Affiliate in connection with any other financing to be obtained by Tenant for the Major Construction Work;

(b)    an assignment of the Lease to any proposed tenant that was the holder of a Recognized Mortgage or that is the affiliated nominee of the former holder of a Recognized Mortgage following either a foreclosure of a Recognized Mortgage or the acceptance by the holder of a Recognized Mortgage (or its nominee) of an assignment of the mortgagor's interest in the Lease in lieu of foreclosure or any purchaser at a sale in a foreclosure of the Recognized Mortgage, its successors and assigns;

provided that such assignee is not a Prohibited Person and meets the vendor responsibility requirements of the State of New York or other applicable Requirements; provided further that, Tenant and the proposed assignee shall execute such documents evidencing the sale, assignment or transfer as Landlord shall reasonably request; provided further that in the event that Landlord fails to respond within one hundred twenty (120) days to a written request by Tenant, or one hundred twenty (120) days to a written request by a Recognized Mortgagee, to sell, assign or transfer the Lease to an entity described in this Section 10.02, Landlord shall be deemed to have consented to such assignment.

Section 10.03    Procedure for Approval of Assignments or Subleases Which Do Not Constitute User Agreements.

(a)    For any proposed assignment or sublease of all or any portion of the Demised Premises in an arrangement which does not constitute a User Agreement, Tenant shall request, in writing, the approval of the Landlord, and, where the State Comptroller's approval is required by Section 10.01(a), the approval of the State Comptroller, setting forth in Tenant's request the identity of the proposed assignee or sublessee, information about the business, character and financial capacity of the proposed assignee or sublessee, and any other information that Landlord shall reasonably request in connection with its determination. Except as otherwise provided in Section 10.02, Landlord shall have one hundred twenty (120) days from the date that

Tenant requests, in writing, approval of a proposed assignment or subletting of all or any portion of the Demised Premises under this Article 10 to notify Tenant whether it approves or disapproves thereof. No assignment which requires the approval of the State Comptroller will be effective until a written approval of such assignment, has been delivered to the Tenant by the State Comptroller.

(b)    From and after the tenth (10th) anniversary of the Commencement Date and provided that no Event of Default has occurred and is continuing, Tenant may deliver a notice (a "Recapture Request") to Landlord requesting Landlord to terminate the Lease and take possession of the Demised Premises as of a date specified in the Recapture Request (the "Recapture Date"), which date shall not be sooner than ninety (90) days nor later than three hundred sixty (360) days from the date of the Recapture Request. Within one hundred twenty (120) days from the delivery of the Recapture Request, Landlord, in Landlord's sole determination, shall deliver a written notice to Tenant granting such Recapture Request (a "Recapture Approval") or denying such Recapture Request (a "Recapture Denial"). In the event that Landlord elects to grant the Recapture Request, on the Recapture Date or such other date set forth in the Recapture Approval and reasonably agreed to by Tenant, Tenant shall surrender the Demised Premises to Landlord, this Lease shall terminate and the rights and obligation of the parties to the other shall be the same as if such date were the Scheduled Expiration Date. In the event that Landlord elects to deny the Recapture Request, Tenant shall have a period of one (1) year from the date of the Recapture Denial to request Landlord's approval in writing (an "Assignment Request") to assign this Lease to a not-for-profit entity with experience and financial capacity sufficient to operate the Demised Premises pursuant to this Lease and that is not a Prohibited Person (a "Proposed Assignee"), which approval shall be in the sole discretion of the Landlord, conditioned or delayed. In the event that Landlord approves such Assignment Request, the parties shall share any payments received from the Proposed Assignee with respect to such assignment (i) on a pari passu basis up to the amount of the sum of (x) Landlord's Contribution (which shall be payable to Landlord), and (y) the total cost incurred by Tenant in connection with the Major Construction Work and any other Capital Improvement, less Landlord's Contribution (which shall be payable to Tenant) and (ii) equally on any amounts thereafter.

(c)    Any consent or approval by Landlord under this Section 10.03 shall apply only to the specific transaction thereby authorized and shall not relieve Tenant from the requirement of obtaining the prior written consent of Landlord to any further assignment of this Lease or subletting of the Demised Premises in an arrangement which does constitute a User Agreement.

(d)    No assignment of this Lease or subletting of the Demised Premises in an arrangement which does not constitute a User Agreement shall have any validity except upon compliance with the provisions of this Section 10.03.

(e)    No approved assignment of this Lease or subletting of the Demised Premises in an arrangement which does not constitute a User Agreement shall become effective until there shall have been delivered to Landlord (i) an executed

counterpart of the sublease or the instrument of assignment of this Lease, in recordable form, containing inter alia, the name, address and telephone number of the assignee or User, and (ii) in the case of an assignment, an executed instrument of assumption by said assignee, in recordable form, whereby assignee expressly assumes all of the obligations of Tenant under this Lease.

(f)     Upon any approved assignment of this Lease and assumption of the obligations of the Tenant hereunder by the assignee, the assignor shall be relieved of all obligations first arising under this Lease following the effective date of the assumption. Nothing herein shall relieve the assignor of any obligations hereunder which are expressly stated in this Lease or in the Landlord's consent to assignment to survive the assignment.

Section 10.04     User Agreements with Respect to Portions of the Demised Premises.

(a)     Notwithstanding the provisions of Section 10.01(a), Tenant may, from time to time demise any portion(s) of the Demised Premises under subleases, occupancy agreements or licenses and/or enter into service or concession agreements, with a term not to exceed fifteen (15) years, for actual use and occupancy by the sublessee or licensee (a "Direct User"), or for production or presentation by the sublessee or licensee of events or other productions (an "Intermediary User"), hereinafter collectively referred to as User Agreements. Neither a Direct User nor an Intermediary User shall be an Affiliate of the Tenant. All User Agreements with Significant Sub-occupants shall be subject to the provisions of Section 10.04(c). All User Agreements shall include a provision requiring the User to use the subleased, licensed, occupied or concessioned space solely for Permitted Uses. Tenant shall perform and observe all of the terms and conditions to be observed by the landlord or licensor under the User Agreements, and shall cause the users, operators, licensees, concessionaires and other occupants (collectively "Users") to comply with their obligations under their User Agreements and shall enforce all of the rights of such landlord or licensor in accordance with the terms thereof.

(b)     All User Agreements must be in writing and meet the following criteria: (i) the use permitted under the User Agreement must be a Permitted Use and shall further the Public Goals set forth in Exhibit K hereto; (ii) the User Agreement shall comply with the Lease and with the requirements of all applicable governmental authorities and all policies of insurance covering the Demised Premises; (iii) the User and the User's officers, directors, managers, employees or operators shall not be Prohibited Parties, and Landlord and/or Tenant may terminate any User Agreement in the event that any User, its officers, directors, managers, employees or operators meet the definition of Prohibited Parties at any time during the term of the user Agreement, (iv) the User Agreement shall be subject and subordinate to the Lease, and shall provide that upon the termination of this Lease, Landlord, at its sole option, may terminate the User Agreement or enforce the User Agreement and the User will attorn to, or enter into a direct lease with Landlord on the same terms and conditions as are contained in the User Agreement for the then remainder of the User Agreement term,

subject, however, to the matters contained in Section 10.07 hereof, (v) the User shall obtain and keep in force adequate Commercial General Liability coverage providing Demised Premises liability, products completed operations, broad form property damage, independent contractors, and blanket contractual including written and oral contracts and otherwise meeting the requirements of Article 7 hereof.

(c)      Any other provision of this Article 10 to the contrary notwithstanding, Tenant shall require any Direct or Intermediary User that is a Significant Sub-occupant, to execute and deliver to Tenant and Landlord a Vendor Responsibility Questionnaire on the form hereto attached as Exhibit O or any successor or replacement form required by the Landlord or the Office of the State Comptroller. In the event that Landlord reasonably determines that the applicable Significant Sub-occupant does not meet the vendor responsibility requirements of the State of New York, Landlord shall notify Tenant of such determination and Tenant shall terminate the applicable User Agreement. Nothing in this Section 10.04 (c) shall relieve any Significant Sub-occupant from complying with any and all approval requirements imposed by any City, State or Federal statute, ordinance, rule or regulation.

(d)      Within 30 days following execution, Tenant shall deliver to Landlord a fully executed copy of the User Agreement and all ancillary agreements, together with such other documentation and information as Landlord shall reasonably request to evidence that the criteria set forth in paragraph (b) have been satisfied.

(e)      Upon and subject to the terms and conditions of Article 19 hereof, Tenant shall indemnify Landlord against, and shall hold Landlord harmless from, any and all liabilities, claims and causes of action arising under the terms and conditions of any User Agreements affecting the Demised Premises or any part thereof.

(f)      The fact that a violation or breach of any of the terms, provisions or conditions of this Lease results from or is caused by an act or omission by any of the Users shall not relieve Tenant of Tenant's obligation to cure, or liability for, the same. Tenant shall take all necessary and reasonable steps to prevent any such violation or breach. Landlord shall afford Tenant a reasonable time in which to enforce Tenant's rights against any User which is in violation or breach of its User Agreement, provided Tenant is diligently proceeding with its remedies against such User.

Section 10.05    Landlord's Right to Collect Rent Under User Agreements. Subject to the rights of a Recognized Mortgagee, Landlord, after an Event of Default by Tenant, may collect subrent and all other sums due under User Agreements and apply the net amount collected to the Rental payable by Tenant hereunder, but no such collection shall be, or be deemed to be, a waiver of any agreement, term, covenant or condition of this Lease or the acceptance by Landlord of any User as Tenant hereunder, or a release of Tenant from performance by Tenant of its obligations under this Lease.

Section 10.06    Assignment to Landlord of Tenant's Interest in User Agreements. To secure the prompt and full payment by Tenant of Rental and the

faithful performance by Tenant of all the other terms and conditions herein contained on its part to be kept and performed, Tenant hereby assigns, transfers and sets over unto Landlord (subject to the conditions hereinafter set forth and subject and subordinate to the rights of the holder of any Recognized Mortgage), all of Tenant's right, title and interest in and to all User Agreements affecting the Demised Premises or any part thereof and hereby confers upon Landlord, its agents and representatives, a right of entry by any lawful means in, and sufficient possession of, the Demised Premises to permit and insure the collection by Landlord of said rentals and other sums payable under the User Agreements, and further agrees that the exercise of said right of entry and qualified possession by Landlord shall not constitute an eviction of Tenant from the Demised Premises or any portion thereof; provided, however, that such assignment shall become operative and effective only in the event that this Lease and the term hereof shall be cancelled or terminated pursuant to the terms, covenants and conditions hereof, or in the event of repossession under a dispossess warrant or other re-entry or repossession by Landlord under the provisions hereof, if an Event of Default by Tenant shall occur hereunder and then only such User Agreements as the Landlord may additionally elect to take over and assume. At any time and from time to time upon Landlord's demand, Tenant shall promptly deliver to Landlord a schedule of all User Agreements setting forth the names of all Users, with a photostatic copy of each of such User Agreements.

Section 10.07    Recognition of Certain Users by Landlord.

(a)    Landlord covenants and agrees, for the benefit of any User having a User Agreement with a term of ten (10) years or more (excluding renewal options) which meets the requirements of Section 10.04 hereof and which User has the right under such User Agreement to occupy or use either (x) more than fifty percent (50%) of any floor of the Administration Building, or (y) the entire Drill Hall, provided that in the case of occupancy or use of the Drill Hall, Tenant certifies to Landlord that such User has delivered a User Pledge to Tenant, Landlord will execute and deliver an agreement in recordable form pursuant to which Landlord agrees to recognize such User as the direct tenant of Landlord upon the termination of this Lease pursuant to any of the provisions of Article 24 hereof, subject to such User fulfilling the terms of its User Pledge in all material respects and paying to Landlord the entire balance of the User Pledge, if any, upon such termination, and agreeing that Landlord will not (x) join the User as a party defendant in any action or proceeding which may be commenced by Landlord to terminate this Lease or (y) evict the User from the portion of the Demised Premises demised to it, or affect any of the User's rights under its User Agreement by reason of any default by Tenant under this Lease; provided, however, that at the time of the termination of this Lease (A) no default exists under the User's User Agreement which at such time would then permit the landlord thereunder to terminate the same or to exercise any dispossess remedy provided for therein, (B) Landlord elects to continue to operate the Demised Premises for the Permitted Uses, (C) Landlord shall not be bound by any provision of the User Agreement which would require Landlord to perform any action or incur any obligation which cannot legally be performed or incurred by a governmental entity, or which would require the payment by Landlord to, or performance by Landlord of any work for the benefit of, the User in excess of the

aggregate of sums actually received by Landlord under such User Agreement and all
other attorned User Agreements but only to the extent such sums received are actually
available for payment after Landlord has paid any necessary expenses for the Demised
Premises and has established any reasonable and customary reserve accounts, and
(D) the User shall deliver to Landlord an instrument confirming the agreement of such
User to attorn to Landlord and to recognize Landlord as the User's landlord under its
User Agreement as required by Section 10.04 hereof, which instrument shall provide
that neither Landlord, nor anyone claiming by, through or under Landlord shall be:

(i) liable for any act or omission of any prior landlord
(including, without limitation, the then defaulting landlord); or

(ii) subject to any offsets or defenses which the User
may have against any prior landlord (including, without limitation, the then defaulting
landlord); or

(iii) bound by any payment of rent which the User might
have paid for more than the current month to any prior landlord (including, without
limitation, the then defaulting landlord); or

(iv) bound by any covenant to undertake or complete
any construction of the Demised Premises demised by the User Agreement; or

(v) bound by any obligation to make any payment to
the User or to expend any money in connection with the development, maintenance,
operation or management of the Demised Premises, except to the extent such sums
received are actually available for payment after Landlord has paid any necessary
expenses for the Demised Premises and has established any reasonable and customary
reserve accounts); or

(vi) bound to perform any action or incur any obligation
which Landlord is legally prohibited from incurring or performing because of its status as
a governmental entity.

(vii) required to use the Demised Premises for the
Permitted Uses.

Section 10.08    Mortgage of Leasehold Interests.

(a) Tenant shall not mortgage, assign or encumber this Lease
or Tenant's interest herein, without Landlord's prior written consent, which consent
shall not be unreasonably withheld, delayed or conditioned provided such proposed
mortgagee qualifies as a Mortgagee.

(b) No Mortgage(s) or any extension thereof shall extend to
or affect the estate and interest of Landlord in and to the Land or Building or any part
thereof.

Section 10.09    Required Provisions in Mortgages. No Mortgage of this Lease or of Tenant's interest herein, shall be valid or of any force or effect, as against Landlord, unless and until a photostatic copy of the original of each instrument creating and affecting such Mortgage, and written notice containing the name and post office address of the holder of such Mortgage, shall have been delivered to Landlord, and unless the Mortgage shall contain, in substance, the following provisions:

(a)    "This mortgage is executed upon the condition that no purchaser at any foreclosure sale shall acquire any right, title or interest in or to the Lease hereby mortgaged, unless the said purchaser, or the person, firm or corporation to whom or to which such purchaser's right has been assigned, shall, in the instrument transferring to such purchaser or to such assignee the interest of Tenant under the Lease, assume and agree, in accordance with the provisions of said Lease, to perform all of the terms, covenants and conditions of said Lease to be observed or performed on the part of Tenant and moreover, that no further or additional mortgage or assignment of said Lease shall be made except in accordance with the applicable provisions contained in Article 10 of the Lease, and that a duplicate original of said instrument containing such assumption agreement, duly executed and acknowledged by such purchaser or such assignee and in recordable form, is delivered to Landlord immediately after the consummation of such sale, or, in any event, prior to taking possession of the Demised Premises demised thereby;" and

(b)    "The mortgagee shall not retain and apply the proceeds of any insurance or the proceeds of any condemnation award toward payment of the sum secured by this mortgage to the extent such proceeds are required for the repair or restoration of the mortgaged Demised Premises in accordance with the provisions of the Lease hereby mortgaged."

Section 10.10    Notice and Cure Period to Recognized Mortgagee for Tenant's Defaults Under the Lease.

(a)    If at any time there shall be a Mortgage to which Landlord has consented pursuant to Section 10.08(a) of this Lease (a "Recognized Mortgage"), Landlord shall give to the holder of such Recognized Mortgage, at the address set forth in the notice mentioned in Section 10.09 hereof, a copy of each notice of default by Tenant given by Landlord under this Lease at the same time as, and whenever, any such notice of Default shall thereafter be given by Landlord to Tenant, and no such notice of default by Landlord shall be deemed to have been duly given to Tenant unless and until a copy thereof shall have been so given to the holder of a Recognized Mortgage of this Lease. The holder of such Recognized Mortgage (i) shall thereupon have a period of thirty (30) days more, after such notice is given to it, for remedying the default, or causing the same to be remedied, or causing action to remedy a default of the nature set forth in Section 24.01(c) to be commenced, than is given Tenant after such notice is given to it, and (ii) shall, within such period and otherwise as herein provided, have the right to remedy such default, cause the same to be remedied or cause action to remedy a default of the nature set forth in Section 24.01(c) to be commenced. Landlord will accept performance by the holder of a Recognized Mortgage of any covenant, condition, or

agreement on Tenant's part to be performed under this Lease with the same force and effect as though performed by Tenant.

(b)      Notwithstanding the provisions of paragraph (a) hereof, no default by Tenant under an this Lease shall be deemed to exist as long as the holder of a Recognized Mortgage shall, in good faith, have commenced promptly either (i) to cure the default and to diligently and continuously prosecute the same to completion, or (ii) if possession of the Demised Premises is required in order to cure the default, to institute foreclosure proceedings and obtain possession directly or through a receiver, to prosecute such proceedings with diligence and continuity and, upon obtaining such possession, commence promptly to cure the default and to prosecute the same to completion with diligence and continuity, provided, however, that the holder of a Recognized Mortgage shall have delivered to Landlord, in writing, its agreement to take the action described in clause (i) or (ii) herein, and that during the period in which such action is being taken (and any foreclosure proceedings are pending) all of the other obligations of Tenant under this Lease, to the extent they are susceptible of being performed by the holder of such Recognized Mortgage, are being duly performed. However, at any time after the delivery of the aforementioned agreement, the holder of such Recognized Mortgage may notify Landlord, in writing, that it has relinquished possession of the Demised Premises or that it will not institute foreclosure proceedings or, if such proceedings have been commenced, that it has discontinued them, and in such event the holder of such Recognized Mortgage shall have no further liability under such agreement from and after the date it delivers such notice to Landlord (except for any obligations accruing prior to the date it delivers such notice), and thereupon Landlord shall have the unrestricted right to terminate this Lease and to take any other action it deems appropriate by reason of any default by Tenant, and upon any such termination the provisions of <u>Section 10.11</u> hereof shall be applicable.

(c)      Anything herein contained to the contrary notwithstanding, except in the event of a condemnation or governmental takings, the effects of which shall be governed by <u>Article 8</u>, hereof, so long as a Recognized Mortgage remains outstanding, if the interests in the Demised Premises of Landlord and Tenant shall simultaneously be owned by the same Person, this Lease, and the leasehold estate created thereby shall not be deemed merged into the fee estate in the Demised Premises, or to have been extinguished, but shall continue nevertheless with the same force and effect as if Landlord and Tenant were different Persons.

(d)      Notwithstanding any other provision of this Lease, or any assumption agreement required hereunder, to the contrary, no holder of any Recognized Mortgage shall become liable under the provisions of this Lease (except to the extent provided in <u>(b)</u>) unless and until such time as it becomes, and then only for as long as it remains, the owner of the leasehold estate created thereby.

Section 10.11    Recognized Mortgagee's Rights Upon Termination of this Lease.

(a)     In case of termination of this Lease by reason of any default or for any other reason, Landlord shall give prompt notice thereof to the holders of any Recognized Mortgages which are a lien thereon. Landlord, on written request of the holder of the Recognized Mortgage most senior in lien priority (or of any junior Recognized Mortgagee in successive order of priority, if a senior Recognized Mortgagee shall have transferred or assigned its rights to such junior Recognized Mortgagee or shall have failed to exercise its rights hereunder within the applicable period of time) made any time within thirty (30) days after the giving of such notice by Landlord, shall execute and deliver a new lease of the portion of the Demised Premises demised under this Lease to the holder of such Recognized Mortgage, or its nominee, for the remainder of the term of this Lease, upon all the covenants, conditions, limitations and agreements therein contained, provided that the holder of such Recognized Mortgage shall not be a Prohibited Party and shall pay to Landlord, simultaneously with the delivery of such new lease, all unpaid Rental due under this Lease up to and including the date of the commencement of the term of such new lease and all expenses including, but not limited to, reasonable attorneys' fees and disbursements and court costs incurred by Landlord in connection with the default by Tenant, the termination of this Lease and the preparation of the new lease.

(b)     Any such new lease and the leasehold estate thereby created shall, subject to the same conditions contained in this Lease, continue to maintain the same priority as the terminated Lease with regard to any lien, charge or encumbrance on Landlord's interest in the Demised Premises. Concurrently with the execution and delivery of such new lease, Landlord shall assign to the tenant named therein all of its right, title and interest in and to moneys (including insurance and condemnation proceeds), if any, then held by or payable to Landlord (or Depositary, as applicable), which Tenant would have been entitled to receive but for the termination of this Lease, and any sums then held by or payable to Landlord shall be deemed to be held by or payable to it as Landlord under the new lease.

(c)     Upon the execution and delivery of a new lease under this Section 10.11, all User Agreements which theretofore may have been assigned to Landlord thereupon shall be assigned and transferred, without representation or recourse (except that Landlord shall represent that it has not previously assigned or transferred the same), by Landlord to the tenant named in such new lease. Between the date of termination of this Lease and (i) the last date on which the holders of Recognized Mortgages constituting a lien thereon shall have failed to exercise their rights to obtain a new lease, or (ii) the date of execution and delivery of the new lease, if the holder of a Recognized Mortgage shall have requested such new lease as provided in paragraph (a) of this Section, whichever of (i) or (ii) is later, Landlord will not cancel any User Agreements or accept any cancellation, termination or surrender thereof (unless such termination shall be effected as a matter of law on the termination of this Lease) without the consent of the holder of such Recognized Mortgage, except for default as permitted in the User Agreement.

(d)     Notwithstanding anything to the contrary contained in this Section 10.11. the holder of a Recognized Mortgage shall have no obligation to cure any