2006 NY Slip Op 52055U, *; 13 Misc. 3d 1229A, **;
831 N.Y.S.2d 352; 2006 N.Y. Misc. LEXIS 3107, ***

LEXSEE 13 MISC.3D 1229A

[*1]  **In the Matter of the Application of Rita C. Chu, Bruce Lee, The Seventh Regiment Fund, The Veterans of the Seventh Regiment, and East 67 Tenants Corp., Petitioners, against New York State Urban Development Corporation d/b/a Empire State Development Corporation, and Seventh Regiment Armory Conservancy, Inc., Respondents.**

**103638/06**

**SUPREME COURT OF NEW YORK, NEW YORK COUNTY**

**2006 NY Slip Op 52055U; 13 Misc. 3d 1229A; 831 N.Y.S.2d 352; 2006 N.Y. Misc. LEXIS 3107; 236 N.Y.L.J. 61**

**September 14, 2006, Decided**

**NOTICE:**    [***1]    THIS OPINION IS UNCORRECTED AND WILL NOT BE PUBLISHED IN THE PRINTED OFFICIAL REPORTS.

**HEADNOTES**

[**1229A]    Environmental Conservation--Environmental Quality Review.

**JUDGES:** Lottie E. Wilkins, J.

**OPINION BY:** Lottie E. Wilkins

**OPINION**

Lottie E. Wilkins, J.

In sequence 001, submitted without opposition, petitioners bring an article 78 proceeding seeking an order from this Court annulling the determination of no significant environmental impact issued by respondent, New York State Urban Development Corp. d/b/a Empire State Development Corporation (hereinafter ESDC), with respect to plans for the renovation and repurposing of the Seventh Regiment Armory and directing ESDC to require respondent Seventh Regiment Armory Conservancy to conduct a full environmental impact review and issue an environmental impact statement in connection with the proposed renovations. In sequence 002, also submitted without opposition, respondents ESDC and Seventh Regiment Armory Conservancy move for an order dismissing the petition in its entirety. In sequence 003, petitioners submit an amended petition once again seeking to    [*2]    annul the Negative Declaration/Determination [***2] of No Significance and related relief and also seek annulment of a November 16, 2005 "Authorization to Act as Agent on Behalf of the People of the State of New York to Execute a Lease and Related Documents for the Project," as well as

annulment of the lease executed between ESDC and the Seventh Regiment Armory Conservancy.

From a procedural standpoint, it would not be overstatement to characterize the submissions in this matter as somewhat chaotic. As already mentioned, the petition in sequence 001 was submitted without opposition, as was the motion submitted in sequence 002. Rather than simply answer the petition and raise objections in point of law, it seems respondents chose to proceed with a cross-motion and the opportunity for a reply that comes with it as a means to maximize the number of papers submitted to the Court (*see,* CPLR § 7804 [f]). In the process, however, respondents have left the Court without a formal answer to the petition (*see,* CPLR § 7804 [d]). Whatever the reason, in a stipulation dated June 16, 2006, the parties recognized that the amended petition and cross-motion submitted in sequence 003 rendered the earlier [***3] papers submitted in sequence 001 and sequence 002 moot. The same stipulation purports to "withdraw" the earlier submissions, but that apparently did not happen. As a result, those items will be dismissed as such. Thus the Court is left with the following submissions for consideration on the merits: the notice of amended verified petition and the amended petition dated May 18, 2006; the notice of cross-motion to dismiss and the affidavit in support thereof dated June 13, 2006; petitioners' affidavits in opposition to the cross-motion dated July 13, 2006; the reply affidavits submitted by respondents dated July 26, 2006; and the various memoranda of law submitted by the parties. Because respondents' cross-motion to dismiss contains broad opposition on the merits of the petition, as well as a legal objection on grounds of standing, it will be treated as an answer that generally denies the allegations of the petition.

The Seventh Regiment Armory (the "Armory") is

2006 NY Slip Op 52055U, *; 13 Misc. 3d 1229A, **;
831 N.Y.S.2d 352; 2006 N.Y. Misc. LEXIS 3107, ***

located at 643 Park Avenue in Manhattan. Over the course of its history, this landmark building has served as a military facility and the home of the storied Seventh Regiment of the State National Guard. More recently, the facility [***4] has been used as a women's shelter and exhibition space for a well known antique show, among other things. There has been a long-running dispute over who owns the Armory and controls its fate, however, that issue is not one to be resolved here. For present purposes, it is sufficient to note that the State has asserted control over the Armory and plans to develop the site through its development arm, respondent ESDC.

Since there is a threshold issue of standing, some detail on the identity of the petitioners is necessary. Rita C. Chu is a resident of 130 East 67th Street, which is located across the street from the armory. She is also the president of petitioner East 67 Tenants [*3] Corp. The East 67 Street Tenants Corp. is a not-for-profit organization which defines its mission as upholding the interests of residents at 130 East 67th Street. Petitioner Bruce Lee is a resident of 115 East 67th Street, which likewise is across the street from the Armory. Mr. Lee is also a member of petitioner Seventh Regiment Fund and petitioner Veterans of the Seventh Regiment. The Seventh Regiment Fund is a not-for-profit corporation comprised of the descendants of Seventh Regiment veterans and [***5] defines its organizational purpose as promoting the interests and welfare of the Seventh Regiment which includes preserving the Armory as a structure and a military facility in times of emergency. The Veterans of the Seventh Regiment is another not-for-profit corporation whose present membership includes present and former members of the successor units of the original Seventh Regiment. The Veterans group defines its mission similarly to that of Seventh Regiment Fund.

The relevant factual background for purposes of this article 78 proceeding begins in 1998, when respondent ESDC issued a request for proposals (RFP) from consultants who could recommend physical improvements to the Seventh Regiment Armory building and develop a plan for a public/private partnership to finance capital improvements, as well as options for possible alternative uses for the newly renovated building. After receiving recommendations from the consultant who was ultimately hired, ESDC issue another RFP in June 2000 for a developer/operator who would undertake renovations and subsequent operation of the Armory as a cultural center. In September 2001, ESDC chose the Seventh Regiment Armory Conservancy as the developer [***6] and operator of the Armory. In 2004, the Legislature declared that leasehold title to the Armory was property of the State and, recognizing that the Seventh Regiment Armory Conservancy had been chosen as the preferred developer and operator for the site, authorized ESDC to enter into a lease with the Conservancy for future renovation and operation of the

Armory (see, L. 2004, ch 482, § 1).

In December 2004, respondent Conservancy hired two engineering firms, AKRF and Philip Habib & Associates, to prepare environmental assessments (EA) of the project. The EA ultimately produced, which consisted of a full environmental assessment form (EAF) and more detailed reports from both firms concerning potential environmental impacts of the project, concluded that the proposed plans for the renovation and operation of the Armory as a cultural center would not have a significant environmental impact.

On June 16, 2005, ESDC issued a notice of intent to declare itself as "lead agency" for purposes of review under the State Environmental Quality Review Act (SEQRA). No other agencies objected to ESDC's designation as lead agency. The notice of intent indicated that the renovation of the Armory [***7] would be treated as a "Type I" action under SEQRA, which is an action that is legislatively presumed to be likely to have at [*4] least one significant adverse impact on the environment which, in turn, would trigger the requirement of a full environmental impact statement (EIS) (see, 6 NYCRR § 617.7 [a] [1]). The parties do not dispute that the sole reason for the designation as a Type 1 action was because the Armory is an historic building (see, 6 NYCRR § 617.4 [b] [9]). [1]

> 1    Although ESDC designated the project as a Type I action, it argues in the papers that it was not actually required to do so since SEQRA regulations explicitly exempt work on historical landmarks that are designed for the preservation of the facility (see, 6 NYCRR 617.4 [b] [9]). According to respondents, the Type I designation was only made in an abundance of caution.

Notwithstanding the designation as a Type I action, on November 16, 2005, ESDC issued a Negative Declaration/Notice of Determination of No Significance for [***8] the project. That determination, which is articulated in a 5-page document, was based on the results of the EAF and the analyses that had been conducted on potential impacts such as traffic, air quality, noise, neighborhood character, and other conditions by the two engineering firms. Petitioners now challenge the negative declaration claiming that there were various procedural and substantive deficiencies in the process, and ask this Court to direct ESDC to require that the Conservancy cause a full EIS to be prepared for this project.

*Analysis*

Respondents seek dismissal of the amended petition arguing that the petitioners do not have standing to challenge the negative declaration. Specifically, respondents allege that the individual petitioners, Rita

2006 NY Slip Op 52055U, *; 13 Misc. 3d 1229A, **;
831 N.Y.S.2d 352; 2006 N.Y. Misc. LEXIS 3107, ***

Chu and Bruce Lee, have not established a particularized injury beyond that to be felt by community at large and that their physical proximity to the Amory, on its own, is insufficient to confer standing on them (*see, Society of Plastics Indus., Inc. v County of Suffolk,* 77 N.Y.2d 761, 573 N.E.2d 1034, 570 N.Y.S.2d 778 [1991]; *Matter of Oates v Village of Watkins Glen,* 290 A.D.2d 758, 736 N.Y.S.2d 478 [2d Dept. 2002]). Moreover, respondents [***9] argue that none of the petitioner organizations meet the requirements for organizational standing set forth by the Court of Appeals in *Society of Plastics* (*supra*).

Contrary to respondents' arguments, both of the individual petitioners have standing to litigate their claims. Both allege that, as a result their homes' close proximity to the Amory, they will be directly and adversely affected by increased noise, traffic and air pollution that will be generated by the proposed cultural center. While it is certainly true that mere physical proximity does not confer standing, extremely close proximity of the type involved here is nonetheless important. The test is "whether the neighbor is close enough to suffer some harm other than that [*5] experienced by the public generally" (*see, Matter of Oates, supra,* 290 A.D.2d at 761). These neighbors are across the street from the Amory and will be the most direct recipients of any environmental impacts generated by the project. Their harm would be more direct and more particularized than that suffered by Upper East Side residents generally. Thus the individual petitioners have standing.

The situation is less clear [***10] with respect to the associational petitioners. Once again, *Society of Plastics* defines the standards to be met: organizations must have one or more members who would have standing in their own right, the association must demonstrate that the interests it is asserting are germane to its organizational purposes, and it must be clear that neither the asserted claim nor the appropriate relief requires the participation of the individual members (*see, Society of Plastics, supra,* 77 N.Y.2d at 775). The East 67 Tenants Corp. appears to meet these requirements. President Rita Chu has standing in her own right. The organization is dedicated to the interests of residents of 130 East 67th Street, which presumably includes the residents' interest in the quiet enjoyment of their homes across the street from the Amory. Nor does the claim or relief sought require participation of the individual members.

On the other hand, neither petitioner Seventh Regiment Fund nor petitioner Veterans of the Seventh Regiment has standing here because, as in *Society of Plastics,* neither can demonstrate that the environmental interests they assert in this proceeding are germane to their [***11] organizational purposes (*see,* 77 N.Y.2d at 776). Although Bruce Lee is a member of both the Seventh Regiment Fund and the Veterans of the Seventh Regiment, by their own admission these organizations are dedicated to the preservation of the Amory as a military and memorial facility. That purpose obviously conflicts with the plan to convert the Amory into a cultural center, however, the conflict is not borne of environmental concerns. As the Court of Appeals stated in *Society of Plastics,* "[we] have recognized the danger of allowing special interest groups or pressure groups, motivated by economic self-interests, to misuse SEQRA for [non-environmental] purposes" (*see,* 77 N.Y.2d at 774). Because the organizational missions of the Seventh Regiment Fund and the Veterans of the Seventh Regiment are not germane to the interests they assert in this proceeding, those petitioners do not have standing.

Turning to the merits, the remaining petitioners urge that the negative declaration must be annulled for seven main reasons (among a much larger number of other reasons), any of which would be sufficient for annulment in its own right. Specifically, [***12] petitioners claim that: ESDC did not give prior notice of its environmental review or provide an opportunity for public comment; ESDC did not involve other agencies in the process whose participation was mandatory under SEQRA; ESDC ignored the potential impact of development rights to more than 360,000 square feet that come with the Amory; ESDC ignored the impact that creating a cultural center [*6] would have on other cultural centers in Manhattan; ESDC ignored the impact a cultural center would have on emergency response times; ESDC's determination on the identified impacts was based on faulty data; and that the basis for the negative declaration was not sufficiently elaborated.

Each of the above arguments will be addressed in turn. But first, as a fundamental guiding principle, it is helpful to remember that, in the context of negative declarations, the Court's review is limited to "whether the agency identified the relevant areas of environmental concern, took a hard look' at them, and made a reasoned elaboration' of the basis for its determination" (*Matter of Jackson v New York State Urban Dev. Corp.,* 67 N.Y.2d 400, 417, 494 N.E.2d 429, 503 N.Y.S.2d 298 [1997]). In addition to raising [***13] numerous arguments on each of the above elements of "substantive" review (i.e., relevant concern, hard look, reasoned elaboration), petitioners also raise numerous "procedural" challenges, claiming that ESDC failed to comply with SEQRA requirements concerning public notice and hearings, notification to other agencies and publication of findings. The cumulative impression left by all these arguments is that petitioners are challenging essentially every aspect of respondents' environmental review, on every conceivable grounds. It should therefore come as no surprise that not every argument has equal merit or warrants equal analysis.

Case 1:07-cv-06851-BSJ-DCF    Document 11-34    Filed 10/04/2007    Page 4 of 6

Page 4

2006 NY Slip Op 52055U, *; 13 Misc. 3d 1229A, **;
831 N.Y.S.2d 352; 2006 N.Y. Misc. LEXIS 3107, ***

Petitioners first primary argument is that ESDC failed to provide adequate notice or an opportunity for public comment before issuing the negative declaration for the project, clearly implying that respondents were under a specific legal obligation to do so, but they cite to no section of SEQRA or other legislation in support this proposition. Respondents counter that SEQRA does not require a public comment period as part of the EA process. Petitioners also take issue with the fact that, although ESDC did actually hold a meeting where the EA was made available, [***14] that meeting did not provide a meaningful opportunity for public comment. Inasmuch as there is no legal requirement for public hearings to be held at the EA stage, it appears that respondents exceeded their legal obligations by holding a meeting where the EA was made available. Thus, petitioners' arguments concerning the sufficiency of public hearings is without merit.

Petitioners next argue that respondents precluded the involvement of other potentially "involved" or "interested" agencies in the environmental review process, as that term is defined in the legislation, by preparing a flawed EAF, by failing to send the (flawed) EAF to all necessary agencies such as the Port Authority and the Department of City Planning, and by failing to provide sufficient documentation in support of the negative declaration. These claims are highly fact-specific, and some familiarity with the factual background is necessary.

The alleged flaws in the EAF were that it indicated that there would not likely be [*7] public controversy related to potentially adverse public impacts of the project and that ESDC incorrectly classified the zoning status of the project. Neither claim has merit. Although [***15] there has been a great deal of controversy surrounding the future of the Armory, hardly any of it has involved the environmental impacts of this development plan. It is also misleading for petitioners to point to the controversies generated by past plans to build a 40-story office tower on the site, since construction of an office tower is clearly not an element of the present development project. As regards the zoning status of the site, there is no factual support for petitioners' claim that the project involves more that 25,000 square feet of office space.

Next, on the issue of whether all the necessary agencies were provided with the EAF, it bears noting that the affidavits submitted by respondents show that none of the agencies who were informed of ESDC's decision to serve as lead agency sought participation in the environmental review process. Moreover, although the Port Authority has committed indirect funding for this project, which could potentially qualify it as an "involved agency" for SEQRA purposes, the Port Authority is a public authority, not an administrative agency. Nor does

the Port Authority consider itself an agency for SEQRA purposes. Thus the omission of the [***16] Port Authority was not fatal. Nor does it appear that respondents were obligated to provide a copy of the EAF to the Department of City Planning for reasons already set forth with respect to the appropriate zoning status for the project. Petitioners have not articulated any substantial interest in this project on the part of other agencies that were allegedly excluded from the process. Thus this argument is not persuasive.

The last means by which respondents are alleged to have bypassed necessary agency participation was by failing to include a copy of the engineers' reports along with the EAF that was sent to various agencies. Once again, the necessity of sending these reports is not presented as a regulatory requirement, but rather as an omission by respondents which this Court presumably is intended to construe as an effort to obfuscate the facts and exclude other agencies from participation in the process. However, given the total lack of desire on the part of any potentially interested agency to be involved at any stage of the SEQRA process here, it is difficult for this Court to conceive how this omission could result in annulment of the negative declaration without a great [***17] deal of conjecture and speculation. As already mentioned, no other agency has asserted an interest in this project or has stepped forward to challenge the sufficiency of respondents' EA.

Petitioners' next claim, that respondents failed to consider the environmental impacts of developing 361,500 square feet of air rights that could potentially be developed is perhaps the least meritorious of all the primary arguments. From the outset, this development project specifically excluded any suggestion or plan that [*8] involved developing the Armory's air rights. Respondents can hardly be faulted for failing to consider the environmental impacts of building something which could not be built.

The next environmental impact alleged to have been overlooked by respondents is the impact that a cultural center at the Armory would have on other cultural venues in the City, such as the Whitney Museum, the 92nd Street Y and Lincoln Center. Contrary to petitioners' arguments, the Court of Appeals decision in *Chinese Staff and Workers Assn. v City of New York* does not require that such patently economic impacts occurring at far-flung locations throughout the City be considered as part of [***18] SEQRA review (68 N.Y.2d 359, 502 N.E.2d 176, 509 N.Y.S.2d 499 [1986]). In considering the effects that building a high-rise luxury condominium tower would have on the character of the local community which traditionally had been made up of low-income residents and small businesses, the Court of Appeals held that factors that are generally regarded as social or economic should nonetheless be considered

2006 NY Slip Op 52055U, *; 13 Misc. 3d 1229A, **;
831 N.Y.S.2d 352; 2006 N.Y. Misc. LEXIS 3107, ***

when they affect "population patterns and neighborhood character" (*Chinese Staff, supra*, 68 N.Y.2d at 366, 502 N.E.2d 176, 509 N.Y.S.2d 499). In this situation, however, the alleged impacts described by petitioners do not affect population patterns or character of the neighborhood. The effects alleged assuming there is any validity to them would be generalized effects on cultural institutions throughout the City. Nor is it likely that the addition of yet another cultural center on the Upper East Side would affect neighborhood character since, by petitioners' own admissions, such institutions are already a prevalent feature of the neighborhood. Finally, it bears noting that respondents have pointed to a number of cultural institutions, including nearby Hunter College, which welcome the addition another cultural venue [***19] in the neighborhood.

Petitioners also allege that ESDC ignored the effects that building a cultural center would have on the ability to respond to emergencies. Interestingly, this argument does not stress any particularized effect that a cultural center would have on traffic patterns in the area, although that is part of the argument. Instead, petitioners focus on the fact that in times of civic emergency the Armory Drill Hall has functioned as a "staging area" or gathering place. Therefore, according to petitioners, the conversion of the Drill Hall into a cultural center will affect the neighborhood's ability to respond to large-scale emergencies. Notwithstanding this claim, petitioners have no response to respondents' claim that, because of its multi-use design, the Armory will continue operate as a municipal gathering place in times of emergency, as required by statute. In fact, respondents point out that when planned electrical upgrades and other improvements are made, the Armory will actually operate more efficiently as an emergency shelter and staging area. Respondents persuasively argue that there is no rational basis for conducting an assessment of the environmental impact [***20] of losing a capability which the project is specifically required to retain. Petitioners' related [*9] argument concerning response times for emergency vehicles is only cursorily asserted and is not sufficiently distinguished from the issue of traffic patterns generally to warrant extended review here. That claim is better considered as part of petitioners' argument concerning the sufficiency of review on traffic impacts generated by the plan, which follows directly.

The next claim, that ESDC's analysis of impacts in areas such as traffic and air pollution was marred by improper procedures and based on flawed data, is another version of earlier arguments that relevant environmental impacts were overlooked. The difference is that, instead of arguing that relevant environmental impacts were ignored entirely, this argument attempts to show that even the impacts that were taken into account were insufficiently reviewed. The conclusion to be reached,

however, is the same: that ESDC failed to take a "hard look" at each of the critical concerns. Perhaps the most notable facet of this argument is that petitioners use it to introduce a report from their own engineer who, not surprisingly, [***21] critiques numerous assumptions and methodologies utilized by respondents' engineers in their reports, suggesting that respondents' review was insufficient.

In the context of the SEQRA process, it is generally improper for courts to substitute the findings of one expert for another since "challenges to the conclusions drawn by the lead agency from the data presented requiring a substitution of judgment by the court will likely fail. . .since differing conclusions reached by other experts concerning the potential adverse environmental impacts are insufficient to annul an agency's determination" (*Roosevelt Islanders for Responsible Southtown Development v Roosevelt Island Operating Corp.*, 291 A.D.2d 40, 55, 735 N.Y.S.2d 83 [1st Dept. 2001] [internal citations and quotations omitted]). The analysis distills to whether the lead agency, here ESDC, acted in arbitrary or capricious manner, or in an excess of its discretion, when it chose to rely upon the reports created by its own engineers. Although petitioners have presented a report which criticizes the methods employed by respondents' experts and questions the conclusions reached, this evidence does not go so far as to plainly show [***22] that petitioners' expert must be preferred over respondents' or that respondents' reliance on their own experts' data was irrational.

In their last principle argument, which is that ESDC failed to make a reasoned elaboration of their determination, petitioners compare this case to *Matter of City Coalition to End Lead Poisoning v Vallone*, calling it "remarkably similar" (100 N.Y.2d 337, 794 N.E.2d 672, 763 N.Y.S.2d 530 [2003]). In *Coalition to End Lead Poisoning*, the Court of Appeals conducted SEQRA review of the negative declaration that accompanied the New York City Council's enactment of legislation which struck down a landmark lead-based paint abatement law and replaced it with a controversial new law that pursued a policy of "containment." The legislation in question removed lead dust from the definition of a [*10] lead-based hazards and raised the threshold age for children would be protected under the City's lead paint laws. In support of these radical changes to former policy, the City Council offered a two-paragraph explanation, which the Court of Appeals found insufficient (*id.*). In the opinion of this Court, the two situations are starkly different.

The action under review [***23] here involves the renovation of a building a very common occurrence in Manhattan which arguably would not have even triggered SEQRA considerations but for the fact that the building is historic. Rather than dealing with such

Case 1:07-cv-06851-BSJ-DCF   Document 11-34   Filed 10/04/2007   Page 6 of 6

2006 NY Slip Op 52055U, *; 13 Misc. 3d 1229A, **;
831 N.Y.S.2d 352; 2006 N.Y. Misc. LEXIS 3107, ***

weighty issues as how the health and safety of some of the poorest and most vulnerable members of our community will be affected by changes to long-standing policy concerning a well-known environmental poison, this dispute focuses on how some of the most privileged members of our community will be affected by an auditorium. Most importantly, despite the obvious differences (both in degree and kind) between the two cases, respondents here produced a five-page explanation for the negative declaration that summarized the findings in each of the identified relevant areas of environmental concern. It is difficult to imagine what more could have been said and petitioners' argument offers no reasonable suggestions in that regard.

There are other arguments made in the voluminous amended petition which are either not directly relevant to the court's scope of review in a SEQRA proceeding or which have no apparent merit, or both. In the final analysis, this Court agrees [***24] with respondents that the renovation of the Armory and the addition of retractable seating in the Drill Hall to give the space greater functionality as a gathering place and cultural center is a project that only questionably triggers SEQRA review. Having opted to do so, however, it appears that ESDC identified all the truly relevant areas of environmental concern attendant in such a project and gave each of them the "hard look" they deserve. Having done so, ESDC then published its findings in a negative declaration that adequately describes the areas of concern identified and the basis for the negative conclusion. That is the essence of what SEQRA requires.

In *Society of Plastics*, the Court of Appeals expressed a concern about relaxing the standards for organizational standing in SEQRA challenges for fear that groups whose interest was primarily economic, or non-environmental, would use the process to generate

delay and interference (*Society of Plastics, supra*, 77 N.Y.2d at 774). Although the petitioners here are both individuals and groups, it seems that some of the same concerns are at play. While there is little doubt that petitioners, particularly the [***25] Seventh Regiment Fund and the Veterans of the Seventh Regiment, have strong opinions about who owns the Armory and who should control its fate and those opinions may one day be vindicated in court they do not find their best expression in a SEQRA challenge such as this. The overall impression left by the diffuse and often strained arguments made in this petition is that petitioners have chosen to use the [*11] SEQRA process more for the purpose of generating delay and interference than advancing any legitimate environmental interest. Accordingly, it is

**Ordered** that the petition is sequence 001 is dismissed as moot; it is further

**Ordered** that the motion to dismiss in sequence 002 is likewise dismissed as moot; it is further

**Ordered** that the cross-motion in sequence 003 is granted to the extent that the petition, insofar as it is made on behalf of the Seventh Regiment Fund and the Veterans of the Seventh Regiment is dismissed for lack of standing; it is further

**Ordered** and **adjudged** that the amended petition (sequence 003) on behalf of the remaining petitioners is denied and the proceeding dismissed.

This constitutes the decision and judgment of [***26] the Court.

Dated:

Lottie E. Wilkins, J.S.C.