UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X

KENYON B. FITZGERALD, JR.              :
PETER SCOVILLE WELLS, SIDNEY SILLER,        07 Civ. 6851 (BSJ) (DCF)
and DISABLED AMERICAN VETERANS         :
DEPARTMENT OF NEW YORK INC.,
                                       :
             Plaintiffs,
                                       :
-against-
                                       :
WADE F. B. THOMPSON, ELIHU ROSE,
ARIE L. KOPELMAN, STEPHEN LASH,        :
EDWARD KLEIN, REBECCA ROBERTSON,
KIRSTEN REOCH, CHARLES GARGANO,        :
WILLIAM SHERMAN, CAROL BERENS,
JOHN DOE, MARY ROE and SEVENTH         :
REGIMENT ARMORY CONSERVANCY, INC.,
                                       :
             Defendants.
                                       :

-------------------------------------X

## MEMORANDUM OF LAW OF STATE DEFENDANTS
## IN SUPPORT OF MOTION TO DISMISS

ANDREW M. CUOMO
Attorney General of the
    State of New York
**Attorney for State Defendants**
    **Berens and Sherman**
120 Broadway – 24th Floor
New York, NY 10271-0332
(212) 416-8645
FAX (212) 416-6009
joel.graber@oag.state.ny.us

LITIGATION BUREAU

JOEL GRABER
Assistant Attorney General
Special Litigation Counsel

October 4, 2007

**TABLE OF CONTENTS**

                                                               **Page**

Table Of Authorities ....................................   iii

Preliminary Statement ...................................    1

Facts Pertinent To This Motion ..........................    3

The 1800s Session Laws And Leases
Concerning The Armory ...................................   17

   A.   The 1874 Lease Between The City Of New York
       And The Seventh Regiment And The Construction
       Of The Armory ................................   17

   B.   The 1879 Lease And Its Conveyance To The
       Trustees Of The Seventh Regiment Armory Fund ..   19

   C.   The 1893 Reassignment Of The Lease To The
       Field Officers Of The Seventh Regiment ........   20

Prior Litigation Concerning The Armory ..................   21

   A.   Veterans of the Seventh Regiment v. Field
       Officers of the Seventh Regiment, 60 Hun. 578,
       14 N.Y.S. 811 (1st Dep't 1891) ................   23

   B.   State of New York v. The Seventh Regiment Fund,
       13 Misc.3d 222 (Sup. Ct. N.Y. Co. 2006)
       (Hon. Richard F. Braun) .......................   25

   C.   The Seventh Regiment Fund v. Pataki,
       179 F.Supp.2d 356 (S.D.N.Y. 2002)
       (Hon. Laura Taylor Swain) .....................   27

   D.   Dalva v. Pataki, Sup. Ct. N.Y. Co.
       (Index No. 116965/05) (Hon. Marilyn Shafer) ...   29

   E.   Chu v. New York State Urban Dev. Corp.,
       13 Misc.3d 1229A (Sup. Ct. N.Y. Co 2006) ......   34

Standard On A Motion To Dismiss .........................   37

POINT I     PLAINTIFFS LACK STANDING TO MAINTAIN
         THIS ACTION ...............................   38

POINT II        THE COMPLAINT'S FIRST CLAIM FAILS TO
                STATE A CAUSE OF ACTION FOR VIOLATION
                OF SUBSTANTIVE DUE PROCESS ................   44

POINT III       THE COMPLAINT'S SECOND CLAIM FAILS TO
                STATE A CAUSE OF ACTION UNDER THE
                PUBLIC USE CLAUSE .........................   52

POINT IV        THE COMPLAINT'S THIRD CLAIM FAILS TO
                STATE A CAUSE OF ACTION UNDER THE
                CONTRACT CLAUSE ...........................   56

POINT V         THE COMPLAINT'S FOURTH CLAIM ALLEGING
                A VIOLATION OF THE UDC ACT IS A N.Y. CPLR
                ARTICLE 78 CLAIM THAT DOES NOT LIE AND IS
                BARRED BY THE STATUTE OF LIMITATIONS .......   58

POINT VI        STATE DEFENDANTS CANNOT BE HELD LIABLE ON
                THE COMPLAINT'S FOURTH CLAIM ALLEGING A
                VIOLATION OF THE UDC ACT ..................   60

POINT VII       THE COMPLAINT FAILS TO STATE A CAUSE OF
                ACTION AS AGAINST STATE DEFENDANTS FOR THE
                ADDITIONAL REASON THAT THEY ARE POWERLESS
                TO AFFORD THE RELIEF DEMANDED BY THE
                COMPLAINT .................................   66

POINT VIII      THE COMPLAINT'S FIFTH CLAIM FAILS TO
                STATE A CAUSE OF ACTION FOR TORTIOUS
                INTERFERENCE WITH A CONTRACT ..............   68

POINT IX        THE COMPLAINT'S SIXTH CLAIM FAILS TO
                STATE A CAUSE OF ACTION FOR CONSTRUCTIVE
                TRUST .....................................   72

POINT X         THE COMPLAINT'S SEVENTH CLAIM MUST BE
                DISMISSED BECAUSE THERE IS NO INDEPENDENT
                CAUSE OF ACTION UNDER 42 U.S.C. § 1983 .....   75

POINT XI        STATE DEFENDANTS ARE ENTITLED TO QUALIFIED
                IMMUNITY WITH RESPECT TO ANY FEDERAL CLAIMS
                MEANT TO HAVE BEEN ASSERTED AGAINST THEM ...   76

POINT XII       THIS COURT LACKS PERSONAL JURISDICTION
                OVER DEFENDANT SHERMAN ....................   79

Conclusion ..............................................   80

**TABLE OF AUTHORITIES**

**Cases**                                                         **Page**

Albright v. Oliver,
    510 U.S. 266 (1994) ..................................... 75

ATSI Communs., Inc. v. Shaar Fund, Ltd.,
    493 F.3d 87 (2d Cir. 2007) ..............................48

Baguer v. Spanish Broad. System,
    2007 U.S. Dist. LEXIS 70793 (S.D.N.Y. 2007) ............. 76

Baker v. McCollan, 443 U.S. 137 (1979) ....................... 75

Bankers Sec. Life Insurance Society v. Shakerdge,
    49 N.Y.2d 939 (1980) .................................... 74

Bell Atlantic Corporation v. Twombly,
    ___ U.S. ___, 127 S. Ct. 1955 (2007) ................... 37

Blatch ex rel. Clay v. Hernandez,
    360 F. Supp. 2d 595 (S.D.N.Y. 2005) ..................... 59

Brevot v. N.Y. City Dep't of Educ.,
    2007 U.S. Dist. LEXIS 16109 (S.D.N.Y. Mar. 6, 2007) ..... 59

Burns Jackson Miller Summit & Spitzer v. Lindner,
    59 N.Y.2d 314 (1983) .................................... 70

City of Monterey v. Del Monte Dunes,
    526 U.S. 687 (1999) ..................................... 46

Conley v. Gibson, 255 U.S. 41 (1957) ......................... 37

Crowley v. Courville,76 F.3d 47 (2d Cir. 1996) ............... 46

Dalva v. Pataki, Sup. Ct. N.Y. Co. (Index No. 116965/05), Slip
    op. dated March 3, 2006 (Hon. Marilyn Shafer) ............ 6

DLC Management Corp. v. Town of Hyde Park,
    163 F.3d 124 (2d Cir. 1998) ............................. 47

Exxon Corp. v. Eagerton, 462 U.S. 176 (1983) ................ 46

Field Day, LLC v. County of Suffolk,
    463 F.3d 167 (2d Cir. 2006) ............................. 38

-iii-

Frank v. Relin, 1 F.3d 1317 (2d Cir.), cert. denied, 510 U.S.
1012 (1993) .............................................. 67

Gilligan v. Morgan, 413 U.S. 1 (1973) ........................ 11

Gonzaga Univ. v. Doe, 536 U.S. 273, 285 (2002) ...............75

Hawaii Housing Authority v. Midkiff, 467 U.S. 229 (1984) ..... 51

Heller v. Doe, 509 U.S. 312 (1993) ........................... 46

Hotel Dorset Co. v. Trust for Cultural Resources,
46 N.Y.2d 358 (1978) ................................... 31

Interport Pilots Agency v. Sammis, 14 F.3d 133
(2d Cir. 1994) ......................................... 47

Iqbal v. Hasty, 490 F.3d 143 (2d Cir. 2007) .............. 37, 77

Jermosen v. Smith, 945 F.2d 547 (2d Cir. 1991) ............... 78

Johnson v. Newburgh Enlarged School District, 239 F.3d 246
(2d Cir. 2001) ......................................... 77

Lama Holding Co. v. Smith Barney Inc.,88 N.Y.2d 413 (1996) ... 69

Leebaert v. Harrington, 332 F.3d 134 (2d Cir. 2003) .......... 45

Lujan v. Defenders of Wildlife, 504 U.S. 555(1992) ....... 38, 44

Maryland ex rel. Levin v. United States,
381 U.S. 41 (1965) ..................................... 12

McGowan v. Maryland, 366 U.S. 420 (1961) ..................... 47

McNeill v. New York City Housing Authority,
719 F. Supp. 233 (S.D.N.Y. 1989) ....................... 70

Moriani v. Hunter, 1979 U.S. Dist. LEXIS 11003
(S.D.N.Y. 1979) ........................................ 76

Natale v. Town of Ridgefield, 170 F.3d 258 (2d Cir. 1999) .... 46

New York v. Richardson, 473 F.2d 923 (2d Cir.), cert. denied
sub nom. Lavine v. Lindsey, 412 U.S. 950 (1973) ......... 57

Palomar Pomerado Health System v. Belshe,
     180 F.3d 1104 (9th Cir. 1999) .......................... 57

Rao v. New York City Health and Hospitals Corp.,
     882 F. Supp. 321 (S.D.N.Y. 1995) ....................... 68

Rojas-Reyes v. INS, 235 F.3d 115 (2d Cir. 2000) ............. 46

Rosenthal & Rosenthal, Inc. v. N.Y. State Urban Dev. Corp.,
     771 F.2d 44 (2d Cir. 1985), cert. denied, 475 U.S. 1018
     (1986) ................................................. 52

Roth v. Jennings, 489 F.3d 499 (2d Cir. 2007) ................ 37

Seventh Regiment Fund v. Pataki, 2001 U.S. Dist. LEXIS 16029
     (S.D.N.Y. 2001) ........................... 27, 28, 36, 62

Sinhogar v. Parry, 74 A.D.2d 204 (3d Dep't 1980), aff'd, 53
     N.Y.2d 424 (1981) ...................................... 64

Sound Aircraft Services v. Town of E. Hampton,
     192 F.3d 329 (2d Cir. 1999) ............................ 78

State of New York v. Seventh Regiment Fund,
     98 N.Y.2d 249 (2002) ................................... 26

Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.),
     377 F.3d 209 (2d Cir. 2004) ............................ 73

The Seventh Regiment Fund v. Pataki,
     179 F. Supp. 2d 356 (S.D.N.Y. 2002) ............ 27, 28, 36

Tobin v. LaGuardia, 276 N.Y. 34 (1937) ...................... 20

Tobin v. La Guardia, 290 N.Y. 119 (1943) ................ 12, 41

Trenton v. New Jersey, 262 U.S. 182 (1923) .............. 56, 57

United States v. Village of New Hempstead,
     832 F. Supp. 76 (S.D.N.Y. 1993) ........................ 70

Vandor, Inc. v. Militello, 301 F.3d 37 (2d Cir. 2002) ........ 59

Veterans of the Seventh Regiment v. Field Officers of the
     Seventh Regiment, 60 Hun. 578, 14 N.Y.S. 811
     (1st Dep't 1891) ........................... 4, 22, 43, 71

Villager Pond, Inc. v. Town of Darien, 56 F.3d 375 (2d Cir.
    1995), cert. denied, 519 U.S. 808 (1996) ............ 47, 48

Williams v. Eggleston, 170 U.S. 304 (1898) .................. 56

Wolcott v. Broughton, 57 A.D.2d 1022 (3d Dep't 1977) ......... 65

U.S. Const. art. I, § 10 ................................. 56, 58
U.S. Const. art. III, § 2, cl. 1 ............................ 38

## Federal Statutes

42 U.S.C. § 1983 ........................................... 75
Article III ................................................ 38

## Federal Rules of Civil Procedure

Fed.R.Civ.P. 4(e) .......................................... 79
Fed.R.Civ.P. 8(a) .......................................... 37
Fed.R.Civ.P. 12(b)(1) ....................................... 1
Fed.R.Civ.P. 12(b)(5) ....................................... 1
Fed.R.Civ.P. 12(b)(6) ....................................... 1

## State Statutes

N.Y. Const. art. IX, § 2(b)(2) ............................. 30
N.Y. Exec. Law § 190(2) ..................................... 7
N.Y. State Finance Law § 123-b ............................. 30
N.Y. General Municipal Law § 51 ............................ 42
N.Y. Laws 1861, ch. 41 ..................................... 23
N.Y. Laws 1879, ch. 57 ..................................... 11
N.Y. Laws 1874, ch. 234 .................................... 11
N.Y. Laws 1893, ch. 518 .................................... 11
N.Y. Laws 1968, ch. 174, § 1 ............................... 12
N.Y. Public Officers Law § 17(4) ............................ 2
N.Y. Unconsol. Law § 6251 et seq ............................ 7
N.Y. Unconsol. Law § 6252 ................................... 7
N.Y. Military Law § 180-a(1) ........................... passim
N.Y. Military Law § 180-a(1)(h) ............................ 12
N.Y. Military Law § 39(b) .................................. 12
UDC Act § 16(d) ............................................ 58

## New York City Code

N.Y.C. Admin. Code § 5-509(1) (1985) ....................... 20

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X

KENYON B. FITZGERALD, JR.               :
PETER SCOVILLE WELLS, SIDNEY SILLER,         07 Civ. 6851 (BSJ) (DCF)
and DISABLED AMERICAN VETERANS          :
DEPARTMENT OF NEW YORK INC.,
                                        :
                Plaintiffs,
                                        :
-against-
                                        :
WADE F. B. THOMPSON, ELIHU ROSE,
ARIE L. KOPELMAN, STEPHEN LASH,         :
EDWARD KLEIN, REBECCA ROBERTSON,
KIRSTEN REOCH, CHARLES GARGANO,         :
WILLIAM SHERMAN, CAROL BERENS,
JOHN DOE, MARY ROSE and SEVENTH         :
REGIMENT ARMORY CONSERVANCY, INC.,
                                        :
                Defendants.
                                        :

--------------------------------------X
```

## MEMORANDUM OF LAW OF STATE DEFENDANTS
## IN SUPPORT OF MOTION TO DISMISS

### Preliminary Statement

This memorandum of law is respectfully submitted by ANDREW
M. CUOMO, Attorney General of the State of New York, attorney for
defendants Carol Berens and William Sherman ("State defendants"),
in support of State defendants' motion for an order and judgment,
pursuant to Rules 12(b)(1), 12(b)(5), and 12(b)(6) of the Federal
Rules of Civil Procedure, dismissing the complaint in this
action, on the grounds that plaintiffs lack standing to maintain
this action, that the complaint fails to state a cause of action
as against State defendants, and that this Court lacks personal

jurisdiction over defendant Sherman.[1]

This action seeks declaratory and injunctive relief invalidating N.Y. Laws of 2004, ch. 482 ("Chapter 482"), in relation to the historic Seventh Regiment Armory, a New York State Army National Guard facility - and a spectacular example of Victorian military architecture - that occupies the city block bounded by East 66th and East 67th Streets, and Lexington and Park Avenues, in the Upper East Side of Manhattan.

By means of Chapter 482, the Legislature set up a plan for the creation of a public-private partnership to restore, maintain and operate the Armory as a community landmark and resource. Under the plan, the State entered into a long-term lease of the Armory with defendant Seventh Armory Conservancy, Inc. (the "Conservancy"), a not-for-profit corporation established in 1997 to explore ways to restore the Armory, to operate the Armory as a nonprofit cultural arts center, and to maintain the Armory on a self-sustaining basis in furtherance of the public interest.

Plaintiffs oppose the restoration plan, claiming that the enactment and implementation of Chapter 482 violates their

---

[1]Plaintiffs also name as a defendant Charles Gargano, former Chair of the Empire State Development Corporation. Although plaintiffs filed affidavits of service with respect to the other defendants, which are Dkt. No. 9 in this Court's docket, no affidavit was filed with respect to Gargano. So far as the Attorney General's Office is aware, Gargano has not been served and this Court therefore lacks personal jurisdiction over Gargano. The Attorney General's Office has not received a request for representation from Gargano as required by N.Y. Public Officers Law § 17(4)(i).

federal constitutional rights and several rights under state
common law.

As demonstrated *infra*, plaintiffs lack standing to maintain
this action, as they fail plausibly to allege any legally
protected interest in the Armory, nor any injury by reason of
Chapter 482.  Each of the seven claims asserted in the complaint
also fails to state a cause of action as a matter of law.

## Facts Pertinent To This Motion

Facts pertinent to this motion to dismiss are set forth in
the supporting declaration of Assistant Attorney General Joel
Graber, dated October 4, 2007 ("Graber decl."), and the exhibits
annexed thereto, to which this Court is respectfully referred.

The supporting declaration, and the statement of facts that
follows, are intended to be confined to the allegations of the
complaint. In addition, the thirteen exhibits attached to the
complaint, public documents that the complaint incorporates by
reference, the legislative history applicable to Chapter 482, and
other public documents referred to *infra* are all subject to
judicial notice on this motion to dismiss.

The Armory was built for the Seventh Regiment of the New
York State Army National Guard, known as the "Silk Stocking
Regiment" for its prestigious roster of members, and the largest
and most admired volunteer militia in the country during the
nineteenth century.  The Armory consists of two parts: a five-

-3-

story Administration Building fronting on Park Avenue, and a
52,550 square-foot column-free Drill Hall that runs from the rear
of the Administration Building to Lexington Avenue. The first
three stories of the Administration Building and the Drill Hall,
designed by renowned architect Charles William Clinton, were
erected from 1879 through 1881. There followed a number of
alterations during 1909-1911, and the addition of a fifth floor
in 1929. Graber decl. ¶ 8; Complaint ¶ ¶ 12-16, 27-31.

It is often noted that the cost of building and furnishing
the Armory was paid for by members of the general public, through
the purchase of State-issued bonds, and by gifts made by members
as well as veterans of the Regiment. Graber decl. ¶ 9; Complaint
¶ ¶ 21-22, 26; Veterans of the Seventh Regiment v. Field
Officers of the Seventh Regiment, 60 Hun. 578, 14 N.Y.S. 811, 814
(1st Dep't 1891) (noting veterans "contributed large sums of
money" to build and furnish the so-called Veterans/Tiffany Room
on the main floor of the Armory).

The Legislature reaffirmed the State's ownership of the
Armory by § 1 of Chapter 482, which provides in pertinent part as
follows:

> [L]easehold title to the seventh regiment
> armory is the property of the state under an
> indenture of lease made on September 23, 1874
> between "the mayor, alderman and commonality
> of the city of New York," as lessors, and
> "the field officers of the seventh regiment
> of the national guard of the state of New
> York," as lessees, which field officers were

> later redesignated as the trustees of the
> seventh regiment armory building (Chapter 518
> of the Laws of 1893), as amended by an
> indenture of lease dated April 23, 1879.

Chapter 482, § 1 merely confirms a fact respecting all State
National Guard armories - all are State facilities as a matter of
law, although some are owned by political subdivisions of the
State and some are owned by the State itself as in the case of
the Seventh Regiment Armory. Graber decl. ¶ 10. Chapter 482 is
Graber decl. Ex. A.

The Armory is a City, State and federal landmark - an
institution and a property of great importance to the People of
the State of New York historically, architecturally and
culturally. Graber decl. ¶ 11; Complaint ¶ ¶ 27-29. The
exterior of the Armory was landmarked by New York City in 1967,
and portions of the interior were designated in 1994. The
interior is described in the Designation Report of the New York
City Landmarks Preservation Commission, dated July 19, 1994, a
copy of which is Graber decl. Ex. B. A portion of the
Designation Report is quoted at Complaint ¶ 28.

As the Landmarks Preservation Commission Report and numerous
other sources have described, the Armory is perhaps the nation's
finest example of the American Aesthetic Movement, with interiors
designed by some of the foremost artists and designers of the
time including Louis Comfort Tiffany, Stanford White, Candace
Wheeler, the Herter Brothers and Jasper Cropsey. Graber decl. ¶

-5-

12; Complaint ¶ 27.  The Landmarks Preservation Commission called the Armory "the single most important collection of nineteenth century interiors to survive intact in one building."

As State Supreme Court found in Dalva v. Pataki, Sup. Ct. N.Y. Co. (Index No. 116965/05), Slip op. dated March 3, 2006, at 3 (Hon. Marilyn Shafer), "sadly," however, the Armory "has deteriorated to a point from which it may never be used again, unless something is done very soon."  A copy of that decision and order, which denied a motion for a preliminary injunction enjoining the implementation of Chapter 482, as against a claimed violation of municipal home rule, is Graber decl. Ex. C.

Indeed, the dire need to restore and renovate the Armory was recognized in 2000, when World Monuments Watch, a global program of the World Monuments Fund aimed at calling attention to imperiled cultural heritage sites around the world, listed the Armory as being one of the World's 100 Most Endangered Sites. See http://www.wmf.org/html/programs/WatchlistPrevious.html. The World Monuments Fund designation is merely emblematic of the overwhelming importance of the Armory to the People of the State of New York according to diverse military, cultural, architectural and historical criteria.  Graber decl. ¶ 14.

The Governor responded to the Armory's drastic circumstances by creating a Seventh Regiment Advisory Council to devise and develop preservation options for the Armory consistent with the

-6-

best interests of the People of the State of New York, as well as the City and the surrounding community. Graber decl. ¶ 15.

Thereafter, State officials enlisted the Empire State Development Corporation to act on behalf of the New York State Division of Military and Naval Affairs ("DMNA") in developing a request for proposals ("RFP") for a public-private partnership for the restoration, preservation, management and operation of the Armory, consistent with the overall public interest and the specific needs of the New York State Militia.[2] Here it should be noted that ESDC was particularly well-situated for this purpose, as it had been established by the Legislature in 1968, as the New York State Urban Development Corporation (see N.Y. Unconsol. Law § § 6251 et seq.), to "undertake public and private improvement programs . . . including the provision of educational, recreational and cultural facilities, and the encouragement of participation in these programs by private enterprise." N.Y. Unconsol. Law § 6252. Graber decl. ¶ 16.

Accordingly, ESDC began by issuing a RFP for a consultant to assess the condition of the Armory, to recommend and evaluate the

---

[2]Pursuant to N.Y. Exec. Law § 190(2), DMNA "includes the organized militia; the state reserve list; the state retired list; all offices, headquarters, units, forces, commands, arsenals, depots, armories, bureaus, agencies, bases, camps, ranges, and other military (including air) and naval activities, property, installations, structures, facilities and functions of the state and all military (including air), naval and civilian personnel who may be serving or employed therein."

-7-

costs and practicality of necessary physical improvements to the facility, and to help develop a proposal for a public-private mechanism to undertake and finance essential improvements as well as to operate the facility together with the National Guard in the overall public interest. Graber decl. ¶ 17.

The State's initiative gave rise to intense interest in the community – for one reason, because the Armory is recognized as being "the city's main showplace for art, antiques and craft shows," and had recently been discussed as a possible future venue for the New York Philharmonic. D. J. Wakin, "Armory's Opera Debut Delayed by Lincoln Center," The New York Times, Jun. 15, 2006 § E, p. 1, col. 6. Graber decl. ¶ 18; Complaint ¶ 34. From inception the Armory has been used for many community functions such as music festivals, tennis tournaments, grand balls, and art fairs, even in the course of construction in the 1800s. See, e.g., www.nyc-architecture.com/UES/UES045.htm. The Legislature itself recognized that the Armory has been a "prominent center of cultural and civic events since its construction in 1879." Chapter 482, § 1. Community involvement has always been a core part of the mission of the State Army National Guard.

As a result of the consultancy process, a second RFP, prepared by the consulting firm of Ernst & Young, was issued by ESDC on behalf of DMNA in July 2000. Graber decl. ¶ 19;

-8-

Complaint ¶ 36. A copy of that RFP is Graber decl. Ex. D.
Despite a broad outreach effort and extensive advertising, there
was only one bid, that of defendant Seventh Regiment Armory
Conservancy, which responded to the RFP with a well-developed
proposal supported by a number of substantial civic-minded
individuals and organizations. The following year, in September
2001, ESDC designated the Conservancy as what is termed the
Preferred Proposer. Id.; Complaint ¶ 37.

As State Supreme Court accurately observed, there is no
"alternative to the State's plan which would salvage the Armory
before it becomes a ruin, no plan for its viable use, and
certainly no evidence of the wherewithal to accomplish either
goal" other than by means of Chapter 482, which "provides for the
restoration of a valuable resource and a viable plan for its
use." Dalva v. Pataki, Slip op. dated March 3, 2006, at 18.
Graber decl Ex. C.

Pursuant to Chapter 482, § 1, State officials and the
People's elected representatives determined that certain
legislative action would be helpful to further the project, with
respect to ESDC's authority to act on behalf of DMNA and the
State, the powers and duties of the Adjutant General/DMNA in
relation to the Armory, and legal details in respect to formal
title to the Armory. Graber decl. ¶ 21.

-9-

Among other things, the Legislature sought to confirm the organizational identity of the "Seventh Regiment," an iconic term referring to a New York Army National Guard unit first organized as a State militia artillery battalion in 1806, and reorganized as infantry and redesignated the Seventh Regiment of Infantry (National Guard) in 1847, a designation that was retained until 1917.   (There were, however, numerous preceding and succeeding name changes and redesignations.)   Graber decl. ¶ 22.

In 1995, by reason of a determination of the Chief of Military History of the United States Army, the ultimate arbiter in such matters involving the Army National Guard, the Lineage and Honors of the original 1806 unit and all of its successors were bestowed upon the 107th Corps Support Group of the New York Army National Guard.   Graber decl. ¶ 23 and Ex. E thereto - describing the United States Army Lineage and Honors applicable to the Regiment up to that point.

Thereafter, by order dated April 24, 2007, but effective *nunc pro tunc* the year before, on September 1, 2006, the National Guard Bureau of the Departments of the Army and the Air Force, United States Department of Defense, reorganized, redesignated and consolidated certain units of the New York Army National Guard including the 107th Corps Support Group.   That unit, two others headquartered at the Armory, and a fourth unit based at the 369th Regiment Armory in Harlem, were made a part of a new

-10-

unit called Headquarters 53d Army Liaison Detachment, with the result that that unit is now the Regiment. Graber decl. ¶ 24 and Ex. F (the National Guard Bureau order). It should be noted that the Supreme Court has held that the composition of military forces, specifically the National Guard, is nonjusticiable. Gilligan v. Morgan, 413 U.S. 1, 10 (1973) ("the complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments"). The headquarters of Headquarters 53d Army Liaison Detachment is now at the Armory, as had been the headquarters of the 107th Corps Support Group. Id.

The Legislature made specific reference in Chapter 482 to the organizational identity of the Seventh Regiment because of language employed by the Legislature in the 1800s requiring the City of New York to lease the land upon which the Armory is situated to the so-called "field officers" of the Regiment. See N.Y. Laws 1874, ch. 234; N.Y. Laws 1879, ch. 57; and N.Y. Laws 1893, ch. 518. Plaintiffs' complaint discusses these session laws. Complaint ¶ ¶ 16, 17, 24.

The "field officers" – a military term of art which refers to officer ranks from major through full colonel – can never have functioned under the law other than in their official military capacities, and as subordinates of the Adjutant General, as head of DMNA, and the Governor as Commander-in-Chief of the State

-11-

Militia.  Tobin v. La Guardia, 290 N.Y. 119, 125 (1943) (holding
that the Armory trustees, that is, the field officers, "are an
'agency or instrumentality of the state'").  See also Maryland ex
rel. Levin v. United States, 381 U.S. 41, 48 (1965) ("military
members of the Guard are employees of the States, and so the
courts of appeals have uniformly held").  Graber decl. ¶ 26.

There can therefore be no doubt about the fact that there
remains today a Seventh Regiment, embodied by Headquarters 53d
Army Liaison Detachment of the New York Army National Guard, and
that the Armory continues to be the armory of the Seventh
Regiment, all in accordance with the lease between the State and
the City.  Graber decl. ¶ 27.

Chapter 482 provides for continuing military use of the
Armory for regimental purposes under the lease with the
Conservancy entered into pursuant to the legislation (see new
N.Y. Military Law § 180-a(1)(h); and new § 39(b), § 1, ch. 174,
N.Y. Laws 1968), and further provides for immediate reversion of
use and control of the entire Armory to State military officials
in the event of a declared "civil or military emergency," as
occurred on the occasion of the terrorist attack of September 11,
2001, when for nearly a year afterwards the Armory had to be
dedicated to essential homeland security functions.  N.Y.
Military Law § § 180-a(1)(h), (1)(I), (1)(j), (3)(a), (3)(b),
(3)(c).  Graber decl. ¶ 28; Complaint ¶ 32.

-12-

In addition, the legislation insures the continuation and improvement of a very important homeless women's shelter in the Armory administered for many years by the City of New York through a subcontract with Lenox Hill Neighborhood House, a highly-respected not-for-profit social services organization devoted to ministering to needy individuals on Manhattan's Upper East Side. Graber decl. ¶ 29; Complaint ¶ 33. The shelter serves about 100 women "over 45 years old, many of whom are mentally ill or who have suffered from other illnesses." See http://www.lenoxhill.org/homeless.html. This women's shelter, which the State Army National Guard has hosted for over twenty-five years, was established not by the City of New York but by the State of New York, by Executive Orders of Governors Hugh Carey and Mario M. Cuomo in the 1980s. Graber decl. ¶ 29.

Apart from addressing these matters involving the military needs of the State and one of New York City's best-run shelters for women, the Legislature's extraordinary "Statement of Legislative Findings and Purposes" (§ 1 of Chapter 482) expressly recognizes the Conservancy as "deemed to fulfill all financial, organizational and operational requirements to undertake this endeavor in partnership with the State."

The elected officials who served as the proponents of Chapter 482 are the representatives within whose districts the Armory is located: Assembly Member Jonathan L. Bing and State Senator Liz Krueger. With one exception, every member of the

-13-

City's Albany delegation who voted on Chapter 482 voted in favor
of the legislation:  a total of 84 members of the Legislature
from the City.  The votes in the Assembly and in the Senate are
Graber decl. Ex. G.[3]  A copy of Assembly Member Jonathan L.
Bing's memorandum in support of the Assembly bill that became
Chapter 482 is Graber decl. Ex. H.

Graber decl. Ex. I is the memorandum of the State Division
of the Budget, directed to the Governor, supporting his signing
of the bill that became Chapter 482.  The Budget Division's
memorandum states in part as follows:

> The Division of Military and Naval Affairs'
> mission to train National Guard soldiers can
> be effectively met in the New York
> metropolitan area without the use of the
> Seventh Regiment Armory.  The costs of
> restoring and maintaining the Armory are
> prohibitive and cannot currently be met by
> the State.  Nonetheless, the Armory remains a
> valuable historic, civic and military
> resource for both the State and the City of
> New York and this bill will ensure that it is
> restored and preserved.

The City of New York issued a memorandum to the Governor
strongly urging him to sign the bill, stating in part as follows:

> The City of New York supports this
> legislation, which allows for the restoration
> of an important and historic city landmark
> without interrupting the operation of a
> homeless shelter for women. * * * This
> legislation strikes a unique balance between

---

[3]Contrary to plaintiffs' allegations, however, the statewide
vote was not "unanimous."  See Complaint ¶ ¶ 47, 77.  There were
thirty-five nays in the Assembly, although none from the City.
See Graber decl. Ex. G.

-14-

> the City's homeless needs and the needs of
> the restoration project. * * * Accordingly,
> it is urged that this bill be approved.

A copy of the City's memorandum is Graber decl. Ex. J, and the
memorandum is also published in 2004 N.Y. Session Laws, at 1970-
71.

    After Chapter 482 was signed into law by the Governor on
September 21, 2004, ESDC adopted, at its Directors' meeting on
November 16, 2005, what is referred to as a General Project Plan,
providing for a lease of the Armory to the Conservancy in
accordance with the terms of Chapter 482.  A copy of the General
Project Plan is Complaint Ex. L, and is Graber decl. Ex. K.

    Prior to the adoption of the General Project Plan, a public
hearing on the plan, conducted by a professional hearing officer,
was held at the Armory on July 21, 2005.  Twenty-seven members of
the public testified at the hearing, and nine subsequent letters
or statements were received during the open public hearing period
which ran through August 2005.  In addition to the witness
testimony, 26 statements, letters and other documents were marked
as hearing exhibits.  One of the witnesses who testified was
plaintiff Peter Wells.  A transcript of the public hearing, which
is quoted in Complaint ¶ 87, is Graber decl. Ex. L, and the
exhibits and written statements are Graber decl. Ex. M.

    Although plaintiffs allege that the implementation of
Chapter 482 would "violate the City Landmarks Commission's
official guidelines" (Complaint ¶ 66), one of the exhibits

-15-

received at the hearing, marked Hearing Ex. 26, is a letter from

Robert B. Tierney, Chair of the New York City Landmarks

Preservation Commission, in which he wrote as follows:

> I am writing to express my support for the
> proposal to allow the Seventh Regiment Armory
> Conservancy to undertake efforts to provide
> for the restoration and renovation of the
> Seventh Regiment Armory.
>
> We understand that the Conservancy intends to
> restore the Armory in a way that is
> appropriate to its architectural and historic
> importance, and to create a new cultural
> institution that will feature performances,
> exhibitions and events that will include
> dance, music and the visual arts.
>
> I look forward to the restoration and
> renovation of this important structure.

The ESDC Board of Directors was presented with a report on

the public process, dated November 16, 2005, and, as noted, the

General Project Plan was thereafter approved. The report, which

is Complaint Ex. M, and Graber decl. Ex. N, included as

attachments the transcript of the July 21, 2005 public hearing

and copies of all written comments received through the August

21, 2005 comment period.

There followed a year-long process of negotiations between

ESDC, on behalf of DMNA, and the Conservancy, culminating in a

lease dated November 14, 2006. The lease was reviewed, approved

and signed on behalf of the New York State Comptroller, as is

mandated by the N.Y. State Finance Law, and on behalf of the New

York Attorney General who is required by statute to review State

-16-

leases for form.  The lease is expressly "incorporated by reference" in the complaint.  Complaint ¶ 50.  A copy of the lease is Graber decl. Ex. O.

On December 19, 2006, the Conservancy formally accepted possession of the portions of the Armory demised under the lease.  Graber decl. ¶ 39.

**The 1800s Session Laws And Leases Concerning The Armory**

Chapter 482, with the consent of the City of New York (Graber decl. Ex. J), recast a lease between the State and the City which had been authorized and directed by the Legislature by means of several session laws enacted in the 1880s.

**A.  The 1874 Lease Between The City Of New York And The Regiment And The Construction Of The Armory.**

In the 1860s, the Regiment, which had outgrown its City-built armory in lower Manhattan, asked the City to construct a new armory farther north.  Complaint ¶ 16.  In response, the City set aside the square block at what is now Park Avenue and 66th Street.

In 1874, the New York State Legislature enacted a law requiring the City of New York to lease

> to the field officers, for the time being, of
> the Seventh regiment of the national guard of
> the State of New York and their successors in
> office, acting for said regiment, and for the
> public purposes of said regiment, the plot of
> ground bounded by and situated between Sixty-
> sixth and Sixty-seventh streets and Fourth
> and Lexington avenues in the city of New
> York, the same being a part of the lands or

-17-

premises belonging to the city of New York.

N.Y. Laws of 1874, ch. 234, § 1, a copy of which is Graber decl.
Ex. P. See Complaint ¶ 17.[4]

The law further provided that the site was to be
"exclusively held and used for an armory and drill rooms by said
regiment," and that the lease would run for 21 years at the
nominal rental of one dollar per year.

Thus, on September 23, 1874, a lease was executed between
"the Mayor, Alderman and Commonalty of the city of New York", as
lessors, and "Emmons Clark, Colonel of the 7th Regiment of the
National Guard of the State of New York, Stephen C. Ryder,
Lieutenant Colonel, and George Moore Smith, Major of said
regiment, and field officers thereof", as lessees (the "1874
Lease"). Complaint ¶ 18 and Ex. A. The 1874 Lease provided that
the above-described property "owned by the City of New York"
would be leased to the lessees and "their successors in office
for the term or period of twenty-one years." The lessees, on
their part, were responsible for erecting "suitable buildings for
the purpose of an Armory and Drill Rooms" and maintaining such
buildings "without any cost, charge or expense to the lessors."

In or about 1876, the Regiment established the New Armory
Fund, which sought and received contributions for the
construction from Regiment members, wealthy individuals and

---

[4]As noted *supra*, "field officers" is military term of art
which, then as now, refers to the ranks of major through colonel.

-18-

financial institutions. Construction on the Armory began on October 14, 1877 and was substantially completed in 1879. Funds continued to be raised privately and through public events to decorate the interiors of the Armory, which were substantially completed in 1881.

## B.    The 1879 Lease And Its Conveyance To The Trustees Of The Seventh Regiment Armory Fund.

In 1879, the Legislature enacted Chapter 57 to "secure the completion of the Seventh regiment new armory." Graber decl. Ex. Q; Complaint ¶ 21. The Act expressly stated that the Armory, "when completed," would be "subject to" the laws of this State pertaining to armories (§ 8).

Chapter 57 was enacted primarily to help the Regiment raise the funds needed to complete the construction of and maintain the Armory. Thus, Chapter 57 authorized the Regiment's board of officers to issue fifteen-year bonds, in the aggregate amount of $150,000, to raise money to complete and furnish the Armory (§ 1). In addition, to secure the payment of the bonds, Chapter 57

- authorized the field officers to reassign the lease to "the trustees of the Seventh Regiment Armory Fund . . . and their successors in trust," who were empowered to pay the bills incurred in completing the construction and furnishing of the Armory (§ 2);

- required the City to extend the term of the 1874 Lease for so long as the Regiment exists as a military organization and desires to occupy the Armory (§ 4), and;

-19-

- required the City to pay $15,000 annually to the trustees or their successors "in lieu of a rental for an armory for said regiment" to be used by them in paying the interest and principal of the bonds (§ 5).[5]

A new lease thereafter was made on April 23, 1879, between "the mayor, aldermen and commonalty of the City of New York," as lessors, and "the field officers of the Seventh Regiment of the National Guard of the State of New York," as lessees (the "1879 Lease"). Complaint ¶ ¶ 18-19 and Ex. B.

The 1879 Lease runs in perpetuity so long as the Regiment exists and acts as a military organization and desires to occupy the Armory for its lawful purposes.

## C. The 1893 Reassignment Of The Lease To The Field Officers Of The Seventh Regiment.

In 1893, the Legislature required the trustees of the Seventh Regiment Armory Fund to reassign to the field officers of the Regiment "the lease of the ground in the City of New York heretofore leased to the said field officers of the said Regiment . . . and the property covered thereby." N.Y. Laws of 1893, ch. 518, § 8; Complaint ¶ 24 and Ex. C; Graber decl. Ex. R.

Section 8 further provided that the field officers "shall be, and they hereby are, constituted trustees" of the Armory, charged with the duty to maintain and improve the Armory for its use by the Regiment.

---

[5]In 1893, after the bonds were paid, the City's required annual payment was reduced to $8,000. See N.Y. Laws of 1893, ch. 518, § 10; Tobin v. LaGuardia, 276 N.Y. 34, 43 (1937). See also N.Y.C. Admin. Code § 5-509(1) (1985).

-20-

With respect to the field officers' status as trustees, by

N.Y. Military Law § 180-a(2)(a), added by Chapter 482, the

Legislature declared that

> The State, acting through [DMNA], is and
> shall be recognized as and declared to be the
> lawful successor to the interest of the
> lessee[s] under the [leases dated September
> 23, 1874 and April 23, 1879].
>
> No other person or party, whether through
> claims or entitlements of past or continuing
> use, occupancy, improvement or otherwise, is
> or shall be recognized as having any lawful
> rights in respect of the Armory other than as
> may be expressly granted by, and subject to
> the applicable subdivisions of [N.Y. Military
> Law § 183].

### Prior Litigation Concerning The Armory

There has been a great deal of litigation around the Armory,

going back to the 1800s, with respect to claims on the part of

veterans of the Seventh Regiment, none of which has succeeded in

favor of veterans, because of judicially-recognized paramount

State interests in the Seventh Regiment and in the Armory.

The claims posed against the State and the Regiment have

always been substantially the same as in the present action:

That discharged veterans of the Seventh Regiment, rather than the

active duty members of the Regiment or the Regiment itself, or

the State, have an interest in the Armory superior to that of the

State or the Regiment.

-21-

This approach has always faltered, but plaintiffs in the present action nonetheless insist upon reprising the theme, without recognizing that every one of the prior judicial decisions, since the 1800s, has ruled decisively in favor of the State and against disgruntled individual veterans who have gotten themselves into disputes with military authorities who have actually always run and controlled the Armory by virtue of ironclad State law.

As will be demonstrated *infra*, however, the present litigants are in the minority among Seventh Regiment veterans, and other members of the public, concerned with the Armory and with the history of the New York State Army National Guard.

The main Seventh Regiment veterans organization, Veterans of the Seventh Regiment, has abjured the present litigation, which makes plaintiffs' allegations, and particularly their class action allegations (Complaint ¶ ¶ 3, 4, 6, 11), ring hollow, bereft of support from the multitude of Seventh Regiment veterans, and decidedly personal to the individual plaintiffs.

State defendants respectfully submit that the several judicial opinions set forth *infra* are important to an assessment of the complaint in this action on the present motion to dismiss.

A.   Veterans of the Seventh Regiment v. Field Officers of the Seventh Regiment, 60 Hun. 578, 14 N.Y.S. 811 (1st Dep't 1891).

As the complaint accurately alleges, so far as the public record reveals "several private groups affiliated with members of

-22-

the Regiment decorated and furnished [the now landmarked] rooms in the Armory." Complaint ¶ 22.

The most prominent such group was Veterans of the Seventh Regiment ("Veterans"), a not-for-profit corporation chartered by the Legislature in 1861 (N.Y. Laws of 1861, ch. 41), and still by all accounts alive and well. Veterans "decorated and furnished," presumably at great expense, the landmarked Veterans Room on the main floor of the Armory, which is also called the Tiffany Room because as it was the work of Louis Comfort Tiffany.

Shortly after the Armory went into operation, a dispute arose between Veterans and the senior active duty officers of the Regiment with regard to access to the Veterans/Tiffany Room. Veterans claimed that, in consideration for having "contributed large sums of money" to build and furnish the room, the regimental officers had granted Veterans "exclusive use and control thereof." Veterans of the Seventh Regiment, 14 N.Y.S. at 814. According to the allegations in the veterans' subsequent lawsuit, the officers had, however, denied any such arrangement, and "molested and interfered with" Veterans' use of the large, dramatic and singular room. Id.

The Appellate Division ruled squarely in favor of the regimental officers, and against the veterans, holding that state law "places the control of armories . . . in the commanding officer of the regiment, battalion, etc. for which it has been provided," and that "certainly, assigning a room to the veterans

-23-

of the seventh regiment, who are not members of the regiment,
cannot be said to be using or occupying the armory for the
regiment for which it has been provided." Id. at 816.

Further, the Appellate Division panel held that even if
there had been an agreement with Veterans concerning the building
and furnishing of certain rooms in the Armory - and it appears
from the decision that there might have been such an agreement in
the 1870s or 1880s - "it was not within the power of the board of
field officers or the board of officers of the seventh regiment,
to authorize the use of the armory for any purposes other than
those pertaining to the regiment itself." Id.

> [T]he seventh regiment armory is a public
> armory, differing in no way in the purposes
> for which it was designed from the other
> armories in the state. We are of the opinion
> that it is a public building, and is to be
> used only for public purposes, and that
> however laudable the uses and purposes are
> for which the plaintiff [Veterans] was
> created, they are not public purposes, nor is
> the plaintiff in any legal sense a member of
> or adjunct to the seventh regiment.

Id.

The court concluded that it is "perfectly clear that the
plaintiff [Veterans] has acquired no legal rights" with respect
to the Armory. Id. at 817. This opinion ought to be dispositive
of all of the present plaintiffs' claims, for the reason that
Veterans, unlike plaintiffs, actually did substantively
contribute to building and furnishing the Armory.

The Appellate Division's holding in Veterans is controlling

-24-

as a matter of state law – it has never been disturbed and is good law today.[6]

B.   State of New York v. Seventh Regiment Fund, 13 Misc.3d 222 (Sup. Ct. N.Y. Co. 2006) (Hon. Richard F. Braun).

Judging by the allegations of the complaint, plaintiffs surely would agree that the Armory contains a priceless treasure trove of art and artifacts collected by the Seventh Regiment even prior to its important participation in the Civil War.

In 1952, the senior regimental officers purported to deed the entire collection to a not-for-profit corporation of their own creation called The Seventh Regiment Fund, Inc. ("The Fund"). Astonishingly, this putative transaction was kept secret from DMNA headquarters for forty-four years. The concealment was only possible because all of the art and artifacts of the Seventh Regiment continued to repose in the Armory as they always had and as they do today.

When DMNA learned of the paper transfer for the first time in 1996, in connection with an effort to inventory the military historical materials in all of the State's armories, of which there are many, the New York Attorney General's Office, on request of the Adjutant General of the State of New York as the head of DMNA, brought an action for common law conversion as against The Fund.   After the New York Court of Appeals reversed a

---

[6]Copies of the opinions discussed in this section of State defendants' memorandum of law are Graber decl. Exs. C, T, U, V, W and X.

dismissal of the conversion action on statute of limitations grounds, see State of New York v. Seventh Regiment Fund, 98 N.Y.2d 249 (2002), the State prevailed after full trial of the action before Justice Richard F. Braun.

As a result, the State is secure in its ownership of the huge collection of art and artifacts in the Armory, with the present use and enjoyment thereof on the part of the Conservancy subject to separate agreements between the Conservancy and the New York State Military Museum and Veterans Research Center, in Saratoga Springs, a branch of DMNA, which agreements are *dehors* the complaint and need not be referenced for purposes of State defendants' present motion to dismiss. It suffices to say that, by virtue of a Supreme Court decision, all of the art and artifacts of the Armory, without which the building would be no more than an example of striking architecture, are securely within the realm of the People of this State.

Plaintiff Fitzgerald was and is President of The Fund, the defendant in the conversion action, and was one of The Fund's three witnesses on the trial of the action in State Supreme Court – a trial that lasted 14 days. The other principal witness was David L. Dalva II, Vice President of and a director of The Fund, who also figures in the cases discussed in the following several subdivisions of this memorandum of law concerning litigation about the Armory.

C.    The Seventh Regiment Fund v. Pataki, 179 F.Supp.2d 356
      (S.D.N.Y. 2002) (Hon. Laura Taylor Swain).

In 2001, The Seventh Regiment Fund, headed by Fitzgerald,
and two other veterans organizations, Associates of the Engineer
Corps and Company K, Seventh Regiment, Inc., and Veterans of the
Seventh Regiment, commenced an action challenging the RFP issued
by ESDC on behalf of DMNA seeking a developer for the long-term
lease and restoration of the Armory.

As noted, plaintiff Fitzgerald was (as now) President of The
Fund, and David L. Dalva II was an officer and director of The
Fund as well as President of Associates of the Engineer Corps and
Company K, which appellation refers to one of the historical
company components of the Regiment.  Associates of the Engineer
Corps and Company K, or a predecessor unincorporated association,
might have funded the building and furnishing of one of the rooms
on the second floor of the Armory specifically dedicated to
Company K.

As in the present action, plaintiffs in Seventh Regiment
Fund asserted "property rights in the Armory and/or its contents"
(Seventh Regiment Fund, 179 F.Supp.2d at 357, 360-61), as well as
"use rights" specifically with respect to physical access to
certain spaces within the Armory.  Id. at 361.  At the time of
the commencement of the action, as noted in the prior section of
this memorandum of law, plaintiffs in Seventh Regiment Fund still
believed that they, and not the State, owned all of the art and

-27-

artifacts in the Armory, and perhaps even the Armory itself.

Numerous federal constitutional claims were alleged in the complaint in the action, but a Fifth Amendment takings claim is the only one that plaintiffs chose to pursue when defendants moved for summary judgment. Id. at 359. This Court found it doubtful that injunctive relief would even lie under the Takings Clause (id. at 361), and held plaintiffs' takings claim to be in any event unripe in the absence of a final State determination with respect to the future of the Armory and in consideration of the existence of adequate statutory post-deprivation remedies under New York State law. Id. at 362-63.

It should be emphasized that Veterans of the Seventh Regiment was one of the plaintiffs in Seventh Regiment Fund, and that Veterans is conspicuous by its absence in the present action – which appears to lead to the conclusion that Veterans has accepted the terms of Chapter 482 and all of its ramifications. While plaintiffs' entity, the so-called 107th Infantry Regiment (Seventh, New York) Historical Society (see Complaint ¶ 3), which is by charter limited to 100 members (Graber decl. Ex. S), Veterans comprises "approximately 1,000 former and present active duty members of the successor units of the Seventh Regiment." Seventh Regiment Fund, 179 F.Supp.2d at 358.

This circumstance belies plaintiffs' rather broad assertion that they might speak for anyone other than themselves.

D.   Dalva v. Pataki, Sup. Ct. N.Y. Co. (Index No. 116965/05)
     (Hon. Marilyn Shafer).

     After the enactment of Chapter 482, David L. Dalva II

commenced an action in the Supreme Court of the State of New

York, New York County, pursuant to N.Y. State Finance Law § 123-b

(a so-called "taxpayer action"), alleging that Chapter 482 must

be enjoined and invalidated as constituting an "illegal or

unconstitutional expenditure of State funds."

     Dalva was the sole named plaintiff, and did not in the

complaint disclose his interest in the Armory;  he claimed merely

to be a resident of Manhattan's Upper East Side.  But in an

earlier filing of a substantially identical complaint, dated

April 12, 2005  - which was filed but not served - Veterans and

The Fund, the not-for-profit entity headed by Fitzgerald, also

were plaintiffs, as is described in a press release, dated April

12, 2005, announcing the commencement of that prior action.  The

press release is Hearing Ex. 16 among the documents received at

the public hearing at the Armory on July 21, 2005.  Graber decl.

Ex. M.[7]  As noted supra, at the present time Dalva and Fitzgerald

apparently no longer have the same influence over Veterans as

they had enjoyed several years ago.  Indeed, even Dalva has

stayed away from the present action.

_____

[7]After the first Dalva complaint, dated April 12, 2005, was
filed, but not served, that case was abandoned, and the second
Dalva complaint, dated December 1, 2005, was filed under a
different index number, and was served together with a motion for
a preliminary injunction.

As N.Y. State Finance Law § 123-b merely provides a procedural vehicle, the substantive claim in Dalva was that Chapter 482 violated what is known as "municipal home rule," embodied in N.Y. Const. art. IX, § 2(b)(2). That section of the New York State Constitution provides that the Legislature "[s]hall have the power to act in relation to the property, affairs or government of any local government . . . by special law only (a) on request of two-thirds of the total membership of its legislative body or on request of its chief executive officer concurred in by a majority of such membership . . . ." Such a request is generally called a "home rule message." Dalva maintained that Chapter 482 violated municipal home rule because the land upon which the Armory is situated is owned by the City of New York, and that there had been no home rule message.

Dalva produced two substantive opinions from State Supreme Court - both of them adverse to the plaintiff. On March 3, 2006, Justice Marilyn Shafer denied plaintiff's motion for a preliminary injunction barring the implementation of Chapter 482. Dalva v. Pataki, Sup. Ct. N.Y. Co. (Index No. 116965/05), Slip op. dated March 3, 2006 (Hon. Marilyn Shafer).[8]

On November 29, 2006, Justice Shafer granted a motion on behalf of the Governor, the Adjutant General, and ESDC, all

_____

[8]A copy of that decision and order is Graber decl. Ex. C, and is available at http://decisions.courts.state.ny.us/fcas/fcas_docs/2006mar/300116 96520052sciv.pdf.

-30-

represented by the New York Attorney General's Office, to dismiss the action. Dalva v. Pataki, Sup. Ct. N.Y. Co. (Index No. 116965/05), Slip op. dated November 29, 2006 (Hon. Marilyn Shafer).[9]

Because plaintiff in Dalva – as is the case with plaintiffs in the present action – insinuated actual ownership of the Armory on the part of current veterans, whose veteran ancestors appear to have financially contributed to the construction and furnishing of the building – which claim was definitively rejected by the Appellate Division in Veterans of the Seventh Regiment v. Field Officers of the Seventh Regiment in 1891 – State Supreme Court performed a close analysis of plaintiff's claims before ruling against the veterans and on behalf of the State sustaining the constitutionality of Chapter 482.

Justice Shafer acknowledged that "[c]ourts are required to exercise a large measure of restraint when considering highly intricate and imaginative schemes for public financing or for public expenditures designed to be in the public interest." Dalva, Slip op. dated March 3, 2006, at 13 (quoting Hotel Dorset Co. v. Trust for Cultural Resources, 46 N.Y.2d 358, 369 (1978)).

Applying that principle, the court found that a home rule message was not required, considering that there is a "recognized

_____

[9]See

http://decisions.courts.state.ny.us/fcas/fcas_docs/2007feb/300116 96520053sciv.pdf.   Graber decl. Ex. W.

-31-

exception to the home rule message requirement when a special law
[such as, arguably, Chapter 482] serves a substantial state
concern." Id. at 16 (quoting Patrolmen's Benevolent Assoc. v.
City of New York, 97 N.Y.2d 378, 386 (2001)). Supreme Court had
no trouble finding that "the State's substantial interest in the
Armory project is manifest in its statement of legislative
intent." Id. at 17.

> The legislation [Chapter 482] will save an
> irreplaceable State landmark for future
> generations. It will sustain the women's
> shelter within its walls. And it will
> maintain the entire facilities of the Armory
> for military use in times of need, as it has
> in the past. All of these uses will, as set
> forth in the statement of legislative intent,
> inure to the health, safety, welfare and
> education of the State of New York.

Id.

In consequence of these findings, Supreme Court held that
"there is no question that the Armory project is in the public
interest, and that the State has a substantial interest in its
completion." Id.

In denying plaintiff's motion for a preliminary injunction,
the court concluded that "the State proposal provides for the
restoration of a valuable resource and a viable plan for its use.
The equities lean inexorably in the State's direction." Id. at
18.

With the motion for a preliminary injunction having been
denied in March 2006, still in advance of a lease between the

-32-

State and the Conservancy, which was much the subject of
negotiation, Dalva and his cohort sought to pursue the action,
causing State defendants to move to dismiss.

Accepting the facts as alleged in the Dalva complaint as
true, according every possible favorable inference, and
determining only whether the facts as alleged fit within any
cognizable legal theory, Supreme Court rejected Dalva's final
effort. Dalva, Slip op. dated November 29, 2006, at 3.

The court held that "numerous substantial State concerns are
encompassed by Chapter 482." Id. at 5. Further, the court
recognized, many New York Court of Appeals opinions dictate
reliance upon "the stated purpose and legislative history of the
act in question to find, or reject, a substantial state concern."
Id. at 6. In the case of Chapter 482, Supreme Court held that
"the State's concerns are neither 'general' nor 'abstract,' but
are, rather, concise and specific, and firmly support the
Legislature's right to forego a home rule message." Id.

In reviewing the Appellate Division's 1891 determination in
Veterans of the Seventh Regiment v. Field Officers of the Seventh
Regiment, the court held that "it is correct to say that the
public uses which the State has chosen to pursue," by means of
Chapter 482, "fall within the terms of the 1894 lease" between
the State, through certain of its public officers, and the City,
through its own designated public officers. Id. at 7-8.

The City, also a defendant in Dalva, for its part affirmed

-33-

that "the City has chosen not to assert any home rule related claim" (id. at 8), which was an understatement considering that the City urged the Governor to sign the bill which became Chapter 482. Graber decl. Ex. J.

In all the circumstances, the complaint was dismissed with costs taxed as against plaintiff Dalva. Dalva, Slip op. dated November 29, 2006, at 8.

E. Chu v. New York State Urban Dev. Corp.,
   13 Misc.3d 1229A (Sup. Ct. N.Y. Co. 2006) (Hon. Lottie E. Wilkins).

In 2006, The Seventh Regiment Fund and Veterans of the Seventh Regiment teamed up again to try to derail the restoration of the Armory pursuant to Chapter 482, this time challenging the General Project Plan on environmental grounds.

They were joined by first-named petitioner Rita Chu, President of East 67th Tenants Corp., owner of a cooperative apartment building. Chu testified at the July 21, 2005 public hearing (Graber decl. Ex. L), and submitted a written statement marked Hearing Ex. 17. Graber decl. Ex. M. In her hearing presentations, Chu repeated the familiar contention that the Armory is not owned by the State, but by Veterans, although she advanced no reasons for this belief. Id.

The Chu proceeding asked State Supreme Court to direct ESDC to require the Conservancy to issue an environmental impact statement with respect to the restoration project, and, in the meantime, to "annul" any lease between the State and the

-34-

Conservancy. <u>Id.</u>

In a threshold determination, Justice Lottie E. Wilkins
dismissed The Fund and Veterans as petitioners, holding that
neither "has standing here because . . . neither can demonstrate
that the environmental interests they assert in this proceeding
are germane to their organizational purposes." <u>Id.</u> The court
observed that since the organizational petitioners, The Fund and
Veterans, purport to be "dedicated to the preservation of the
Armory as a military and memorial facility," their conflict with
the State "is not borne of environmental concerns." <u>Id.</u>

The court then performed a close analysis of the
requirements of the State Environmental Quality Review Act
("SEQRA"), which has given rise to a fairly complex jurisprudence
in New York State, and held that ESDC had met all applicable
State requirements with respect to the Armory project authorized
by Chapter 482. <u>Id.</u> These matters, which were exhaustively
examined by State Supreme Court, need not be elaborated upon
here, but it is worth noting that Justice Wilkins seemed rather
disturbed by the SEQRA challenge raised on behalf of The Fund,
Veterans and Chu:

> The action under review here involves the
> renovation of a building, a very common
> occurrence in Manhattan which arguably would
> not have even triggered SEQRA considerations
> but for the fact that the building is
> historic. Rather than dealing with such
> weighty issues as how the health and safety
> of some of the poorest and most vulnerable
> members of our community will be affected by

-35-

> changes to long-standing policy concerning a
> well-known environmental poison, this dispute
> focuses on how some of the most privileged
> members of our community will be affected by
> an auditorium.
>
> *    *    *
>
> The overall impression left by the diffuse
> and often strained arguments made in this
> petition is that *petitioners have chosen to
> use the SEQRA process more for the purpose of
> generating delay and interference than
> advancing any legitimate environmental
> interest.*

Id. (emphasis added).  The petition was therefore dismissed.

In sum, having failed in this Court in The Seventh Regiment
Fund v. Pataki, and in state court in Dalva and Chu, Fitzgerald
and the several others who signed on to the present action - but
not including Dalva or Veterans - instituted this lawsuit trying
to attack Chapter 482 on grounds that did not go to decision in
Seventh Regiment Fund v. Pataki or in Dalva, and that were not
directly at issue in Chu.

**Standard On A Motion To Dismiss**

Within the past year, in <u>Bell Atlantic Corporation v.</u>
<u>Twombly</u>, ___ U.S. ___, 127 S. Ct. 1955 (2007), the Supreme Court
altered the legal standards applicable to Rule 12(b)(6) motions.

In <u>Twombly</u> the Court abandoned the familiar standard from
<u>Conley v. Gibson</u>, 255 U.S. 41 (1957), that a complaint should not
be dismissed "unless it appears beyond doubt that the plaintiff
can prove no set of facts in support of his claim which would
entitle him to relief." <u>Twombly</u>, 127 S. Ct. at 1968 (quoting
<u>Conley</u>, 255 U.S. at 45-46). In its place the Court held that
Fed.R.Civ.P. 8(a) requires complaints to allege "enough facts to
state a claim to relief that is plausible on its face," <u>id.</u> at
1974, or, put otherwise, to "possess enough heft to 'show that
the pleader is entitled to relief.'" <u>Id.</u> at 1966.

<u>Twombly</u> has been applied by the Second Circuit as
establishing a rule of general applicability. <u>See</u>, <u>e.g.</u>, <u>Iqbal</u>
<u>v. Hasty</u>, 490 F.3d 143 (2d Cir. 2007); <u>Roth v. Jennings</u>, 489 F.3d
499 (2d Cir. 2007). In <u>Iqbal</u>, the Second Circuit concluded that
<u>Twombly</u> creates "a flexible 'plausibility standard,' which
obliges a pleader to amplify a claim with some factual
allegations in those contexts where such amplification is needed
to render the claim plausible." <u>Iqbal</u>, 490 F.3d at 157-58.

-37-

### POINT I

## PLAINTIFFS LACK STANDING TO MAINTAIN THIS ACTION

All seven claims alleged in the complaint fail to articulate
that plaintiffs enjoy, even colorably, any protected interest in
the Armory.  While two of the three individual plaintiffs are
alleged to be National Guard veterans (Fitzgerald and Wells but
not Siller), their legal relationship to the Armory is a mystery,
so far as the allegations of the complaint reveal.

The sense of military history professed by plaintiffs,
particularly as regards the Seventh Regiment and the National
Guard, is worthy of respect, but concern for the remembrance and
memorialization of the storied history of the Seventh Regiment
cannot suffice for purposes of standing to invoke federal Article
III jurisdiction.

As the Second Circuit has held, "[u]nder Article III of the
Constitution, federal courts have jurisdiction only over 'cases'
and 'controversies.'  U.S. Const. art. III, § 2, cl. 1.
'Standing is an essential and unchanging part of the case-or-
controversy requirement of Article III.'" Field Day, LLC v.
County of Suffolk, 463 F.3d 167, 175 (2d Cir. 2006) (quoting
Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).

> Three elements make up the irreducible
> constitutional minimum of standing.  In order
> to have constitutional standing, first, the
> plaintiffs must have suffered an injury in
> fact - an invasion of a legally protected

-38-

> interest which is (a) concrete and
> particularized, and (b) actual or imminent,
> not conjectural or hypothetical.  Second,
> there must be a causal connection between the
> injury and the conduct complained of – the
> injury has to be fairly . . . trace[able] to
> the challenged action of the defendant, and
> not . . . the result [of] the independent
> action of some third party not before the
> court.  Third, it must be likely, as opposed
> to merely speculative, that the injury will
> be redressed by a favorable decision.
> Moreover, the party invoking federal
> jurisdiction bears the burden of establishing
> these elements.  As the party invoking
> federal jurisdiction, a plaintiff bears the
> burden of establishing that he has suffered a
> concrete injury or is on the verge of
> suffering one.

Id. (quotation and internal quotation marks omitted).

With regard to the requirement of "a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," the complaint begins by describing the purpose of the action as being "to regain access, possession and control of the Seventh Regiment Armory . . . for the Regiment and its successor units . . . ." Complaint ¶ 1.  But plaintiffs are not the Regiment.  And the New York State Army National Guard unit that is the Regiment, Headquarters 53d Army Liaison Detachment (Graber decl. ¶ 24 and Ex. F), does maintain its headquarters in the Armory.

Plaintiffs further assert that on account of Chapter 482, the 107th Infantry Regiment (Seventh, New York) Historical Society (the "Society"), an entity which they apparently control (Complaint ¶ ¶ 3, 4; see supra at 28), will be unable to carry

-39-

out a "museum program." Id. ¶ ¶ 42, 69(b). However, the Society's charter, as quoted in the complaint, does not even mention the Armory. Id. ¶ 41.

Similarly, the application submitted by plaintiff Fitzgerald to the Board of Regents of the State of New York in 1996 to revive the Society makes no mention of the Armory in the Society's proposed constitution and bylaws. Graber decl. Ex. S. The complaint contains no allegations with regard to what the Society has been doing since it was established forty-three years ago (Complaint ¶ 41), the Society is not in the telephone book, and a Web search does not disclose even the existence of any such society. The complaint does not allege that in the past forty-three years the Society has ever had any kind of presence in the Armory.

In addition, it is expansively claimed in Complaint ¶ 69(a) that the lease with the Conservancy authorized by Chapter 482 is "in violation of *plaintiffs'* City lease, ownership rights, and First Amendment rights" (emphasis added). Here, it appears that plaintiffs identify *themselves* as the trustees of the Armory, which is an odd and contradictory claim given that elsewhere in the complaint they seem to acknowledge the reality that by statute the trustees can only have been the so-called field officers of the then-current incarnation of the Regiment, which is today Headquarters 53d Army Liaison Detachment. Id. ¶ ¶ 16, 18, 21, 24, and 72 (the latter referring approvingly to

-40-

"ownership of the Armory building by the Board of Officers of the
Seventh Regiment as trustees"). <u>Tobin v. La Guardia</u>, 290 N.Y. at
125 (holding that the regimental field officers as Armory
trustees "are an 'agency or instrumentality of the state'").
Therefore plaintiffs cannot plausibly claim a protected interest
as trustees.

Plaintiffs further assert that Chapter 482 will have
resulted in a "[d]enial to veterans organization members of the
right to free use of the Armory for meetings and gatherings in
violation of Section 183 of the New York State Military Law and
of their First, Fifth and Fourteenth Amendment rights."
Complaint ¶ 69(c).[10]  This allegation is directly contradicted by
the express terms of Chapter 482.  N.Y. Military Law § 180-
a(3)(c)(I), added by Chapter 482, provides:

> On application of any of the associations of
> veterans described in [N.Y. Military Law §
> 183(1)(b)], the lessee or the manager
> pursuant to the terms of the management
> agreement shall provide a proper and
> convenient room or rooms or other appropriate
> space in the armory where such posts or
> chapters may hold regular and special
> meetings and organizational social events of
> a private nature, without the payment of any
> charge or expense therefor . . . .

Logically, a claim of entitlement to "free use" cannot plausibly
afford standing to attack a statute *mandating* "free use."

---

[10]Plaintiffs make several references to the First Amendment
in the complaint's preliminary recitals, but none of the seven
claims alleged in the complaint is predicated on the First
Amendment.

-41-

Plaintiffs also allege that one of their number (Wells but not Fitzgerald or Siller) is a New York State and City "taxpayer" (Complaint ¶ ¶ 3, 4, 5), and fault Chapter 482 for "[d]epriving City and State taxpayers of support for publicly-funded cultural institutions by diverting audience and donor revenues to the Conservancy and its favored private charities and arts organizations." Id. ¶ 69(d). However, this is not a "taxpayer action," which is a procedural vehicle afforded by N.Y. State Finance Law § 123-b with respect to State action, and by N.Y. General Municipal Law § 51 with respect to municipal action. No such state law cause of action is included among the seven claims in the complaint.[11]

Although plaintiffs also have complaints about the public hearing conducted at the Armory on July 21, 2005 (Complaint ¶ ¶ 82-91), they do not complain about notice thereof, or how the hearing was conducted. Notably, plaintiff Peter Wells testified, as did David L. Dalva II, who has now dropped out of plaintiffs' present effort. Graber decl. Ex. L. Here, too, it is claimed that the public process was a "fraud" because ESDC's approval of the General Project Plan "would deny access to the Armory's principal historic rooms and artifacts to plaintiffs as well as to . . . veterans organizations" of which they are members. Id.

---

[11]Justice Marilyn Shafer found, in Dalva v. Pataki, Sup. Ct. N.Y. Co. (Index No. 116965/05), Slip op. dated March 3, 2006, at 9, that the City of New York would receive a "bounty . . . from the enactment of Chapter 482."

¶ 91.  Even if this were true - which, as seen by reference to
N.Y. Military Law § 180-a(3)(c)(i), added by Chapter 482, it
cannot be - no constitutionally-protected liberty or property
interest is implicated.  As the Appellate Division made clear in
1891, in <u>Veterans of the Seventh Regiment v. Field Officers of
the Seventh Regiment</u>, 60 Hun. 578, 14 N.Y.S. 811, 816 (1st Dep't
1891), plaintiff veterans *qua* veterans enjoy access to the Armory
as no more than invitees.  There can be no "legally protected
interest" that might plausibly confer standing.

        There is also an assertion that the treatment of Armory
rental revenues under the management agreement authorized by
Chapter 482 would cause "injury and damages to plaintiffs by
denying them access and use of . . . [the Armory's] rental
proceeds . . . ."  Complaint ¶ 92.  This kind of an allegation
cannot establish standing because the rental proceeds have never
at any time in history accrued to plaintiffs.  Moreover, before
the enactment of Chapter 482, *all* of the rental proceeds went to
DMNA headquarters in Latham, with half of the proceeds remitted
to the State general fund, and the other half distributed among
all of the State's National Guard units according to troop
strength.  N.Y. Military Law § 183(5).

        The foregoing sums up plaintiffs' allegations pertaining to
the issue of standing, demonstrating that none of the allegations
of the complaint comes to terms with the essential criterion of

-43-

standing: What, plausibly, is plaintiffs' "legally protected
interest" in the Armory?

Finally, none of the foregoing allegations demonstrates that
plaintiffs' have suffered any injury *caused by* Chapter 482 or
State defendants, and plaintiffs lack standing for that
additional reason.

As standing is absent, this Court lacks subject matter
jurisdiction over this action. Lujan v. Defenders of Wildlife,
504 U.S. at 560.

## POINT II

### THE COMPLAINT'S FIRST CLAIM FAILS TO STATE A CAUSE OF ACTION FOR VIOLATION OF SUBSTANTIVE DUE PROCESS

Plaintiffs' first claim alleges that Chapter 482 facilitated
a "taking of private property" in violation of substantive due
process. Complaint ¶ ¶ 70-73. Plaintiffs' theory is that prior
to the enactment of Chapter 482, the Armory was "owned" by the
"Board of Officers of the Seventh Regiment as trustees," and that
"this taking of private property and transferring it to a favored
private party violates the Constitution's due process principles
made applicable to this state legislation by the Fourteenth
Amendment." Id. ¶ 72.

This claim fails, as a matter of law, because:

- The Armory has never been "private property";

- Plaintiffs are not and never have been the trustees –
  that is, the senior officers of the Seventh Regiment –

-44-

nor have they ever been in privity with the trustees;

• Plaintiffs have no constitutionally-protected property or liberty interest in the Armory; and

• Chapter 482 was a rational and reasonable exercise of legislative power in relation to government-owned property.

The Fourteenth Amendment § 1 provides in pertinent part:

"No State . . . deprive any person of life, liberty, or property, without due process of law." The Second Circuit has instructed that when legislation allegedly

> impinges on a substantive due process right, the first step is to determine whether the asserted right is "fundamental." Rights are fundamental when they are implicit in the concept of ordered liberty, or deeply rooted in this Nation's history and tradition. Where the right infringed is fundamental, strict scrutiny is applied to the challenged governmental regulation. Where [,however,] the claimed right is not fundamental, the governmental regulation need only be reasonably related to a legitimate state objective to survive constitutional review.

Leebaert v. Harrington, 332 F.3d 134, 140 (2d Cir. 2003) (citations and internal quotation marks omitted).

Here, the complaint contains no allegations suggesting that plaintiffs possess any rights with respect to the Armory, much less "fundamental" rights, relegating plaintiffs' substantive due process claim to rational basis review.

Similarly, a "substantive due process *taking* claim concentrates on whether the government's aims are 'clearly arbitrary and unreasonable, having no substantial relation to the

-45-

public health, safety, morals, or general welfare.'" City of
Monterey v. Del Monte Dunes, 526 U.S. 687, 754 n. 13 (1999)
(emphasis added) (quoting Village of Euclid v. Ambler Realty Co.,
272 U.S. 365, 395 (1926)).

The Second Circuit has held that "[s]ubstantive due process
is an outer limit on the legitimacy of governmental action . . .
. Substantive due process standards are violated only by conduct
that is so outrageously arbitrary as to constitute a gross abuse
of governmental authority." Natale v. Town of Ridgefield, 170
F.3d 258, 263 (2d Cir. 1999); Crowley v. Courville, 76 F.3d 47,
52 (2d Cir. 1996) (substantive due process claim requires that
the government had "no legitimate reason for its decision")
(internal quotations omitted).

"[A] law will be upheld under rational basis review 'if any
reasonably conceivable state of facts' could demonstrate that the
statute is rationally related to a legitimate government purpose.
This is the standard of review because the judicial system has
long recognized that 'the problems of government are practical
ones and may justify, if they do not require, rough
accommodations - illogical, it may be, and unscientific.'"
Rojas-Reyes v. INS, 235 F.3d 115, 123-24 (2d Cir. 2000) (quoting
Heller v. Doe, 509 U.S. 312, 319 (1993)).

"[A] statute will be sustained if the legislature could have
reasonably concluded that the challenged classification would
promote a legitimate state purpose," Exxon Corp. v. Eagerton, 462

-46-

U.S. 176, 196 (1983), and it may not be set aside "if any state of facts reasonably may be conceived to justify it." McGowan v. Maryland, 366 U.S. 420, 426 (1961). See also Interport Pilots Agency v. Sammis, 14 F.3d 133, 145 (2d Cir. 1994) ("legislative acts are presumed valid and must be upheld if rationally related to a legitimate governmental objective").

To maintain a substantive due process claim with regard to real property, such as the Armory, the Second Circuit has stated that courts will begin their analysis "by determining whether a constitutionally cognizable property interest is at stake." DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 130 (2d Cir. 1998)(quoting Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995), cert. denied, 519 U.S. 808 (1996)).

> In this regard, a property right will not be recognized as cognizable under the due process doctrine if the person claiming the right has a mere abstract need or desire for, or unilateral expectation of the claimed right. Rather, the person claiming the right must have a "legitimate claim of entitlement" to it. Given that the substantive component of the Due Process Clause derives not from the language of the Constitution, but from "the accumulated product of judicial interpretation of the Fifth and Fourteenth Amendments," we approach this analysis, as we must, with caution and restraint.
>
> In land use regulation cases, including zoning cases, this Court is committed to applying a strict "entitlement test" when determining whether an alleged property right is sufficient to support a substantive due process claim . . . . [T]he inquiry . . . seeks to determine whether there is a "legitimate claim of entitlement" to the

-47-

> benefit in question. * * * In applying the
> entitlement test, we look to "existing rules
> or understandings that stem from an
> independent source such as state law" to
> determine whether a claimed property right
> rises to the level of a right entitled to
> protection under the substantive due process
> doctrine.

Id. (citations and internal quotation marks omitted).

Here, as noted, the complaint fails even to allege that
plaintiffs have any rights in the Armory, so that the complaint
lacks "plausibility." See ATSI Communs., Inc. v. Shaar Fund,
Ltd., 493 F.3d 87, 98 (2d Cir. 2007) ("to survive dismissal, the
plaintiff must provide the grounds upon which his claim rests
through factual allegations sufficient to raise a right to relief
above the speculative level") (quoting Twombly, 127 S. Ct. at
1965). The nearest plaintiffs come to having an interest in the
building is as mere invitees, insofar as new N.Y. Military Law §
180-a(3)(c)(i), added by Chapter 482, requires that the Armory
continue to be available to veterans groups. Facially, Chapter
482 is unassailable on that account, and, as applied, the
complaint does not allege that access to the Armory pursuant to
N.Y. Military Law § 180-a(3)(c)(i) has been requested and denied.
The lack of constitutionally-protected rights in the Armory
plainly forecloses plaintiffs' substantive due process claim.

But assuming, arguendo, a constitutionally-protected right
with respect to the building, the "rationality" and public
interest purposes of Chapter 482 are not plausibly open to

-48-

question. Notably, the extensive – by New York State legislative standards – statement of legislative findings and purposes that is § 1 of Chapter 482 is not directly contested in the complaint.

The Legislature "found and declared that New York State's Seventh Regiment Armory, located in the city of New York, is an important historic landmark." Id. Plaintiffs of course agree. Complaint ¶ ¶ 27-31, 63-64. The Legislature's introductory declaration is the starting point for the entire concept of how to save the Armory.

In succession, the Legislature set forth all of the findings that pertain to this undertaking:

- That the Armory "has been a prominent center of cultural and civic events since its construction in 1879;"

- "That it is of great military historic value;"

- "That the continued ability to operate the Seventh Regiment Armory for military purposes in times of civil or military emergency is vitally important to the city and state;" and

- "That the physical restoration and refurbishment of the Armory is necessary and important to preserve this structure for current and future generations of New Yorkers."

The Legislature further found and declared:

- "That the Armory is an important civic and cultural facility for the community in which it is located and for the residents of the city and state;"

- "That the continued use of the armory for cultural events and other civic uses is beneficial to the health, safety, welfare, and education of the people of the city and the state, and is consistent with the Armory's purpose as a military facility;"

-49-

- "That a portion of the Armory has been successfully utilized for a range of activities, including use as a shelter for homeless women that has been operated by the City of New York and that continued use of a portion of the Armory as a shelter for homeless women is beneficial to the health, safety, welfare and education of the people of the city and state, and is consistent with the Armory's purpose as a military facility and is contemplated pursuant to this legislation."

Having declared a recognition of the historic and present importance of the Armory to the People of the State and of the City of New York, the Legislature set forth its findings with respect to dire problems which the legislation was designed to address:

> It is further found and declared that the Armory has suffered deterioration in its physical infrastructure and plant in recent decades and that the continued deterioration of the facility must be remedied and reversed; that the renovation of the Armory will require the investment of many millions of dollars and that financial circumstances make such public expenditures very difficult.

This assessment was confirmed by the memorandum of the State Division of the Budget in support of Chapter 482, stating as follows:

> The Division of Military and Naval Affairs' mission to train National Guard soldiers can be effectively met in the New York metropolitan area without the use of the Seventh Regiment Armory. The costs of restoring and maintaining the Armory are prohibitive and cannot currently be met by the State. Nonetheless, the Armory remains a valuable historic, civic and military resource for both the State and the City of New York and this bill will ensure that it is restored and preserved.

-50-

Graber decl. Ex. I.

Accordingly, the Legislature

> further found and declared that the
> restoration and renovation of the Armory is
> in the public interest and that a partnership
> between the state and the private sector is
> necessary to undertake the financing of the
> restoration and future operation of this
> historic structure;  that the division of
> military and naval affairs and the urban
> development corporation issued a request for
> proposals from· interested private sector
> organizations in the year 2000 to undertake
> the restoration and operation of the Armory.
> A not-for-profit organization, the Seventh
> Regiment Armory Conservancy, was named as
> chosen developer and deemed to fulfill all
> financial, organizational and operational
> requirements to undertake this endeavor in
> partnership with the state.

As noted *supra*, the foregoing findings and purposes were

sustained by State Supreme Court in Dalva, Slip op. dated March

3, 2006, at 17, where the court held that Chapter 482

> will save an irreplaceable State landmark for
> future generations.  It will sustain the
> women's shelter within its walls.  And it
> will maintain the entire facilities of the
> Armory for military use in times of need, as
> it has in the past.  All of these uses will,
> as set forth in the statement of legislative
> intent, inure to the health, safety, welfare
> and education of the State of New York.

Therefore, "there is no question that the Armory project is in

the public interest."  Id.

As the Supreme Court stated in a case claiming a violation

of the "public use" requirement of the Fifth and Fourteenth

Amendments, "when the legislature has spoken, the public interest

-51-

has been declared in terms well-nigh conclusive." <u>Hawaii Housing</u>
<u>Authority v. Midkiff</u>, 467 U.S. 229, 239 (1984).

By reason of the foregoing, the complaint fails plausibly to
state a cause of action for violation of substantive due process.

### POINT III

### THE COMPLAINT'S SECOND CLAIM FAILS TO STATE A
### CAUSE OF ACTION UNDER THE PUBLIC USE CLAUSE

Plaintiffs' second claim asserts a violation of the Fifth
Amendment's public use clause. Complaint ¶ ¶ 74-78.

As the Second Circuit has stated, "under the public use
clause, 'one person's [private] property may not be taken for the
benefit of another private person without a justifying public
purpose.'" <u>Rosenthal & Rosenthal, Inc. v. N.Y. State Urban Dev.</u>
<u>Corp.</u>, 771 F.2d 44, 46 (2d Cir. 1985) (concerning the Forty-
Second Street Development Project), <u>cert. denied</u>, 475 U.S. 1018
(1986).

Plainly, the public use clause is concerned with the "taking
of *private* property." <u>Id.</u> (emphasis added). The "taking," or
for that matter the "giving," of *public* property (at least non-
federal public property) are subjects with which the United
States Constitution is not concerned. There is no federal or
state law claim in the complaint assailing an unlawful gift of
public property.

Here, of course, because no private property is implicated,
the claim is not plausible on its face. Although the complaint

-52-

implies that the trustees were private actors, by the terms of

the 1800s leases and legislation they could never have been more

than New York Army National Guard officers, subordinates of the

Adjutant General (in the 1800s called Chief of Staff) of the New

York National Guard, who is in turn subordinate to the Governor

as commander-in-chief of the State Militia of which the National

Guard is a component. See Maryland ex rel. Levin, 381 U.S. at 48

("military members of the Guard are employees of the States, and

so the courts of appeals have uniformly held").

Thus, there can have been no "taking of private property

owned by the Regiment's trustees." Complaint ¶ 74.  Accordingly,

the implausibility of plaintiffs' claim renders a public use

clause analysis unwarranted.

Furthermore, the concept embodied in the complaint that

Chapter 482 effects a "taking" on behalf of "a known private

party" - whereby plaintiffs refer to the Conservancy - entailing

nothing more for the benefit of the public interest, according to

plaintiffs, than "improved maintenance" of the Armory (id. ¶ 76),

is entirely belied by the plain terms of Chapter 482.

The complaint does not demonstrate an awareness of the fact

that prior to Chapter 482 all Armory rental revenues went

directly to the State, not to the trustees, public officers whom

plaintiffs imagine to have been somehow independent of their

superior officers and the State itself. N.Y. Military Law §

183(5), as that section applied to the Armory prior to the

-53-

enactment of Chapter 482 and the execution of the lease with the
Conservancy, provides as follows:

>           a.    Fifty per centum of all moneys paid as
>     rent as provided in this section [governing
>     armory rental revenues], together with all
>     sums paid to cover expenses of heating and
>     lighting, shall be transmitted by the officer
>     in charge and control of the armory through
>     the adjutant general to the state treasury.
>
>           b.    The balance of such moneys paid as rent
>     shall be transmitted to the adjutant general
>     who shall hold the same until the first day
>     of April next ensuing and he shall then
>     apportion and divide the same to and among
>     all the units of the organized militia
>     located within the state in proportion to the
>     number of officer and enlisted personnel
>     assigned strength on the preceding March
>     thirty-one as certified in accordance with
>     regulations issued pursuant to this chapter.
>     Such moneys so apportioned and divided shall
>     become a part of the military fund of each
>     such unit and shall be in addition to and not
>     in diminution of any amount constituting the
>     military fund of such unit according to any
>     other provisions of this chapter.

The law prior to Chapter 482 therefore provided that *no*
rental revenues were retained by the trustees or otherwise by or
on behalf of the Regiment or the Armory.  Absent Chapter 482 and
the lease with the Conservancy, this is what the Legislature
mandated for *all* of the State's 70-plus armories.  Thus, in this
claim, as well, plaintiffs evince an unawareness of the terms of
existing law applicable to armories: by statute, there is no
sense in which "Armory rental revenues properly belong to the

trustees of the Armory."  Complaint ¶ 97.[12]

Under Chapter 482, 'the result is just the opposite, as the

Legislature provided that the lessee (presently, the

Conservancy):

> shall be required to apply all revenues
> generated by operations at the Armory to pay
> or provide for the costs of repairs,
> restoration, refurbishment, operating,
> maintenance and programming of the Armory and
> the uses therein and the activities of the
> lessee or subsequent lessee with respect
> thereto.

Chapter 482, § 3.

These are not matters of "fact" subject to dispute on the

present motion, but statutory mandates, which only further

reinforces the implausibility of plaintiffs' Fifth Amendment

public use clause claim.

---

[12]Here plaintiffs also persist in asserting that rental
revenues from the Armory ought to be "allocated" to "the
installation and operation of a military history museum approved
by the Board of Regents in 1964."  Complaint ¶ 97.  As noted, the
107th Infantry Regiment (Seventh New York) Historical Society,
with which plaintiff Fitzgerald claims to be affiliated, took no
steps in forty-three years, since 1964, so far as the allegations
of the complaint reveal, to establish any kind of museum anywhere
which might be devoted to the history of the Seventh Regiment.
And, saliently, the constitution and bylaws of the society make
no mention at all of the Armory;  the society's founding
documents could not have put the Regents, or anyone else, on
notice of any plans or aspirations in relation to the building.
See Graber decl. Ex. S.  Beyond that failure of mention, the
society, and every other person or entity concerned with the
Armory, were and are subject to the specific provisions of the
N.Y. Military Law with respect to uses of Armory facilities.  As
Chapter 482 makes expressly clear, above all else the legislation
maintains the Armory as a facility as it always has been of the
New York Army National Guard.

-55-

By reason of the foregoing, the complaint fails to state a
cause of action under the public use clause.

## POINT IV

### THE COMPLAINT'S THIRD CLAIM FAILS TO STATE A
### CAUSE OF ACTION UNDER THE CONTRACT CLAUSE

Plaintiffs' third claim is that by allegedly "impairing and
invalidating the City lease," Chapter 482 violates the contract
clause, U.S. Const. art. I, § 10, which provides in pertinent
part that "No State shall . . . pass any . . . Law impairing the
Obligation of Contracts . . . ." Complaint ¶ ¶ 79-81.

This claim is meritless, as a matter of law, apart from the
fact that, as noted previously, plaintiffs lack standing to
attempt to "enforce" a contract between the State and one of its
political subdivisions.

It has always been the rule that an entire stranger to a
contract cannot raise a question of the validity of state law
under the contract clause. Williams v. Eggleston, 170 U.S. 304,
309-10 (1898).

Beyond the foregoing principle, the contract clause simply
is inapplicable to relations between the states and their
municipalities:

> The power of the State, unrestrained by the
> contract clause . . . over the rights and
> property of cities held and used for
> "governmental purposes" cannot be questioned.

Trenton v. New Jersey, 262 U.S. 182, 188 (1923). So that even if
plaintiffs had a stranger's right to attempt to "enforce" a

contract between the State and the City, the contract clause
cannot be the vehicle.

Fundamentally, a "city cannot possess a contract with the
State which may not be changed or regulated by state
legislation." Id. (citing Town of E. Hartford v. Hartford Bridge
Co., 51 U.S. 511 (1851)). See also New York v. Richardson, 473
F.2d 923, 929 (2d Cir.) ("political subdivisions of a state may
not challenge the validity of a state statute under the
Fourteenth Amendment"), cert. denied sub nom. Lavine v. Lindsey,
412 U.S. 950 (1973); Palomar Pomerado Health Sys. v. Belshe, 180
F.3d 1104 (9th Cir. 1999) ("political subdivisions, like
'municipal corporations[,] have generally been denied standing in
the federal courts to attack state legislation as violative of
the federal Constitution, on the ground that they have no rights
against the state of which they are a creature'") (quoting Hart
and Wechsler's The Federal Courts and The Federal System 180
(Richard H. Fallon et al., eds. 1996)).

Because plaintiffs are strangers to the 1800s contract, and
a contract clause claim would not lie even on behalf of the City
directly with respect to a contract between the State and the
City, plaintiff's third claim, alleging that Chapter 482 impaired
a contract between officers of the State National Guard and
officers of the City of New York, must therefore be dismissed as
a matter of law.

## POINT V

### THE COMPLAINT'S FOURTH CLAIM ALLEGING A VIOLATION OF THE UDC ACT IS A N.Y. CPLR ARTICLE 78 CLAIM THAT DOES NOT LIE AND IS BARRED BY THE STATUTE OF LIMITATIONS

Plaintiffs' fourth claim alleges a "failure to comply with the UDC Act" (Complaint ¶ ¶ 82-91), which is set forth at N.Y. Laws of 1968, ch. 174. It is alleged that ESDC made no proper "finding of need," as plaintiffs allege is required by § 10 of the Act (Complaint ¶ 83), and that the public process with respect to the General Project Plan was conducted in "disregard" of the specific terms of § 16(d) of the Act. Complaint ¶ 86.

These allegations do not state any claim under New York common law. Rather, as the complaint itself represents, they attempt a claim against a body or officer under State statute, the UDC Act, which is a claim that can only be maintained pursuant to N.Y. CPLR art. 78.

N.Y. CPLR § 7803(3) provides for a special proceeding in State Supreme Court to determine "whether a determination was made [by a body or officer] *in violation of lawful procedure*, was affected by an error of law or was arbitrary and capricious or an abuse of discretion" (emphasis added). Further, N.Y. CPLR § 7803(4) provides for Article 78 review as to "whether a determination made as a result of a hearing held, and at which evidence was taken, pursuant to direction by law is, on the entire record, supported by substantial evidence." These

-58-

formulations precisely comport with the allegations of the
complaint's fourth claim.

The weight of authority in the Second Circuit is that
"Article 78 claims brought in federal court 'must be dismissed
for lack of subject matter jurisdiction, as New York State has
not empowered the federal courts to consider such claims.'"
Brevot v. N.Y. City Dep't of Educ., 2007 U.S. Dist. LEXIS 16109,
*29 n. 14 (S.D.N.Y. Mar. 6, 2007) (quoting Blatch ex rel. Clay v.
Hernandez, 360 F. Supp. 2d 595, 637 (S.D.N.Y. 2005)).

Even if this Court did have jurisdiction over plaintiffs'
Article 78 claim, the claim is time-barred.  The statute of
limitations on an Article 78 claim is four months "after the
determination to be reviewed becomes final and binding upon the
petitioner . . . ."  N.Y. CPLR § 217(1).  The N.Y. CPLR statute
of limitations for Article 78 proceedings is applicable in this
Court.  Vandor, Inc. v. Militello, 301 F.3d 37, 39 (2d Cir.
2002).

Here, the public hearing was conducted on July 21, 2005, the
General Project Plan was affirmed on November 16, 2005, and the
lease is dated and took effect on November 14, 2006.  This action
was filed on July 31, 2007.

By reason of the foregoing, this Court lacks subject matter
jurisdiction over the complaint's fourth claim alleging a
violation of the UDC Act, and the claim is, in any event, barred
by the statute of limitations.

## POINT VI

### STATE DEFENDANTS CANNOT BE HELD LIABLE ON THE COMPLAINT'S FOURTH CLAIM ALLEGING A VIOLATION OF THE UDC ACT

State defendants, Berens and Sherman, cannot be held liable on plaintiffs' fourth claim, alleging a violation of the UDC Act, because under New York law they are immune from liability for the performance of discretionary acts.

Defendants Berens and Sherman are described to have been ESDC "project managers." Complaint ¶ 8. They are alleged to have "induc[ed] the Directors of the ESDC to issue required statutory findings and to adopt resolutions that were unsupported, misleading and false." Id. ¶ 68.

The means of "inducement" is alleged to have been the submission of "a report to the Directors of the ESDC on the public hearing seeking the Directors' affirmation of the General Project Plan" (id. ¶ 87), referring to a public hearing conducted at the Armory on July 21, 2005.[13]

The complaint alleges two matters with respect to the report:

• That the report made no mention of negative testimony on the part of one person who complained that the Armory room in which the hearing was held, known as the Veterans Room, or sometimes as the Tiffany Room,

_____

[13]A copy of the report, dated November 16, 2005, is Ex. M to the complaint, and is Graber decl. Ex. N. The transcript of the public hearing, which is quoted in Complaint ¶ 87, is Graber decl. Ex. L  Written testimony and exhibits are Graber decl. Ex. M.

-60-

"should not be used as a dining room." Id.  "This is a memorial."  Id.

• That the report "misrepresented the permitted future use of the Armory by veterans organizations."  Id. ¶ 89.

There is no other mention of Berens or Sherman in the 104-paragraph complaint, with respect to the six other federal and state claims.  The foregoing allegations with respect to the report, even if accurate – and the public record reveals that they are not – are insufficient as a matter of law to state a claim that Berens and Sherman violated the UDC Act by "misleading" the ESDC Board of Directors.

The report of the public hearing contains an extensive discussion of the views presented.  Twenty-seven people testified at the hearing, and eight subsequent letters or statements were received during the open public hearing period.  Eighteen speakers supported the proposed project.  Report at 2.

> Eight speakers opposed the project, the
> majority of whom either represented or
> supported the Veterans of the Seventh
> Regiment ("Veterans") and the Seventh
> Regiment Armory Fund ("Fund"), entities which
> claim ownership of the artifacts, fixtures
> and the building itself.  The speakers stated
> that the State did not own the Armory and
> that the Veterans should control the
> building.
>
> *  *  *
>
> Other negative testimony revolved around the
> request to remember the importance of the
> National Guard, specifically the memory of
> the Seventh Regiment.  In response, it should
> be noted that the Seventh Regiment is part of

-61-

> the New York State National Guard on whose
> behalf we [the ESDC] are undertaking the
> project.  The proposed project will restore
> the company rooms and have exhibits
> highlighting the history of the Seventh
> Regiment.  The remaining negative testimony
> was critical of the State's maintenance of
> the building and cast doubts on the State's
> following through on its commitment to
> rehabilitate the Armory under this Project.

Report at 2-3.

Thus, there is no plausible basis for plaintiffs' allegation
that reporting with respect to the rather uncomplicated comments
of one speaker might have caused the ESDC Board to be "misled"
with respect to a project of this magnitude and public
importance.  Indeed, plaintiffs' own Ex. H shows that the
Veterans/Tiffany Room to which the speaker was referring has been
designated as a "reception room," not a "dining room."  Ex. H
shows dining facilities located elsewhere in the building.
Plaintiffs' allegations are negated by their own exhibits
attached to and incorporated by reference into the complaint.

Moreover, as to the memorialization of the Seventh Regiment,
which the Legislature expressly found to be an important public
purpose of Chapter 482, it is an indisputable fact that all of
the art and artifacts of the Seventh Regiment, which have been
adjudicated to be owned by the State, see State of New York v.
Seventh Regiment Fund, Inc., 13 Misc.3d 222 (Sup. Ct. N.Y. Co.
2006), continue to repose in the Armory as they always have.
Beyond that, probably the best memorialization of the storied

-62-

Seventh Regiment is the restoration and revitalization of the
Armory itself, which the Legislature reasonably determined can
only practically be accomplished by means of the public-private
partnership enabled by Chapter 482.

Plaintiffs' allegation with respect to veterans groups' use
of Armory facilities is equally untenable.  The following
statement in the report can hardly be described as a "willful
misrepresentation" (Complaint ¶ 90):

> It should be noted that under New York State
> Military Law, these [veterans] groups are
> entitled to use from time to time parts of
> armories with the consent of DMNA [the State
> Division of Military and Naval Affairs].
> Under the proposed project, DMNA retains
> space within the Armory and can allow access
> [to veterans organizations] to its retained
> space.

Report at 3.

It cannot be a "willful misrepresentation" to the ESDC
Directors for the report basically to quote N.Y. Military Law §
180-a(3)(c)(i):

> On application of any of the associations of
> veterans described in [N.Y. Military Law §
> 183(1)(b)], the lessee or the manager
> pursuant to the terms of the management
> agreement *shall provide* a proper and
> convenient room or rooms or other appropriate
> space in the armory where such posts or
> chapters may hold regular and special
> meetings and organizational social events of
> a private nature, without the payment of any
> charge or expense therefor . . . .

-63-

The two simple allegations of the complaint respecting the
report are therefore facially inadequate to sustain plaintiffs'
fourth claim on this motion to dismiss.

This necessary conclusion is underlined by reference to
applicable New York law concerning the acts of public officers.
The general rule in New York pertaining to a public officer's
immunity for official acts has been stated as follows:

> A public official may be held liable in
> damages for a wrongful act only where such
> act is ministerial in nature.  Where,
> however, an act is discretionary or quasi-
> judicial in nature no liability attaches even
> if the act was wrongfully performed * * * .
> Even if a public official knows that his act
> might be wrong, the rule of immunity is not
> vitiated:  The well-settled rule of law [is]
> that no public officer is responsible in a
> civil suit for a judicial determination,
> however erroneous or wrong it may be, or
> however malicious even the motive which
> produced it.

Sinhogar v. Parry, 74 A.D.2d 204, 216-217 (3d Dep't 1980)
(citations and internal quotation marks omitted), aff'd, 53
N.Y.2d 424 (1981).

Manifestly, the preparation of a report to one's
governmental superiors following a public hearing is not a
ministerial function but entails the exercise of judgment and
discretion.  The characterizations of the public hearing and
other aspects of the public process contained in the report -
even if wrong - cannot give rise to personal liability on the
part of a public officer.

-64-

        This is a hardfast rule in New York, and so even if the

actions of an officer were "malicious." In <u>Wolcott v. Broughton</u>,

57 A.D.2d 1022, 1023 (3d Dep't 1977), the Appellate Division

held, in an employment context, that "no matter how malicious the

action of a supervisor may be, if the action complained of was in

regard to any duty which involves discretion to act, personal

liability for such action or non-action may not be asserted."

There, unlike here, a plaintiff had alleged "personal animosity,"

"malice," and "revenge," and a panoply of prima facie torts.

Accepting all of plaintiff's allegations as true for purposes of

defendants' motion to dismiss, dismissal was nonetheless affirmed

by the Appellate Division. <u>Id.</u>

        This rule recently has been reaffirmed. <u>See</u> <u>Landmark West!</u>

<u>v. Tierney</u>, 9 Misc. 3d 1102A, 7 (Sup. Ct. N.Y. Co. 2005) (Hon.

Michael D. Stallman, Jr.) ("absolute immunity protects an

official for his or her discretionary acts * * * . Such immunity

serves an important public purpose: fear of personal liability

might influence the exercise of judgment and conflict with the

official's responsibility to give undivided loyalty to the public

interest") (citations and internal quotation marks omitted),

<u>aff'd</u>, 29 A.D.3d 219 (1st Dep't 2006), <u>app. denied</u>, 6 N.Y.3d 710

(2006).[14]

_____

        [14]Counsel for plaintiffs in the present action were also
counsel for plaintiffs in <u>Landmark West!</u>.  Indeed, the claim
rejected in <u>Landmark West!</u> was against an agency commissioner,
not a mid-level career public servant.

In the circumstances, the allegations of the complaint fail to state a cause of action, as a matter of law, as against Berens and Sherman for the content of the report on the public hearing.

### POINT VII

**PLAINTIFFS FAIL TO STATE A CAUSE OF ACTION AS AGAINST STATE DEFENDANTS FOR THE ADDITIONAL REASON THAT THEY ARE POWERLESS TO AFFORD THE RELIEF DEMANDED BY THE COMPLAINT**

Plaintiffs' fourth claim – the only claim asserted against State defendants Berens and Sherman – fails for the additional reason that they are powerless to afford any of the relief demanded by the complaint.

While both defendants are professionals – Berens is an architect licensed by the Office of the Professions of the New York State Education Department, and Sherman was an admitted but non-practicing attorney (Graber decl. ¶ 40) – they did not at relevant times hold supervisory positions at ESDC, but served as professional staff in a large and far-reaching statewide organization.

As to Sherman, no relief is available as against him in his (former) official capacity because he is long gone from the agency and, so far as the New York Attorney General's Office is aware, from New York State (Graber decl. ¶ 40), a circumstance that does not appear to be susceptible to dispute even though plaintiffs appear to have been unaware of it. As to Berens, it cannot seriously be contended that she, in her official capacity

-66-

as an ESDC architect, could be in a position to effect any kind
of injunctive remedy as demanded in the complaint.

The complaint also purports to sue Berens and Sherman in
their personal or individual capacities. Complaint ¶ 8.
Obviously, plaintiffs do not appear to have considered that
Berens would not be capable of stopping the further
implementation of Chapter 482 in her individual capacity, and
neither could Sherman have done so even if he were still a public
officer.

This same futile and, perhaps, ill-intentioned claim was
attempted as against a public officer in his individual capacity,
and later by necessity withdrawn, in Seventh Regiment Fund v.
Pataki, 2001 U.S. Dist. LEXIS 16029 (S.D.N.Y. 2001) (Hon. Laura
Taylor-Swain), an action commenced by an entity, the Seventh
Regiment Fund, of which plaintiff Fitzgerald long has been a
principal officer.

Plainly, there is no sense in attempting to sue a public
officer such as Berens in her personal or individual capacity to
obtain the declaratory or injunctive relief which is the object
of this action. Frank v. Relin, 1 F.3d 1317, 1327 (2d Cir.)
("equitable relief could be obtained against Relin [the Monroe
County District Attorney] only in his official, not his
individual, capacity"), cert. denied, 510 U.S. 1012 (1993); Rao
v. New York City Health and Hospitals Corp., 882 F.Supp. 321, 330
(S.D.N.Y. 1995) (equitable remedies "may be directed only at

liable individuals in their official capacities").

For these additional reasons, plaintiffs' fourth claim as against Berens and Sherman, in both their official and individual capacities, must be dismissed as a matter of law.

## POINT VIII

### THE COMPLAINT'S FIFTH CLAIM FAILS TO STATE A CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH A CONTRACT

Plaintiffs' fifth claim – based on New York common law – is that defendants "caused the Mayor of New York City to consent to the breach of the lease," and that this supposedly amounted to a tortious interference of contract. Complaint ¶ 92.

How the ESDC defendants might have "caused" Mayor Michael R. Bloomberg to consent to the "breach" of a lease is not explicated by the allegations of the complaint. The City's unambiguous support of Chapter 482, as expressed to the Governor prior to his signing of the legislation into law (see Graber decl. Ex. J), is not acknowledged by the complaint, probably because, as the complaint clearly shows, this action was commenced with no knowledge of or investigation into the legislative history. Otherwise plaintiffs could not have made allegations about the public record that are plainly wrong such as that the legislation passed "unanimously." Complaint ¶ ¶ 47, 77.

In any event, as a matter of law, plaintiffs cannot maintain an action for tortious interference. Under New York law,

> Tortious interference with contract requires
> the existence of a valid contract between the
> *plaintiff* and a third party, defendant's
> knowledge of that contract, defendant's
> intentional procurement of the third-party's
> breach of the contract without justification,
> actual breach of the contract, and damages
> resulting therefrom.

Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424 (1996)
(emphasis added).

Here, obviously, there has never been a "valid contract
between [any] plaintiff and a third party" - the basic
requirement for a tortious interference claim.  Indeed, no such
contract is alleged in the complaint - the only contract alleged
is the 1800s lease between the State and the City.

While not paying cognizance to the common law elements of
the claim propounded, plaintiffs seem to attempt to allege rights
as "beneficiaries" of the lease relationship between the State
and the City.  Complaint ¶ 93.

Plaintiffs alleged "beneficiary" status is also, of course,
a matter of state law.  In New York, this is a high hurdle that
plaintiffs cannot overcome even if all of the allegations of the
complaint are deemed to be true for purposes of the present
motion.

In general, as a matter of both state and federal law, "a
nonparty normally lacks standing to challenge noncompliance with
a lawful lease."  United States v. Village of New Hempstead, 832
F.Supp. 76, 81 (S.D.N.Y. 1993).

-69-

Under both federal common law and New York common law, a
third party may have enforceable rights under a lease or other
contract if the contract was made for his or her "direct
benefit." <u>McNeill v. New York City Housing Authority</u>, 719
F.Supp. 233, 248-249 (S.D.N.Y. 1989) (applying New York as well
as federal common law).

The New York Court of Appeals has stated that non-parties,
such as plaintiffs, may recover under a contract if the following
elements are established: (1) the existence of a valid and
binding contract between other parties; (2) that the contract was
intended for the non-party's benefit, and; (3) that the benefit
to the non-party is sufficiently immediate, rather than
incidental, to indicate the assumption by the contracting parties
of a duty. <u>Burns Jackson Miller Summit & Spitzer v. Lindner</u>, 59
N.Y.2d 314, 336 (1983) (holding that consumers of public
transportation are not the intended beneficiaries of collective
bargaining agreements between the New York City transit system
and its workforce). This appears to be the leading New York
Court of Appeals case on the subject so far as research reveals.

The bare allegations of the complaint do not meet any of the
criteria required by the New York Court of Appeals. Here, while
there is a valid contract between the State and the City,
plaintiffs have failed to meet the second and third criteria.

    •   Certainly the lease of the 1800s cannot plausibly be
alleged to have been "intended" for plaintiffs' benefit.

-70-

Plaintiffs did not exist in the 1800s, and, in respect to plaintiffs' implied predecessors – other various veterans of the historic Seventh Regiment and their private affiliated organizations – the Appellate Division determined long ago that even the veterans of the Seventh Regiment possessed no rights to the Armory including even a right to maintain some limited presence there. Veterans of Seventh Regiment v. Field Officers of Seventh Regiment, 60 Hun. 578, 14 N.Y.S. 811, 816 (1st Dep't 1891) ("the armory . . . is a public building, devoted to a public use"). It is impossible to understand how plaintiffs' status could be superior to that of the organized veterans of the Seventh Regiment in 1891.

    •    No theory can support the proposition – which is not even asserted in the complaint – that the Legislature intended in the 1800s to convey an "immediate, rather than incidental, benefit" upon any person or entity other than the New York Army National Guard, with which plaintiffs have no cognizable association, and any such claim would be utterly implausible.

The allegations of the complaint therefore fail, as a matter of law, to state a cause of action for tortious interference with contract.[15]

_____

[15]In connection with plaintiffs' tortious interference claim, they also assert interference with a "fiduciary duty" allegedly owed by senior officers of the present incarnation of the Seventh Regiment - the former trustees - to former members of the Regiment's past incarnations. Complaint ¶ 93. Defendants are unable to find any legal precedent for the proposition that an

-71-

## POINT IX

### THE COMPLAINT'S SIXTH CLAIM FAILS TO STATE A CAUSE OF ACTION FOR CONSTRUCTIVE TRUST

Plaintiffs' sixth claim is for the imposition of a constructive trust and an accounting. Complaint ¶ 95-100. Plaintiffs apparently believe that "Armory rental revenues properly belong to the trustees of the Armory building, and should be allocated to them" (Complaint ¶ 97). This claim is not only implausible but baseless on several grounds as a matter of law and must also be dismissed.

In the first place, as set forth in POINT III *supra*, the claim runs directly contrary to N.Y. Military Law § 183(5), as that section applied to the Armory prior to the enactment of Chapter 482. Section 183(5), which is not challenged in this action, provides that "fifty per centum of all moneys paid as rent . . . shall be transmitted by the officer in charge and control of the armory through the adjutant general to the state treasury," and that "the balance of such moneys paid as rent shall be transmitted to the adjutant general who shall hold the same until the first day of April next ensuing and he shall then apportion and divide the same to and among all the units of the

---

Army National Guard officer might have any kind of continuing fiduciary duty to a former member of a military formation in relation to the use of State military property. This novel concept therefore cannot aid plaintiffs' claim of tortious interference.

organized militia located within the state in proportion to the
number of officer and enlisted personnel assigned strength . . .
. "

The law prior to Chapter 482 therefore provided that *no*
rental revenues were retained by the trustees or otherwise by the
Armory.  Absent Chapter 482 and the lease with the Conservancy,
this is what the Legislature mandated for *all* of the State's 70-
plus armories.  Thus, there is no sense in which "Armory rental
revenues properly belong to the trustees of the Armory."
Complaint ¶ 97.  Under Chapter 482, the result is just the
opposite, as the Legislature provided that the lessee (presently,
the Conservancy):

> shall be required to apply all revenues
> generated by operations at the Armory to pay
> or provide for the costs of repairs,
> restoration, refurbishment, operating,
> maintenance and programming of the Armory and
> the uses therein and the activities of the
> lessee or subsequent lessee with respect
> thereto.

Chapter 482, § 3.

Equally important, the complaint utterly fails to plead the
elements of a New York common law cause of action for the
imposition of a constructive trust and a concomitant accounting,
which elements have been clearly set forth by numerous opinions
of the New York Court of Appeals.

Under New York law, there are four elements to a
constructive trust claim, none of which is met by the allegations

-73-

of the complaint:

> (1) a confidential or fiduciary relationship;
> (2) a promise, express or implied;    (3) a
> transfer of the subject *res* made in reliance
> on that promise;    and (4) unjust enrichment.

Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.),

377 F.3d 209 (2d Cir. 2004) (citing Bankers Sec. Life Ins. Soc'y

v. Shakerdge, 49 N.Y.2d 939, 940 (1980)).

Here, plaintiffs do not allege having any relationship with

either the State or the City, much less a "confidential or

fiduciary" relationship.    They allege no "promise, express or

implied."    They do not allege a transfer of a subject *res* made in

reliance on a promise.    At most plaintiffs allege the specific

terms of Chapter 482, which terms have nothing apparently to do

with them.

Plaintiffs therefore considerably overreach in alleging in

the complaint that they might somehow be entitled to the

imposition of a constructive trust with respect to Armory rental

revenues.    No discharged veterans of United States Army-

designated lineal descendant units of the Seventh Regiment could

possibly be the beneficiaries of rental revenues of this State-

owned property.

This state law claim therefore completely fails and must be

dismissed as a matter of law.

-74-

## POINT X

### THE COMPLAINT'S SEVENTH CLAIM MUST BE DISMISSED BECAUSE THERE IS NO INDEPENDENT CAUSE OF ACTION UNDER 42 U.S.C. § 1983

The complaint, in its seventh claim, purports to depict an independent substantive cause of action under 42 U.S.C. § 1983. Complaint ¶ ¶ 101-104.

Plaintiffs seem to be unaware that there is no such thing as a stand-alone § 1983 claim. See Gonzaga Univ. v. Doe, 536 U.S. 273, 285 (2002) ("1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere, i.e., rights independently 'secured by the Constitution and laws' of the United States").

The whole complaint has to be based on § 1983, so far as the federal constitutional claims are concerned, because provisions of the United States Constitution do not create an independent cause of action in a case not involving federal officials. "Constitutional causes of action should be implied only where they are necessitated by the absence of alternative relief." Moriani v. Hunter, 1979 U.S. Dist. LEXIS 11003 (S.D.N.Y. 1979).

A duplicative claim should be dismissed. Baquer v. Spanish Broad. Sys., 2007 U.S. Dist. LEXIS 70793, *23 (S.D.N.Y. 2007). Plaintiffs' seventh claim adds nothing substantive to the complaint and must therefore be dismissed.

## POINT XI

### STATE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY WITH RESPECT TO ANY FEDERAL CLAIMS MEANT TO HAVE BEEN ASSERTED AGAINST THEM

As noted, State defendants Berens and Sherman are not mentioned in plaintiffs' prolix complaint other than with respect to the fourth claim, alleging an Article 78 claim with respect to the UDC Act. As to any state law claims, they are entitled under state law to immunity for their performance of official functions which entail the exercise of judgment and discretion. See POINT VI supra.

To the extent that State defendants might be deemed to have also been targeted by plaintiffs' three federal constitutional claims - and the complaint does not put them on notice of any such intention - they are entitled to qualified immunity on any claim for money damages including the exemplary or punitive damages demanded in the complaint - insofar as plaintiffs seek monetary relief against them.

> Qualified immunity is an immunity from suit and not just a defense to liability. The first step in a qualified immunity inquiry is to determine whether the alleged facts demonstrate that a defendant violated a constitutional right. If the allegations show that a defendant violated a constitutional right, the next step is to determine whether that right was clearly established at the time of the challenged action - that is, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. A defendant will be entitled to qualified

-76-

> immunity if either (1) his actions did not
> violate clearly established law or (2) it was
> objectively reasonable for him to believe
> that his actions did not violate clearly
> established law.

Iqbal v. Hasty, 490 F.3d 143, 152 (2d Cir. 2007) (citations and

internal quotation marked omitted).

> In determining whether a right was clearly
> established, the court must assess whether
> "the contours of the right [were]
> sufficiently clear in the context of the
> alleged violation such that a reasonable
> official would understand that what he [was]
> doing violate[d] that right."  Id. at 250-51
> (internal quotation marks omitted).  To that
> end, the court should consider what a
> reasonable officer in the defendant's
> position would have known about the
> lawfulness of his conduct, "not what a lawyer
> would learn or intuit from researching case
> law."  Id. at 251 (internal quotation marks
> omitted).

Id. at 152 (quoting Johnson v. Newburgh Enlarged School District,

239 F.3d 246, 250 (2d Cir. 2001)).

"To determine whether a particular right was clearly

established at the time the defendants acted, the district court

should consider '(1) whether the right in question was defined

with reasonable specificity; (2) whether the decisional law of

the Supreme Court and the [Second Circuit] support the existence

of the right in question; and (3) whether under preexisting law a

reasonable defendant official would have understood that his or

her acts were unlawful.'"  Sound Aircraft Servs. v. Town of E.

Hampton, 192 F.3d 329, 337 (2d Cir. 1999) (quoting Jermosen v.

Smith, 945 F.2d 547, 550 (2d Cir. 1991)).

With respect to the present action, neither the Supreme Court nor the Second Circuit has held, so far as research reveals, that a mid-level public servant can be individually liable for official acts in connection with the implementation of State legislation concerning a public development project, as a matter of substantive due process, the public use clause or the contract clause.

Because there is no clearly established constitutional right which a reasonable public officer such as Berens or Sherman would have understood to have been violated by their official conduct, and the implausibility of any contention that their acts were objectively unreasonable, Berens and Sherman are entitled to qualified immunity with respect to plaintiffs' federal claims.

Therefore, as a matter of law, to the extent that the complaint purports to allege any federal claims as against State defendants, those claims must be dismissed.

### POINT XII

### THIS COURT LACKS PERSONAL JURISDICTION OVER DEFENDANT SHERMAN

This Court lacks personal jurisdiction over defendant Sherman, a former ESDC staff member who resigned from ESDC and relocated from the State of New York to a different state in 2006, long before the filing of this action in July 2007. Graber decl. ¶ 40. Sherman did not retire from State service, and has no relationship with the State or State government so far as the

-78-

New York Attorney General's Office has been able ascertain.   Id.

Plaintiffs purported to serve Sherman by delivering a copy of the summons and complaint in this action to a person of suitable age and discretion at the ESDC offices in Manhattan, and by mailing a copy of the summons and complaint to Sherman at those same ESDC offices, as set forth in plaintiffs' affidavit of service which Dkt. No. 9 in this Court's docket.   If Sherman had been in New York and working for ESDC, service might have complied with N.Y. CPLR R. 308, hence with Fed.R.Civ.P. 4(e).

The New York Attorney General's Office filed a notice of appearance in this action, on August 6, 2007, expressly on behalf of State defendant Berens - not Sherman - as set forth at Dkt. No. 3 of this Court's docket.   The Attorney General's Office appears on behalf of Sherman for the purpose of bringing to this Court's attention plaintiffs' failure of service.

In the absence of proper service, the complaint must be dismissed as against State defendant Sherman for lack of personal jurisdiction.[16]

---

[16]However, in the event this Court were to dismiss the complaint , or, m more specifically the fourth claim, the only claim in which Berens and Sherman are mentioned, it is requested that the dismissal would apply to Sherman also.

## Conclusion

THE MOTION SHOULD BE GRANTED IN ENTIRETY AND
THE COMPLAINT SHOULD BE DISMISSED

Dated:     New York, New York
           October 4, 2007

                                    Respectfully submitted,

                                    ANDREW M. CUOMO
                                    Attorney General of the
                                        State of New York
                                    **Attorney for State Defendants**
                                    **Berens and Sherman**

                                    By:

                                    _____
                                    JOEL GRABER  (JG-3337)
                                    Assistant Attorney General
                                    Special Litigation Counsel
                                    120 Broadway - 24th Floor
                                    New York, NY 10271-0332
                                    (212) 416-8645
                                    FAX (212) 416-6009
                                    joel.graber@oag.state.ny.us

LITIGATION BUREAU

JOEL GRABER
Assistant Attorney General