In addition to the areas mentioned above the asbestos investigation also included sampling of ceiling plaster, wall plaster and exterior window caulk/glaze from throughout the entire Headhouse and Drill Hall. Analysis of all plaster samples revealed no ACM present. In the Headhouse analysis of window caulk/glaze from windows on the first and second floors revealed the material to be ACM. For the purposes of this investigation, all window caulk/glaze of the Headhouse is classified as presumed ACM.

On the roof of the Drill Hall there are two sets of clerestory windows. Analysis of the caulk material revealed that no asbestos was detected.

Laboratory reports of all asbestos analytical results are provided in Appendix B.

**ASBESTOS SUMMARY TABLE**

| Location | Type of Material | Condition | Estimated Quantity |
|---|---|---|---|
| Drill Hall<br>Cellar Level (rifle range and fallout shelter area) | Spray on insulation | Poor | 10,000 square feet |
| Main Level (north side storage rooms) | Corrugated Pipe Insulation | Good | 800 linear feet |
| Headhouse<br>Cellar Level<br>Kitchen outside Pistol Range | Corrugated Pipe Insulation | Poor | 8 linear feet |
| Bathrooms on Westside (inside ceiling cavity) | Corrugated Pipe Insulation | Good | 10 linear feet |
| *First Floor*<br>Field Officers and Staff Off. Room | Corrugated Pipe Insulation | Good | 15 linear feet |
| *Second Floor* | NO ACM PRESENT | | |
| Third Floor<br>Room 304 | 9"x 9" Floor Tile | Good | 700 square feet |
| Room 304 and 312 | Transite like paneling inside radiator covers (two radiator covers total) | Good | 8 square feet |
| Room 306 (rear office area) | Corrugated Pipe Insulation | Good | 25 linear feet |
| Head House - Fourth Floor<br>Room labeled HHC 1/107 | 1'x 1' Floor Tile | Good | 2,500 square feet |
| Room labeled Co. A 1/27 | 1'x 1' Floor Tile | Good | 2,500 square feet |
| Room labeled Co. B 1/107 | 1'x 1' Floor Tile | Good | 2,500 square feet |
| Room labeled Co. C HHC | 1'x 1' Floor Tile | Good | 2,500 square feet |
| Room labeled CSC 207 | 1'x 1' Floor Tile | Good | 2,500 square feet |
| Room labeled 2BDE | 1'x 1' Floor Tile | Good | 2,500 square feet |
| Fifth Floor | NO ACM PRESENT | | |

N-3-6

| | | | |
|---|---|---|---|
| Exterior windows (Cellar to Fifth Floor) | Window caulk/glaze | Good | Approximately 200 windows |

NOTE: The following materials did not contain ACM:
The window caulk/glaze of Clerestory windows on the Drill Hall roof.
Wall and ceiling plaster throughout the entire facility.
Insulation on boiler flues (Headhouse cellar).
Plaster type insulation of elbows and joints of overhead pipes (Headhouse cellar).
9"x 9" floor tile in Adjutant's office (Headhouse).
9"x 9" floor tile in Room 307 (Headhouse).

*The roof membrane was not included in this survey

## LEAD BASED PAINT INVESTIGATION

An RMD-1 XRF detector was used to analyze painted surfaces for the presence of Lead Based Paint. The EPA definition of Lead Based Paint is paint that contains greater than 1.0 milligram of Lead per square centimeter of surface via XRF testing. Throughout the entire Headhouse and Drill Hall the vast majority of all painted walls, ceilings, radiators and wooden window components (sills, sashes and frames) were identified as containing Lead Based Paint. In the Headhouse the overall condition of painted surfaces is good, with a few exceptions where water damage has caused localized peeling and flaking. Also present in the Headhouse are wood doors, ornate wooden framing, and wainscoting located on each floor and in most rooms. No Lead Based Paint was present in these stained wooden surfaces. No Lead Based Paint was detected on the wood surfaces of the central staircase.

On the north and south sides of the Headhouse building there are staircases that begin at the second floor and terminate at the fifth floor. XRF testing of the painted surfaces of the metal banisters and railings of these staircases was inconclusive. In order to identify the presence of Lead Based Paint on the banisters and railings of these staircases, chip samples were collected and analyzed for lead content via Atomic Absorption method. The EPA definition of Lead Based Paint is paint that contains greater than 0.5% Lead by weight via analysis by Atomic Absorption. Analysis of all paint chip samples from the banisters and railing revealed the paint to be identified as Lead Based Paint.

Laboratory reports of paint chip analysis are provided in Appendix C.

In the Drill Hall Lead Based Paint was present throughout the entire interior. Painted surfaces of the walls located on the east and west sides of the interior space were in generally poor condition with several hundred square feet of surface area that was peeling and chipping. Painted surfaces on the Drill Hall's interior truss, north and south walls and the walls of the storage rooms were in good condition.

A survey of the building's exterior revealed Lead Based Paint on the following materials: painted surfaces of exterior window sills and frames, black metal fence around entire perimeter, black metal fire escapes, and black metal bars covering each first floor

Doc #:NY6:491877.32

window. Painted surfaces of the exterior doors and walls around the Lexington Avenue vehicle entrance did not contain lead based paint.

Doc #:NY6:491877.32

**LEAD BASED PAINT SUMMARY**

Surfaces with LBP

- Exterior fire escapes/stairwells
- Exterior perimeter fence
- Exterior window bars (First floor only)
- Exterior side of window frames, sashes and sills
- Banisters and railings of north and south stairwells in Headhouse (2nd to 5th floor)
- All painted radiators
- All interior painted walls and ceilings (with several exceptions noted below)
- All interior sides of painted window frames, sashes and sills (with several exceptions noted below)

Areas that do not contain Lead Based Paint:

**Headhouse**

All interior wood doors, wood framing, wainscoting and other ornate wood surfaces.

Cellar – cement floors, brick walls of corridor, walls and ceiling of entrance foyer to elevator, and ceiling of Men's and Ladies' bathrooms.

First Floor – window sashes and frames of Reception Room, Board of Officers' Room, and Colonel's Room, interior wall partitions of Custodian's Office (Hors'g Equipment Rm) and Line Officer's Room.

Wood surfaces of central staircase.

Second Floor – window sashes and frames of First Colonel's Room Fourth Colonel's Room, Seventh Colonel's Room, and Ninth Colonel's Room, painted wallpaper on partitions of rear room inside Tenth Colonel's Room and ceiling of 11th Colonel's Room.

Third Floor - window sashes and frames of Rooms 302, 307, 308, and 310, interior wall partitions of Rooms 300, 305, 307, 309, and 311, and ceiling of Room 311.

Fourth Floor – hallway stucco walls, hallway ceiling, stucco walls of restaurant's dining room, ceiling of dining room, hallway partition walls at north and south stairwells, Men's and Ladies bathrooms, red paint on shelves, walk-in box and framing components of restaurant's kitchen, and interior partitions of Room 414.

Fifth Floor – window sashes and frames of glass brick style windows throughout the entire floor, walls of Conference Room, Storage Room and Office (formerly squash courts) located along the north side of the floor.

**Drill Hall**

The green paint on the wooden floor material was non-lead based paint. Painted surfaces of the walls and doors around the Lexington Avenue vehicle entrance were non-lead based paint.

## LEAD CONTAMINATION INVESTIGATION (RIFLE RANGE)

Located below the south side of the Drill Hall is a closed down rifle range. The center and east sections of the rifle range space were converted into a storage area and fall-out shelter in the early 1950s. The section of the rifle range closest to the Head House was converted to a Pistol Range at an unknown time (post 1950s). The Pistol Range was completely closed in 1997 due to lead contamination problems. As part of this investigation dust wipe samples of the Pistol Range floor, Rifle Range/Fall-out Shelter floor, Kitchen floor outside the Pistol Range and Headhouse cellar level hallway floor (outside the kitchen) were collected.

Analysis of the dust wipes from the pistol range floor measured from approximately 1,000 to 73,000 micrograms of lead per square foot (ug/ft$^2$). Results from two dust wipes of the Rifle Range/Fall-out Shelter floor were 9,432 ug/ft$^2$ near the target trap area and 7,343 ug/ft$^2$ near the Fall-out shelter area. A dust wipe from the cellar kitchen floor outside the Pistol Range measured 1,020 ug/ft$^2$. A dust wipe from the cellar hallway floor directly outside the kitchen measured 217 ug/ft$^2$ A dust wipe from the cellar hallway floor away from the kitchen near the main stairwell measured 131 ug/ft$^2$. The EPA/HUD level of acceptable lead content in dust on floors is 40 ug/ft$^2$ for residential buildings. This value has been adopted by the New York City Department of Health as an acceptable level for indoor floors of any facility/building that is open to the public. The results of the investigation reveal extremely elevated levels of lead dust and confirm that lead dust has migrated into the Headhouse's cellar hallway.

Laboratory reports of the dust wipe analyses are provided in Appendix D.

Also, ventilation ductwork contaminated with lead dust is located in the Pistol and Rifle Range areas. In 1997 analysis of one dust wipe from inside a section of exhaust duct revealed lead levels of 210,900 ug/ft$^2$. Approximately 100 linear feet of 3'X2' ductwork was observed. No samples of the ductwork were collected as part of this investigation.

In addition to the contaminated ductwork, many miscellaneous items such as lockers, furniture tools, benches, ammunition, target liner, bull's-eye paper, and fallout shelter supplies have been left behind. There are also three portable vacuums, one of which contains a lead warning label and a 5-gallon bucket of debris with a lead warning label. All of these items must also be identified as being contaminated with lead; thus disposal of these items must follow hazardous waste disposal procedures. In the Pistol Range there are accumulations of bullet fragments along the floor of the target trap area, which also must be disposed of as hazardous waste.

In the Rifle Range/Fall-out shelter area there is an accumulation of sand in the target trap area. No visible bullet fragments were observed in the sand. The sand is bordered by metal paneling and does not connect to the soil below the rifle range. Samples of the sand

N-3-10

were collected and analyzed via Toxic Characterization Leachate Procedure (TCLP) for lead content. Analytical results measured 3000 milligrams of Lead per Liter of leachate/water (mg/L) for sand in the lower target trap. The sand of the upper target trap measured 2700 mg/L. The EPA definition of hazardous waste for lead content via TCLP is 5 mg/L. Thus all sand in the target trap area is considered hazardous waste.

Laboratory reports of the TCLP analysis are provided in Appendix E

**OTHER ENVIRONMENTAL ISSUES**

Light fixtures and electrical panels throughout the Headhouse and Drill Hall may contain mercury or PCB oils. In the Drill Hall there are approximately 100 ceiling suspended high intensity light fixtures with possible mercury content. No sampling was conducted as part of this investigation. Future renovation projects will require sampling and proper disposal of any items that contain mercury or PCB oils. During the course of the site survey no transformers or other large electrical components were observed. Other than the light fixtures there were no sources of mercury or PCBs that were observed during the survey. No other hazardous waste materials such as waste oils, unidentified drums or batteries were present.

Sections of the Rifle Range/fallout shelter area have been subject to flooding and ponded water. A broken rainwater drain line was observed. In addition, there may be ground water intrusion from the floor of the rifle range. These conditions may result in microbial contamination and a future indoor air quality problem and should be promptly rectified.

Doc #:NY6:491877.32

ABATEMENT COST ESTIMATES

Asbestos

| Type of Material | Estimated Quantity | Cost |
|---|---|---|
| Corrugated Pipe insulation | 850 ln. ft. | $13,000 |
| Window caulk/glaze | 200 to 250 windows | $50,000 |
| Spray on insulation | 10,000 sq. ft. | $150,000 |
| Floor Tile | 17,000 sq. ft. | $85,000 |
| Radiator panels | 10 sq. ft. (2 panels) | $1,000 |
| | Sub total | $299,000 |
| Air monitoring Cost (@ 20%) | | $59,800 |
| | TOTAL | $358,800 |

Lead Based Paint

| Location/Type of Material | Estimated Quantity | Cost |
|---|---|---|
| Exterior metal fence | 6,000 sq. ft. | $48,000 |
| Exterior fire escapes | 2,000 sq. ft. | $16,000 |
| Exterior window bars | 2,000 sq. ft. | $16,000 |
| Drill Hall walls (hall, rifle range and north cellar level) | 100,000 sq. ft. | $1,100,000 |
| Drill Hall roof truss | 10,000 sq. ft. | $100,000 |
| Headhouse north and south staircase railings | 8,000 sq. ft. | $64,000 |
| Headhouse ceilings | 80,000 sq. ft. | $640,000 |
| Headhouse walls | 50,000 sq. ft. | $400,000 |
| Headhouse windows | 200 to 250 windows | $50,000 |
| | TOTAL | $2,434,000 |

Lead Dust Decontamination/Disposal of Lead Debris the Rifle Range

| Type of Activity | Estimated Quantity | Cost |
|---|---|---|
| Cleaning/Decon of Headhouse Cellar floors | 8,000 sq. ft. | $10,000 |
| Cleaning/Decon of Pistol & Rifle Range floors & surfaces | 40,000 sq. ft. | $100,000 |
| Removal and Disposal of Lead bullet debris of Pistol Range | 1,000 lbs. | $10,000 |
| Removal and Disposal of sand from Rifle Range target traps | 50 cubic yards | $30,000 |
| Removal and Disposal of lead contaminated items (lockers, supplies, furniture, etc.) | 100 cubic yards | $60,000 |
| Removal and disposal of Ventilation ductwork | 200 ln. ft. | $30,000 |
| | TOTAL | $240,000 |

These cost estimates are budgetary in nature and are based upon analysis of costs associated with full-scale asbestos and lead abatement projects of similar scope that have occurred in the recent past. It should be noted that the estimated costs might be impacted by the economic climate, which may alter in the future.

**CONCLUSION**

Warren & Panzer's investigation has revealed extensive asbestos and lead issues throughout the entire Seventh Regiment Armory Facility. All of these issues must be addressed through large-scale professional hazardous material abatement projects. At this time, there are no asbestos and lead issues that can be abated by the current management during routine operations and maintenance. The types and scopes of any abatement projects should be decided after the future use of the facility has been determined.

**DISCLAIMER**

This investigation did not utilize destructive sampling techniques. There may be additional hidden asbestos, lead and other hazardous materials present in the facility that might be discovered only during future renovation activities.

Respectfully submitted,

WARREN & PANZER ENGINEERS, P.C.

James Scullin
Project Manager

Chet Bijoor, P.E., DEE
Vice President

N-3-13

EXHIBIT N-4

PHASE II ADDENDUM REPORT

[Attached behind.]



Warren & Panzer Engineers, P.C.
228 East 45th Street, 10th Floor
New York, NY 10017
Tel. (212) 922-0077
Fax (212) 922-0630

April 12, 2006

Mr. Jack Dobson
The 7th Regiment Armory Conservancy
643 Park Avenue
New York, NY 10019

RE:     The 7th Regiment Armory, Phase II Environmental Investigation
        ADDENDUM REPORT
        WP# 1199.01.01

Dear Mr. Dobson:

Warren & Panzer Engineers, P.C. (W&P) authored a Phase II Environmental
Investigation report dated **July 12, 2004**. The findings of that report did not discuss
specific issues concerning lead or other hazardous material contamination present in
ponded water located in the basement of the Drill Hall. At the time of the investigation
areas of poned water were observed in low lying sections of the former rifle range located
in the basement of the Drill Hall. At the time of the investigation, no information was
provided as to how long the ponded water was present, the cause of the water intrusion or
any specific future plans for removing the water.

W&P wishes to clarify that dust wipe and bulk sampling confirmed the presence of lead
contamination in the dust, debris and sand that was located in close proximity to the
water. The lead contaminated dust, debris and sand was also submerged in the water.
Therefore the water is considered assumed contaminated by lead until water testing
determines otherwise. Such testing may also reveal the presence of other contaminants.

Efforts to identify the source of the water intrusion, test the water and remove the water
were postponed so that these efforts could occur simultaneously with decontamination
activities in the former rifle range. Water testing, disposal and water intrusion repairs
have been addressed in the W&P abatement specifications and drawings dated **January
2006.**

Sincerely,

Warren & Panzer Engineers, P.C.

*James Scullin*

James Scullin
Project Manager

EXHIBIT O

VENDOR RESPONSIBILITY QUESTIONNAIRE

[Attached behind]

O-1

## STATE OF NEW YORK
## VENDOR RESPONSIBILITY QUESTIONNAIRE

FEIN #

| 1. VENDOR IS: | |
|---|---|
| ☐ PRIME CONTRACTOR   ☐ SUB-CONTRACTOR | |

| 2. VENDOR'S LEGAL BUSINESS NAME | 3. IDENTIFICATION NUMBERS<br><br>a) FEIN #<br><br>b) DUNS # |
|---|---|

| 4. D/B/A – Doing Business As (if applicable) & COUNTY FILED: | 5. WEBSITE ADDRESS (if applicable) |
|---|---|

| 6. ADDRESS OF PRIMARY PLACE OF BUSINESS/EXECUTIVE OFFICE | 7. TELEPHONE NUMBER | 8. FAX NUMBER |
|---|---|---|

| 9. ADDRESS OF PRIMARY PLACE OF BUSINESS/EXECUTIVE OFFICE *IN NEW YORK STATE*, if different from above | 10. TELEPHONE NUMBER | 11. FAX NUMBER |
|---|---|---|

| 12. PRIMARY PLACE OF BUSINESS IN NEW YORK STATE IS:<br><br>☐ Owned      ☐ Rented<br><br>If rented, please provide landlord's name, address, and telephone number below: | 13. AUTHORIZED CONTACT FOR THIS QUESTIONNAIRE<br><br>Name<br>Title<br>Telephone Number<br>Fax Number<br>e-mail |
|---|---|

**14. VENDOR'S BUSINESS ENTITY IS** (please check appropriate box and provide additional information):

| a) ☐ Business Corporation | Date of Incorporation | State of Incorporation* |
|---|---|---|
| b) ☐ Sole Proprietor | Date Established | |
| c) ☐ General Partnership | Date Established | |
| d) ☐ Not-for-Profit Corporation | Date of Incorporation | State of Incorporation*<br>Charities Registration Number |
| e) ☐ Limited Liability Company (LLC) | Date Established | |
| f) ☐ Limited Liability Partnership | Date Established | |
| g) ☐ Other – Specify: | Date Established | Jurisdiction Filed (if applicable) |

* If not incorporated in New York State, please provide a copy of authorization to do business in New York.

**15. PRIMARY BUSINESS ACTIVITY** - (Please identify the primary business categories, products or services provided by your business)

**16. NAME OF WORKERS' COMPENSATION INSURANCE CARRIER:**

**17. LIST ALL OF THE VENDOR'S PRINCIPAL OWNERS AND THE THREE OFFICERS WHO DIRECT THE DAILY OPERATIONS OF THE VENDOR** (Attach additional pages if necessary):

| a) NAME (print) | TITLE | b) NAME (print) | TITLE |
|---|---|---|---|
| c) NAME (print) | TITLE | d) NAME (print) | TITLE |

# STATE OF NEW YORK
## VENDOR RESPONSIBILITY QUESTIONNAIRE

FEIN #

> **A DETAILED EXPLANATION IS REQUIRED FOR EACH QUESTION ANSWERED WITH A "YES," AND MUST BE PROVIDED AS AN ATTACHMENT TO THE COMPLETED QUESTIONNAIRE. YOU MUST PROVIDE ADEQUATE DETAILS OR DOCUMENTS TO AID THE CONTRACTING AGENCY IN MAKING A DETERMINATION OF VENDOR RESPONSIBILITY. PLEASE NUMBER EACH RESPONSE TO MATCH THE QUESTION NUMBER.**

| | | |
|---|---|---|
| 18. | Is the vendor certified in New York State as a (check please):<br>☐ Minority Business Enterprise (MBE)<br>☐ Women's Business Enterprise (WBE)<br>☐ Disadvantaged Business Enterprise (DBE)?<br>*Please provide a copy of any of the above certifications that apply.* | ☐ Yes  ☐ No |
| 19. | Does the vendor use, or has it used in the past ten (10) years, any other Business Name, FEIN, or D/B/A other than those listed in items 2-4 above?<br>*List all other business name(s), Federal Employer Identification Number(s) or any D/B/A names and the dates that these names or numbers were/are in use. Explain the relationship to the vendor.* | ☐ Yes  ☐ No |
| 20. | Are there any individuals now serving in a managerial or consulting capacity to the vendor, including principal owners and officers, who now serve or in the past three (3) years have served as: | |
| a) | An elected or appointed public official or officer?<br>*List each individual's name, business title, the name of the organization and position elected or appointed to, and dates of service.* | ☐ Yes  ☐ No |
| b) | A full or part-time employee in a New York State agency or as a consultant, in their individual capacity, to any New York State agency?<br>*List each individual's name, business title or consulting capacity and the New York State agency name, and employment position with applicable service dates.* | ☐ Yes  ☐ No |
| c) | If yes to item #20b, did this individual perform services related to the solicitation, negotiation, operation and/or administration of public contracts for the contracting agency?<br>*List each individual's name, business title or consulting capacity and the New York State agency name, and consulting/advisory position with applicable service dates. List each contract name and assigned NYS number.* | ☐ Yes  ☐ No |
| d) | An officer of any political party organization in New York State, whether paid or unpaid?<br>*List each individual's name, business title or consulting capacity and the official political party position held with applicable service dates.* | ☐ Yes  ☐ No |

# STATE OF NEW YORK
## VENDOR RESPONSIBILITY QUESTIONNAIRE

FEIN #

---

**21.** Within the past five (5) years, has the vendor, any individuals serving in managerial or consulting capacity, principal owners, officers, major stockholder(s) (10% or more of the voting shares for publicly traded companies, 25% or more of the shares for all other companies), affiliate[1] or any person involved in the bidding or contracting process:

**a)** 1. been suspended, debarred or terminated by a local, state or federal authority in connection with a contract or contracting process;    ☐ Yes ☐ No

2. been disqualified for cause as a bidder on any permit, license, concession franchise or lease;

3. entered into an agreement to a voluntary exclusion from bidding/contracting;

4. had a bid rejected on a New York State contract for failure to comply with the MacBride Fair Employment Principles;

5. had a low bid rejected on a local, state or federal contract for failure to meet statutory affirmative action or M/WBE requirements on a previously held contract;

6. had status as a Women's Business Enterprise, Minority Business Enterprise or Disadvantaged Business Enterprise denied, de-certified, revoked or forfeited;

7. been subject to an administrative proceeding or civil action seeking specific performance or restitution in connection with any local, state or federal government contract;

8. been denied an award of a local, state or federal government contract, had a contract suspended or had a contract terminated for non-responsibility; or

9. had a local, state or federal government contract suspended or terminated for cause prior to the completion of the term of the contract?

**b)** been indicted, convicted, received a judgment against them or a grant of immunity for any business-related conduct constituting a crime under local, state or federal law including but not limited to, fraud, extortion, bribery, racketeering, price-fixing, bid collusion or any crime related to truthfulness and/or business conduct?    ☐ Yes ☐ No

**c)** been issued a citation, notice, violation order, or are pending an administrative hearing or proceeding or determination for violations of:    ☐ Yes ☐ No

1. federal, state or local health laws, rules or regulations, including but not limited to Occupational Safety & Health Administration (OSHA) or New York State labor law;

2. state or federal environmental laws;

3. unemployment insurance or workers' compensation coverage or claim requirements;

4. Employee Retirement Income Security Act (ERISA);

5. federal, state or local human rights laws;

6. civil rights laws;

7. federal or state security laws;

---

## STATE OF NEW YORK
## VENDOR RESPONSIBILITY QUESTIONNAIRE

FEIN #

|  |  |  |  |
|---|---|---|---|
|  | 8. federal Immigration and Naturalization Services (INS) and Alienage laws; <br> 9. state or federal anti-trust laws; or <br> 10. charity or consumer laws? <br> *For any of the above, detail the situation(s), the date(s), the name(s), title(s), address(es) of any individuals involved and, if applicable, any contracting agency, specific details related to the situation(s) and any corrective action(s) taken by the vendor.* |  |  |
| 22. | In the past three (3) years, has the vendor or its affiliates[1] had any claims, judgments, injunctions, liens, fines or penalties secured by any governmental agency? <br> *Indicate if this is applicable to the submitting vendor or affiliate. State whether the situation(s) was a claim, judgment, injunction, lien or other with an explanation. Provide the name(s) and address(es) of the agency, the amount of the original obligation and outstanding balance. If any of these items are open, unsatisfied, indicate the status of each item as "open" or "unsatisfied."* | ☐ Yes | ☐ No |
| 23. | Has the vendor (for profit and not-for profit corporations) or its affiliates[1], in the past three (3) years, had any governmental audits that revealed material weaknesses in its system of internal controls, compliance with contractual agreements and/or laws and regulations or any material disallowances? <br> *Indicate if this is applicable to the submitting vendor or affiliate. Detail the type of material weakness found or the situation(s) that gave rise to the disallowance, any corrective action taken by the vendor and the name of the auditing agency.* | ☐ Yes | ☐ No |
| 24. | Is the vendor exempt from income taxes under the Internal Revenue Code? <br> *Indicate the reason for the exemption and provide a copy of any supporting information.* | ☐ Yes | ☐ No |
| 25. | During the past three (3) years, has the vendor failed to: |  |  |
|  | **a)** file returns or pay any applicable federal, state or city taxes? <br> *Identify the taxing jurisdiction, type of tax, liability year(s), and tax liability amount the vendor failed to file/pay and the current status of the liability.* | ☐ Yes | ☐ No |
|  | **b)** file returns or pay New York State unemployment insurance? <br> *Indicate the years the vendor failed to file/pay the insurance and the current status of the liability.* | ☐ Yes | ☐ No |
| 26. | Have any bankruptcy proceedings been initiated by or against the vendor or its affiliates[1] within the past seven (7) years (whether or not closed) or is any bankruptcy proceeding pending by or against the vendor or its affiliates regardless of the date of filing? <br> *Indicate if this is applicable to the submitting vendor or affiliate. If it is an affiliate, include the affiliate's name and FEIN. Provide the court name, address and docket number. Indicate if the proceedings have been initiated, remain pending or have been closed. If closed, provide the date closed.* | ☐ Yes | ☐ No |

# STATE OF NEW YORK
## VENDOR RESPONSIBILITY QUESTIONNAIRE

FEIN #

| | | | |
|---|---|---|---|
| 27. | Is the vendor currently insolvent, or does vendor currently have reason to believe that an involuntary bankruptcy proceeding may be brought against it?<br>*Provide financial information to support the vendor's current position, for example, Current Ratio, Debt Ratio, Age of Accounts Payable, Cash Flow and any documents that will provide the agency with an understanding of the vendor's situation.* | ☐ Yes | ☐ No |
| 28. | Has the vendor been a contractor or subcontractor on any contract with any New York State agency in the past five (5) years?<br>*List the agency name, address, and contract effective dates.  Also provide state contract identification number, if known.* | ☐ Yes | ☐ No |
| 29. | In the past five (5) years, has the vendor or any affiliates[1]:<br>  **a)** defaulted or been terminated on, or had its surety called upon to complete, any contract (public or private) awarded;<br>  **b)** received an overall unsatisfactory performance assessment from any government agency on any contract; or<br>  **c)** had any liens or claims over $25,000 filed against the firm which remain undischarged or were unsatisfied for more than 90 days ?<br>*Indicate if this is applicable to the submitting vendor or affiliate.  Detail the situation(s) that gave rise to the negative action, any corrective action taken by the vendor and the name of the contracting agency.* | ☐ Yes | ☐ No |

[1] "Affiliate" meaning: (a) any entity in which the vendor owns more than 50% of the voting stock; (b) any individual, entity or group of principal owners or officers who own more than 50% of the voting stock of the vendor; or (c) any entity whose voting stock is more than 50% owned by the same individual, entity or group described in clause (b).   In addition, if a vendor owns less than 50% of the voting stock of another entity, but directs or has the right to direct such entity's daily operations, that entity will be an "affiliate" for purposes of this questionnaire.

# STATE OF NEW YORK
# VENDOR RESPONSIBILITY QUESTIONNAIRE

FEIN #

State of:                ）
                         ） ss:
County of:               ）

## CERTIFICATION:

The undersigned: recognizes that this questionnaire is submitted for the express purpose of assisting the State of New York or its agencies or political subdivisions in making a determination regarding an award of contract or approval of a subcontract; acknowledges that the State or its agencies and political subdivisions may in its discretion, by means which it may choose, verify the truth and accuracy of all statements made herein; acknowledges that intentional submission of false or misleading information may constitute a felony under Penal Law Section 210.40 or a misdemeanor under Penal Law Section 210.35 or Section 210.45, and may also be punishable by a fine and/or imprisonment of up to five years under 18 USC Section 1001 and may result in contract termination; and states that the information submitted in this questionnaire and any attached pages is true, accurate and complete.

The undersigned certifies that he/she:
- has not altered the content of the questions in the questionnaire in any manner;
- has read and understands all of the items contained in the questionnaire and any pages attached by the submitting vendor;
- has supplied full and complete responses to each item therein to the best of his/her knowledge, information and belief;
- is knowledgeable about the submitting vendor's business and operations;
- understands that New York State will rely on the information supplied in this questionnaire when entering into a contract with the vendor; and
- is under duty to notify the procuring State Agency of any material changes to the vendor's responses herein prior to the State Comptroller's approval of the contract.

Name of Business                Signature of Owner/Officer_____

Address                         Printed Name of Signatory

City, State, Zip                Title

Sworn to before me this _____ day of _____, 20____ ;

_____
Notary Public

_____
Print Name

_____
Signature

_____
Date

Issued:  November 1, 2004              Page 6 of 6

APPENDIX A


STANDARD CLAUSES FOR NEW YORK STATE CONTRACTS


[Attached behind.]

**NEW YORK STATE OFFICE OF GENERAL SERVICES**
**PROCUREMENT SERVICES GROUP**

## APPENDIX A

## STANDARD CLAUSES FOR NEW YORK STATE CONTRACTS

**PLEASE RETAIN THIS DOCUMENT**
**FOR FUTURE REFERENCE.**

June, 2006

# TABLE OF CONTENTS

1.    Executory Clause
2.    Non-Assignment Clause
3.    Comptroller's Approval
4.    Workers' Compensation Benefits
5.    Non-Discrimination Requirements
6.    Wage and Hours Provisions
7.    Non-Collusive Bidding Certification
8.    International Boycott Prohibition
9.    Set-Off Rights
10.   Records
11.   Identifying Information and Privacy Notification
12.   Equal Employment Opportunities For Minorities and Women
13.   Conflicting Terms
14.   Governing Law
15.   Late Payment
16.   No Arbitration
17.   Service of Process
18.   Prohibition on Purchase of Tropical Hardwoods
19.   MacBride Fair Employment Principles
20.   Omnibus Procurement Act of 1992
21.   Reciprocity and Sanctions Provisions
22.   Purchases of Apparel

June, 2006

## STANDARD CLAUSES FOR NYS CONTRACTS

The parties to the attached contract, license, lease, amendment or other agreement of any kind (hereinafter, "the contract" or "this contract") agree to be bound by the following clauses which are hereby made a part of the contract (the word "Contractor" herein refers to any party other than the State, whether a contractor, licenser, licensee, lessor, lessee or any other party):

**1. EXECUTORY CLAUSE**. In accordance with Section 41 of the State Finance Law, the State shall have no liability under this contract to the Contractor or to anyone else beyond funds appropriated and available for this contract.

**2. NON-ASSIGNMENT CLAUSE**. In accordance with Section 138 of the State Finance Law, this contract may not be assigned by the Contractor or its right, title or interest therein assigned, transferred, conveyed, sublet or otherwise disposed of without the previous consent, in writing, of the State and any attempts to assign the contract without the State's written consent are null and void. The Contractor may, however, assign its right to receive payment without the State's prior written consent unless this contract concerns Certificates of Participation pursuant to Article 5-A of the State Finance Law.

**3. COMPTROLLER'S APPROVAL**. In accordance with Section 112 of the State Finance Law (or, if this contract is with the State University or City University of New York, Section 355 or Section 6218 of the Education Law), if this contract exceeds $50,000 (or the minimum thresholds agreed to by the Office of the State Comptroller for certain S.U.N.Y. and C.U.N.Y. contracts), or if this is an amendment for any amount to a contract which, as so amended, exceeds said statutory amount, or if, by this contract, the State agrees to give something other than money when the value or reasonably estimated value of such consideration exceeds $10,000, it shall not be valid, effective or binding upon the State until it has been approved by the State Comptroller and filed in his office. Comptroller's approval of contracts let by the Office of General Services is required when such contracts exceed $85,000 (State Finance Law Section 163.6.a).

**4. WORKERS' COMPENSATION BENEFITS**. In accordance with Section 142 of the State Finance Law, this contract shall be void and of no force and effect unless the Contractor shall provide and maintain coverage during the life of this contract for the benefit of such employees as are required to be covered by the provisions of the Workers' Compensation Law.

**5. NON-DISCRIMINATION REQUIREMENTS**. To the extent required by Article 15 of the Executive Law (also known as the Human Rights Law) and all other State and Federal statutory and constitutional non-discrimination provisions, the Contractor will not discriminate against any employee or applicant for employment because of race, creed, color, sex, national origin, sexual orientation, age, disability, genetic predisposition or carrier status, or marital status. Furthermore, in accordance with Section 220-e of the Labor Law, if this is a contract for the construction, alteration or repair of any public building or public work or for the manufacture, sale or distribution of materials, equipment or supplies, and to the extent that this contract shall be performed within the State of New York, Contractor agrees that neither it nor its subcontractors shall, by reason of race, creed, color, disability, sex, or national origin: (a) discriminate in hiring against any New York State citizen who is qualified and available to perform the work; or (b) discriminate against or intimidate any employee hired for the performance of work under this contract. If this is a building service contract as defined in Section 230 of the Labor Law, then, in accordance with Section 239 thereof, Contractor agrees that neither it nor its subcontractors shall by reason of race, creed, color, national origin, age, sex or disability: (a) discriminate in hiring against any New York State citizen who is qualified and available to perform the work; or (b)

discriminate against or intimidate any employee hired for the performance of work under this contract. Contractor is subject to fines of $50.00 per person per day for any violation of Section 220-e or Section 239 as well as possible termination of this contract and forfeiture of all moneys due hereunder for a second or subsequent violation.

**6. WAGE AND HOURS PROVISIONS**. If this is a public work contract covered by Article 8 of the Labor Law or a building service contract covered by Article 9 thereof, neither Contractor's employees nor the employees of its subcontractors may be required or permitted to work more than the number of hours or days stated in said statutes, except as otherwise provided in the Labor Law and as set forth in prevailing wage and supplement schedules issued by the State Labor Department. Furthermore, Contractor and its subcontractors must pay at least the prevailing wage rate and pay or provide the prevailing supplements, including the premium rates for overtime pay, as determined by the State Labor Department in accordance with the Labor Law.

**7. NON-COLLUSIVE BIDDING CERTIFICATION**. In accordance with Section 139-d of the State Finance Law, if this contract was awarded based upon the submission of bids, Contractor affirms, under penalty of perjury, that its bid was arrived at independently and without collusion aimed at restricting competition. Contractor further affirms that, at the time Contractor submitted its bid, an authorized and responsible person executed and delivered to the State a non-collusive bidding certification on Contractor's behalf.

**8. INTERNATIONAL BOYCOTT PROHIBITION**. In accordance with Section 220-f of the Labor Law and Section 139-h of the State Finance Law, if this contract exceeds $5,000, the Contractor agrees, as a material condition of the contract, that neither the Contractor nor any substantially owned or affiliated person, firm, partnership or corporation has participated, is participating, or shall participate in an international boycott in violation of the federal Export Administration Act of 1979 (50 USC App. Sections 2401 et seq.) or regulations thereunder. If such Contractor, or any of the aforesaid affiliates of Contractor, is convicted or is otherwise found to have violated said laws or regulations upon the final determination of the United States Commerce Department or any other appropriate agency of the United States subsequent to the contract's execution, such contract, amendment or modification thereto shall be rendered forfeit and void. The Contractor shall so notify the State Comptroller within five (5) business days of such conviction, determination or disposition of appeal (2NYCRR 105.4).

**9. SET-OFF RIGHTS**. The State shall have all of its common law, equitable and statutory rights of set-off. These rights shall include, but not be limited to, the State's option to withhold for the purposes of set-off any moneys due to the Contractor under this contract up to any amounts due and owing to the State with regard to this contract, any other contract with any State department or agency, including any contract for a term commencing prior to the term of this contract, plus any amounts due and owing to the State for any other reason including, without limitation, tax delinquencies, fee delinquencies or monetary penalties relative thereto. The State shall exercise its set-off rights in accordance with normal State practices including, in cases of set-off pursuant to an audit, the finalization of such audit by the State agency, its representatives, or the State Comptroller.

**10. RECORDS**. The Contractor shall establish and maintain complete and accurate books, records, documents, accounts and other evidence directly pertinent to performance under this contract (hereinafter, collectively, "the Records"). The Records must be kept for the balance of the calendar year in which they were made and for six (6) additional years thereafter. The State Comptroller, the Attorney General and any other person or entity authorized to conduct an examination, as well as the agency or agencies involved in this contract, shall have access to the

Records during normal business hours at an office of the Contractor within the State of New York or, if no such office is available, at a mutually agreeable and reasonable venue within the State, for the term specified above for the purposes of inspection, auditing and copying. The State shall take reasonable steps to protect from public disclosure any of the Records which are exempt from disclosure under Section 87 of the Public Officers Law (the "Statute") provided that: (i) the Contractor shall timely inform an appropriate State official, in writing, that said records should not be disclosed; and (ii) said records shall be sufficiently identified; and (iii) designation of said records as exempt under the Statute is reasonable. Nothing contained herein shall diminish, or in any way adversely affect, the State's right to discovery in any pending or future litigation.

**11. IDENTIFYING INFORMATION AND PRIVACY NOTIFICATION.** (a) FEDERAL EMPLOYER IDENTIFICATION NUMBER and/or FEDERAL SOCIAL SECURITY NUMBER. All invoices or New York State standard vouchers submitted for payment for the sale of goods or services or the lease of real or personal property to a New York State agency must include the payee's identification number, i.e., the seller's or lessor's identification number. The number is either the payee's Federal employer identification number or Federal social security number, or both such numbers when the payee has both such numbers. Failure to include this number or numbers may delay payment. Where the payee does not have such number or numbers, the payee, on its invoice or New York State standard voucher, must give the reason or reasons why the payee does not have such number or numbers.

(b) PRIVACY NOTIFICATION. (1) The authority to request the above personal information from a seller of goods or services or a lessor of real or personal property, and the authority to maintain such information, is found in Section 5 of the State Tax Law. Disclosure of this information by the seller or lessor to the State is mandatory. The principal purpose for which the information is collected is to enable the State to identify individuals, businesses and others who have been delinquent in filing tax returns or may have understated their tax liabilities and to generally identify persons affected by the taxes administered by the Commissioner of Taxation and Finance. The information will be used for tax administration purposes and for any other purpose authorized by law. (2) The personal information is requested by the purchasing unit of the agency contracting to purchase the goods or services or lease the real or personal property covered by this contract or lease. The information is maintained in New York State's Central Accounting System by the Director of Accounting Operations, Office of the State Comptroller, 110 State Street, Albany, New York 12236.

**12. EQUAL EMPLOYMENT OPPORTUNITIES FOR MINORITIES AND WOMEN.** In accordance with Section 312 of the Executive Law, if this contract is: (i) a written agreement or purchase order instrument, providing for a total expenditure in excess of $25,000.00, whereby a contracting agency is committed to expend or does expend funds in return for labor, services, supplies, equipment, materials or any combination of the foregoing, to be performed for, or rendered or furnished to the contracting agency; or (ii) a written agreement in excess of $100,000.00 whereby a contracting agency is committed to expend or does expend funds for the acquisition, construction, demolition, replacement, major repair or renovation of real property and improvements thereon; or (iii) a written agreement in excess of $100,000.00 whereby the owner of a State assisted housing project is committed to expend or does expend funds for the acquisition, construction, demolition, replacement, major repair or renovation of real property and improvements thereon for such project, then:

(a) The Contractor will not discriminate against employees or applicants for employment because of race, creed, color, national origin, sex, age, disability or marital status, and will undertake or continue existing programs of affirmative action to ensure that minority group members and women are afforded equal employment opportunities

without discrimination. Affirmative action shall mean recruitment, employment, job assignment, promotion, upgradings, demotion, transfer, layoff, or termination and rates of pay or other forms of compensation;

(b) at the request of the contracting agency, the Contractor shall request each employment agency, labor union, or authorized representative of workers with which it has a collective bargaining or other agreement or understanding, to furnish a written statement that such employment agency, labor union or representative will not discriminate on the basis of race, creed, color, national origin, sex, age, disability or marital status and that such union or representative will affirmatively cooperate in the implementation of the contractor's obligations herein; and

(c) the Contractor shall state, in all solicitations or advertisements for employees, that, in the performance of the State contract, all qualified applicants will be afforded equal employment opportunities without discrimination because of race, creed, color, national origin, sex, age, disability or marital status.

Contractor will include the provisions of "a", "b", and "c" above, in every subcontract over $25,000.00 for the construction, demolition, replacement, major repair, renovation, planning or design of real property and improvements thereon (the "Work") except where the Work is for the beneficial use of the Contractor. Section 312 does not apply to: (i) work, goods or services unrelated to this contract; or (ii) employment outside New York State; or (iii) banking services, insurance policies or the sale of securities. The State shall consider compliance by a contractor or subcontractor with the requirements of any federal law concerning equal employment opportunity which effectuates the purpose of this section. The contracting agency shall determine whether the imposition of the requirements of the provisions hereof duplicate or conflict with any such federal law and if such duplication or conflict exists, the contracting agency shall waive the applicability of Section 312 to the extent of such duplication or conflict. Contractor will comply with all duly promulgated and lawful rules and regulations of the Governor's Office of Minority and Women's Business Development pertaining hereto.

**13. CONFLICTING TERMS.** In the event of a conflict between the terms of the contract (including any and all attachments thereto and amendments thereof) and the terms of this Appendix A, the terms of this Appendix A shall control.

**14. GOVERNING LAW.** This contract shall be governed by the laws of the State of New York except where the Federal supremacy clause requires otherwise.

**15. LATE PAYMENT.** Timeliness of payment and any interest to be paid to Contractor for late payment shall be governed by Article 11-A of the State Finance Law to the extent required by law.

**16. NO ARBITRATION.** Disputes involving this contract, including the breach or alleged breach thereof, may not be submitted to binding arbitration (except where statutorily authorized), but must, instead, be heard in a court of competent jurisdiction of the State of New York.

**17. SERVICE OF PROCESS.** In addition to the methods of service allowed by the State Civil Practice Law & Rules ("CPLR"), Contractor hereby consents to service of process upon it by registered or certified mail, return receipt requested. Service hereunder shall be complete upon Contractor's actual receipt of process or upon the State's receipt of the return thereof by the United States Postal Service as refused or undeliverable. Contractor must promptly notify the State, in writing, of each and every change of address to which service of process can be made. Service by the State to the last known address shall be sufficient. Contractor will have thirty (30) calendar days after service hereunder is complete in which to respond.

STANDARD CLAUSES FOR NYS CONTRACTS                                                                                    APPENDIX A

**18. PROHIBITION ON PURCHASE OF TROPICAL HARDWOODS**. The Contractor certifies and warrants that all wood products to be used under this contract award will be in accordance with, but not limited to, the specifications and provisions of State Finance Law §165. (Use of Tropical Hardwoods) which prohibits purchase and use of tropical hardwoods, unless specifically exempted, by the State or any governmental agency or political subdivision or public benefit corporation. Qualification for an exemption under this law will be the responsibility of the contractor to establish to meet with the approval of the State.

In addition, when any portion of this contract involving the use of woods, whether supply or installation, is to be performed by any subcontractor, the prime Contractor will indicate and certify in the submitted bid proposal that the subcontractor has been informed and is in compliance with specifications and provisions regarding use of tropical hardwoods as detailed in §165 State Finance Law. Any such use must meet with the approval of the State; otherwise, the bid may not be considered responsive. Under bidder certifications, proof of qualification for exemption will be the responsibility of the Contractor to meet with the approval of the State.

**19. MACBRIDE FAIR EMPLOYMENT PRINCIPLES**. In accordance with the MacBride Fair Employment Principles (Chapter 807 of the Laws of 1992), the Contractor hereby stipulates that the Contractor either (a) has no business operations in Northern Ireland, or (b) shall take lawful steps in good faith to conduct any business operations in Northern Ireland in accordance with the MacBride Fair Employment Principles (as described in Section 165 of the New York State Finance Law), and shall permit independent monitoring of compliance with such principles.

**20. OMNIBUS PROCUREMENT ACT OF 1992**. It is the policy of New York State to maximize opportunities for the participation of New York State business enterprises, including minority and women-owned business enterprises as bidders, subcontractors and suppliers on its procurement contracts.

Information on the availability of New York State subcontractors and suppliers is available from:

NYS Department of Economic Development
Division for Small Business
30 South Pearl St -- 7th Floor
Albany, New York  12245
Telephone:  518-292-5220
Fax: 518-292-5884
http://www.empire.state.ny.us

A directory of certified minority and women-owned business enterprises is available from:

NYS Department of Economic Development
Division of Minority and Women's Business Development
30 South Pearl St -- 2nd Floor
Albany, New York  12245
Telephone:  518-292-5250
Fax: 518-292-5803
http://www.empire.state.ny.us

The Omnibus Procurement Act of 1992 requires that by signing this bid proposal or contract, as applicable, Contractors certify that whenever the total bid amount is greater than $1 million:

(a)  The Contractor has made reasonable efforts to encourage the participation of New York State Business Enterprises as suppliers and subcontractors, including certified minority and women-owned business enterprises, on this project, and has retained the documentation of these efforts to be provided upon request to the State;

(b) The Contractor has complied with the Federal Equal Opportunity Act of 1972 (P.L. 92-261), as amended;

(c) The Contractor agrees to make reasonable efforts to provide notification to New York State residents of employment opportunities on this project through listing any such positions with the Job Service Division of the New York State Department of Labor, or providing such notification in such manner as is consistent with existing collective bargaining contracts or agreements. The Contractor agrees to document these efforts and to provide said documentation to the State upon request; and

(d) The Contractor acknowledges notice that the State may seek to obtain offset credits from foreign countries as a result of this contract and agrees to cooperate with the State in these efforts.

**21. RECIPROCITY AND SANCTIONS PROVISIONS**. Bidders are hereby notified that if their principal place of business is located in a country, nation, province, state or political subdivision that penalizes New York State vendors, and if the goods or services they offer will be substantially produced or performed outside New York State, the Omnibus Procurement Act 1994 and 2000 amendments (Chapter 684 and Chapter 383, respectively) require that they be denied contracts which they would otherwise obtain. NOTE:  As of May 15, 2002, the list of discriminatory jurisdictions subject to this provision includes the states of South Carolina, Alaska, West Virginia, Wyoming, Louisiana and Hawaii. Contact NYS Department of Economic Development for a current list of jurisdictions subject to this provision.

**22. PURCHASES OF APPAREL**. In accordance with State Finance Law 162 (4-a), the State shall not purchase any apparel from any vendor unable or unwilling to certify that: (i) such apparel was manufactured in compliance with all applicable labor and occupational safety laws, including, but not limited to, child labor laws, wage and hours laws and workplace safety laws, and  (ii) vendor will supply, with its bid (or, if not a bid situation, prior to or at the time of signing a contract with the State), if known, the names and addresses of each subcontractor and a list of all manufacturing plants to be utilized by the bidder.

June, 2006

THIS PAGE IS INTENTIONALLY LEFT BLANK