EXHIBIT 9

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of<br>RITA C. CHU, BRUCE LEE, THE SEVENTH<br>REGIMENT FUND, THE VETERANS OF THE<br>SEVENTH REGIMENT, and EAST 67 TENANTS<br>CORP.<br><br>                    Petitioners,<br><br>          -against-<br><br>NEW YORK STATE URBAN DEVELOPMENT<br>CORPORATION d/b/a EMPIRE STATE<br>DEVELOPMENT CORPORATION, and<br>SEVENTH REGIMENT ARMORY<br>CONSERVANCY, INC.,<br><br>                    Respondents. | Index No. 103638/06<br><br>(Justice Lottie E. Wilkins)<br><br><br><br>**AMENDED<br>VERIFIED PETITION** |

Petitioners, RITA C. CHU, BRUCE LEE, THE SEVENTH REGIMENT FUND, THE VETERANS OF THE SEVENTH REGIMENT, and EAST 67 TENANTS CORP. (collectively "Petitioners"), by and through their attorneys, Pryor Cashman Sherman & Flynn LLP, as and for their amended verified petition in this Article 78 proceeding, respectfully allege as follows:

## PRELIMINARY STATEMENT

1.    This Article 78 Proceeding relates to the historic Seventh Regiment Armory, located at 643 Park Avenue, between 67th and 68th Streets, New York, New York (the "Armory"), and to the proposed plan to alter the long-standing purpose and function of the Armory (the "Project"). Petitioners seek to vacate and annul actions taken by Respondent New York State Urban Development Corporation d/b/a Empire State Development Corporation (the "ESDC") relating to the Project.

2.     Petitioners seek an Order vacating and annulling three ESDC actions, to wit:  (1) the issuance on November 16, 2005 of an "Authorization to Act as Agent on Behalf of The People of the State of New York to Execute a Lease and Related Documents for the Project" (the "Authorization"); (2) the issuance on November 16, 2005 of a "Notice of Determination of No Significance" (the "Negative Declaration"), upon which the Authorization of that same day depended; and (3) upon information and belief, the ESDC's entry into a 99-year lease of the Armory (the "Lease") with Respondent the Seventh Regiment Armory Conservancy, Inc. (the "Conservancy"). Petitioners further seek:  (a) an Order directing Respondents to conduct a full environmental impact review process and issue an Environmental Impact Statement before taking any actions based upon the Conservancy's proposed Armory Project; and (b) an Order, during the pendency of this proceeding, preventing Respondents from taking any action in reliance on or in furtherance of the challenged Lease.

3.     Petitioners seek a determination that the Negative Declaration and the Authorization failed to comply with the New York State Environmental Quality Review Act and the attendant regulations promulgated by the New York State Department of Environmental Conservation (collectively "SEQRA") as a result of the following deficiencies, each which would independently entitle Petitioners to the relief they seek: (1) the ESDC gave no prior notice of its environmental review and provided no opportunity for public comment on the environmental review; (2) the ESDC failed to involve other agencies in their review, even those agencies whose involvement was mandatory under SEQRA;  (3) the ESDC's review totally ignored the impact of the development rights to more than 360,000 square feet of space, the equivalent of a 40-story

building, even though this issue was brought to the ESDC's attention by community members and even though SEQRA required a consideration of this issue; (4) the ESDC's review totally ignored the impact of creating a cultural venue on extant, proximate cultural venues such as Zankel Hall, Merkin Concert Hall, the 92nd Street Y, City Center and the Lincoln Center, even though this issue was brought to the ESDC's attention by community members and even though SEQRA required a consideration of this issue; (5) the ESDC's review ignored the decades of controversy surrounding development at and control of the Armory site; and (6) on the issues that the ESDC purported to actually consider, the ESDC relied on faulty data and skewed interpretations thereof.

4.     Independent of the ESDC's failure to comply with SEQRA, Petitioners seek a determination that the Negative Declaration and the Authorization were arbitrary, capricious and an abuse of discretion.

5.     These errors and omissions prevented an accurate public review of the impact of the Project on environmental factors such as air quality, traffic, noise, land use, and extant cultural venues. As a result of the ESDC's complete failure to comply with the procedural and substantive provisions of SEQRA, the Authorization and the Negative Declaration were arbitrary, capricious and an abuse of the ESDC's discretion.

6.     Petitioners also seek to vacate and annul the Lease as having been entered into without legal authority as a result of the legally defective Authorization. Moreover, upon information and belief, the ESDC and the Conservancy entered into the Lease with full knowledge of and responsibility for the legally defective Authorization.

7.    On the facts of this case, SEQRA required as a matter of law that Respondents conduct a full environmental impact review and issue an Environmental Impact Statement ("EIS").  Respondents failed, however, to conduct a full environmental review or issue an EIS, and instead issued a Negative Declaration without adequately consulting with the public or with any other agency.

## PROCEDURAL HISTORY

8.    This proceeding was timely commenced on March 16, 2006 by the filing of a Verified Petition (the "Petition").

9.    In lieu of the verified answer provided for in CPLR 7804(d), Respondents submitted a motion to dismiss the Petition on April 12, 2006.  The basis of the motion to dismiss is an alleged jurisdictional defect.

## THE PARTIES

10.    Petitioner Rita C. Chu is a citizen, resident and taxpayer of the City of New York, Borough of Manhattan, residing at 130 East 67th Street, in the County and State of New York, which is located directly across the street from the Armory.  Ms. Chu enjoys the environment immediately adjacent to the Armory; on a daily basis she breathes the air outside of the Armory and is exposed to the traffic, noise and solid waste produced at and by events at the Armory.  Ms. Chu has standing in this matter because she lives directly across the street from the Armory and because the Project would cause environmental harm to her person and property.  See e.g., Gernatt Asphalt Prods. v. Town of Sardinia, 87 N.Y.2d 668, 687, 642 N.Y.S.2d 164, 175-76 (1996); King v. County of Monroe, 255 A.D.2d 1003, 679 N.Y.S.2d 863 (4th Dep't 1998).

11.    Petitioner Bruce Lee is a citizen, resident and taxpayer of the City of New York, Borough of Manhattan, residing at 115 East 67th Street, in the County and State of New York, which is located directly across the street from the Armory. Mr. Lee is also a member of the Veterans and the Fund. Mr. Lee enjoys the environment immediately adjacent to the Armory; on a daily basis he breathes the air outside of the Armory and is exposed to the traffic, noise and solid waste produced at and by events at the Armory. Mr. Lee has resided in his apartment for more than 30 years. Mr. Lee has standing in this matter because he lives directly across the street from the Armory and because the Project would cause environmental harm to his person and property. See e.g., Gernatt Asphalt, 87 N.Y.2d at 687, 642 N.Y.S.2d at 175-76; King, 255 A.D.2d 1003, 629 N.Y.S.2d at 863.

12.    Petitioner the Seventh Regiment Fund (the "Fund") is a not-for profit corporation duly organized on April 3, 1909 under the laws of the State of New York, having its offices at the Armory. The Fund is comprised of past and present members of the lineal descendents of the Seventh Regiment of the New York National Guard. The Fund is dedicated to promoting the interests and welfare of the Seventh Regiment, and to holding real property in trust for the benefit of the Seventh Regiment. The Fund has standing in this matter because at least one member of the Fund has standing to assert the claims made in this Amended Petition, to wit petitioner Lee; the purposes of the Fund include holding and preserving the Armory as a structure and as a military facility available in times of emergency for use by the Seventh Regiment and by the military generally, purposes which are threatened, for example, by the Conservancy's plan to install a 1,500 seat theatre in what is now the Drill Hall; and the relief sought

does not require the participation of any of the Fund's members. Cf. Chinese Staff &
Workers Ass'n v. New York, 68 N.Y.2d 359, 363, 509 N.Y.S.2d 499, 501
(1986)(granting relief in a SEQRA challenge to development in Chinatown, where the
petitioners included restaurant and garment workers that had formed a nonprofit
organization dedicated to preserving the historical resources of Chinatown).

13.    Petitioner the Veterans of the Seventh Regiment (the "Veterans") is a not-
for-profit corporation duly organized on March 11, 1861 under chapter 41 of the Laws
of 1861 of the State of New York, with its offices located at the Armory.  The
Veterans' present membership includes approximately 1,000 former and present active
duty members of the successor units of the Seventh Regiment.  The Veterans have
standing in this matter because at least one member of the Fund has standing to assert
the claims made in this Amended Petition, to wit petitioner Lee; one purpose of the
Veterans is to preserve the Armory's function as a military facility available in times of
emergency for use by the Seventh Regiment and by the military generally, a purpose
that is threatened, for example, by the Conservancy's plan to install a 1,500 seat theatre
in what is now the Drill Hall; and the relief sought does not require the participation of
any of the Veterans' members. Cf. Chinese Staff & Workers Ass'n, 68 N.Y.2d at 363,
509 N.Y.S.2d at 501.

14.    Petitioner East 67 Street Tenants Corp. ("East 67") is located at 130 East
67 Street, State and County of New York, which is directly across the street from the
Armory.  East 67 is a not-for profit organization dedicated to the interests of the
residents of 130 East 67th Street.  East 67 has standing in this matter because its
members automatically have standing, as they live directly across from the Project site;

its purposes include promoting the safety and health of their members' environment; and the relief sought does not require the participation of any of its members.

     15.   Upon information and belief, Respondent New York State Urban Development Corporation d/b/a Empire State Development Corporation is a public benefit corporation and a corporate governmental agency of the State of New York organized under the laws of the State of New York.

     16.   Upon information and belief, Respondent Seventh Regiment Armory Conservancy, Inc. is a not-for-profit corporation duly organized on September 27, 1999, under the laws of the State of New York, with offices located at 643 Park Avenue, New York, New York.

## FACTUAL BACKGROUND

A.    <u>The Armory's History</u>

     17.   As detailed in the Project's General Project Plan, the Armory was constructed by the Veterans and the Fund between 1877 and 1881 to serve as a home to the Seventh Regiment (the "Regiment"). Located on the full city block bounded by 66th and 67th Streets and Lexington and Park Avenues, the Armory was designed by Charles W. Clinton, a member of the Regiment, and decorated by Louis Comfort Tiffany, Stanford White, Candace Wheeler, the Herter Brothers, and Jasper Cropsey, among others. The Armory is considered a National Historic Landmark, a New York City Landmark, is listed on the New York State's and National Registers of Historic Places, and is the most historically and socially significant as well as architecturally influential armory in New York. <u>See</u> the General Project Plan attached as Exhibit "B" at pp. 2-3.

18.   The Armory is composed of two structures: (1) a multistoried building, or administrative building (the "Administrative Building"), which contains administrative and social areas, and (2) a one-story drill room (the "Drill Hall") used for military training.  See Exh. B at p. 3.

19.   The Administrative building contains important late nineteenth-century period rooms designed and decorated by the above-referenced artists.  The Drill Hall, a 200 by 300 foot structure, is thought to be the oldest extant "balloon shed" (a barrel vaulted-shaped roof supported on visible trusses or ribs) in America.  See Exh. B at p. 2-3

20.   The Armory's principal purpose is as a military building for use in the event of a civil emergency as a gathering point, and it was used as such following the terrorists attacks on September 11, 2001.  See Exh. B at p. 4.

21.   In addition to its role as a military building, the Armory houses a women's shelter run by the Lenox Hill Neighborhood House.  The women's shelter occupies two floors of the Armory and, in times of emergency, the Armory can also provide an additional facility for the homeless.  See Exh. B at p. 7.

22.   The Armory is also a venue for a variety of antique shows, craft shows, and other cultural venues which are used as fund raising events for a host of community and charitable organizations.  For example, the Winter Antique Show held annually at the Armory nets more than $1 million for the East Side Settlement House.  See Exh. B at p. 3.  See also the transcript of the July 21, 2005 hearing attached as Exhibit "F" at p. 106.

470195

8

23.    Petitioners the Veterans and the Fund built the Armory and have been its principal occupants since they constructed the Armory in the late 1800's. The Veterans and the Fund have spent years trying to get the State to consider renovating the Armory, and have even attempted to submit proposals for renovation, including a plan to create a museum in the Armory. The State has repeatedly refused to discuss the matter. As a result of years of the State's protracted neglect, the Armory's interior and exterior structures have deteriorated and are in need of repair or replacement. See Exh. B at p. 2. See also Exh. F at p. 59-61 and 91-93.

24.    A decades-old, ongoing controversy surrounds the development of the Armory site. This ongoing controversy includes public opposition to prior proposals to develop the airspace above the Armory, some of which were even proposed by the ESDC. Specific examples include the opposition in 1981 by citizens' groups and the Veterans to then-Governor Hugh Carey's plan to build a 40-story tower above the Armory. As another example, in 1999, citizens' groups opposed another plan to build a 250,000 square-foot expansion into the air space over the Armory, this time proposed by Hunter College. More recently, there has been ongoing concern and discussion about the fate of the Armory and its physical deterioration.

**B.**    **The Request for Project Proposals and the ESDC's Involvement**

25.    In 1998, the ESDC issued a request for proposals ("RFP") for a consultant to analyze the condition of the building and also to recommend and evaluate physical improvements and uses, help develop a public/private partnership mechanism to finance capital improvements and operations, and write and evaluate an RFP for future

developer(s)/operators(s).  See Exh. B at p. 3-4.

26.  In August 1999, the Directors of the ESDC approved a $325,000 contract

for E&Y Kenneth Leventhal Real Estate Group to provide consulting services.  See

Exh. B at p. 4.

27.  In June 2000, the ESDC issued an RFP for a developer/operator of the

Armory.  See Exh. B at p. 4.

28.  On November 15, 2000, the Conservancy submitted its bid for the

restoration of the Armory.  See Exh. B at p. 4.

29.  On September 9, 2001, the ESDC issued a letter stating that the

Conservancy was the "Preferred Proposer" for the restoration of the Armory.  See Exh.

B at p. 4.

30.  By notice dated June 16, 2005, the ESDC declared itself the lead agency

for the Project's environmental review to be undertaken pursuant to SEQRA.  A copy

of this notice is attached as Exhibit "C."

C.    **Challenges to the Conservancy Undertaking the Project**

31.  On August 12, 2004, the New York State Legislature enacted Chapter 482

of the Laws of the State of New York (the "Legislation"), amending the Military Law

to authorize the ESDC to act on behalf of the State of New York to lease the Armory

and undertake related actions.  See Exh. B at p. 4.

32.  By this Legislation, the State (i) asserted control of the Armory to

preclude triggering reversionary language in the ground lease executed in the 1860's

between the City of New York and the Trustees of the Seventh Regiment, and (ii)

claimed that the State is the lawful successor of the original City lease and thus owns

the building and everything affixed within. See Exh. B at p. 4.

33.   An action challenging the constitutionality of the Legislation, entitled Dalva, et. al v. Pataki, et al., Index. No. 105005/05 (Cahn, J.), is pending in Supreme Court, New York County.

34.   Notwithstanding that the ESDC identified several potentially significant adverse environmental impacts, and that it refused to consider still other substantial impacts, on November 16, 2005, ESDC issued a Negative Declaration, asserting that the Project would have no significant environmental impact.  A copy of the Resolution issuing the Negative Declaration is attached hereto as Exhibit "A."

35.   In that same November 16, 2005 instrument, ESDC issued the Authorization to enter the Lease.  See Exh. A.

36.   Petitioners challenged the Negative Declaration and the Authorization on March 16, 2006 by the filing of a Verified Petition.

37.   Notwithstanding the pending Petition, on May 5, 2006, Respondents, upon information and belief, entered into a 99-year Lease for the Armory.

38.   Accordingly, as this matter currently sits, the Project is being implemented by the State, acting through the ESDC, by leasing the Armory to the Conservancy for a 99-year term, notwithstanding a total failure to conduct an adequate or public review of the Project's substantial environmental impacts.

D.   **The Proposed Project**

39.   The Conservancy proposed to alter drastically the purpose and function of the Armory while restoring and renovating certain portions of the interior and exterior

of the building.

    40.   To accomplish the foregoing, the Conservancy proposed major renovations. For example, the Drill Hall—which currently is used as a staging area in case of emergency—would serve as a cultural arts center for exhibits and performances. To that end, the Conservancy has at various times shown reflecting a 1,500 seat theatre at the location where the Drill Hall now stands. <u>See</u> Exh. B at p. 5. <u>See also</u> the Environmental Assessment Form and the Environmental Assessment attached hereto as Exhibit "E" at p. 16.

    41.   The Project would thus change the Armory's primary existing uses, which include headquarters for the National Guard, a civilian and governmental emergency facility and rallying point, particularly in the event of catastrophic events such as that which occurred on September 11, 2001, with intermittent charitable and community art and antiques exhibits, and a women's homeless shelter, to a primary use as a "unique destination for the public that offers the highest quality cultural programming" such as "visual and/or performing arts," "interpretive and/or educational programs," and "revenue-producing ancillary activities" for as many as 330 days of the year (up from 183 days in 2004). <u>See</u> Exh. B at p. 5.

    42.   Beyond the change to the Armory's primary use, further development of the Armory is contemplated by the Conservancy's Project documents. Those documents, which list the size of the Armory at 178,500 square feet of developed space, affirmatively state that the Armory can accommodate 540,000 square feet of space. <u>See</u> Exh. E at pp. 4 and 17. Yet, the record is silent as to the fate of the 361,500 square feet

of developable space, the rough equivalent of a <u>forty-story tower</u>.

43.    Notably, in 1981, former Governor Hugh Carey proposed building a forty-story tower over the Armory.  And again, in 1999, Hunter College proposed a 250,000 square foot expansion into the air space over the Armory.  Community groups vigorously opposed these plans.  Former Governor Carey is the Honorary Chairman of the Conservancy, and the President of Hunter College is one of the Conservancy's Board Members.

E.    **Relevant Regulations and Definitions**

44.    SEQRA regulations provide a regulatory framework for all state and local agencies.  6 NYCRR § 617.1(e).  No state agency may "undertake, fund, or approve [an] action until it has complied with the provisions of SEQR[A]."  6 NYCRR § 617.3(a).

45.    Because the ESDC is a state agency, its actions must comply with SEQRA.  6 NYCRR §§ 617.1(e) and 617.3(a).

46.    The State's Environmental Assessment Form ("EAF") is a standardized document that consists of a series of questions and check-boxes to be completed by the lead agency, as well as certain documents that the lead agency attaches to the EAF. There are both short and full versions of the document.  <u>See</u> Exh. E.

47.    An Environmental Assessment ("EA") is a detailed analysis of the relevant areas identified in the EAF by the lead agency.  In this case, the EA was prepared by third party consultants AKRF and Philip Habib & Associates.  <u>See</u> Exh. E. Where, as here, the EA is prepared by a third party, the EA must be formally adopted

by the lead agency, here, the ESDC. Where a review of the EA indicates that the proposed action may have a significant adverse impact on any listed environmental factor, the lead agency must then conduct an "Environmental Impact Statement" or "EIS," which, as explained below, is far more detailed than an EA. 6 NYCRR § 617.7(a).

48.    In determining whether an EIS is necessary, the proposed action must be placed in one of three categories to help assess its potential impact. Those categories include the following: "unlisted," "Type II," or "Type I."

49.    The majority of state actions are unlisted actions. For unlisted actions, the lead agency must prepare a short EAF to determine if further inquiry is possible, although the agency may use a full EAF. 6 NYCRR § 617.6(a)(3).

50.    Type II actions, which a smaller number of proposals fall within, are a list of 37 actions that are presumed to have no substantial effect on the environment. 6 NYCRR § 617.5(c). For Type II actions, no environmental review is necessary, as these actions are presumed to have no substantial adverse impact on the environment. 6 NYCRR § 617.6(a)(1)(i).

51.    An even smaller subset of actions (eleven in total), Type I actions, are presumed to have an adverse environmental impact and require the lead agency to complete the full EAF. 6 NYCRR §617.6(a)(2).

52.    Here, the Project is a Type I action because it involves an historic facility. 6 NYCRR § 617.4(b)(9).

53.    Here, the proposed action is a Type I action. Under SEQRA, "a Type I action carries with it the presumption that it is likely to have a significant adverse

impact on the environment and may require an EIS." 6 NYCRR § 617.4(a)(1).

54.    An EIS is an in-depth analysis of a proposed act's environmental impact.
An agency must conduct an EIS if, on the basis of the EAF and the EA, it determines
"that the action <u>may</u> include the <u>potential</u> for at least <u>one</u> significant adverse
environmental impact." 6 NYCRR § 617.7(a)(1) (emphases added).

55.    The EIS "is at the heart of SEQRA" and is designed to inject
environmental issues "directly and openly into government decision making." <u>Miller v.
City of Lockport</u>, 210 A.D.2d 955, 957, 620 N.Y.S.2d 680, 682-683 (4th Dep't 1994).

56.    As the First Department has observed:

> The purpose of an EIS is to act as an environmental alarm bell, the purpose of
> which is to alert public officials to environmental shifts before those changes
> reach ecological points of no return.

<u>Williamsburg Around the Bridge Block Ass'n v. Giuliani</u>, 223 A.D.2d 64, 71, 644
N.Y.S.2d 252, 257 (1st Dep't 1996)(quotations omitted).

57.    This presumption in favor of an EIS may be rebutted only if the lead
agency is able to "determine either that there will be no adverse environmental impacts
or that the identified adverse environmental impacts will not be significant." 6 NYCRR
617.7(a)(2).

58.    SEQRA thus favors an EIS and sets a low threshold for requiring an EIS
in a Type I action. <u>See e.g.</u>, <u>Chinese Staff & Workers Ass'n</u>, 68 N.Y.2d at 364-365,
509 N.Y.S.2d at 502(1986)(citations omitted).

59.    In making these determinations, SEQRA requires that the lead agency
consider reasonably related long-term, short-term, direct, indirect and cumulative
impacts, including other simultaneous or subsequent actions which are: (i) included in

any long-range plan of which the action under consideration is a part; (ii) likely to be undertaken as a result thereof; or (iii) dependent thereon." 6 NYCRR § 617.7(c)(2).

60.    SEQRA also requires the lead agency to assess the significance of an act's likely consequences "in connection with: (i) its setting (e.g., urban or rural); (ii) its probability of occurrence; (iii) its duration: (iv) its irreversibility; (v) its geographic scope; (vi) its magnitude; and (vii) the number of people affected." 6 NYCRR § 617.7(c)(3).

61.    SEQRA further requires that "the impacts that may be reasonably expected to result from the proposed action must be compared against," among other things, the following criteria:

(i) a substantial adverse change in existing air quality, ground or surface water quality or quantity, traffic or noise levels; a substantial increase in solid waste production; a substantial increase in potential for erosion, flooding, leaching or drainage problems;

(iv) the creation of a material conflict with a community's current plans or goals as officially approved or adopted;

(v) the impairment of the character or quality of important historical, archeological, architectural, or aesthetic resources or of existing community or neighborhood character;

(viii) a substantial change in the use, or intensity of use, of land including agricultural, open space or recreational resources, or in its capacity to support existing uses;

(ix) the encouraging or attracting of a large number of people to a place or places for more than a few days, compared with the number of people who would come to such place absent the action; and

(x) the creation of a material demand for other actions that would result in one of the above consequences;

(xi) changes in two or more elements of the environment, no one of which has a

significant impact on the environment, but when considered together result in a substantial adverse impact on the environment.

6 NYCRR § 617.7(c)(1).

62. As demonstrated below, the ESDC did not conduct an EIS. Instead, the ESDC issued the Negative Declaration, flatly declaring that the Project would have no significant environmental impact, even though the ESDC's own EAF identified several potentially profound impacts upon the environment, and even though the EA did not even address the environmental impact of building an additional 361,500 square feet of developable space above or across from the Armory, and did not address the impact of the Project on extant cultural venues in the vicinity surrounding the Armory.

## ARGUMENT

## POINT I

### THE ESDC'S ENVIRONMENTAL REVIEW FAILS THE SEQRA STANDARD

63. The Court of Appeals has articulated the courts' role in a SEQRA challenge as follows:

> [I]t is not the role of the courts to weigh the desirability of any action or choose among alternatives, but to assure that the agency itself has satisfied SEQRA, procedurally and substantively. Thus, we do not decide here whether an EIS is required prior to the construction of Henry Street Tower or what environmental impacts may flow from that construction. The limited issue presented for our review is whether the respondents identified the relevant areas of environmental concern, took a hard look at them, and made a reasoned elaboration of the basis for their determination.

Chinese Staff & Workers Ass'n, 68 N.Y.2d at 363-364, 509 N.Y.S.2d at 501(quotations and citations omitted). See also City Coalition to End Lead Poisoning, Inc. v. Vallone,

100 N.Y.2d 337, 348, 763 N.Y.S.2d 530, 535-36 (2003); <u>Committee to Preserve Brighton Beach & Manhattan Beach, Inc. v. Planning Comm'n</u>, 259 A.D.2d 26, 695 N.Y.S.2d 7 (1st Dep't 1999).

64.     As demonstrated below, the ESDC failed to identify all relevant areas of environmental concern; it also failed to take a hard look at the areas of environmental concern that it did identify; and it failed to make a reasoned elaboration of its decision in light of established SEQRA standards.

A.     **The ESDC Completely Ignored Significant
<u>Environmental Concerns and Procedures</u>**

65.     The first point of analysis in a SEQRA challenge is determining whether the agency identified all relevant areas of environmental concern.

66.     New York courts have consistently held that the failure to identify potentially significant impacts is <u>per se</u> a violation of SEQRA and is fatal to an agency action. For example, in declaring an agency action null and void for failure to comply with SEQRA, the Court of Appeals stated:

> Our holding is limited to a determination that existing patterns of population concentration, distribution or growth and existing community or neighborhood character are physical conditions such that the regulations adopted by the City of New York pursuant to SEQRA require an agency to consider the potential long-term secondary displacement of residents and businesses in determining whether a proposed project may have a significant effect on the environment. <u>Since respondents did not consider these potential effects on the environment in their environmental analysis, their determination does not comply with the statutory mandate and therefore is arbitrary and capricious.</u>

<u>Chinese Staff & Workers Ass'n</u>, 68 N.Y.2d at 368, 509 N.Y.S.2d at 504 (emphasis added).

67.     A "hard look" is impossible if the agency does not even know where to look. A hard look is also impossible if the agency knows where to look but chooses to

look the other way.

68.    Here, the ESDC's review contains at least three glaring omissions, each of which is independently fatal to the validity of the challenged actions.

69.    The ESDC failed to consider the impact of the transfer of development rights to 361,500 square feet of space.

70.    The ESDC failed to consider the Project's impact on extant, proximate cultural venues such as the Sylvia and Danny Kaye Playhouse, the Whitney Museum, Merkin Concert Hall, Zankel Hall, the 92nd Street Y, the City Center and the Lincoln Center.

71.    The ESDC failed to consider the Project's impact on emergency response times for the local police and fire units.

1.    **The ESDC Totally Ignored the Impact of 361,500 Feet of Developable Space**

72.    As the ESDC itself asserts in the EAF, current zoning rights allow the Armory site to contain 540,000 square feet of developed space.  See Exh. E at p.4, question 3.

73.    The Armory as it exists consists of only 178,500 square feet of developed space.  See Exh. E at p. 17.

74.    Thus, the Project would permit an additional 361,500 square feet of development at the Armory site.  Such additional development could, of course, be vertical development intruding upon the air rights above the Armory, or it could be transferred to an adjacent parcel of land under Department of City Planning Zoning Regulations, Article VII §74-79.

75.    Such vertical development above the Armory was discussed in 1999, for

470195                                    19

example, when Hunter College suggested a 250,000 square foot expansion into the air space above the Armory.  See Exh. F at p. 63.

76.   The president of Hunter College is appointed to the Board of the Conservancy.

77.   As a further example of suggested intrusions upon the Armory's air space, former Governor Hugh Carey proposed to build a 40-story tower above the Armory in 1981.

78.   Former Governor Carey is the Honorary Chairman of the Conservancy.

79.   Both of these projects were vigorously opposed by community groups and citizens.

80.   Further, under the zoning regulations, the development rights to the additional 361,500 square feet of space could be transferred to a site adjacent to the Armory that had not maximized its allowable development potential.  See Department of City Planning Zoning Regulations, Article VII §74-79.

81.   Given the Armory's status as an historic building, Respondents may very well pursue a transfer of development rights to an adjacent site because that would be easier the building above the Armory.

82.   Several such adjacent sites are available, and the transfer of these development rights would, upon information and belief, be valued at as much as $500 per square foot, or more than $180 million.  Such a transfer is possible or likely under the Project given the strong economic incentive and previous contemplation to do so.

83.   Although the ESDC has not provided a copy of the Lease to the public or

470195

to Petitioners, the "Highlights of the Lease" contained in the Project's General Project Plan makes no reference to any limits on development rights, or on the transfer of development rights from the lessee following Authorization and the Lease. <u>See</u> Exh. B at p. 6.

84.   What the General Project Plan does mention is that the Project will implement "revenue-producing ancillary activities." This term is not defined in any ESDC document, nor are any examples of such activities given. Further, there does not appear to be <u>any</u> limitation upon the nature or scope of such activity, or where they could take place.

85.   At the July 21, 2005 hearing on the Project's General Project Plan, several speakers specifically raised the issue of air rights and the transfer of development rights to the vertical space above the Armory. For example, the final speaker of the day, who lives across the street from the Armory, asked:

> When Lincoln Center, when other organizations and venues are having such severe financial problems, what is going to be the fate of the Armory should the Conservancy Group and the State prevail and it doesn't work out economically, then what? Will we get the next Bloomberg Building over this site?

Exh. F at p. 127, lines 18-19. <u>See also</u> Exh. F at p. 63, lines 3-7.

86.   Notwithstanding these facts, the ESDC issued the Negative Declaration and the Authorization without <u>any</u> consideration of the impact of the transfer of development rights of 361,500 square feet of space. <u>See</u> Exh. A. The record is totally devoid of any reference to this issue whatsoever.

87.   The ESDC also failed to consider the consequential impact of the transfer of development rights on traffic, air quality, noise, solid waste, or land use in the

affected area, on any possible conflict with the community's character, plans or goals, or on the unavoidable creation of material demand for these factors that would necessarily result in the addition of a more than 360,000 additional square feet of developed space on the site.

88.   The ESDC's utter failure to consider the potentially profound impact of the transfer of development rights on any of the mandatory criteria of 6 NYCRR § 617.7(c)(1) represents a fatal flaw in the SEQRA review process.

89.   Further, the EAF prepared by the ESDC makes no reference to, and is inconsistent with, the development of 361,500 square feet of the Armory's air space, or with the transfer of those development rights to an adjacent parcel of land.

90.   As a result of this inaccuracy, the third-party consultants who conducted the EA did not examine the effect of this additional developed space on air quality, traffic patterns, noise, solid waste, or on any other SEQRA criteria.  See Exh. E at p. 19.

91.   As a further result of this omission, other agencies were precluded from commenting on the obvious and profound environmental impact of an additional 361,500 square feet of developed space.

92.   The ESDC's failure to identify or consider the issue of transfer of development rights is independently fatal to the Negative Declaration and to the Authorization.

2.     **The ESDC Totally Ignored the Impact on Nearby Cultural Venues**

93.   SEQRA requires an EIS if the proposed project may include the potential to have a significant adverse impact by causing a substantial change in the use, or intensity

of use, of land, including recreational resources, or in the land's capacity to support existing uses.  6 NYCRR § 617.7(c)(1)(viii).

94.    SEQRA also requires an EIS if the proposed project <u>may</u> include the <u>potential</u> to have a significant adverse impact by causing a material conflict with a community's current plans or goals as officially approved or adopted.  6 NYCRR § 617.7(c)(1)(iv).

95.    The Lincoln Center is located directly across Central Park from the Armory.

96.    The Lincoln Center is in the midst of an $800 million renovation intended to boost its cultural program, a plan which was, upon information and belief, authorized and approved by the Lincoln Center's duly constituted directors.

97.    The Lincoln Center relies on substantial city and state assistance, as well as charitable contributions and fundraising from the private sector.

98.    Here, a principal purpose of the Project is to create quality cultural programming at the Armory for as many as 330 days of the year.  <u>See</u> Exh. B at p. 5.

99.    In an apparent effort to fulfill this purpose, the Conservancy has hired as its president Ms. Rebecca Robertson, the former Executive Director of the Lincoln Center Development Project.

100.    Upon information and belief, Ms. Robertson is fully informed of the internal deliberations at the Lincoln Center relating to programming and fundraising.

101.    At the July 21 hearing to the Project's General Project Plan, at least one speaker specifically raised the issue of the Lincoln Center and other cultural venues in the vicinity of the Armory.  See Exh. F at p. 127, lines 15-18.

102.  Notwithstanding the foregoing facts, the ESDC's review ignored the Project's likely impact on the Lincoln Center, an established and iconic institution that is part of the neighborhood's cultural fabric, or on any of the other cultural venues in the vicinity of the Armory, such as, by way of example, the Sylvia and Danny Kaye Playhouse, a 675-seat proscenium theatre located within Hunter College, Hunter College itself, the Whitney Museum, Merkin Concert Hall, located at 129 West 67th Street, Zankel Hall, a multi-cultural performance hall located inside Carnegie Hall on West 57th Street, the 92nd Street Y and the City Center.

103.  SEQRA requires such consideration.  See e.g., 6 NYCRR § 617.7(c)(1) subparts (iv), (v), (viii), (ix), (xi), and (xii).

104.  The ESDC's failure to consider or even identify this issue, is independently fatal to the issuance of the Negative Declaration and the concomitant Authorization.

**3.   The ESDC Ignored the Project's
Impact on Emergency Response Time**

105.  The Armory's the Drill Hall is currently used as a staging area in the event of an emergency, and it was used as such following the events of September 11, 2001. See Exh. B at p. 4.

106.  Under the Project, however, the Drill Hall would serve as a cultural arts center for the exhibits and performances.  See Exh. B at p. 5.  See also Exh. E at p. 16.

107.  To that end, the Conservancy has shown plans reflecting a 1,500 seat theatre at the location where the Drill Hall presently stands.

108.  The Project would therefore change the Armory's primary existing use as a National Guard headquarters and civilian emergency facility and gathering point, as it

was used on September 11, 2001, with intermittent charitable and community art and antiques exhibits as well as a women's homeless shelter, to a primary use as a "unique destination for the public that offers the highest quality cultural programming" for as many as 330 days of the year (up from between 117 and 183 days per year), offering "visual and/or performing arts," as well as "interpretive and/or educational programs," and conducting "revenue-producing ancillary activities." Exh. B at p. 5.

109. Despite this radical change to the present purpose of the Armory, the ESDC did not consider the impact of the Project on the community's ability to respond to an emergency. See Exhs. A and E.

110. Further, the Project will generate substantially more automobile, pedestrian, and taxi traffic. Yet, the ESDC's review of the Project is totally devoid of any reference to or consideration of the response time of emergency vehicles. See Exhs. A and E.

111. The ESDC's failure to consider these issues and their environmental impact is independently fatal to the Negative Declaration and to the Authorization.

112. In sum, the ESDC's failure to identify these foregoing significant areas of environmental impact renders the Negative Declaration and the Authorization per se violations of SEQRA and thus null and void. Chinese Staff & Workers Ass'n, 68 N.Y.2d at 364, 509 N.Y.S.2d at 501-02.

113. Under similar circumstances to the case at bar, for example, the Fourth Department held that:

> Clearly UDC failed to take a "hard look" at the problems and adverse potential effects of the project on traffic stoppage, parking, air pollution or noise level damage. Not only did it fail to analyze the traffic and parking problems

entailed, but it vaguely recognized their existence and relied upon general assurances that after the problems developed the university and City of Syracuse would adequately mitigate them by some unspecified appropriate action. It gave no consideration to the effect on the neighborhood of the operation of this facility nor to the consequence of unplanned "subsequent action" which the contemplated new parking facilities would have on the area. It is inconceivable that the Legislature envisioned or intended that its EIS requirements could be avoided by an applicant and agency which both declined to recognize egregious environmental problems. In Alice-in-Wonderland manner, respondents separated and put aside the realities of the traffic and parking problems from the totality of this project.

H.O.M.E.S. v. New York State Urban Dev. Corp., 69 A.D.2d 222, 232, 418 N.Y.S.2d 827, 832 (4th Dep't 1979). See also City Coalition to End Lead Poisoning, Inc., 100 N.Y.2d at 349-350, 763 N.Y.S.2d at 536-37 (invalidating a negative declaration for failure to consider the effect of lead dust on the contemplated action).

**B.    The ESDC Ignored SEQRA's Mandatory Procedures**

114. The ESDC further completely failed to follow mandatory SEQRA procedures in three other respects: (1) by preventing substantive public involvement or comment on the Project, (2) by preventing substantive comment or involvement by other agencies; and (3) by failing to publish notice of the Negative Declaration.

115. The Court of Appeals has repeatedly held that " the requirement of strict compliance and attendant specter of de novo environmental review insure that agencies will err on the side of meticulous care in their environmental review." City Coalition to End Lead Poisoning, Inc., 100 N.Y.2d at 348, 763 N.Y.S.2d at 535.

116. Summarizing its case law on this point, held that:

"[t]he mandate that agencies implement SEQRA's procedural mechanisms to the 'fullest extent possible' reflects the Legislature's view that the substance of SEQRA

> cannot be achieved without its procedure, and that departures from SEQRA's procedural mechanisms thwart the purposes of the statute." Strict compliance with SEQRA guarantees that environmental concerns are confronted and resolved prior to agency action and insulates rational agency determinations from judicial second-guessing

Id. at 350, 763 N.Y.S.2d at 537(brackets in original), quoting, inter alia, King v. Saratoga County Bd. of Supervisors, 89 N.Y.2d 341, 348, 653 N.Y.S.2d 433, 235 (1996)).

### 1.    The ESDC Prevented Substantive Public Involvement

117.  Not only did respondents fail to consider the environmental impacts of development rights, effect on the surrounding venues and the effect on emergency response time, Respondents also tried to prevent the public from raising any such issues.  In fact, respondents ignored SEQRA's requirement that "[t]he lead agency will make every reasonable effort to involve project sponsors, other agencies and the public in the SEQR[A] process."  6 NYCRR § 617.3(d).

118.  Further, when a lead agency decides to hold a public hearing, it must publish notice of that hearing.  6 NYCRR § 617.12(c)(2).

119.  Any SEQRA notice of hearing "must state that it has been prepared in accordance with article 8 of the Environmental Conservation Law."  6 NYCRR § 617.12(a)(1).

120.  Rather than comply with this statutory directive, Respondents sought to prevent any substantive involvement by the public on the environmental effects of the Project by declining to hold a public hearing or to make the EA available to the public, and then later by disingenuously claiming that such a hearing was held.

121.  Although the ESDC published notice of a July 21, 2005 hearing, the notice

was expressly limited "to consider the [General Project] Plan", and the published notice was for a hearing pursuant to Section 16(2) of the Urban Development Corporation Law. Neither this notice, nor any other notice published by the ESDC, refer to an environmental review of the Project, or to the Environmental Conservation Law, or to SEQRA, or to any environmental review whatsoever. See copies of the published notices attached hereto as Exhibit "D."

122.  Apart from that independently dispositive failure, the July 21, 2005 hearing is moot for SEQRA purposes for an additional failing. A hearing held according to SEQRA must be given at least fourteen days prior to the hearing. 6 NYCRR § 617.12(c)(2). No such notice was possible for the July 21 hearing, because the EA was prepared a mere day before the hearing, on July 20, 2005. See Exh. E.

123.  Petitioners and the public at large therefore had no way of knowing that the environmental effects of the Project would be raised at the July 21, 2005 hearing or the need to prepare a substantive response to the Project's EA. To state the obvious, such preparation would have been impossible, because, as noted above, the Project's EA is dated July 20, 2005, the day before the hearing.

124.  Further, the July 21, 2005 hearing was held in a manner that precluded any discussion or comment on the ESDC's environmental review process. As the transcript of the meeting reveals, the hearing officer informed the attendees:

> This hearing is being held pursuant to a Public Notice published in accordance with the UDC Act in the July 6, 2005 edition of the New York Post and The City Record.
>
> The Purpose of this hearing is to afford the general public an opportunity to make statements and comments about ESD's General Project Plan.

Exh. F at p. 5, lines 15-23.

125.  The Hearing Officer then went on to inform the attendees that "copies of ESDC's General Project Plan for the proposed project are available for your information and convenience".  Exh. F at p. 7 lines 6-9.

126.  The Hearing Officer made no mention whatsoever of any environmental review or the attendant documents.

127.  Further, the Hearing Officer again precluded any discussion of the environmental review process by stating that,

> Finally, I want to remind you that the purpose of this hearing is to afford you an opportunity to make statements about the ESDC General Project Plan for the proposed project.  This is not a question-and-answer session.

Exh. F at p. 8 lines 8-14.

128.  The Hearing Officer then introduced the three exhibits to the hearing: the two notices and the General Project Plan.  Exh. F at p. 8 line 15 to p. 9 line 18.  Conspicuously absent from these exhibits was the EA for the Project.

129.  Indeed, although the Hearing Officer solicited and entered as exhibits written comments from various attendees and entered more than twenty additional documents as exhibits, the EA was never entered as an exhibit to the hearing.  See Exh. F.

130.  In fact, only once was the EA even mentioned during the July 21, 2005 hearing.

131.  Ms. Berens of the ESDC, at the conclusion of her remarks, mentioned that the "public is free to review and comment on the environmental assessment prepared by the Conservancy.  There are copies here for the public's information."  Exh. F at p. 13

470195

29

lines 15-19.

132.  It appears, however, that the members of the public were not even able to hear the comments.  Immediately after these comments by Ms. Berens, the Hearing Officer asked if the people in the back could hear and was told that they could not:

> HEARING OFFICER:     Can the people in the back hear?
> AUDIENCE:            No
> HEARING OFFICER:     I'm sorry, we do not have a microphone.  I will try to speak as loudly as possible…I would ask whoever is going to speak to literally yell so everybody can hear".

Exh. F at p. 13 line 25 to p. 14 line 10 (emphasis added).

133.  Even if the members of the public had heard Ms. Berens's comments, it would have been impossible for them to review the environmental assessment (the "EA") and respond to it during the hearing.  The EA was created a mere day before the hearing and was not made available, so advance preparation was impossible.  The hearing lasted only two hours and ten minutes, and the EA is almost an inch thick and contains tabular and graphic data such as traffic counts and air quality assays.  As the EA was provided for the first time at the hearing, and as the public had no prior notice that the environmental effects of the Project would be discussed at the hearing, it would be impossible for a member of the public to read, digest, and intelligently comment on the EA at the hearing.

134.  Furthermore, the ESDC did not purport to adopt the EA, or even to claim it as its own study or as any part of the ESDC's review of the environmental review process required by SEQRA.  The EA is referred to as merely a document prepared by the private beneficiary of the Project.  See Exh. F at p. 13 lines 16-17.

135.  As the foregoing represents the totality of the ESDC's solicitation or

allowance of public participation, the ESDC's review process did not provide <u>any</u> opportunity for the public to raise their concerns over the significant environmental effects of the project. This is a violation of SEQRA's clear command to "make every reasonable effort to involve…the public in the SEQR process." 6 NYCRR § 617.3(d)

### 2. The ESDC Precluded Comments from Other Agencies

136. Not only did Respondents seek to limit the public's involvement, they also sought to prevent other governmental agencies from raising their environmental concerns about the Project.

137. SEQRA prescribes that "the lead agency will make every reasonable effort to involve project sponsors, other agencies and the public in the SEQR process." 6 NYCRR § 617.3(d).

138. SEQRA specifically states that

> Early consultations initiated by agencies can serve to narrow issues of significance and to identify areas of controversy relating to environmental issues, thereby focusing on the impacts and alternatives requiring in-depth analysis in an EIS.

<u>Id</u>.

139. The ESDC precluded the involvement of other agencies in at least three ways. First, the ESDC prepared a flawed EAF that omitted critical details. Second, the ESDC neglected to send the EAF to involved agencies, as it was required to do, or to any other agency whose expertise may have informed the review. Third, although the ESDC provided the preliminary document, the EAF, to a handful of agencies, the ESDC did not provide the EA or any other environmental-review document to any other agency.

470195

C.    **The ESDC Prepared a Flawed EAF**

140.  On June 16, 2005, the ESDC filed a notice wherein it proposed to be the lead agency in the SEQRA review.  See Exh. C.  While the ESDC purports to have sent the EAF to certain agencies, the EAF contained errors and misstatements that prevented it from being a sufficiently informative document.

1.    **The ESDC Obscured the Public Controversy**

141.  In question 20, the EAF asks "is there, or is there likely to be, public controversy related to potentially adverse environmental impacts?".  See Exh. E at p. 15.

142.  Note that the EAF instruction direct the lead agency to "Answer yes if there will be any impact", and that "Maybe answers should be considered yes answers". (emphasis in original). See Exh. E at p. 8.

143.  Note also that three decades worth of similar proposals to develop the Armory site have been vigorously opposed by citizens groups and community members.

144.  Nevertheless, the ESDC indicated "NO" public controversy in answer to question 20.  See Exh. E at p. 15.

145.  An Answer of "No" controversy to question 20 is impossible to reconcile with the many years of dispute and litigation concerning the project.

146.  An honest answer to this question would have alerted other agencies to potential issues that deserved special, or any, attention.

147.  An honest answer would also have more fully informed the third-parties who conducted the resulting EA.

148. The "No" answer limited both the usefulness of the resulting EA and limited the scope of agency comment on the EAF.

## 2. The ESDC Incorrectly Classified the Project's Zoning Status

149. In addition to the public controversy misstatement, the EAF asserts that the Project is classified as a community facility and therefore exempt from certain zoning requirements. See Exh. E at p. 6.

150. This is demonstrably false, as the definition of a community facility for zoning purposes expressly excludes situations where, as here, more than 25,000 square feet are used for office space. See Department of City Planning Zoning Regulations Article I §12-10; Article 2 §§ 22-13, 22-14. See also Exh. E at p. 17 (noting a 126,000 square foot administrative building).

151. As a result of this error, the Department of City Planning was not listed as an involved agency and was not involved in the ESDC's environmental review process. See Exh. C.

152. These material errors and misstatements skew the resulting EA and render unreliable any resulting act in reliance upon either the EAF or the resulting EA.

## D. The ESDC Failed to Send the EAF to Involved Agencies

153. Not only did the ESDC send a flawed EAF, the ESDC further limited the scope of other agencies' involvement by neglecting to send the EAF to required agencies.

154. SEQRA requires the lead agency on Type I Projects to send a copy of the EAF to all involved agencies. 6 NYCRR § 617.6(a)(2).

470195

33

155. SEQRA requires the lead agency to "exercise all due diligence" in identifying involved agencies. Id. SEQRA defines an "involved agency" as "an agency that has the jurisdiction by law to fund, approve or directly undertake an action," even if the agency is not contemplating such an action. 6 NYCRR § 617.2(s).

156. SEQRA requires such consultation to provide an opportunity for agencies with expertise in their area of jurisdiction to comment on and inform a lead agency's SEQRA review.

157. Even though the ESDC was aware of the requirement that it provide notice and the EAF to involved agencies, the ESDC did not send a copy of the EAF to the Port Authority. See Exh. C.

158. This was a violation of SEQRA because the Port Authority is providing $30 million to fund the Project and is therefore an involved agency under SEQRA. See Exh. B at p. 5. See also Exh. E at p. 3, question 24. The ESDC thereby prevented the Port Authority from providing any input into the ESDC's review.

159. Additionally, the ESDC did not send a copy of the EAF to the Department of City Planning. See Exh. C. The Department of City Planning has the authority to approve the Project as it relates to zoning requirements and is therefore an involved agency under SEQRA.

160. Notwithstanding the Department's expertise and jurisdiction over the zoning elements of the Project, the ESDC prevented the Department of City Planning from providing any input into the ESDC's review. This is a violation of SEQRA.

161. Further, the ESDC did not send a copy of the EAF to any other agency with expertise on relevant aspects of the Project. See Exh. C. For example, the ESDC

did not contact or involve the Metropolitan Transportation Authority, the Department of Transportation, or the Landmarks Preservation Commission, notwithstanding these agencies' expertise with the transportation elements of the Project and the protection of landmarked buildings. The ESDC thereby prevented these agencies from providing any input into the ESDC's review.

E.    **The ESDC Failed to**
      **Publish Notice of the Negative Declaration**

162. SEQRA requires the lead agency to publish notice of a Type I negative declaration. 6 NYCRR § 617.12(c)(1). SEQRA further requires that "[n]otice of a negative declaration must be incorporated once into any other subsequent notice required by law." 6 NYCRR §617.12(c)(4).

163. The ESDC issued the Negative Declaration on November 16, 2005. Upon information and belief, the ESDC did not publish notice of the Negative Declaration.

164. Upon information and belief, the ESDC did not incorporate notice of the Negative Declaration into any other subsequent notice.

165. Even if any such notice had occurred, any such publishing of notice of the Negative Declaration would have been insufficient as a matter of law. The ESDC relied upon the Negative Declaration in issuing the Authorization, which was issued on the same day, and in the same instrument, as the Negative Declaration, thereby completely foreclosing any opportunity for comment on the merits of Negative Declaration. See Exh. A.

POINT II

## THE ESDC'S REVIEW DID NOT
## TAKE A HARD LOOK AT IDENTIFIED ISSUES

A.    **There Was No Deliberation**
      **Within the ESDC or with any Other Agency**

166.  Significantly, the EAF is only a preliminary document. The document upon which the Authorization and the Negative Declaration purport to rely is the EA. See Exh. A.

167.  On September 29, 2005 and again on December15, 2005, Petitioners submitted Freedom of Information Act request to the ESDC for documents including, "all documents pertaining to [ESDC's] preparation of the Seventh Regiment Armory Environmental Assessment dated July 2005". Copies of these letters, and the ESDC's response to them, are attached hereto as Exhibit "I."

168.  Upon information and belief, after review of all ESDC documents produced in response to the Freedom of Information Act request, the ESDC did not promulgate the EA to any agency, and did not share or otherwise involve any agency in the development or review of the EA or in the issuance of the Negative Declaration and Authorization.[1]

169.  Upon information and belief, after review of all ESDC documents produced in response to a Freedom of Information Act request, there are no internal memoranda within the ESDC discussing the SEQRA review.

---

[1] Although Ms. Shatz did consult with Ms. Cumming of the Office of Parks, Recreation and Historic Preservation, the subject of this consultation was the Lease, not the Project generally or the environmental review specifically. Ms. Shatz sent a copy of the Lease to Ms. Cumming, and Ms. Cumming suggested two changes in the Lease. That appears to be the totality of other agency involvement, or for that matter of the discussion even within the ESDC itself. A copy of the letter from Ms. Cumming to Ms. Shatz is attached hereto as Exhibit "H."

170. It therefore appears that the entire ESDC environmental review process consisted of a <u>single</u> individual at the ESDC (Ms. Shatz) reviewing a <u>single</u> report (the July 20, 2005 EA) prepared on the basis of a flawed and misleading EAF, without consulting with any other agency or individual.

171. The ESDC's failure to involve other agencies and the public, and to actually examine and deliberate the environmental issues involved, represents a total failure to comply with SEQRA or to take a hard look at the data, and independent of any other defects in the substance of the ESDC's review this failure renders as a matter of law the Negative Declaration and the Authorization arbitrary, capricious, and an abuse of discretion.

**B.    The EA Contains Glaring Errors**
**    <u>that Betray a Total Failure to Take a Hard Look</u>**

172. The EA was prepared by third-party consultants AKRF, Inc. and by Philip Habib & Associates, and was issued on July 20, 2005.  <u>See</u> Exh. E.  To the extent that the EA relied upon the ESDC's flawed EAF, the EA itself is flawed.

173. Furthermore, the EA itself is based upon inadequate and incorrect data. For example, the EA's study of traffic patterns was based upon data collected the week leading up to the Thanksgiving Holiday and therefore provided aberrant data from which to proceed.

174. The EA is also based upon inadequate and incorrect data selection and analysis.  For example, rather than use traffic date collected and averaged over the course of a week of observation, as is the standard, the EA is based instead on traffic

470195

data selected from a <u>single</u> hour during a <u>single</u> day. <u>See</u> the Review and Assessment of Brian Ketcham, P.E., a professional engineer with expertise in transportation engineering, attached hereto as Exhibit "J" at p. 2. <u>See also</u> Brian Ketchum's response to the Conservancy's reply to Exh. J, attached hereto as Exhibit "K" at p. 2.

175.  Further, the day selected, Thursday, had the single lowest day observed: 350 fewer trips than the day before or after the selected day, and 500 trips less than the number of trips on the following Monday.

176.  There is no scientifically or statistically accepted reason for this sample bias, which belies the study's true character: a conclusion seeking an argument. <u>See</u> Exh. K at p. 2.

177.  A hard look at the EA, with anything approaching a critical eye, would have discovered these obvious flaws and errors.

178.  Notably, the Armory retained its own expert to analyze the Project's environmental impacts. Brian Ketcham, P.E., a professional engineer with expertise in transportation engineering, critiqued the ESDC's findings and determinations as follows:

- the EA failed to evaluate the midday and evening peak traffic hours, analyzing only a single, narrow time period (from 7 to 8 P.M.) designed to account only for trips to the proposed theatre, and ignoring weekday, midday and evening peak periods of traffic when other activities at the Armory would generate additional substantial travel. <u>See</u> Exh. J at p. 2; Exh. K at p. 2.

- the EA improperly reported only a half to a third of vehicle trips at the proposed new art exhibits compared to those observed at the predecessor arts and antiques exhibits with more than double the number of attendees. <u>See</u> Exh. J at p. 3;

- the EA improperly assumed a vehicle occupancy for proposed art exhibit trips that was much higher than observed a the existing Armory for similar activities thereby reducing the number of vehicles trips. See Exh. J at p. 3;

- the EA failed to recognize that vehicle occupancy of nearly 3 people for theatre events would involve at least some drop offs at the Armory entrance. See Exh. J at p.3;

- the EA incredibly assumed that all passenger car trips were intercepted at parking garages prior to arriving at the Armory and that all art show and theatre goers arriving by car would walk to the Armory entrance from the parking garages. See Exh. J at p.3;  Exh. K at p. 3.

- the EA incorrectly assumed that the only vehicles making drop offs at the Armory were taxis and limousines. See Exh. J at p.3; Exh. K at p. 3.

- the EA wrongfully assumed that there is sufficient parking capacity at all nearby garages whereas there is almost none or where parking is severely constrained. See Exh. J at p.3;

- the EA relied on an analytical method that does not reflect traffic-queuing behavior characteristics of the area and does not avail itself of methodology used routinely by state agencies. See Exh. J at p.5-6; and

- the EA used methodology that isolates intersections and again does not account for queuing, or for spillover, both of which have major impacts on traffic. See Exh. J at p.5-6; Exh. K at p. 4.

179. Appendix C of the EA, which provides analysis of traffic and parking in support of its determination of no significant adverse impact, is fatally defective and legally insufficient because: (i) it assumed travel characteristics for the proposed art exhibits that were very different from those reported for the existing art and antique fairs, resulting in a very significant underreporting of vehicular trips for the proposed Project compared to current and similar uses; (ii) it underreported existing background

traffic volume and thus overstated available roadway capacity; (iii) it underreported traffic impacts by assuming that all auto trips reached off-street parking before reaching the Armory and further underreported the amount of taxis/limousines dropping people off in front of the Armory; and (iv) it improperly assigned vehicles to garages that did not have the capacity to accommodate those vehicles. See Exh. J at p. 3.

180. Mr. Ketcham concluded that because the proposed Project would generate many more auto and taxi trips than reported, the impact on the local traffic, pollution and noise level would be much greater than reported. Based on the foregoing, the Negative Declaration violates SEQRA criteria, and must, therefore, be annulled. See Exh. J at p. 2

181. Furthermore, the ESDC's finding that the Project "would not result in the creation of a material demand for other actions that would result in one of the above consequences" is similarly contradicted by its EA findings.

182. Again, as set forth above, the Project will increase not only the amount of people attracted to the Armory, but also the number of days these people would be attending the various functions. Thus, the Project would produce considerable traffic, which will contribute significantly to additional congestion on the streets near the Armory and further limit existing parking in proximity to the Armory, for both on- and off-street parking. See Exh. J at p. 9.

183. The air quality analysis in the EA also failed to consider the Project's possible detrimental effects on human health as a result of the increase in fine particulate matter from the increased number of vehicles in the area surrounding the Armory. Specifically, while motor vehicles emit $PM_{2.5}$ and this fine particulate matter

lingers in the air for long periods thereby placing nearby workers and residents at risk, these effects were ignored by the Conservancy and the ESDC.  <u>See</u> Exh. J at p. 12-13.

184.  Undoubtedly, the Project will "result in the creation of a material demand for other actions", <u>i.e.</u> obtaining, if at all possible given the current characteristics of the neighborhood, alternative parking for the neighborhood's existing residents. Accordingly, the Negative Declaration violates SEQRA criteria, and must therefore be annulled.

**POINT III**

**THE ESDC FAILED TO MAKE A
<u>REASONED ELABORATION OF ITS DECISION</u>**

185.  The third point of analysis in a SEQRA challenge is whether the agency made a reasoned elaboration of its decision.

186.  In setting aside an agency's action under circumstances remarkably similar to the sparse agency record in the case at bar, the Court of Appeals noted that the lead agency's unsupported assertions had not complied with SEQRA's "stringent" requirements:

> the narrative attachment to the negative declaration addresses "Hazardous Materials" as a subsection of the "Environmental Assessment." The subsection consists of two paragraphs summarizing the purposes of the law's interim controls for the repair of lead-based paint hazards. This provision, along with general descriptions of the legislation and its socioeconomic impacts, comprises the entire explanation provided in the negative declaration supporting the determination that Local Law 38 would have no significant adverse environmental effects. This does not provide the "reasoned elaboration" mandated by SEQRA...SEQRA requires more.

<u>City Coalition to End Lead Poisoning, Inc.</u>, 100 N.Y.2d at 349-350, 763 N.Y.S.2d at 536-37.

187. Similarly, the ESDC's unsupported record in the case at bar fails the reasoned elaboration test because, in light of the several potential impacts that the ESDC identified, the Negative Declaration fails to rebut the presumption favoring an EIS, and because the data relied upon not only incomplete but is strongly and demonstrably biased.

A.   **The ESDC Failed to Articulate a Rebuttal
     of the Presumption in Favor of an EIS in Type I Actions**

188. Where, as here, the proposed action is a Type I action, SEQRA requires that "a Type I action carries with it the presumption that it is likely to have a significant adverse impact on the environment and may require an EIS". 6 NYCRR § 617.4(a)(1).

189. This presumption in favor of an EIS may be rebutted only if the lead agency is able to "determine either that there will be no adverse environmental impacts or that the identified adverse environmental impacts will not be significant." 6 NYCRR 617.7(a)(2).

190. SEQRA favors an EIS and sets a low threshold for requiring an EIS in a Type I action. See e.g., Chinese Staff & Workers Ass'n, 68 N.Y.2d at 364-365, 509 N.Y.S.2d at 502(citations omitted).

191. The ESDC fails to rebut adequately the presumption in favor of an EIS in light of the factors that the ESDC itself identified. See Exh. A at p. 3.

192. For example, SEQRA required an EIS if the Project may include the potential to have a significant adverse impact by creating a substantial change in the use, or intensity of use, of recreational resources, or in the land's capacity to support existing uses. 6 NYCRR § 617.7(c)(1)(viii). The EAF and the General Project Plan state that the Project will create a cultural center with events held on as many as 90% of the days

470195                              42

of the year, offering concerts, dance, and visual arts programming, all located directly across Central Park from the Lincoln Center and close to other extant cultural centers. See Exh. B at p. 5; Exh. E at p. 16. Further, the Project involves the development of more than 350,000 square feet of space. See Exh. E at p. 4 and p. 17. Respondents did not address this subject prior to issuing the Negative Declaration. See e.g. Exh. E at p. 19.

193. As a further example, SEQRA required an EIS if the Project may include the potential to have a significant adverse impact by encouraging or attracting a large number of people to a place or places for more than a few days, compared with the number of people who would come to such place absent the Project. 6 NYCRR § 617.7(c)(1)(ix). As the EAF and the General Project Plan state that the Project will install a 1,500 seat theatre, that the level of activity at the Armory will increase from 183 days per year to 330 days per year, and that the Armory will offer dance, concerts and visual-arts programming, the EAF itself raises the potential of a significant environmental impact by attracting additional people to the Armory. See Exh. B at p. 5; Exh. E at p. 16. Further, the General Project Plan states without elaboration that the Project will implement "revenue-producing ancillary activities". See Exh. B at p.5. Respondents did not address this subject prior to issuing the Negative Declaration.

194. As another example, SEQRA required an EIS if the Project may include the potential to have a significant adverse impact by creating a substantial adverse change in existing traffic, or noise levels; or by creating a substantial increase in solid waste production. 6 NYCRR § 617.7(c)(1)(i). The EAF and the General Project Plan state that the Project will install a 1,500 seat theatre, and that the level of activity at the Armory will

increase from between 117 and 183 days per year to as many as 330 days per year. See Exh. B at p. 5; Exh. E at p. 16. Further, the General Project Plan states that the Project will implement "revenue-producing ancillary activities", and the EAF indicates that the Project will affect existing transportation systems by increasing use of vehicular traffic, subways, buses, and taxis. See Exh. B at p.5. Respondents did not address this subject prior to issuing the Negative Declaration.

195. As yet another example, SEQRA required an EIS if the Project may include the potential to have a significant adverse impact by creating a substantial adverse change in existing air quality. 6 NYCRR § 617.7(c)(1)(i) The EAF indicates that the Project would affect air quality by increasing vehicular traffic. See Exh. E at p. 10-11. Respondents did not address this subject prior to issuing the Negative Declaration. Indeed, the EA does not sufficiently address the impact of the Project on any of the social and economic considerations required by SEQRA.

B.    **On This Record and as a Matter of Law, the ESDC**
      **Failed to Make A Reasoned Elaboration of Its Decision**

196. Notwithstanding this presumption, and notwithstanding the myriad of environmental impacts that the ESDC identified in the EAF, the ESDC flatly states that there will be no significant environmental impact. See Exh. A at p. 3.

197. The resolution through which the ESDC issued the Negative Declaration and the Authorization dedicated a total of five sentences to the environmental review, without so much as a reference to the EA or to any other fact, deliberation, or opinion, other than the comments regarding the Lease. See Exh. A at p. 3.

198. As the Court of Appeals said in <u>Vallone</u>, where two full paragraphs were insufficient, "SEQRA requires more".

199. The ESDC's Authorization and Negative Declaration on this record are, as a matter of law, inadequate to constitute a reasoned elaboration of the agency's determination that the Authorization would have no significant environmental impact.

200. No prior application has been made for the relief now requested, except as requested in the Petition as set forth above.

## CLAIMS FOR RELIEF

### Count I

201.     Petitioners repeat and reallege the allegations set forth in paragraphs 1 through 200 as if fully set forth herein.

202. The first inquiry in a SEQRA challenge is whether the agency identified all of the relevant areas of environmental concern.

203. The ESDC did not identify and did not address the environmental impact of the developments of an additional 361,500 square feet of space.

204. The ESDC did not identify and did not address the environmental impact of the Project on extant, proximate cultural institutions with which the Project would compete for resources and audiences.

205. The ESDC did not identify and did not address the environmental effect of the Project on the ability of the Armory to serve its military role in times of emergency, or on the effect of the Project's attendant traffic increases on the response time of emergency vehicles.

206. The ESDC's issuance of the Negative Declaration and of the Authorization was therefore arbitrary, capricious, and an abuse of discretion as a matter

45

of law for failure to comply with SEQRA.

### Count II

207.     Petitioners repeat and reallege the allegations set forth in paragraphs 1 through 206 as if fully set forth herein.

208.  The second inquiry in a SEQRA challenge is whether the agency took a hard look at all of the relevant areas of environmental concern.

209.  The ESDC did not take a hard look, or any look, at the environmental impact of the developments of an additional 361,500 square feet of space.

210.  The ESDC did not take a hard look, or any look, at the environmental impact of the Project on extant, proximate cultural institutions with which the Project would compete for resources and audiences.

211.  The ESDC did not take a hard look, or any look, at the environmental effect of the Project on the ability of the Armory to serve its military role in times of emergency, or on the effect of the Project's attendant traffic increases on the response time of emergency vehicles.

### Count III

212.     Petitioners repeat and reallege the allegations set forth in paragraphs 1 through 211 as if fully set forth herein.

213.  The second inquiry in a SEQRA challenge is whether the agency took a hard look at all of the relevant areas of environmental concern.

214.  Upon information and belief, after review of all ESDC documents produced in response to a Freedom of Information Act request, there are no internal memoranda within the ESDC discussing the SEQRA review.

215. It therefore appears that the entire ESDC environmental review process consisted of a <u>single</u> individual at the ESDC, Ms. Shatz, reviewing a <u>single</u> report (the July 20, 2005 EA) prepared on the basis of a flawed and misleading EAF, without consulting with any other agency or individual.

216. The ESDC's issuance of the Negative Declaration and of the Authorization was therefore arbitrary, capricious, and an abuse of discretion for failure to comply with SEQRA.

### Count IV

217.    Petitioners repeat and reallege the allegations set forth in paragraphs 1 through 216 as if fully set forth herein.

218. The second inquiry in a SEQRA challenge is whether the agency took a hard look at all of the relevant areas of environmental concern.

219. The ESDC violated SEQRA's requirements by failing to send the EAF to Involved Agencies such as the Port Authority.

220. The ESDC failing to send the EAF to any other agency whose expertise might have better informed the review process.

221. The ESDC prepared an inaccurate, incomplete, and flawed EAF, thereby preventing meaningful input from those few agencies who received the EAF.

222. The ESDC, in issuing the Negative Declaration and the Authorization, relied on the EA, yet the ESDC did not send the EA to any other agency.

223. The ESDC's issuance of the Negative Declaration and of the Authorization was therefore arbitrary, capricious, and an abuse of discretion for failure

to comply with SEQRA.

### Count V

224.    Petitioners repeat and reallege the allegations set forth in paragraphs 1 through 223 as if fully set forth herein.

225. The second inquiry in a SEQRA challenge is whether the agency took a hard look at all of the relevant areas of environmental concern.

226. The EA contains substantial errors that make it inherently unreliable.

227. For example, although traffic counts were conducted over the course of a week, all of the EA's traffic analysis was based on a data collected over a single hour on a single day, the lowest single day observed.

228. The ESDC's failure to discover or address these errors evinces a failure to take a hard look at the record.

229. The ESDC's issuance of the Negative Declaration and of the Authorization was therefore arbitrary, capricious, and an abuse of discretion for failure to comply with SEQRA.

### Count VI

230.    Petitioners repeat and reallege the allegations set forth in paragraphs 1 through 229 as if fully set forth herein.

231. The second inquiry in a SEQRA challenge is whether the agency took a hard look at all of the relevant areas of environmental concern.

232. The ESDC never gave public notice of a public hearing to discuss the EA, the EAF, or any other aspect of a SEQRA review.

233. The ESDC never conducted a hearing designed to elicit or allow public comment on or involvement in the ESDC's environmental review process.

234. The ESDC further failed to give any public notice of its issuance of the Negative Declaration and the Authorization.

235. The ESDC's issuance of the Negative Declaration and of the Authorization was therefore arbitrary, capricious, and an abuse of discretion for failure to comply with SEQRA.

## Count VII

236. Petitioners repeat and reallege the allegations set forth in paragraphs 1 through 235 as if fully set forth herein.

237. The third inquiry in a SEQRA challenge is whether the agency made a reasoned elaboration of its decision.

238. The ESDC's "elaboration" of its decision occupied all of five sentences, which sentences did not even reference the EA or any other environmental review document.

239. As a matter of law, this is not a reasoned elaboration on this record, where a Type I action involves several identified potential environmental impacts.

240. The ESDC's issuance of the Negative Declaration and of the Authorization was therefore arbitrary, capricious, and an abuse of discretion as a matter of law for failure to comply with SEQRA.

## Count VIII

241.    Petitioners repeat and reallege the allegations set forth in paragraphs 1 through 240 as if fully set forth herein.

242.    The third inquiry in a SEQRA challenge is whether the agency made a reasoned elaboration of its decision.

243.    Where, as here, the proposed action is a Type I action because of the Armory's status as an historical and land marked building, SEQRA requires a presumption that the Project is likely to have a significant adverse impact on the environment and may require an EIS.  6 NYCRR § 617.4(a)(1).

244.    Further, SEQRA requires an EIS when the lead agency finds "that the action may include the potential for at least one significant adverse environmental impact."  6 NYCRR § 617.7(a)(1).

245.    The ESDC's own EAF identified several potential environmental impacts of the Project.

246.    The ESDC failed to make a reasoned elaboration of its decision sufficient, on this record, to rebut the presumption in favor of an EIS.

247.    Further, the ESDC's "elaboration" of its decision occupied all of five sentences, which sentences did not even reference the EA.

248.    The ESDC's issuance of the Negative Declaration and of the Authorization was therefore arbitrary, capricious, and an abuse of discretion as a matter of law for failure to comply with SEQRA.

## Count IX

249.    Petitioners repeat and reallege the allegations set forth in paragraphs 1 through 248 as if fully set forth herein.

250.  The Lease was executed between parties with full knowledge of and responsibility for the Authorization's legal deficiencies.

251.  The ESDC's execution of the Lease is void and without legal authority because it was based upon supposed authority granted in a manner that was arbitrary, capricious, and an abuse of discretion.

## Count X

252.  Petitioners repeat and reallege the allegations set forth in paragraphs 1 through 251 as if fully set forth herein.

253.  The State, acting through the ESDC, was not substantially justified in issuing the Authorization and the Negative Declaration, or in executing the Lease.

254.  Petitioners are therefore entitled to reasonable attorneys' fees under CPLR 8601, in an amount to be determined at a hearing on the matter to be held following the disposition of the Amended Petition.

**WHEREFORE**, Petitioners respectfully request that the Court:

(i) vacate and annul the Negative Declaration issued by the ESDC as arbitrary, capricious, and an abuse of discretion for failure to comply with SEQRA;

(ii) vacate and annul the Authorization issued by the ESDC as arbitrary, capricious, and an abuse of discretion for failure to comply with SEQRA;

(iii) declare the Lease null and void;

(iv) direct Respondents to conduct a full environmental impact review process and issue an EIS to determine whether the Conservancy should be permitted to go forward with the Project;

(v) award reasonable attorneys' fees to Petitioners pursuant to CPLR 8601, in an amount to be determined at a hearing on the matter to be held following the disposition of the Amended Petition;

(vi) grant an order, during the pendency of this proceeding, preventing Respondents from taking any action in reliance on or in furtherance of the challenged Lease; and

(vii) grant to Petitioners such other and further relief as this Court deems just and proper.

Dated: New York, New York
       May 18, 2006

PRYOR CASHMAN SHERMAN & FLYNN LLP
Attorneys for Petitioners

By: _____
          Eric D. Sherman
          Mark A. Tamoshunas
          Donald R. Dunn, Jr.
       410 Park Avenue
       New York, New York 10022
       (212) 421-4100

470195

52