UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

KENYON B. FITZGERALD, JR.,       :   07 Civ. 6851 (BSJ) (DCF)
PETER SCOVILLE WELLS, SIDNEY SILLER,
and DISABLED AMERICAN VETERANS   :
DEPARTMENT OF NEW YORK, INC.,

                   :

              Plaintiffs,

       v.                :

WADE F. B. THOMPSON, ELIHU ROSE, ARIE L.  :
KOPELMAN, STEPHEN LASH, EDWARD KLEIN,
REBECCA ROBERTSON, KIRSTEN REOCH,    :
CHARLES GARGANO, WILLIAM SHERMAN,
CAROL BERENS, JOHN DOE, MARY ROE and    :
SEVENTH REGIMENT ARMORY
CONSERVANCY, INC.,                :
           Defendants.

                   :        October 22, 2007

-------------------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS

WHITNEY NORTH SEYMOUR, JR.
425 Lexington Avenue, Room 1721
New York, NY   10017
Tel:  212-455-7640

GABRIEL NORTH SEYMOUR
200 Route 126
Falls Village, CT   06031

Attorneys for Plaintiffs

**Table of Contents**

**Page**

Preliminary Statement ............................................................................................ 3
Statement of the Case ............................................................................................ 3
    Applicability of Rule 56 ................................................................................... 5
    Service of Process ............................................................................................. 5
    Timeliness of Suit ............................................................................................. 5
Plaintiffs' Standing Arises Under  The Fourteenth Amendment ........................ 6
    Due Process ...................................................................................................... 7
    Equal Protection ............................................................................................... 8
    Privileges and Immunities ............................................................................... 8
    Substantive Due Process ................................................................................ 11
Argument ............................................................................................................ 12
    Guide to Principal Arguments Relating to Sufficiency of Plaintiffs' Complaint ......... 12
    First Claim for Relief ..................................................................................... 12
    Second Claim for Relief ................................................................................. 13
    Third Claim for Relief ................................................................................... 13
    Fourth Claim for Relief .................................................................................. 13
    Fifth Claim for Relief ..................................................................................... 13
    Sixth Claim for Relief .................................................................................... 13
    Seventh Claim for Relief ............................................................................... 14
POINT I  CHAPTER 482 VIOLATES DUE PROCESS ................................. 14
POINT II  CHAPTER 482 VIOLATES THE PUBLIC USE CLAUSE ......... 16
POINT III  CHAPTER 482 VIOLATES THE CONTRACT CLAUSE ........... 27
POINT IV  THE ESDC LEASE SHOULD BE DECLARED VOID .............. 28
POINT V  THE DEFENDANTS INTERFERED TORTIOUSLY WITH THE
CITY LEASE ....................................................................................................... 29
    Veterans' Continuing Relationship to the Military ....................................... 35
POINT VI  DEFENDANT'S CONDUCT WARRANTS EXERCISE OF THE
COURT'S EQUITABLE POWERS TO PROTECT THE PUBLIC INTEREST ........... 37
    Breach of Trust ............................................................................................... 39
    Constructive Trust and Accounting ............................................................... 41
POINT VII  DEFENDANTS ARE LIABLE FOR DAMAGES UNDER 42 U.S.C.
§1983 ................................................................................................................... 42
    Exhaustion of State Remedy .......................................................................... 43
CONCLUSION .................................................................................................... 43

## Table of Authorities

**Page(s)**

### Cases

U.S. Supreme Court
Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty., 488 U.S. 336
   (1989)........................................................................................................... 25
Block v. Hirsh, 256 U.S. 135(    ) ........................................................................ 27
Bowen v. Georgetown Univ. Hospital, 488 U.S. 204 (1988) ........................... 15
Calder v. Bull, 3 Dall. 386 (1798) ...................................................................... 21
Chastleton Corp. v. Sinclair, 264 U.S. 543 (1924) ........................................... 27
Cincinnati v. Vester, 281 U.S. 439 (1930)......................................................... 21
Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432 (1985)...................... 26
Davidson v. City of New Orleans, 96 U.S. 97 (1877) ....................................... 16
Dennis v. Higgins, 498 U.S. 439 (1991).............................................................. 42
Department of Agriculture v. Moreno, 413 U.S. 528 (1973) ............................ 26
Eastern Enterprises v. Apfel, 524 U.S. 498 (1998)............................................ 16
Flast v. Cohen, 392 U.S. 83 (1968)..................................................................... 11
Golden State Transit Corp. v. Los Angeles, 493 U.S. 103(1989)...................... 42
Kaiser Aluminum & Chemical Corp. v. Bonjorno, 494 U.S. 827 (1990) ........ 15
Kelo v. New London, 545 U.S. 469 (2005) .............................................. passim
Marbury v. Madison, 5 U.S. 137 (1803)...............................................................4
Missouri Pacific R. Co. v. Nebraska, 164 U.S. 403 (1896)............................... 19
Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978)......... 42
Monroe v. Pape, 365 U.S. at 183 ........................................................................ 43
Sierra Club v. Morton, 405 U.S. 727 (1972) ...................................................... 11
Sioux City Bridge Co. v. Dakota County, 260 U.S. 441 (1923)........................ 25
Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350 (1918) .......... 25
Trustees of Dartmouth College v. Woodward,17 U.S. 518 (1819) ............ 28, 41
Warth v. Seldin, 422 U.S. 490 (1975).................................................................. 12
Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522(        )........ 27

Second Circuit Court of Appeals
Hellenic v. City of New York, 101 F.3d 877 (2d Cir., 1996)............................ 43
Leebaert v. Harrington, 332 F.3d 134 (2d Cir., 2003)........................................ 8
New York v. Richardson, 473 F.2d 923 (2d Cir.     ).......................................... 27

S.D.N.Y.
McNeill v. New York City Housing Authority, 719 F.Supp. 233 (S.D.N.Y.
   1989) ................................................................................................... 30

New York State
Burns Jackson Miller Summit & Spitzer v. Lindner, 59 N.Y.2d 314 (1983)... 30
Dash v. Van Kleeck, 7 Johns. (NY 1811)........................................................... 15

**Table of Authorities**
**(continued)**

**Page(s)**

Lama Holding Co. v. Smith Barney, Inc. 88 N.Y.2d 413 (1996) ...................................... 29

NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc., 87 N.Y.2d 614 (1996).................. 34

Sharp v. Kosmalski, 40 N.Y. 2d 119 (1976)..................................................................... 41

Tobin v. LaGuardia, 276 NY 34 (1937) .......................................................................... 17

Veterans of Seventh Regiment v. Field Officers of Seventh Regiment, 60 Hun
    578, 14 NYS 811 (1891)........................................................................................ 17, 40

White Plains Coat & Apron Co. v. Cintas Corp., 8 N.Y.3d 422 (2007)........................... 32

Other States


99 Cents Only Stores v. Lancaster Redevelopment Agency, 237 F. Supp. 2d 1123
    (CDCal. 2001)                                 21

**Statutes**

38 U.S.C. § 101 ............................................................................................................... 37

42 U.S.C. §1983............................................................................................................. 3, 42

C.G.S. 8-186 .................................................................................................................... 18

Chapter 482.............................................................................................................. passim

Commentaries on the Constitution §1398 (5th ed. 1891) ................................................ 16

N.Y. Urban Development Corporation Act ................................................................. 15, 17

TITLE 20, CHAPTER 43, SUBCHAPTER II, §2141...................................................... 10

**Rules**

Amendment I ..................................................................................................................... 2

Amendment V.................................................................................................................... 2

Amendment XIV................................................................................................................ 1

Article I, Section 10 ........................................................................................ 1, 13, 14, 28

Article III, Section 1 ......................................................................................................... 1

Article III, Section 2 ......................................................................................................... 1

Article VI .......................................................................................................................... 2

United States Constitution ............................................................................................... 45

**Other Authorities**

American Legion Magazine May 2007 .............................................................................. 6

http://en.wikipedia.org/wiki/Flag_of_the_United_States.................................................. 9

http://en.wikipedia.org/wiki/Wikipedia:About................................................................. 9

http://murray.senate.gov/news.cfm?id=215020............................................................... 10

http://www.il.ngb.army.mil/Funeral/flag.htm#fold .......................................................... 9

http://www.mythfolklore.net/3043mythfolklore/reading/aeneid/pages/05.htm ............... 38

Lujan v. Defenders of Wildlife, 504 U.S. 555 at 560 (1992) ........................................... 11

**Constitutional Provisions Involved in This Case:**

Article I, Section 10 (in pertinent part); Article VI (in pertinent part); Amendment I; Amendment V; and Amendment XIV, Section 1

"Article I,

Section 10. No state shall enter into any treaty, alliance, or confederation; grant letters of marque and reprisal; coin money; emit bills of credit; make anything but gold and silver coin a tender in payment of debts; pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts, or grant any title of nobility."

"Article III

Section 1. The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish. The judges, both of the supreme and inferior courts, shall hold their offices during good behaviour, and shall, at stated times, receive for their services, a compensation, which shall not be diminished during their continuance in office.

Section 2. The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority;--to all cases affecting ambassadors, other public ministers and consuls;--to all cases of admiralty and maritime jurisdiction;--to controversies to which the United States shall be a party;--to controversies between two or more states;--between a state and citizens of another state;--between citizens of different states;-- between citizens of the same state claiming lands under grants of different states, and between a state, or the citizens thereof, and foreign states, citizens or subjects.

In all cases affecting ambassadors, other public ministers and consuls, and those in which a state shall be party, the Supreme Court shall have original jurisdiction. In all the other cases before mentioned, the Supreme Court shall have appellate jurisdiction, both as to law and fact, with such exceptions, and under such regulations as the Congress shall make...."

"Article VI

"….This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding….."

"Amendment I

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

"Amendment V

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

"Amendment XIV

Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

## PRELIMINARY STATEMENT

Plaintiffs respectfully submit this Memorandum of Law in response to the Defendants' Motions to Dismiss.

## STATEMENT OF THE CASE

The various arguments in Defendants' papers can be distilled into the following four basic questions:

1. Do Plaintiffs have standing to bring this proceeding?

2. Is Chapter 482 of the laws of 2004 unconstitutional?

3. Do Plaintiffs have a valid claim for deprivation of their civil rights under 42 U.S.C. §1983?

4. Should the Court grant equitable relief?

There is no dispute about the desirability of restoring and preserving the Seventh Regiment Armory as a National Historic Landmark. Plaintiffs welcome the long-overdue steps to repair and restore portions of the building that have suffered from age and insufficient state funding in the past. That is why Plaintiffs have not sought a preliminary injunction to halt this work.

What Plaintiffs object to is the proposed program for future use of the interior spaces of the restored Armory for commercial and entertainment purposes and the transfer of absolute control over such use to a private organization antagonistic to the traditional military purposes and meaningful interpretation of the military history associated with this noble structure.

The occurrence of other litigation involving particular aspects of the transfer of control of the Armory provides interesting background reading, showing the depth of feeling of the affected parties, but has no direct relevancy to this litigation, which

3

specifically seeks to overturn the unconstitutional private benefit legislation and 99-year

lease granting control of Armory to a private third party.

These are important constitutional and legal issues that need to be resolved by the

United States Courts. In the words of Chief Justice John Marshall, Plaintiffs invoke the

Court's power of judicial review:

> The Government of the United States has been emphatically termed a government
> of laws, and not of men. It will certainly cease to deserve this high appellation if
> the laws furnish no remedy for the violation of a vested legal right. * * * The
> Constitution is either a superior, paramount law, unchangeable by ordinary
> means, or it is on a level with ordinary legislative acts, and, like other acts, is
> alterable when the legislature shall please to alter it. * * * Certainly all those
> who have framed written Constitutions contemplate them as forming the
> fundamental and paramount law of the nation, and consequently the theory of
> every such government must be that an act of the Legislature repugnant to the
> Constitution is void. * * * The judicial power of the United States is extended to
> all cases arising under the Constitution.
>
> Marbury v. Madison, 5 U.S. 137, 163-164, 178-180 (1803)
> (Emphasis added.)

In their motions to dismiss, the Defendants make numerous references to state

legislation and state court decisions. In considering these references, we respectfully

remind Defendants of the supremacy of the U.S. Constitution, which controls the issues

in this case:

> This Constitution, and the laws of the United States which shall be made in
> pursuance thereof; and all treaties made, or which shall be made, under the
> authority of the United States, shall be the supreme law of the land; and the judges
> in every state shall be bound thereby, anything in the Constitution or laws of any
> State to the contrary notwithstanding.
>
> Constitution of the United States, Article VI (Emphasis added.)

## Applicability of Rule 56

There is one significant procedural question raised by Defendants' motions,

growing out of the voluminous exhibits and affidavits filed by defendants:

4

Is the Court going to treat Defendants' motions as motions under Rule 56? If so, Plaintiffs ask that the Defendants be directed to comply with Local Rule 56.1, and that Plaintiffs be allowed an opportunity to conduct necessary discovery before submitting evidence in opposition to Defendants' submissions.

## Service of Process

The Attorney General has raised a procedural point relating to service of process on Defendants Charles Gargano and William Sherman. Plaintiffs' counsel mistakenly assumed that the Attorney General was voluntarily appearing for all state defendants, as counsel for the Conservancy defendants has done, to avoid these Defendants being annoyed by the appearance of process servers.

Since the Attorney General has taken a different – but perfectly proper – approach of demanding that Defendants Sherman and Gargano be served personally, we will, of course, do so.

## Timeliness of Suit

Defendants have challenged the timeliness of this suit, pointing out that the offending legislation was passed in 2004. However, the Conservancy's 99-year lease which implemented that legislation and revealed the Defendants' true intentions regarding the regimental rooms was not executed until November 14, 2006. Although the complaint was filed within the Statute of Limitations, Defendants claim 'prejudice from delay' because the Conservancy has expended money on preservation work. As noted at the outset, preservation work is not wasted effort and benefits everyone. It also is funded primarily with public moneys. The claims of prejudice are not persuasive.

In practical human terms, the timing of the Complaint was the result of three quite recent events, occurring within a few weeks of the actual drafting and filing of the Complaint (see Exhibit 13 attached to the Declaration of Peggy Chen):

(1) Disclosure of the Conservancy's plan to install a high-priced exclusive restaurant and cocktail bar in the landmarked Regimental rooms – instead of respecting their dedication to military use;

(2) Response by veterans across the country to an article in the May 2007 issue of American Legion Magazine (attached as Appendix A), leading to the Rule 23 class action allegations and the participation of the NYS Disabled Veterans as plaintiffs;

(3) Revelation that Chapter 482 was engineered not by members of the Legislature, but by the Conservancy's private legal counsel.

All things considered, Plaintiffs moved with alacrity in researching, drafting and filing the comprehensive Complaint initiating this action.

## PLAINTIFFS' STANDING ARISES UNDER

## THE FOURTEENTH AMENDMENT

The Fourteenth Amendment contains the following guarantees:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Plaintiffs' standing to bring this action, and to seek relief under each of the seven claims alleged in the complaint, are rooted in every one of the foregoing constitutional guarantees.

**DUE PROCESS.** The citizen-soldier Plaintiffs who bring this class action are first and foremost persons who possess the basic constitutional rights of life, liberty and

6

property, all of which have been deprived by the adoption of the unconstitutional 2004 legislation [see First, Second and Third Claims for Relief]; the ESDC 99-year lease implementing that legislation [Fourth and Fifth Claims for Relief]; and by the unlawful and unjust actions of the Defendants [Sixth and Seventh Claims for Relief].

**Life.**  While not literally threatened with mortal loss of life, Plaintiffs have individually been deprived of the respect, honor, gratitude and compassion they have earned from serving this country and its inhabitants.  Whether endangered by a roadside bomb in Iraq in 2007 or a British bayonet in 1775, America's citizen-soldier veterans have earned a place in national life for the balance of their lives – especially those who are disabled because of their service.  A significant part of that honorable life has been taken from them by the deliberate, harsh, grasping and wrongful actions of the Defendants.

**Liberty.**

(a) Plaintiffs have a Liberty right under the First Amendment to tell the stories of their military service, and advocate and install a military history museum in the Armory - -- whose continued existence depends on such "military use."  (b) Plaintiffs also have a Freedom of Association liberty to meet together in the Armory, share experiences, and maintain personal friendship ties.  (c) Plaintiffs also have the constitutional right to petition the courts for redress of their grievances – assuring their standing here to present their legitimate case or controversy.

**Property.**  Plaintiffs all have a property interest in the Armory.  Plaintiffs Fitzgerald and Wells as past and present members of the Seventh Regiment and its successor organizations – including its Historical Society – and the other veteran class

Plaintiffs by virtue of their statutory rights of access and use under Section 183 of the Military Law (whose attempted repeal this action challenges).

**EQUAL PROTECTION.** The Defendants' denial of equal protection to Plaintiffs, results directly from the takeover of the Armory, and denial to Plaintiffs of access to the building, including its elegant Regimental Rooms (furnished and decorated out of the personal funds of the Seventh Regiment members) while at the same time allowing full access and use of those rooms by corporate executives and other well-heeled private guests. As the Second Circuit has said, when a party is intentionally treated differently from others similarly situated, with no rational basis, that party has standing to sue under the Fourteenth Amendment. (See discussion of Willowbrook and Kelo, at page 30 ff.)

**PRIVILEGES AND IMMUNITIES.** We urge the Court to recognize constitutionally-protected privileges and immunities of free access to all active historic military sites and monuments for the benefit of America's citizen-soldiers and veterans, an access which may not be abridged by discriminatory enactment or enforcement of state law under the Fourteenth Amendment. These privileges and immunities stems from the Second Circuit's opinion in Leebaert v. Harrington, 332 F.3d 134, 140 (2d Cir., 2003) [Cited in the Attorney General's Memorandum at page 45]:

> Rights are fundamental when they are implicit in the concept of ordered liberty, or deeply rooted in this Nation's history and tradition. Where the right infringed is fundamental, strict scrutiny is applied to the challenged governmental regulation.

One example of a privilege accorded veterans is that of a burial flag. The U.S. Department of Veterans Affairs provides the flag at no cost to the family. While the flags are provided as a matter of course at Arlington, National, state and post cemeteries, for

8

private funerals flags are requested, and qualify upon presentation of the veteran's discharge papers. During the funeral, the flag drapes the coffin to honor the memory of the veteran's service to America. The custom began during the Napoleonic Wars (1796-1815) when a flag was used to cover war dead transported from battle on a caisson. The ritual has specific requirements: the blue field of stars is placed at the head and left shoulder of the deceased, in reverse, to indicate mourning: the flag thus embraces the dead who in life served the flag; taps is played; the flag is folded in a symbolic tri-corner shape reserved for the U.S. flag alone, so that the only part of the flag showing is a blue field with stars. This privileged ritual is followed by presentation of the flag by the U.S. government to the family with the following words: (Army) "It is my high privilege to present to you this flag. Let it be a symbol of the grateful appreciation our nation feels for the distinguished service rendered to our country and our flag by your loved one."[1]

According to present-day interpretation, the flag itself is symbolic of the fundamental cornerstones of American democracy:

> Many understand the flag to represent the freedoms and rights guaranteed in the U.S. Constitution and its Bill of Rights and perhaps most of all to be a symbol of individual and personal liberty as set forth in the Declaration of Independence.

(http://en.wikipedia.org/wiki/Flag_of_the_United_States)[2]

Thomas Paine described the sacrifices of citizen soldiers in the first issue of The Crisis just before Washington's bold move to recapture Trenton:

> These are the times that try men's souls. The summer soldier and the sunshine patriot will, in this crisis, shrink from the service of their country; but he that

---

[1]  http://www.il.ngb.army.mil/Funeral/flag.htm#fold

[2]  Wikipedia, established in 2001, is a web-based free multilingual encyclopedia. The name means 'collaborative encyclopedia'. The site provides links to other websites with related materials pertinent to entries. The content of this encyclopedia is written collaboratively by volunteers within reach of the world wide web internet. The project claims 75,000 active contributors working in more than 250 languages. There are currently 2,058,778 articles in English. (http://en.wikipedia.org/wiki/Wikipedia:About)

<u>stands by it now, deserves the love and thanks of man and woman</u>. Tyranny, like hell, is not easily conquered; yet we have this consolation with us, that the harder the conflict, the more glorious the triumph. What we obtain too cheap, we esteem too lightly; it is dearness only that gives every thing its value. Heaven knows how to put a proper price upon its goods; and it would be strange indeed if so celestial an article as FREEDOM should not be highly rated.

In more modern times, the Congress has repeatedly paid tribute to citizen soldiers, as demonstrated in the statement of findings for a Congressional program to preserve veterans' oral histories in the Library of Congress:

TITLE 20, CHAPTER 43, SUBCHAPTER II, §2141

(a) Findings. Congress finds as follows: (1) Military service during a time of war is the highest sacrifice a citizen may make for his or her country.

Recently, America's obligation to its citizen soldiers now serving in Iraq was expressed in a statement by United States Senator Patty Murray on Veterans Day, 2003:

No one can predict how long the war on terrorism will last. But we do know that more soldiers will be called to duty and that today's soldiers are tomorrow's veterans. Before our young people answer the call to serve their country, they must know that they will be protected when they return. With a new generation of combat veterans deployed around the world, the federal government must meet its obligations to veterans rather than look away in favor of other priorities. We must all support our troops – both while they are serving and after they return home.

(http://murray.senate.gov/news.cfm?id=215020)

These privileges may not be abridged through state legislation as Defendants have conspired to do here.

**<u>Substantive Due Process</u>**

The harsh and arbitrary deprivation of the fundamental rights of all citizen-soldier veterans by Defendants through manipulation of the legislative process and the abuse of UDC procedures, shocks the conscience, and constitutes denial of substantive due process for all U.S. veterans, including those represented here.

10

Paragraph 69 of the Complaint itemizes the injuries in fact that give Plaintiffs

Article III standing to bring this action:

> 69.  Defendants' wrongful conduct and conspiracy have resulted in the following injuries to plaintiffs, among others:
>
> (a)  Denial of access, control and use of the Armory for traditional military and related purposes (except for two small offices on the third floor of the Administration Building amounting to 1.4% of the entire structure) in violation of plaintiffs' City lease, <u>ownership rights, and First Amendment rights</u>.
>
> (b)  Preventing establishment and operation of a military history museum and interpretive programs in the Armory's historic spaces for public education by turning over use and control of the Armory's most beautiful and historic rooms to private commercial businesses to operate profit-making bar, restaurant and private corporate reception services, <u>in violation of plaintiffs' First, Fifth and Fourteenth Amendment rights</u>;
>
> (c)  Denial to veterans organization members of the right of free use of the Armory for meetings and gatherings <u>in violation of Section 183 of the New York State Military Law and of their First, Fifth and Fourteenth Amendment rights</u>; and
>
> (d)  Depriving City and State taxpayers of support for publicly-funded cultural institutions by diverting audience and donor revenues to the Conservancy and its favored private charities and arts organizations.
>
> (Emphasis added.)

The Complaint's Prayer for Relief (par. 105) specifies how Plaintiffs' injuries can

be redressed by this Court, thereby satisfying all of the Supreme Court's criteria for

"standing" to bring suit in the Federal Courts under Article III, as described in <u>Lujan v.</u>

<u>Defenders of Wildlife</u>, 504 U.S. 555 at 560 (1992).

Violation of NYS Military Law section 183 is alone sufficient basis for finding

standing.

> Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, e.g., <u>Flast v. Cohen</u>, 392 U.S. 83, 99 (1968), it often turns on the nature and source of the claim asserted. The actual or threatened injury required by Art. III may exist solely by virtue of "statutes creating legal rights, the invasion of which creates standing. . . ." See <u>Linda R. S. v. Richard D.</u>, supra at 617 n. 3; <u>Sierra Club v. Morton</u>, 405 U.S. 727, 732 (1972).

11

> Moreover, the source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing that, apart from Art. III's minimum requirements, serve to limit the role of the courts in resolving public disputes. Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.

Warth v. Seldin, 422 U.S. 490, 500 (1975)

America's veterans – represented here by the Plaintiffs in this action -- are fighting to preserve an important part of the country's military history. Their rights both as citizens and as veterans provide a unique standing to present this petition for redress of their grievances to the United States Courts.

## ARGUMENT

[For the Court's convenience in correlating the arguments set forth in the somewhat disparate briefs of the parties, Plaintiffs offer the following guide.]

### Guide to Principal Arguments Relating to Sufficiency of Plaintiffs' Complaint[3]

**First Claim for Relief** (Complaint p. 22)
(Declaratory Judgment – Unconstitutionality of Statute for Violation of Due Process)

**A.** Plaintiffs' Arguments:  Point I, p._____

**B.** Conservancy Defendants' Arguments:  PW Memo, Point II, A, p. 19; D, p. 26; F, p. 31, J, p. 37.

**C.** State Defendants' Arguments:  AG Memo Point II, p. 44

**Second Claim for Relief** (Complaint p. 23)
(Declaratory Judgment – Unconstitutionality of Statute under Public Use Clause)

**A.** Plaintiffs' Arguments:  Point II, p. _____

**B.** Conservancy Defendants' Arguments:  PW Memo, Point II, D, p. 26; E, p. 28.

**C.** State Defendants' Arguments:  AG Memo Point III, p. 44, p. 52

---

[3] Subject, of course, to any revisions or corrections by Defendants in their Reply papers.

**Third Claim for Relief** (Complaint p. 24)
(Declaratory Judgment – Violation of Article I, Section 10)

**A.** Plaintiffs' Arguments:  Point III, p. _____

**B.** Conservancy Defendants' Arguments:  PW Memo, Point ___ p. _____

**C.** State Defendants' Arguments:  AG Memo Point IV, p. 56


**Fourth Claim for Relief** (Complaint p. 25)
(Declaratory Judgment Voiding ESDC Lease)

**A.** Plaintiffs' Arguments:  Point IV, p. _____

**B.** Conservancy Defendants' Arguments:  PW Memo, Point I, p. 34

**C.** State Defendants' Arguments:  AG Memo Point V, p. 58; Point VI, p. 60; Point VII, p. 66.


**Fifth Claim for Relief** (Complaint p. 28)
(Tortious Interference with a Contract)

**A.** Plaintiffs' Arguments:  Point V, p. _____

**B.** Conservancy Defendants' Arguments:  PW Memo, Point II, H p. 32

**C.** State Defendants' Arguments:  AG Memo Point VIII, p. 68.


**Sixth Claim for Relief** (Complaint p. 29)
(Constructive Trust and Accounting)

**A.** Plaintiffs' Arguments:  Point VI, p. _____

**B.** Conservancy Defendants' Arguments:  PW Memo, Point II, G, p. 31

**C.** State Defendants' Arguments:  AG Memo Point IX, p. 72.


**Seventh Claim for Relief** (Complaint p. 30)
(Violations of 42 U.S.C. Section 1983)

**A.** Plaintiffs' Arguments:  Point VII, p. _____

**B.** Conservancy Defendants' Arguments:  PW Memo, Point II, C, p. 24

**C.** State Defendants' Arguments:  AG Memo Point X, p. 75; Point XI, p. 76.

**POINT I**

**<u>CHAPTER 482 VIOLATES DUE PROCESS</u>**

The Complaint asserts the unconstitutionality of turning the Armory over to the

Conservancy on three separate grounds:

**1.** The legislation violates Plaintiffs' procedural and substantive due process

rights by transferring private property from one owner (the Armory's trustees) to another

(the Conservancy) in violation of the takings clause of the Fifth Amendment, as

incorporated into the Fourteenth Amendment (pars. 70-73).

**2.** The claimed public purpose of the legislation is only incidental to the benefits

to be conferred upon the Defendants, and the legislation therefore violates the Public Use

clause of the Fifth Amendment, incorporated into the Fourteenth Amendment (pars. 74-

78).

**3.** The legislation invalidates the City's lease to the Armory trustees of the land

on which the building stands without a bona-fide purpose, and therefore further violates

Article I, Section 10 of the U.S. Constitution (pars. 79-81).

We here address the first ground for declaring Chapter 482 unconstitutional.

Two undisputed facts lie at the heart of Plaintiffs' claim of unconstitutionality of

Chapter 482 for violation of Due Process:

1. The land under the 1874/1879 City lease is "to be held and used exclusively

for an armory and drill rooms by said regiment." (Complaint Ex. B)

14

2. Much of the cost of the Armory's construction -- including its elegant landmark interior spaces – was paid out of private funds by members and veterans of the Seventh Regiment. (Complaint, pars. 22-26)

Chapter 482 of the Laws of 2004, allowing the Conservancy to take over the Armory, includes two retroactive provisions:

- Section 1 of Chapter 482 inserted a statement that "leasehold title to the seventh regiment armory is the property of the state" thereby wiping out Armory ownership by the "Trustees" of the Seventh Regiment for the benefit of the members and veterans of the Regiment.

- Section 3 of Chapter 482 inserted language in the Urban Development Corporation Act stating that the leasing of the Armory "for cultural and other civic uses" is "hereby declared to be a valid use under the City lease, and is undertaken for public purposes." (Complaint, Ex D)

These retroactive legislative fiats taking away leasehold ownership of the Armory building from the Seventh Regiment Trustees and the trust beneficiaries were plain violations of the Takings Clause of the U.S. Constitution.

> Retroactivity is generally disfavored in the law, Bowen v. Georgetown Univ. Hospital, 488 U.S. 204, 208 (1988), in accordance with "fundamental notions of justice" that have been recognized throughout history, Kaiser Aluminum & Chemical Corp. v. Bonjorno, 494 U.S. 827, 855 (1990) (Scalia, J., concurring). See also, e.g., Dash v. Van Kleeck, 7 Johns.*477, *503 (NY 1811) ("It is a principle in the English common law, as ancient as the law itself, that a statute, even of its omnipotent parliament, is not to have a retrospective effect"); H. Broom, Legal Maxims 24 (8th ed. 1911)("Retrospective laws are, as a rule, of questionable policy, and contrary to the general principle that legislation by which the conduct of mankind is to be regulated ought to deal with future acts, and ought not to change the character of past transactions carried on upon the faith of the then existing law"). In his Commentaries on the Constitution, Justice Story

reasoned, "[r]etro-spective laws are, indeed, generally unjust; and, as has been forcibly said, neither accord with sound legislation nor with the fundamental principles of the social compact." 2 J. Story, <u>Commentaries on the Constitution</u> <u>§1398</u> (5th ed. 1891).

<u>Eastern Enterprises v. Apfel</u>, 524 U.S. 498, 532-533 (1998)

The yardstick for judging whether these retroactive enactments meet the criteria for "due process" was well stated in a High Court concurring opinion 130 years ago:

> **I think, therefore, we are entitled, under the fourteenth amendment, not only to see that there is some process of law, but 'due process of law,' provided by the State law when a citizen is deprived of his property; and that, in judging what is 'due process of law,' respect must be had to the cause and object of the taking, whether under the taxing power, the power of eminent domain, or the power of assessment for local improvements, or none of these: and if found to be suitable or admissible in the special case, it will be adjudged to be 'due process of law;' but <u>if found to be arbitrary, oppressive, and unjust, it</u> <u>may be declared to be not 'due process of law.'</u> Such an examination may be made without interfering with that large discretion which every legislative power has of making wide modifications in the forms of procedure in each case, according as the laws, habits, customs, and preferences of the people of the particular State may require.**
>
> **Mr. Justice Bradley, concurring,** Davidson v. City of New Orleans, 96 U.S. 97, 107-108 (1877)

(Emphasis added.)

**POINT II**

**<u>CHAPTER 482 VIOLATES THE PUBLIC USE CLAUSE</u>**

Prior to passage of Chapter 482, the Seventh Regiment Armory was private property dedicated to public use for military and related purposes. This legal status was confirmed long before the passage of Chapter 482 by two New York State Court decisions:

**A.** A unanimous 1937 decision by the New York Court of Appeals (in a case involving the City's obligation to contribute toward the Armory's upkeep) squarely held:

16

It was clearly the purpose of the Legislature to recognize that the building in question is <u>owned by the regiment</u>…

<u>Tobin v. LaGuardia</u>, 276 NY 34, 43 (1937) (Emphasis added.)

**B.** Earlier, a lower New York court (in a suit against the Field Officers of the Seventh Regiment, as trustees for the Armory) ruled in 1891 that the building was solely built for use by the Regiment itself as a public armory:

> Upon a very careful examination of the case, we have concluded that it was not within the power of the board of field officers or the board of officers of the seventh regiment, or of any one connected with the said regiment, to authorize the use of the armory for any purposes other than those pertaining to the regiment itself. Notwithstanding the observations which are made in the brief of the learned counsel for the appellants, we are of the opinion that <u>the seventh regiment armory is a public armory</u>, differing in no way in the purposes for which it was designed from the other armories in the state.

> <u>Veterans of Seventh Regiment v. Field Officers of Seventh Regiment</u>, 60 Hun 578, 14 N.Y.S. 811, 816 (First Dep't, 1891) (Emphasis added.)

The interpretation of the Takings Clause of the Fifth Amendment enunciated by the High Court in <u>Kelo v. New London</u> is clear: taking of property must comply with all of the requirements of the state and federal Constitutions.

As in Connecticut in <u>Kelo</u>, there exists in New York a state statute specifically enabling the kind of economic development project at the Armory – the Urban Development Corporation Act. The Connecticut statute in question in <u>Kelo</u> allowed an economic development project in New London. However, unlike this case, the properties taken in <u>Kelo</u> were encompassed in a formal plan required under the Connecticut statute, fulfilling <u>a specific purpose</u> outlined in a broad <u>plan</u> intended to benefit the public, with no specific private entity beneficiary in view. The beneficiary was the public, and the specific project was intended to address economic distressed areas of New London.

The Connecticut statute in <u>Kelo</u> provided:

17

**Sec. 8-186. Declaration of policy.** It is found and declared that the economic welfare of the state depends upon the continued growth of industry and business within the state; that the acquisition and improvement of unified land and water areas and vacated commercial plants to meet the needs of industry and business should be in accordance with local, regional and state planning objectives; that such acquisition and improvement often cannot be accomplished through the ordinary operations of private enterprise at competitive rates of progress and economies of cost; that permitting and assisting municipalities to acquire and improve unified land and water areas and to acquire and improve or demolish vacated commercial plants for industrial and business purposes and, <u>in distressed municipalities, to lend funds to businesses and industries within a project area in accordance with such planning objectives are public uses and purposes for which public moneys may be expended; and that the necessity in the public interest for the provisions of this chapter is hereby declared as a matter of legislative determination.</u>

> General Statutes of Connecticut, Revised to January 1, 2005, Title 8, Zoning, Planning, Housing, Economic and Community Development and Human Resources, Chapter 132, Municipal Development Projects, Section 8-186 ( http://www.cga.ct.gov/2005/pub/titles.htm ) (Emphasis added.)

The key issue in <u>Kelo</u> was whether "public use" is the equivalent of "public purpose." The High Court said yes, because the taking in New London was <u>consistent with the municipality's plan</u> upon which the taking was based, and for which the taking was made; the taking was also <u>consistent with the specific state economic development statute whose expressed policy authorized the taking</u> (see C.G.S. 8-186 supra).

The <u>Kelo</u> ruling broadened the legal interpretation of the constitutional provision in the Takings Clause of the Fifth Amendment, ("...nor shall private property be taken for public use, without just compensation.") holding that the terms "public use" appearing in the Constitutional provision (i.e., a statute) was now <u>to be more broadly considered permissible as long as the "public use" was for an expressed and specific "public purpose" based upon a carefully considered plan</u> – <u>whose economic private-entity partners and beneficiaries were blindly chosen.</u>

18

The majority of the split High Court[4] made a specific finding that a taking to

benefit a <u>known private party</u> -- such as the Conservancy here -- <u>is forbidden</u> under the

Constitutional provision for "public use":

> Two polar propositions are perfectly clear. On the one hand, it has long been
> accepted that the sovereign may not take the property of *A* for the sole purpose of
> transferring it to another private party *B*, even though *A* is paid just compensation.
> On the other hand, it is equally clear that a State may transfer property from one
> private party to another if future "use by the public" is the purpose of the taking;
> the condemnation of land for a railroad with common-carrier duties is a familiar
> example. Neither of these propositions, however, determines the disposition of
> this case.
>
> As for the first proposition, the City would no doubt be forbidden from taking
> petitioners' land for the purpose of conferring a private benefit on a particular
> private party. See <u>Midkiff</u>, 467 U.S., at 245 ("A purely private taking could not
> withstand the scrutiny of the public use requirement; it would serve no legitimate
> purpose of government and would thus be void"); <u>Missouri Pacific R. Co. v.
> Nebraska</u>, 164 U.S. 403 (1896). <u>Nor would the City be allowed to take property
> under the mere pretext of a public purpose, when its actual purpose was to bestow
> a private benefit.</u> The takings before us, however, would be executed pursuant to a
> "carefully considered" development plan. 268 Conn., at 54, 843 A. 2d, at 536.
> The trial judge and all the members of the Supreme Court of Connecticut agreed
> that there was no evidence of an illegitimate purpose in this case. Therefore, as
> was true of the statute challenged in <u>Midkiff</u>, 467 U.S., at 245, the City's
> development plan was not adopted "to benefit a particular class of identifiable
> individuals."
>
> Majority Opinion, <u>Kelo v. New London</u>, 545 U.S. 469, 477 (2005) (Emphasis
> added.)

The events and facts surrounding the wresting of control of the Armory presents a

distinct scenario in which state legislation – adopted through political machinations

known only to the powerful and the moneyed -- evades any carefully considered public-

benefit plan, required to avoid being stricken on constitutional grounds. The City and

State's development plan for the Armory was instead adopted "to benefit a particular

class of identifiable individuals." In fact, those very individuals who exercised the

---

[4] Stevens, J. delivered the opinion of the Court, in which Kennedy, Souter, Ginsburg and Breyer, J.J.,
joined; Kennedy, J., filed a concurring opinion, O'Connor, J., filed a dissenting opinion, in which
Rehnquist, C.J., and Scalia and Thomas, J.J., joined. Thomas, J., filed a dissenting opinion.

influence that produced the statute enabling the bestowing of the benefits upon themselves -- identified in an elaborate two-step scheme through (1) Chapter 482 and (2) the 99-year lease authorized under the new law, making an express exception to the way this Armory was to be treated (unlike every other Armory in the State of New York) – and confirming that the entire scheme was designed, intended, drafted and executed for the very purpose of granting private benefits. This grant of private benefits is prohibited by the United States Supreme Court.

It is precisely this impermissible government manipulation to benefit known private entities that is specifically prohibited by the <u>Kelo</u> interpretation of the Takings Clause. Indeed, this sort of arranged private benefit is that warned against by the Supreme Court.

The Court also held that it would be <u>an unusual exercise of government power</u> for a city to transfer "citizen *A*'s property to citizen *B* for the sole reason that citizen *B* will put the property to a more productive use and thus pay more taxes.":

> It is further argued that <u>without a bright-line rule nothing would stop a city from transferring citizen *A*'s property to citizen *B* for the sole reason that citizen *B* will put the property to a more productive use</u> and thus pay more taxes. Such a one-to-one transfer of property, executed outside the confines of an integrated development plan, is not presented in this case. While such an unusual exercise of government power would certainly raise a suspicion that a private purpose was afoot,http://www.law.cornell.edu/supct/html/04-108.ZO.html - FN17#FN17 the hypothetical cases posited by petitioners can be confronted if and when they arise. They do not warrant the crafting of an artificial restriction on the concept of public use.

> Alternatively, petitioners maintain that for takings of this kind we should require a "reasonable certainty" that the expected public benefits will actually accrue. Such a rule, however, would represent an even greater departure from our precedent. "When the legislature's purpose is legitimate and its means are not irrational, our cases make clear that empirical debates over the wisdom of takings–no less than debates over the wisdom of other kinds of socioeconomic legislation–are not to be carried out in the federal courts." <u>Midkiff</u>, 467 U.S., at 242.

20

Kelo v. New London, 545 U.S. 469, 486-487 (2005)
(Emphasis added.)

Here the scheme and the schemers put in place, through an elaborate legislative

scheme, a project that effectively avoided property taxes, thereby not only depriving the

Regiment and the veterans their property and access rights, but also depriving the

taxpayers of the State of New York of their due.

The clear conclusion, as the High Court warned in Kelo, is the "suspicion that a

private purpose was afoot." The Court points out in a footnote that such private purposes

are not only prohibited, they also implicate other constitutional guarantees:

> [FN17]  Courts have viewed such aberrations with a skeptical eye. See, e.g., 99
> Cents Only Stores v. Lancaster Redevelopment Agency, 237 F. Supp. 2d 1123
> (CD Cal. 2001); cf. Cincinnati v. Vester, 281 U.S. 439, 448 (1930) (taking invalid
> under state eminent domain statute for lack of a reasoned explanation). These
> types of takings may also implicate other constitutional guarantees. See Village of
> Willowbrook v. Olech, 528 U.S. 562 (2000) (per curiam).

Id. at 487

It was Justice O'Connor, in her dissent in Kelo (in which she is joined by the

Chief Justice, Justice Scalia and Justice Thomas) who described the distinction between

true "public use" and what is to be prohibited in this contentious area:

> 'An act of the Legislature (for I cannot call it a law) contrary to the great first
> principles of the social compact, cannot be considered a rightful exercise of
> legislative authority … . A few instances will suffice to explain what I mean… .
> [A] law that takes property from A. and gives it to B: It is against all reason and
> justice, for a people to entrust a Legislature with such powers; and, therefore, it
> cannot be presumed that they have done it.' Calder v. Bull, 3 Dall. 386, 388
> (1798) (emphasis deleted).

> Today the Court abandons this long-held, basic limitation on government power.
> Under the banner of economic development, all private property is now

21

vulnerable to being taken and transferred to another private owner, so long as it might be upgraded–*i.e.*, given to an owner who will use it in a way that the legislature deems more beneficial to the public–in the process. To reason, as the Court does, that the incidental public benefits resulting from the subsequent ordinary use of private property render economic development takings "for public use" is to wash out any distinction between private and public use of property– and thereby effectively to delete the words "for public use" from the Takings Clause of the Fifth Amendment.

Dissent, Justice O'Connor, Kelo v. New London, 545 U.S. 469, 494 (2005)

(Emphasis added.)

Kelo does not confer or recognize such legislative power. Rather, that decision rides the very fine line that "public purpose," is the seizing of private property for economic development that rests on a comprehensive and duly deliberated and carefully considered and adopted plan conferring an economic benefit on an unknown private entity is permissible under the Fifth Amendment, applicable to the states through the Fourteenth Amendment. In contrast, says the Court, the seizing of private property for economic development, even if resting on a comprehensive and duly deliberated and adopted comprehensive plan, and conferring an economic benefit on a known private entity is distinctly and expressly impermissible, unconstitutional and prohibited.

That prohibited act is precisely what happened here, and the instant case matches the facts warned about by the entire Supreme Court, including the majority, the concurring Justice [Kennedy] and the dissent in the landmark Kelo decision.

Here, the equivalent enabling legislation to authorize and license the transfer of property from one private entity to another was Chapter 482, about which the NYS Attorney General says:

The Legislature reaffirmed the State's ownership of the Armory by §1 of Chapter 482, which provides in pertinent part as follows:

22

> [L]easehold title to the seventh regiment armory <u>is the property of the state under an indenture of lease</u> made on September 23, 1874 between 'the mayor, alderman and commonality of the city of New York,' as lessors, and 'the field officers of the seventh regiment of the national guard of the state of New York,' as lessees, which field officers were later redesignated as the trustees of the seventh regiment armory building (Chapter 518 of the Laws of 1893), as amended by an indenture of lease dated April 23, 1879.

> <u>Chapter 482, §1 merely confirms a fact</u> respecting all State National Guard armories – all are State facilities as a matter of law, although some are owned by political subdivisions of the State and some are owned by the State itself as in the case of the Seventh Regiment Armory.  Graber decl. ¶10.

(State Defendants' Memorandum, October 4, 2007, pp. 4-5) (Emphasis added.)

By citing as the authority for "ownership" the very statute challenged as unconstitutional in this case, the State effectively concedes the sandy foundation of the legislative scheme – initiated by self-serving individuals using legislative slight-of-hand to bestow control on the New York State Economic Development Corporation, and then pass it through that state entity to a private entity by means of a 99-year lease.

The Attorney General also attempts to support his claim of legitimacy through the language of Chapter 482,

> …the Legislature's extraordinary "Statement of Legislative Findings and Purposes" (§ 1 of Chapter 482) <u>expressly recognizes the Conservancy</u> as "deemed to fulfill all financial, organizational and operational requirements to undertake this endeavor in partnership with the State."

> (State Memorandum of October 4, 2007, page 13)
> (Emphasis added.)

This statutory language, written by the Conservancy's own lawyers, is totally lacking in any semblance of objectivity or impartiality.  Instead, the Legislature became the prisoner of the private Conservancy and served as its mouthpiece in saying whatever might escape scrutiny in claiming a public purpose and public benefit.

23

The Defendants' scheme was subtle and well hidden, accomplished with skillful legislative wording containing all the recitals needed to make it appear to be bona fide independent action by the State's elected representatives acting solely in the public interest.

This targeted law specified the beneficiary to be the Empire State Development Corporation, which, in turn, specified as the beneficiary lessee a private entity misleadingly named "Seventh Regiment Armory Conservancy, Inc." This linking scheme, from the legislation transferring to ESDC, and ESDC then leasing possession and control through a long-term lease to the previously selected private entity, effected an illegal, unconstitutional taking, which might never have been detected by Plaintiffs if the Conservancy's counsel had not boasted about its accomplishment in turning the legislative process to the benefit of its private entity client to attract more clients. (Complaint, Exhibit E):

> 9/22/2004
> **Governor Pataki Signs Into Law a Bill Drafted by Paul, Weiss**
> Lewis R. Clayton , Meredith J. Kane
>
> On September 22, 2004, Governor Pataki signed into law <u>a bill drafted by Paul, Weiss lawyers that facilitates the restoration and reuse by our client the Seventh Regiment Armory Conservancy, Inc. of the historic Seventh Regiment Armory building located at Park Avenue and 66th Street. The new law, which amends provisions of the New York Military Law and the New York Urban Development Corporation Law regarding the use, disposition and renovation of the armory, enables our client to enter into a long-term lease of the Armory,</u> to restore its extraordinary 19th century architectural and decorative splendor, and to open it to the public as a performing and visual arts center. The renovation will be accomplished with <u>a mix of public and private funds.</u> The bill, which was passed <u>at the very end of the New York State legislative session,</u> just after adoption of New York State's 2005 fiscal year budget, was drafted by Meredith Kane and Elizabeth Stein, with input from Lew Clayton.
>
> (Complaint, Ex E)  (Emphasis added.)

It is particularly to be noted that there is no mention of "public use" or "public purpose." Instead, the description of the legislation is that it facilitates the Armory's "reuse by our client" [the Conservancy – mentioned twice in a single paragraph]. There can be no doubt whatsoever that from the outset, the Legislature's action was intended and crafted to transfer private property from "A" to "B" in direct violation of the Supreme Court majority's language in Kelo, "under the mere pretext of a public purpose." (quoted supra at p.____)

Footnote 17 to the Kelo majority opinion states that:

> These types of takings may also implicate other constitutional guarantees. See Village of Willowbrook v. Olech, 528 U.S. 562 (2000) (per curiam).

> Kelo v. New London, 545 U.S. 469, 487 (2005) (Emphasis added.)

In Village of Willowbrook, it was the scheme itself that bestowed standing on the plaintiffs, by depriving them of Equal Protection.

Singling out the beneficiaries for whom the Armory was constructed to be deprived of their access and use of the building triggers the Fourteenth Amendment's guarantee of Equal Protection:

> Our cases have recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. See Sioux City Bridge Co. v. Dakota County, 260 U.S. 441 (1923); Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty., 488 U.S. 336 (1989). In so doing, we have explained that" '[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" Sioux City Bridge Co., supra, at 445 (quoting Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 352 (1918)).

> Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)

25

The applicability of the Equal Protection Clause was explained in Justice

Kennedy's Concurring Opinion in <u>Kelo</u>:

> A court applying rational-basis review under the Public Use Clause should strike
> down a taking that, by a clear showing, is intended to favor a particular private
> party, with only incidental or pretextual public benefits, just as a court applying
> rational-basis review under the Equal Protection Clause must strike down a
> government classification that is clearly intended to injure a particular class of
> private parties, with only incidental or pretextual public justifications. See
> <u>Cleburne v. Cleburne Living Center, Inc.</u>, 473 U.S. 432, 446—447, 450 (1985);
> <u>Department of Agriculture v. Moreno</u>, 413 U.S. 528, 533-536 (1973). As the trial
> court in this case was correct to observe, "Where the purpose [of a taking] is
> economic development and that development is to be carried out by private
> parties or private parties will be benefited, the court must decide if the stated
> public purpose–economic advantage to a city sorely in need of it–is only
> incidental to the benefits that will be confined on private parties of a development
> plan." 2 App. to Pet. for Cert. 263. See also ante, at 477-478....A court confronted
> with a plausible accusation of impermissible favoritism to private parties should
> treat the objection as a serious one and review the record to see if it has merit,
> though with the presumption that the government's actions were reasonable and
> intended to serve a public purpose.

<u>Kelo v. New London</u>, 545 U.S. 469, 491 (2005)

The Attorney General mistakenly asserts that

> Plaintiffs <u>oppose the restoration</u> plan claiming that the enactment and
> implementation of Chapter 482 violates their federal constitutional rights and
> several rights under state common law.

> (State Memorandum of October 4, 2007, page 2)
> (Emphasis added.)

Plaintiffs do not oppose restoration of the Armory.  They concede they have not

had the funding to accomplish restoration, but would have, had <u>they</u> been the

beneficiaries of the Governor's discretionary gift of $30 million in 2004, rather than the

Seventh Regiment Armory Conservancy, Inc.  But they were not.

Instead of equal treatment, the door was slammed against the Plaintiffs by the

Legislature's unconstitutional action to benefit well-connected private parties with

special access to City Hall and the State Capital.

26

## POINT III

## CHAPTER 482 VIOLATES THE CONTRACT CLAUSE

Chapter 482 drastically altered the "military use" requirement in the City Lease, and by a fraudulent and misleading recital effected a unilateral evasion of the reverter provision of the City Lease. The sole public purpose was to enable a private party to take over the Armory and limit occupancy by the Seventh Regiment successor unit to two offices on the third floor – a total of 1.4% of the building's space -- in direct violation of the City's contract's terms.

There was no valid public purpose for the Legislative action altering the basic terms of the City Lease through a misstatement of continuing military use by the Regiment in the legislative declaration.

> We repeat what was stated in Block v. Hirsh, 256 U.S. 135, 154, 41 S. Sup. Ct. 458, 16 A.L.R. 165, as to the respect due to a declaration of this kind by the Legislature so far as it relates to present facts. But even as to them a Court is not at liberty to shut its eyes to an obvious mistake, when the validity of the law depends upon the truth of what is declared. 256 U.S. 154, 41 Sup. Ct. 458, 16 A.L.R. 165, Chas. Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522, 536, 43 S. Sup. Ct. 630, 27 A.L.R. 1280.

> Chastleton Corp. v. Sinclair, 264 U.S. 543, 547-548 (1924)

The property grab was a plain violation of Article I, Section 10.

The City Lease (Complaint Ex B) explicitly states that the Armory is to be used "exclusively for an armory and drill rooms by said regiment" a requirement disregarded and voided by Chapter 482.

The State Defendants argue that "political subdivisions of a state may not challenge the validity of a state statute under the Fourteenth Amendment." (AG Memorandum, p. 57, citing New York v. Richardson, 473 F.2d 923, 929 (2d Cir.)

27

(Emphasis added.)  However, the City Lease was <u>not</u> between the City and the State.  The contract was between the City and the field officers of the Seventh Regiment.

> [T]he American people have said in the Constitution of the United States that "no State shall pass any bill of attainder, *ex post facto law,* or law impairing the obligation of contracts." In the same instrument, they have also said, "that the judicial power shall extend to all cases in law and equity arising under the Constitution." On the judges of this Court, then, is imposed the high and solemn duty of protecting, from even legislative violation, those contracts which the Constitution of our country has placed beyond legislative control; and however irksome the task may be, this is a duty from which we dare not shrink.

Trustees of Dartmouth College v. Woodward,17 U.S. 518, 626 (1819)

### POINT IV

### THE ESDC LEASE SHOULD BE DECLARED VOID

The Defendants' action in forcing the Trustees to violate their fiduciary duties provided the grounds for declaring the ESDC 99-year Armory lease void as an instrumentality planned, engineered and executed for exactly that purpose – to force the Trustees to surrender occupancy and use of most of the Armory space.  As a component part of that scheme, the ESDC lease was itself absolutely void.

In addition, as alleged in paragraphs 82-91, the co-conspirators made false and misleading statements and material omissions in violation of the UDC Acts which themselves invalidated the lease.

It is particularly to be noted that the fact that the Veterans Room – the specific subject of the 1891 decision mandating its use by the Regiment quoted above – was now to be diverted from the public use specified by the Legislature at the time it authorized the building, and in direct violation of the mandatory provisions of the City lease, a fact that was concealed by the ESDC Defendants when they failed to mention the testimony objecting to that action in their report to the ESDC Directors (Complaint, pars. 87–88).

28

## POINT V

## THE DEFENDANTS INTERFERED TORTIOUSLY WITH THE CITY LEASE

Defendants – third parties to the City lease – prevented performance in accordance with its terms by causing the Trustees to violate their fiduciary duty as described above and in Complaint, pars. 92-94. But Defendants did not stop there. They also perpetrated a fraud on the Legislature, the City, the public and on Plaintiffs by writing misleading language into Section 3 of Chapter 482. (Complaint Ex D)

> The division shall cause the 107[th] corps support group or its lineal descendant to maintain military use within the reserved portions of the armory.

The "reserved portions" consist of exactly two rooms on the third floor of the Administration Building measuring 40' x 22' and 40' x 23' respectively. (Complaint Ex F)

The City Lease has now been made a charade. What military use can possibly be made of a space barely over twenty feet wide? What size military unit could ever "drill" in such a confined area? How can two third floor offices ever compare to the Armory drill shed and Regimental meeting rooms as originally constructed? And how can one explain the large amount of space (over 98% of the Armory) assigned to non-military use? This flagrant violation of the City lease – which defendants' lawyers attempted to conceal by using clever statutory language -- was fraud, pure and simple.

The state asserts that, "as a matter of law, plaintiffs cannot maintain an action for tortious interference" with a contract. (AG Memorandum, p. 68) The state then provides a summary of the elements from Lama Holding Co. v. Smith Barney, Inc. (88 N.Y.2d 413, 424 (1996), emphasizing the requirement of the existence of a valid contract

between the <u>plaintiff</u> and a third party, with defendant's intentional procurement of the third-party's breach, in addition to other elements.

The state's argument is that "there has never been a 'valid contract between [any] plaintiff and a third party' – the basic requirement for a tortious interference claim." (Ibid.) The state's assertion is that "the only contract alleged is the 1800s lease between the State and the City" and that the only conceivable relationship plaintiffs could have with that contract is as "alleged 'beneficiary'". The state refers to the "very high hurdle" that plaintiffs cannot overcome even if all of the allegations of the complaint are deemed to be true for purposes of the present motion." (Ibid.) Yet the State acknowledges that

> Under both federal common law and New York common law, a third party may have enforceable rights under a lease or other contract if the contract was made for his or her 'direct benefit.' <u>McNeill v. New York City Housing Authority</u>, 719 F.Supp. 233, 248-249 (S.D.N.Y. 1989)....The New York Court of Appeals has stated that non-parties, such as plaintiffs, may recover under a contract if the following elements are established:  (1) the existence of a valid and binding contract between other parties; (2) that the contract was intended for the non-party's benefit, and; (3) that the benefit to the non-party is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty. <u>Burns Jackson Miller Summit & Spitzer v. Lindner</u>, 59 N.Y.2d 314, 336 (1983)

The State also concedes that Plaintiffs have proven the first element of Tortious Interference, "while there is a valid contract between the State and the City, plaintiffs have failed to meet the second and third criteria." (Ibid.) Once again the State uses as a basis for its legal argument the very legislation and lease at issue.

It is the State's contention that "certainly the lease of the 1800s <u>cannot plausibly be alleged</u> to have been 'intended' for plaintiffs' benefit." (Ibid. Emphasis added.) But that is precisely what Plaintiffs do allege here. As direct organizational descendants and

veterans of the party and beneficiary Regiment, these Plaintiffs were express

beneficiaries, as stated in the Statute and the City Lease.

> As to the third element, the State asserts

> No theory can support the proposition...that the Legislature intended in the 1800s
> to convey an 'immediate, rather than incidental, benefit' upon any person or entity
> other than the New York Army National Guard.
>
> (Id. at 71)

Yet the City lease, which the State has already conceded was valid, explicitly

states who it is to benefit:

> RESOLVED:  That the plot of ground bounded by and situated between Sixty-
> sixth and Sixty-seventh Streets and Fourth and Lexington Avenues, be leased to
> the field officers for the time being, of the Seventh Regiment of the National
> Guard of the State of New York, and their successors in office acting for said
> regiment, and for the public purposes of said regiment....NOW THIS
> INDENTURE WITNESSETH that said parties of the first part have leased and by
> these presents do grant, devise and to farm let unto the said parties of the second
> part and their successors in office,....to have and to hold the same with the
> appurtenances unto the said parties of the second part and their successors in
> office....to be exclusively held and used for an Armory and Drill Rooms by said
> regiment yielding and paying therefor.....AND the said parties of the second part
> do hereby covenant and agree to and with the said parties of the first part to erect
> or cause to be erected upon the said devised premises suitable buildings for the
> purposes of an Armory and Drill Rooms for said regiment....

(Complaint, Ex A) (Emphasis added.)

The City Lease was an executory contract, valid,[5] in effect and binding through

the performances of the parties ("the field officers for the time being, of the Seventh

Regiment of the National Guard of the State of New York, and their successors in office

acting for said regiment, and for the public purposes of said regiment," supra.)  It was the

Regiment – not the Field Officers who held a pen to sign the agreement -- who, under the

contract, performed its contractual duty and did, indeed, build the structure ("to erect or

cause to be erected upon the said devised premises suitable buildings for the purposes of

---

[5] Conceded by the State, Memorandum, page 70.

an Armory and Drill Rooms for said regiment," supra.) as part of the bargained for benefit. Can the State in good conscience assert here that the terms of this contract "for the purposes of an Armory and Drill Rooms <u>for said regiment</u>" are in any way equivocal or subject to misinterpretation? Or that the language "and their successors" does <u>not</u> convey an 'immediate, rather than incidental, benefit'?

The contract was executory because the duties were binding and in 2004 were still in the process of being fulfilled annually in accordance with the terms of the contract. What bound the contract was the <u>consideration</u> on each side. In its brief, the State is engaged in attempting to rewrite history, just as the Conservancy's lawyers rewrote State law in order to substitute one executory contract for another. It cannot be done.

The Plaintiffs have pleaded all necessary elements for Tortious Interference with a Contract, in keeping with up-to-the-minute New York State law. In 2007 the New York State Court of Appeals responded to a question certified to it by the Second Circuit Court of Appeals about proper economic defenses to the Tort. (<u>White Plains Coat &</u> <u>Apron Co. v. Cintas Corp.</u>, 8 N.Y.3d 422, 835 N.Y.S.2d 530 (2007). The New York Court refined the third element of the tort to require a pleading of (3) the "defendant's <u>intentional and improper procuring of the breach</u>" and (4) damages. (Id. at 426) Not only are these elements properly and completely pleaded, (Complaint pars. 92, 93, 94), the events and actions pleaded are described as "wrongful" (pars. 8, 68, 69, 103), improperly manipulating legislative process (pars. 51, 75), illegal under <u>Kelo</u> and constitutional protections (pars. 52, 69, 79) and "all in violation of basic principles of due process, fairness and lawful functioning of government, as well as antithetical to the State

Military Law." (par. 52); as well as that Defendants' actions were fraudulent and

misleading (pars. 53, 55ff., 89, 90, 91, 101, 102 ).

Third party beneficiaries contemplated by the lease are those who ordinarily have

access to a military facility, to wit: servicemen and women and veterans who, under state

law, have access to all Armories in New York State:

> § 183. Use of armories. 1. Armories may be used as follows:
>   a. By members and units of the organized militia and cadet corps of
> such units.
>   b. On application of one or more posts or chapters of the United
> Spanish War Veterans, the American Legion, the Veterans of Foreign Wars
> of the United States, the Disabled American Veterans, the AMVETS,
> American Veterans of World War II, the Jewish War Veterans of the United
> States, Inc., the Catholic War Veterans, Inc., the Italian American War
> Veterans of the United States, Incorporated, the Polish Legion of
> American Veterans, Inc., the Army and Navy Union of the United States of
> America, posts of the Masonic War Veterans of the state of New York,
> Incorporated, or groups or squadrons of New York Wing, Civil Air Patrol,
> or of incorporated associations of veterans of units of the organized
> militia, or one or more posts or chapters of organizations of sons of
> veterans of any war of the United States or of the Reserve Officers
> Association of the United States, or those historic military commands
> set forth in section two hundred forty-a of the this chapter, approved
> by the officer in charge and control of the armory, and by his military
> superiors as prescribed by regulations issued pursuant to this chapter
> and under such restrictions as may be prescribed by the adjutant
> general, the officer in charge and control of an armory shall provide a
> proper and convenient room or rooms or other appropriate space in such
> armory where such posts or chapters may hold regular and special
> meetings and organizational social events of a private nature without
> the payment of any charge or expense therefor, provided that such use
> does not interfere with the members and units of the organized militia
> stationed in such armory.
>   c. By a civil association existing under the provisions of this
> chapter and located in the armory, for the purpose of holding athletic,
> military or social events of a private nature conducted solely and
> exclusively by and for such civil association, provided that the same is
> approved by the officer in charge and control of the armory and by his
> military superior as prescribed by regulations issued pursuant to this
> chapter.
>                N.Y.S. Military Law, Article 9, § 183 (1) (a) – (c)

These beneficiaries were contemplated in the lease, contrary to the State's

assertion (AG Memorandum, p. 70). These groups, Plaintiffs in this class action, are

effectively and improperly shut out of the Seventh Regiment Armory, despite the

executory lease that was valid and in effect.

Thus, Plaintiffs have pleaded all necessary elements to this cause of action,

including

> "defendant's <u>knowledge</u> of that contract, defendant's <u>intentional procurement of</u>
> <u>the third-party's breach of the contract</u> without justification, <u>actual breach</u> of the
> contract and <u>damages</u>...." (State Memorandum, p. 69) (Emphasis added.)

The Court need only refer to the braggadocio of the legal counsel to the "Seventh

Regiment Armory Conservancy, Inc." to find every necessary element:

> "....Governor Pataki signed into law <u>a bill drafted by Paul, Weiss lawyers</u> that
> <u>facilitates</u> the restoration and <u>reuse by our client</u> the Seventh Regiment Armory
> Conservancy, Inc. <u>of the Seventh Regiment Armory building</u>....The new law,
> which amends provisions of the New York Military Law and the New York
> Urban Development Corporation Law regarding the use, disposition and
> renovation of the armory, <u>enables our client to enter into a long-term lease of the</u>
> <u>Armory</u>...."
>
> (Complaint, Ex E) (Emphasis added.)

The Defendant had knowledge of a valid contract; intentionally procured the

breach of that contract by a party to that contract without justification; the valid contract

was breached; and damages resulted.

"Justification" is the legal safety valve for conventional business interference with

contracts in the setting of commercial competition where the defendant has an economic

interest that is not malicious or illegal. (<u>NBT Bancorp Inc. v. Fleet/Norstar Fin. Group,</u>

<u>Inc.</u>, 87 N.Y.2d 614, 621, 681 N.Y.S.2d 581 (1996))

More significantly for the Court, one facet of the analysis of the cause of action is

eminently present here:  the wrongfulness of the intentional procurement of the breach.

34

The facts asserted are straightforward. Before the involvement of the "Seventh Regiment Conservancy, Inc." and its lawyers, Plaintiffs had the right of access to, full use, and enjoyment of the Seventh Regiment Armory as provided for in the valid City Lease. But the bill that "facilitate[d]" the "reuse" of the building through the amendment of the provisions of the New York Military Law and the New York Urban Development Corporation Law (both of which affected the rights of Plaintiffs as beneficiaries under the extant executory and valid contract, now wrongfully usurped by the "enabl[ing]" of "our client" to "enter into a long-term lease."

All the elements fit the classic elements for a Tortious Interference with a Contract cause of action under New York law.

## Veterans' Continuing Relationship to the Military

In a footnote (AG Memorandum, p. 71-72) the State asserts that "Defendants are unable to find any legal precedent for the proposition that an Army National Guard officer might have any kind of continuing fiduciary duty to a former member of a military formation in relation to the use of State military property. This novel concept therefore cannot aid plaintiffs' claim of tortious interference."

The "novel concept" of duty between active members of the military and those who have been discharged from active service (veterans) is not so novel.

The diaries of General George Washington shed light on this misconstruction by the State defendants:

> "June 16, 1781: Directed that no more Invalids be transferred untill further Orders – that a detachment be formed of the weakliest [sic] Men for garrisoning of West Point & that a Camp be marked out by the Chief Engineer & Q.M. Genl. near Peekskill to assemble the Troops on."

The General's diary contains this footnote by the editors:

35

"GW's command that no men were 'to be transferred to the Corps of Invalids until further orders' is in General Orders, 15 June 1781 (DLC: GW). The Corps of Invalids had been established 16 July 1777 for <u>the utilization of veterans who were not fit for active service but were still able to perform such assignments as garrison duty</u> (JCC, 8:554-56)."

> (George Washington Papers at the Library of Congress, 1741-1799: The Diaries of George Washington. Vol. III. 1771-75; 1780-81. Donald Jackson and Dorothy Twohig, eds. Charlottesville: University Press of Virginia, 1978. Found at: http://memory.loc.gov/cgi-bin/query ) (Emphasis added.)

Veterans are not ineffective, unnecessary appendages as the State suggests. They are and have always been perceived as parts of American military. The language used for "discharge" is not terminal or final. The language of discharge the Congressional definition of "veteran" merely signals <u>inactive duty</u>:

<u>TITLE 38</u> > <u>PART I</u> > <u>CHAPTER 1</u> > § 101
*§ 101. Definitions,*

(2) The term "veteran" means a person who served in the <u>active</u> military, naval, or air service, and who was discharged or released therefrom under conditions other than dishonorable.

38 U.S.C. § 101 (Emphasis added.)

*The definition of a discharge is:*

(18) The term "discharge or release" includes
(A) retirement from the <u>active</u> military, naval, or air service, and
(B) the satisfactory completion of the period of <u>active</u> military, naval, or air service for which a person was obligated at the time of entry into such service in the case of a person who, due to enlistment or reenlistment, was not awarded a discharge or release from such period of service at the time of such completion thereof and who, at such time, would otherwise have been eligible for the award of a discharge or release under conditions other than dishonorable.

*(Ibid. Emphasis added.)*

*Why this emphasis on "active duty"? The section goes on to define "active duty":*

(21) The term "active duty" means—
(A) <u>full-time</u> duty in the Armed Forces, other than active duty for training;
(B) <u>full-time</u> duty (other than for training purposes) as a commissioned officer of the Regular or Reserve Corps of the Public Health Service * * *

36

(Ibid. Emphasis added.)

As long as a veteran lives, he or she is simply "inactive," available for duty when and if called (witness the "home guard" and aircraft spotters serving in Great Britain after the fall of France in 1940). Does honor end when service is complete? When a uniform is removed, are affiliation, loyalty and duty shed as well? The State completely misses this point.

## POINT VI

### DEFENDANT'S CONDUCT WARRANTS EXERCISE OF THE COURT'S EQUITABLE POWERS TO PROTECT THE PUBLIC INTEREST

The story of the fall of Troy has fascinated readers of Virgil's <u>Aeneid</u> and Homer's <u>Iliad</u> for centuries. The story relates how the attackers hid inside a wooden horse, and the gullible defenders took the horse inside the city's walls where the concealed attackers emerged after dark, killing off the city's defenders and pillaging and plundering Troy's treasures.[6]

---

[6] Virgil relates that Laocoon, priest of Neptune, warned the citizens of Troy: '*Equo ne credite, Teucri; quidquid id est, timeo Danaos et dona ferentes.* Trojans, don't trust this horse; Whatever it is, I'm afraid of Greeks even those bearing gifts.' A.S.Kline, translator. *Vergil's Aeneid* (2002). They disregarded his warning, and the Greeks accomplished a feat they were unable to do from outside the walls. The key to this success was the wooden horse:

> Opened, it releases them to the air,
> and sliding down a lowered rope, Thessandrus, and Sthenelus,
> the leaders, and fatal Ulysses, emerge joyfully
> from their wooden cave, with Acamas, Thoas,
> Peleus's son Neoptolemus, the noble Machaon,
> Menelaus, and Epeus who himself devised this trick.
> They invade the city that's drowned in sleep and wine,
> kill the watchmen, welcome their comrades
> at the open gates, and link their clandestine ranks. * * *
> The ancient city falls, she who ruled for so many years...

> A.S.Kline, translator. *Vergil's Aeneid* (2002).

(http://www.mythfolklore.net/3043mythfolklore/reading/aeneid/pages/05.htm)

The takeover of the Seventh Regiment Armory is a modern-day reenactment of the fall of Troy: a handful of masterful, ingenious attackers, hiding behind a gift of preserving a national historic landmark, have now emerged and killed off its defenders and pillaged the Armory and plundered its treasures.

These are the real-life events that are taking place now:

1. Hiding behind a promise to preserve the building, the defendants have captured total control of the Armory and have forced its defenders ["Trustees"] -- the 107th Support Group -- to surrender the entire building (except for two offices on the third floor).

2. The Defendants have drawn up plans to create a huge performance space in the Armory's drill hall and to install dining rooms and corporate reception spaces in the historic landmark interiors, from all of which they will be able to collect substantial revenues for their favorite charities (while building personal reputations as great benefactors).

3. The Defendants have already collected substantial tax-deductible contributions to restore and preserve the Armory, as well as a gift of $ 30 million of public funds, all for the Defendants to spend with no impartial oversight or accounting.

Discovery in this case will reveal exactly what threats and pressures were used to force the 107th field officers to violate their duty as Trustees of the Armory; what deals have been made with commercial firms to operate restaurants, cocktail bars and corporate reception facilities in the historic military spaces in the Administration Building; and what lobbying expenses, private lawyer fees and political contributions have been disbursed out of public and tax-deductible moneys provided to defendants for preservation work.[7]

---

[7] These are not irresponsible claims and statements. Public filings already reveal hundreds of thousands of dollars spent by the defendants for these purposes.

The proof already at hand establishes a major breach of fiduciary duty by the field officers' surrender of Armory space engineered by the Defendants, and the Defendants' plans to use public funds for private benefit, to warrant the exercise of the Court's equitable powers to protect the public interest as well as the interests of the veterans groups who make up the Plaintiff classes.

## Breach of Trust

The Seventh Regiment Armory is in a class by itself. Unlike every other armory in the nation, it was largely built by private funds. For 130 years it was owned and managed by Trustees pursuant to the state legislative mandate authorizing its construction. (Complaint Ex C) Those Trustees not only had responsibility for the care and operation of the Armory, but they had an additional obligation under the City lease of the public land on which the Armory sits, to insure that the Armory was "used exclusively for an armory and drill rooms by said regiment."

Early in the performance of their fiduciary duties, the Trustees were told by the Courts of New York that any attempt to enter into a partnership with another and an entirely different and distinct corporation "granting exclusive use of a large and valuable room [in that case the same "Veteran's Room" that is today involved in this dispute] "for purposes entirely separate and distinct from an armory or drill rooms for the regiment would be "a breach of trust."

> The armory in question, as already stated, is a public building, devoted to a public use, and the board of field officers to whom the same was leased under the provisions of the act of 1874, before referred to, hold the same really <u>as trustees for the public, for public purposes, and upon the express condition that the site is to be thereafter exclusively held and used for an armory and drill rooms by said regiment.</u> Green's Brice, Ultra Vires, p. 120. <u>As such trustees, the board of field officers were not authorized to divert the use of the building in any way from the public use to which it was devoted by the various acts of the legislature under</u>

39

> which it was erected; yet if the contention of the plaintiff is sound, it was within
> their power to enter into partnership with another and an entirely different and
> distinct corporation, by which the latter should have the exclusive use of a large
> and valuable room for purposes entirely separate and distinct from an armory or
> drill rooms for the regiment as long as the latter continued in possession of the
> armory.  To enforce such an agreement would be to lend the sanction of a court of
> equity to a breach of trust.

Veterans of Seventh Regiment v. Field Officers, 60 Hun 578, 14 NYS 811, 816 (1891).
(Emphasis added.)

The Court ruled that any such agreement would be "absolutely void, as not within

the power of the [trustee] defendants" and would constitute "a violation of their duty as

trustees."

> If the agreement is absolutely void, as not within the power of the defendants, no
> acquiescence can estop them, as public officers and trustees of a public trust, from
> alleging, when affirmative action is demanded from the court by the appellants,
> that the agreement, if made, was beyond their powers, and a violation of their
> duty as trustees.

Id. at 817

That breach of trust and violation of duty as trustees has now occurred with the

agreement by the 107th to restrict the military occupancy to two offices on an upper floor

in the Armory.  [The officers of the 107th have been tight-lipped about their negotiations

and agreement with the Conservancy, which will have to be explored during discovery –

but there can be no doubt that the Trustees have breached their trust and fiduciary duty,

and the defendants are responsible -- and liable to plaintiffs as beneficiaries – for causing

that breach for their own interest.]

It was these Trustees who had the duty to prevent the surrender of the Armory to

the Defendants, and the Defendants must now answer for causing the Trustees to breach

their fiduciary responsibilities.

In every literary or charitable institution, unless the objects of the bounty be themselves incorporated, the whole legal interest is in Trustees, and can be asserted only by them. The donors, or claimants of the bounty, if they can appear in Court at all, can appear only to complain of the Trustees. In all other situations, they are identified with, and personated by, the Trustees, and their rights are to be defended and maintained by them.

Trustees of Dartmouth College v. Woodward,17 U.S. 518, 645-646 (1819)

## **Constructive Trust and Accounting**

Defendants have received a five-year $30 million grant of public funds through the ESDC to carry out the project. (Complaint, Ex L, p. 5)  Having usurped the role of the original Trustees of the Armory, defendants now stand in their shoes as fiduciaries, in addition to any accountings as signatories to the ESDC lease.  Defendants have promised to restore and preserve the Armory by accepting these public funds along with the rental revenues from the property.  The Complaint alleges that improper expenditures appear to have been made from these funds – constituting unjust enrichment.  If these allegations are confirmed by discovery, then all of the conditions are met for imposing a constructive trust, ordering an accounting, and appointing a Master to oversee future expenditures. See Sharp v. Kosmalski, 40 N.Y. 2d 119, 386 NYS 2d 72 (1976).

## POINT VII

## **DEFENDANTS ARE LIABLE FOR DAMAGES UNDER 42 U.S.C. §1983**

The recital of Plaintiff's constitutional, statutory, common law and equitable rights, along with their injuries, provides the necessary basis for granting judgment under 42 U.S.C. §1983, as requested in the complaint (Seventh Claim for Relief):

104.  Plaintiffs ask the Court to enter judgment directing defendants to pay exemplary and punitive damages in an amount not less than $30 million, sufficient to complete renovation, restoration and preservation of the Armory, and for research, design and installation of a first rate world-class military history

41

museum telling the story of the citizen-soldier in American history, together with plaintiffs' attorneys fees and expenses.

The Supreme Court has directed courts to apply a "broad construction" to Section 1983:

> A broad construction of §1983 is compelled by the statutory language, which speaks of deprivations of '*any* rights, privileges, or immunities secured by the Constitution and laws.' (Emphasis added). Accordingly, we have 'repeatedly held that the coverage of [§1983] must be broadly construed.' Golden State Transit Corp. v. Los Angeles, 493 U.S. 103, 105, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989). The legislative history of the section also stresses that as a remedial statute, it should be " ' liberally and beneficently construed.'" Monell v. New York City Dept. of Social Services, 436 U.S. 658, 684, 98 S.Ct. 2018, 2032, 56 L.Ed.2d 611 (1978) (quoting Rep. Shellabarger, Cong.Globe, 42d Cong., 1st Sess., App. 68 (1871)).

Dennis v. Higgins, 498 U.S. 439, 443 (1991) (Emphasis in original.)

All of the necessary §1983 elements are present in this case.

The Conservancy's Memorandum contains the bizarre assertion (at p. 20) that plaintiffs have no rights under Military Law §183 because the section has been replaced by a new §180-a(3)(c)(i) giving control over veterans' access to the Conservancy – which is precisely one of the provisions of Chapter 482 the plaintiffs seek to have declared unconstitutional.

The Conservancy's brief also asserts (at pp. 24-25) that its actions in taking over and exercising control of the Armory through passage of Chapter 482 was the equivalent of "lobbying" and acting as a "consultant" to the Legislature, and therefore the defendants did not act "under color of state law." Defendants' attempt to underplay their part in the alleged conspiracy is disingenuous. In any case, Defendants' argument raises issues of fact that defeat their Rule 12(b)(6) motion.

42

**Exhaustion of State Remedy**

Where the deprivation of constitutional rights are at issue (here First, Fifth and

Fourteenth Amendment rights) there is no requirement to exhaust state remedies.  See

Hellenic v. City of New York, 101 F.3d 877 (2d Cir., 1996):

> If there *is* a constitutional violation, federal courts are available to hear §1983
> suits despite the availability of adequate state procedures.  Monroe v. Pape, 365
> U.S. at 183, 81 S.Ct. at 481-82.
>
> (Emphasis in original.)

## CONCLUSION

George Washington Plunkitt, the 19th century Tammany leader, is credited with

the classic statement describing how to use political power for personal benefit (which he

called "honest graft"):

"I see my opportunity and I take it."  ("Plain Words From Truthful George,"

American Heritage, June, 1963)

The Defendants' takeover of the Seventh Regiment Armory is a near-perfect

example of the 'Plunkitt Principle' in operation.

The Armory presented an irresistible opportunity to generate large amounts of

money for salaries, consultants and for Defendants' favorite private charities.  Its prime

location in the wealthiest neighborhood in Manhattan, on a thoroughfare whose very

name is a symbol of elegance and class around the world, made the takeover of this great

landmark structure an unparalleled temptation.

The Defendants recognized the opportunity when the structure began to fall into

disrepair as a result of the State's siphoning off the rental income from drill hall rentals.

Starting with good intentions to preserve the landmark building, the Defendants soon

found a way not only to preserve the structure, but also to gain absolute and total control

43

of the space, ending its use as a military center and converting it into their image of success – glittering shows and exhibitions, expensive restaurant, cocktail bar, and corporate reception rooms – a veritable 'Lincoln Center East.'

While the original Lincoln Center was created from scratch to lift up a slum neighborhood marked for urban renewal, this version would be the jewel set in a crown that was already in place – a National Historic Landmark, created through the efforts and financial contributions of citizen soldiers – soldiers who had saved the Nation's capital during the Civil War, fought one of the hardest battles in World War I, and produced seven Medal of Honor awardees through their heroism and sacrifice for the country.

It was a very ingenious plan. Hiring a former NYC Landmarks Preservation Commissioner to craft legislation that appeared to cover all contingencies, the Defendants pulled off the classic Plunkitt-style political trick of final hour passage of a bill through the Rules Committee – without any chance for public debate – giving them total control of the great landmark structure and its income potential – with virtually no strings attached.

The National Guard veterans were then locked out of the building (see Appendix A) and the City land lease was twisted and manipulated beyond recognition.

There was only one problem:

The Defendants repeatedly violated the Fourteenth Amendment to the United States Constitution in the process:

> 1. They had transferred a privately owned building from one private owner (the Trustees) to another (the Conservancy, through a 99-year leasehold).
>
> 2. They had blocked the Regiment Historical Society (and other veteran groups) from ever installing a military history museum in the Armory under its State charter.

44

3. They had deprived all citizen-soldier veterans of equal access to the greatest armory in New York State.

The constitutional remedy against constitutional violations by State Legislatures is action by Article III Courts. That is what Plaintiffs seek here.

The very constitutional protections that citizen-soldiers have fought to preserve for over two centuries have now been denied to them.

That is why the Plaintiffs have brought this Complaint and why we respectfully ask the Court to deny the Defendants' motions to dismiss in their entirety.

WHITNEY NORTH SEYMOUR, JR.
Federal Bar No. WS2019
425 Lexington Avenue, Room 1721
New York, NY  10017
Tel:  212-455-7640
Fax: 212-455-2502
Email:  wseymour@stblaw.com


GABRIEL NORTH SEYMOUR
Federal Bar No. ct27131
200 Route 126
Falls Village, CT   06031
860-824-1412
Email:  certiorari@earthlink.net

Attorneys for Plaintiffs

October 22, 2007