

New York County American Legion historian Bob Corrigan, left, and veteran John McNamara pause to ponder the ornate interior of the armory, which was designed by some of the biggest names of the Gilded Age. Amy C. Elliott

rooms I don't even know about. There are rooms the state doesn't know about."

McNamara and others who spent their National Guard days drilling at the armory have consumed the better part of a decade at war with the State of New York over control of the famous structure, its contents and its future. In September 2004, then-Gov. George Pataki signed a law that McNamara complains was passed in haste and without a hearing, which gave the state power over the armory and attempted to stifle an ownership dispute with descendants of the regiment. A separate court decision later determined that the state also has rights to about $10 million worth of art, antiques and furnishings displayed or stored there. Legal appeals have been filed over both the law and the lower-court decision about the contents.

Veterans of the regiment's lineage are furious and say they won't surrender, even though the state has evicted them from the armory, and an arts conservancy has moved in, launching a multi-million-dollar, four-year renovation project. Veterans say their case for custody hinges on history, morality and military law. They believe the state has violated all three.

"When they passed this law, one of the paragraphs says everything that was attached to the walls, even light fixtures, were deemed to be a gift to the state. That's just stealing," says David Dalva, a veteran who relentlessly fights the state's ownership claims. "I called a legislator, who was very honest. He said, 'If you don't like it, sue us.'"

**Built and Paid For.** The crown jewel among about 120 historic armories and arsenals constructed between the late 18th and early 20th centuries across New York, the Seventh Regiment Armory went up between 1877 and 1881 with private funds raised by the National Guardsmen themselves. They were a particularly well-heeled band of citizen soldiers, known as the "silk-stocking regiment," whose connections generated big donations from the likes of John Jacob Astor and William H. Vanderbilt after $350,000 in expected city funds didn't materialize. A veteran of the regiment and well-known architect, Charles W. Clinton, designed the brick fortress, which occupies an entire city-owned block along Park Avenue, between 66th and 67th streets.

Members and veterans of the regiment came up with nearly $120,000, a fortune at the time, from their own pockets to get the project under way. When the armory and its 56,000-square-foot drill shed stood finished

but empty, members and veterans filled it to capacity for three weeks with an extravagant community fair to raise money for furnishings. President Rutherford B. Hayes came to speak on the opening day of the event, which featured entertainment, art auctions, prize drawings and sales of everything from yachts to Angora cats. More than $140,000 – about $3 million today – was raised. The regiment and its veterans, by virtue of their own hard work and ingenuity, had invented a national prototype for the modern multiple-use armory. It was a marvel of function and form.



David Dalva has spent more than a decade fighting to keep the armory under control of the veterans whose military ancestors built it.
Amy C. Elliott

Legal owners of the armory were initially listed as the field officers – the colonel, the lieutenant colonel and the major – of the regiment. That status went largely unchallenged for nearly 115 years.

No one questioned whether or not the regiment deserved such a palatial installation. Its rich military roots could be traced to 1806 and the consolidation of four artillery companies that fought the British in New York Harbor. The term "National Guard" originated within this ancestry, after members provided escort security in the final visit to the United States by French Gen. Lafayette. The regiment or its descendant units would quell a string of violent city riots, defend Washington, D.C., during the Civil War, and play a vital role in the breakthrough of the Hindenburg Line in World War I. Elements from the armory were mobilized in the majority of U.S. military actions of the 19th and 20th centuries. Along the way, the Seventh became known as a training ground for officers – "the West Point of the National Guard," McNamara explains.

"The Seventh Regiment Armory is incredibly important, historically and architecturally, to the city of New York and to the country," Dalva says. "The heritage of our people has to be preserved."

**A Twist of Eminent Domain.** In 1996, when a state task force made an attempt to inventory and tag the armory's treasures, Dalva personally blocked the door. The state then sued the Seventh Regiment Fund, a separate corporation with a veteran board of directors that for more than 50 years functioned as legal owner of the armory's art, antiques and other belongings. The items had been transferred to the fund in 1952 out of concern that the state would abscond with them in the event of a Korean War deployment. Many other regiment possessions, including a great deal of original art and the vast collection of its library, were previously donated to the New York Historical Society. The state assumed maintenance and operational control over all New York armories in 1942.

"But," says Kenyon Fitzgerald, president of the Seventh Regiment Fund, "title to the buildings did not change. The regiment still owned the armory. The regiment was not even there when this happened. They had been called up."

Dalva, 70, served nearly three decades in the National Guard and Army Reserve, including a stint at the Pentagon, before retiring as a colonel. He is so impassioned about the state's seizure of the armory he once was jailed for resisting arrest while trying to show a TV camera crew that the armory was not falling apart, as the state had claimed when arguing the need to transfer it to someone who would restore it. Dalva says that although maintenance of the armory had been poor since the state assumed that function from the regiment, which had covered maintenance costs through member dues that were later eliminated by law, the structure was, and remains, structurally sound. "There is a ceiling on the first floor that has some water damage and some scaffolding under it. There is some chipped and flaking paint in the hallway of the first floor. Wherever they investigate a crack, they put up scaffolding and just leave it there."

The 2004 law enabled the State of New York to travel a path that closely resembles controversial eminent-domain takings of recent years. Government entities, sanctioned by the U.S. Supreme Court, have more freedom than ever to take property, especially if it can be shown as run-down, and broker it to development corporations on the promise of greater economic benefit under different ownership. In the case of the armory, the state trans-